UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONIQUE SYKES, RUBY COLON, REA VEERABADREN, FATIMA GRAHAM, KELVIN PEREZ, SAUDY RIVERA, PAULA ROBINSON, and ENID ROMAN, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  - against -<br><br>MEL S. HARRIS AND ASSOCIATES LLC; MEL S. HARRIS; MICHAEL YOUNG; DAVID WALDMAN; KERRY LUTZ; TODD FABACHER; MEL HARRIS JOHN/JANE DOES 1-20; LEUCADIA NATIONAL CORPORATION; L-CREDIT, LLC; LR CREDIT, LLC; LR CREDIT 10, LLC; LR CREDIT 12, LLC; LR CREDIT 14, LLC; LR CREDIT 18, LLC; LR CREDIT 19, LLC; JOSEPH A. ORLANDO; PHILIP M. CANNELLA; LR CREDIT JOHN/JANE DOES 1-20; SAMSERV, INC.; WILLIAM MLOTOK; BENJAMIN LAMB; MICHAEL MOSQUERA; JOHN ANDINO; HUSAM AL-ATRASH; ASSMAT ABDELRAHMAN; and SAMSERV JOHN/JANE DOES 1-20,<br><br>        Defendants. | ECF Case<br>No. 09 Civ. 8486(DC) |

PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW
IN OPPOSITION TO ALL DEFENDANTS' MOTIONS TO DISMISS
THE SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**PAGE NO(s)**:

TABLE OF AUTHORITIES ................................................................................. ii-xi

PRELIMINARY STATEMENT .............................................................................. 1

ARGUMENT .......................................................................................................... 4

I.    DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' FDCPA CLAIMS ............... 4

    A.   The FDCPA Claims Are Timely ................................................................. 4

        1.   Plaintiffs' Claims Must Have Accrued On or After December 28, 2008 ......... 4

        2.   Plaintiffs Rivera, Robinson, and Roman Clearly Have Timely Claims ........... 5

        3.   Plaintiffs Sykes and Perez Have Timely Claims Against All Defendants
            Under a Fraudulent Concealment Theory ................................................... 5

        4.   Plaintiffs Sykes, Graham, and Perez Have Timely Claims Against
            the Mel Harris and Leucadia Defendants Based on their Attempts to
            Collect on Fraudulently Obtained Default Judgments ................................. 8

    B.   The Leucadia Defendants Are Debt Collectors ....................................... 10

    C.   The Samserv Defendants Are Debt Collectors ........................................ 14

II.   DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' RICO CLAIMS ................. 17

    A.   Plaintiffs Have Alleged A Violation Of The RICO Statute ...................... 17

        1.   Plaintiffs Have Alleged An Association-In-Fact Enterprise ......................... 18

        2.   Defendants Participated In The Operation Or Management .......................... 21

        3.   Plaintiffs Have Sufficiently Alleged Mail/Wire Fraud For Each Defendant ..... 22

            a.   Plaintiffs Have Satisfied Rule 9(b)'s Particularity Requirement ............... 23

            b.   Plaintiffs Have Shown That The Mel Harris Defendants, And The
               OtherDefendants, Had The Requisite Fraudulent Intent ............................ 26

    B.   The Complaint Alleges Cognizable RICO Injuries ................................. 27

i

      C.    Defendants' RICO Violations Proximately Caused Plaintiffs' Injuries ................... 30

      D.    The Leucadia Defendants Have Stated No Reason.................................................... 33

III.  PLAINTIFFS' GBL § 349 CLAIM SHOULD NOT BE DISMISSED
      BECAUSE DEFENDANTS ENGAGED IN DECEPTIVE ACTS
      AND PRACTICES .......................................................................................................... 33

IV.  THE LEUCADIA PARENT CORPORATIONS ARE PROPER PARTIES AND
      SHOULD REMAIN IN THIS CASE AND BE HELD ACCOUNTABLE FOR THE
      UNLAWFUL ACTS OF THEIR SUBSIDIARIES AND THEIR PRINCIPALS............ 37

V.   PLAINTIFFS STATE A CLAIM UNDER JUDICIARY LAW § 487 ............................ 42

VI.  THE ROOKER-FELDMAN DOCTRINE DOES NOT BAR THIS ACTION ................ 43

VII.  THE STIPULATION IN THE UNDERLYING CIVIL COURT CASE DOES
       NOT BAR PLAINTIFF RUBY COLON'S CLAIMS..................................................... 44

VIII. THE LITIGATION PRIVILEGE DOES NOT BAR PLAINTIFFS' CLAIMS.............. 46

IX.  THE NOERR-PENNINGTON DOCTRINE DOES NOT APPLY ................................. 47

CONCLUSION.......................................................................................................................... 49

# TABLE OF AUTHORITIES

## CASES

**PAGE NO (s):**

**Federal Cases**:

*Aekyung Co., Ltd. v. Intra & Co., Inc.*,
No. 99 Civ. 11773, 2008 WL 4974424 ................................................................ 40

*American Pipe & Construction Co. v. Utah*,
414 U.S. 538 (1974) .............................................................................................. 4

*Andrews v. S. Coast Legal Services, Inc.*
582 F. Supp. 2d 82 (D. Mass. 2008) .............................................................. 27, 31

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ........................................................................................ 27, 31

*Azrielli v. Cohen Law Offices*,
21 F.3d 512 (2d Cir.1994) .................................................................................... 18

*Bailey v. Glover*,
88 U.S. 342 (1874) ............................................................................................. 5, 7

*Baisch v. Gallina*,
346 F. 3d 366 (2d Cir. 2003) ........................................................................... 21, 30

*Basile v. Blatt, Hasenmiller, Liebsker & Moore LLC*,
632 F.Supp.2d 842 (N.D. Ill. 2009) ................................................................... 447

*Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*,
No. 00-7302, 2000 WL 1508873 (2d Cir. Oct. 11, 2000) .................................... 47

*Beck v. Manufact. Hanover Trust Co.*,
820 F.2d 46, 50 (2d Cir. 1987) ............................................................................ 26

*Berg v. Blatt, Hasenmiller, Leibsker & Moore LLC*,
No. 07 C 4887, 2009 WL 901011 (N.D. Ill. June 24, 2009) ................................ 47

*Black Radio Network, Inc. v. NYNEX Corp.*,
44 F.Supp.2d 565 ................................................................................................. 33

*Bridge C.A.T. Scan Assocs. v. Ohio-Nuclear, Inc.*,
608 F. Supp. 1187 ................................................................................................ 46

*Bridge v. Phoenix Bond & Indem. Co.*,
    128 S.Ct. 2131 (2008) ........................................................................... 22, 32

*Byrd v. Law Offices of John D. Clunk, Co.*,
    No. 1:09-CV-076, 2010 U.S. Dist. LEXIS 20636 (S.D. Oh. Mar. 8, 2010) ............................ 14

*Calka v. Kucker, Kraus & Bruh, LLP*,
    No. 98-0990, 1998 U.S. Dist. LEXIS 11868, 1998 WL 437151 (S.D.N.Y. Aug. 3, 1998) ........ 9

*Campos v. Brooksbank*,
    120 F. Supp. 2d 1271 (D.N.M. 2000) ...................................................... 8

*Cedar Swamp Holdings, Inc. v. Zaman*,
    487 F. Supp2d 444 (S.D.N.Y. 2007) ........................................................ 21

*Cohen v. J.P. Morgan Chase & Co.*,
    498 F.3d 111 (2d Cir. 2007) .................................................................. 34

*Cohen v. Koenig*,
    25 F.3d 1168 (2d Cir. 1994) .................................................................. 27

*Connecticut Nat. Bank v. Fluor Corp.*,
    808 F.2d 957 (2d Cir. 1987) .................................................................. 26

*Curley v. Cumberland Farms Dairy, Inc.*,
    728 F. Supp. 1123 (D.N.J. 1989) ............................................................ 29

*De Falco v. Bernas*,
    244 F.3d 286 (2d Cir.2001) ................................................................... 21

*DeGraziano v. Verizon Comm., Inc.*,
    325 F. Supp. 2d 238 (E.D.N.Y. 2004) ...................................................... 39

*Denny v. Barber*,
    576 F.2d 465, 469 (2d Cir. 1978) ........................................................... 23

*DiVittorio v. Equidyne Extractive Industries, Inc.*,
    822 F.2d 1242 (2d Cir. 1987) .............................................................. 24, 25

*Ellis v. General Motors Acceptance Corp.*,
    160 F.3d 703 (11th Cir. 1998) ................................................................ 6

*Excellus Health Plan, Inc. v. Tran*,
    287 F. Supp. 2d 167 (W.D.N.Y. 2003) ...................................................... 34

*Exploration Co., Ltd. v. United States*,
    247 U.S. 435 (1918) ............................................................................. 5

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,*
    544 U.S. 280 (2005)........................................................................................ 43

*Federal Trade Comm'n v. Check Investors, Inc.,*
    502 F.3d 159 (3d Cir. 2007)........................................................................... 11

*First Capital Asset Management v. Satinwood, Inc.,*
    385 F.3d 159 (2d Cir. 2004)...................................................................... 18, 21

*First Interregional Advisors Corp. v. Wolff,*
    956 F. Supp. 480 (S.D.N.Y. 1997)............................................................... 5, 34

*First Nationwide Bank v. Gelt Funding Corp.,*
    820 F. Supp. 89 .............................................................................................. 20

*Flamm v. Sarner & Assoc.,*
    No. 02-4302, 2002 U.S. Dist. LEXIS 22255 (E.D. Pa. Nov. 6, 2002) .............. 15, 16

*Fletcher v. Atex, Inc.,*
    68 F.3d 1451 (2d Cir. 1995)........................................................................... 38

*Florida Evergreen Foliage v. E.I. DuPont de Nemours & Co.,*
    135 F. Supp. 2d. 1271 (S.D. Fla. 2001) .......................................................... 46

*Foster v. D.B.S. Collection Agency,*
    463 F. Supp. 2d 783 (S.D. Ohio 2006) ............................................................ 6

*Freeman v. Complex Computing Co., Inc.,*
    119 F.3d 1044 (2d Cir. 1997)......................................................................... 39

*Genesco Entertainment v. Koch,*
    593 F.Supp. 743 ............................................................................................. 35

*Gerber v. Citigroup, Inc.,*
    No. CIV S-07-0785, 2009 WL 248094 (E.D. Cal. Jan. 29, 2009)...................... 47

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974)........................................................................................ 48

*Goldman v. Cohen,*
    445 F.3d 152 (2d Cir. 2006)........................................................................... 13

*Gross v. Waywell,*
    628 F.Supp.2d  475 ........................................................................................ 25

*Harco Nat'l Ins. Co. v. Green Farms, Inc.,*
    No. Civ. A. 1331, 1989 WL 110537, at *5 (Del. Ch. Sept. 19, 1989)................. 38

*Harper v. Delaware Valley Broadcasters, Inc.,*
  743 F.Supp. 1076 (D.Del. 1990) ...................................................................... 38

*Hartman v. Great Seneca Financial Corp.,*
  569 F.3d 606 (6th Cir. 2009) ......................................................................... 47

*Heintz v. Jenkins,*
  514 U.S. 291 (1995) .................................................................................. 13

*Herkert v. MRC Receivables Corp.,*
  655 F. Supp. 2d 870 (N.D. Ill. 2009) ............................................................... 13

*Hirschfeld v. Spankos,*
  104 F.3d 16 (2d Cir. 1987) ........................................................................... 47

*Hoblock v. Albany County Bd. of Elections,*
  422 F.3d 77 (2d Cir. 2005) ........................................................................... 43

*Holmberg v. Armbrecht,*
  327 U.S. 392 (1946) ................................................................................. 5, 6

*Holmes v. Sec. Investor Protection Corp.*
  503 U.S. 258 (1992) ................................................................................... 30

*ICOS Vision Syst. Corp. v. Scanner Technologies Corp.,*
  No. 05 Civ. 6322 (DC), 2006 WL 838990 ........................................................... 47

*In re Sumitomo Copper Litig.,*
  995 F. Supp. 451 ............................................................................ 20, 21, 22

*Int'l Bhd. of Teamsters v. Carey,*
  297 F.Supp.2d 706 (S.D.N.Y. 2004) ................................................................. 18

*Jones v. Trans Ohio Sav. Ass'n,*
  747 F.2d 1037 (6th Cir. 1984) ......................................................................... 6

*Judy v. Blatt, Hasenmiller, Leibsker, and Moore, LLC,*
  No. 09-1226, 2010 U.S. Dist. LEXIS 8027 (N.D. Ill. Jan. 29, 2010) .......................... 8

*Kimber v. Federal Fin. Corp.,*
  668 F. Supp. 1480 (M.D. Ala. 1987) ............................................................... 14

*Kinel v. Sherman Acquisition II, LP,*
  No. 05-3456, 2006 U.S. Dist. LEXIS 97073 (S.D.N.Y. Feb. 28, 2006) ..................... 11

*King v. State of California,*
   784 F.2d 910 (9th Cir.1986) ................................................................... 6

*Laubach v. Arrow Service Bureau, Inc.,*
   987 F. Supp. 625 (N.D. Ill. 1997) ....................................................... 17

*Lawyers Title Ins. Corp. v. Dearborn Title Corp.,*
   118 F.3d 1157 (7th Cir. 1997) .............................................................. 6

*Lerner v. Fleet Bank,*
   318 F.3d 113, 123 (2d Cir. 2003) ........................................................ 30

*Liberty Lake Investments, Inc. v. Magnuson,*
   12 F.3d 155 (9th Cir. 1993) ................................................................ 48

*Mangum v. Action Collection Serv., Inc.,*
   575 F.3d 935 (9th Cir. 2009) ................................................................ 6

*Martinez v. California,*
   444 U.S. 277 (1980) ............................................................................ 46

*Maurizio v. Goldsmith,*
   230 F.3d 518, 521 (2d Cir. 2000) ........................................................ 34

*McNall v. Credit Bureau of Josephine County,*
   No. 07-3075, 2010 U.S. Dist. LEXIS 11359 (D. Or. Feb. 5, 2010) ................. 14, 15

*Merck & Co. v. Reynolds, __ U.S. __,*
   2010 U.S. LEXIS 3671 (2010) .............................................................. 7

*Midland Funding v. Brent,*
   644 F. Supp. 2d 961 (N.D. Oh. 2009) ................................................ 17

Midwest Grinding Co., Inc. v. Spitz,
   976 F.2d 1016 (7th Cir. 1992) ............................................................ 46

*Mike Building & Contracting, Inc. v. Just Homes, LLC,*
   2010 WL 457303 (Sup. Ct. Kings Cty 2010) ..................................... 38

*Miller v. Midland Credit Mgmt, Inc.,*
   621 F. Supp. 2d 621 (N.D. Ill. 2009) ................................................. 13

*Moll v. U.S. Life Title Ins. Co.,*
   654 F. Supp. 1012 (S.D.N.Y. 1987) .............................................. 18, 20

*Moses v. Martin,*
   360 F. Supp 533 .......................................................................... 37, 42

*Napoli v. United States,*
   45 F.3d 680 (2d Cir. 1995)............................................................................ 20, 22

*Nemours & Co.,*
   135 F. Supp. 2d. 1271 .................................................................................... 47

*Network Enterprises, Inc. v. APDB Offshore Productions, Inc.,*
   No. 01-11765, 2002 WL 31050846 (S.D.N.Y. 2002)................................... 42

*Nichols v. Mahoney,*
   608 F.Supp.2d 526 (S.D.N.Y. 2009).............................................................. 19

*Nutter v. Messerli & Kramer, P.A.,*
   500 F. Supp. 2d 1219 (D. Minn. 2007).......................................................... 46

*OSRecovery, Inc. v. One Groupe Intern., Inc.*
   354 F.Supp.2d 357 (S.D.N.Y. 2005)......................................................... 17, 27

*Pecarsky v. Galaxiworld.com Ltd.,*
   249 F.3d 167 (2d Cir. 2001)........................................................................... 32

*Perry v. Stewart Title Co.,*
   756 F.2d 1197 (5th Cir. 1985) ....................................................................... 11

*Ramadan v. Chase Manhattan Corp.,*
   156 F.3d 499 (3d Cir. 1998)............................................................................. 6

*Reves v. Ernst & Young,*
   507 U.S. 170 (1993)....................................................................................... 21

*Robles v. Copstat Sec., Inc.,*
   No. 08-9572, 2009 WL 4403188 ................................................................... 42

*Romea v. Heiberger & Assoc.,*
   163 F.3d 111 (2d Cir. 1998)........................................................................... 14

*Ross v. A.H. Robins Co.,*
   607 F.2d 545 (2d Cir. 1979)........................................................................... 23

*Ruth v. Unifund CCR Partners, __ F.3d __,*
   2010 U.S. App. LEXIS 9568 (6th Cir. 2010) .................................................. 6

*S.J. Berwin & Co. v. Evergreen Entertainment Group, Inc.,*
   No. 92-6209, 1995 WL 606094 ..................................................................... 38

*Schlosser v. Fairbanks Capital Corp.,*
   323 F.3d 534 (7th Cir. 2003) ......................................................................... 11

*Schuh v. Druckman & Sinel, L.L.P.,*
 602 F. Supp. 2d 454 ................................................................. 8, 13

*Securitron Magnalock Corp. v. Schnabolk,*
 65 F.3d 256 (2d Cir. 1995) ........................................................ 21

*Sedima, S. P. R. L. v. Imrex Co.,*
 473 U.S. 479 (1985) ................................................................. 18, 35

*Segal v. Gordon,*
 467 F.2d 602 (2d Cir.1972) ........................................................ 25

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.,*
 130 S. Ct. 1431 (2010) ............................................................. 36

*Sierra v. Forster & Garbus,*
 48 F. Supp. 2d 393 (S.D.N.Y. 1999) .............................................. 9

*Sial v. Unifund CCR Partners,*
 No. 08 CV 0905, 2008 WL 4079281 ............................................. 47

*Somin v. Total Community Mgmt Corp.,*
 494 F. Supp. 2d 153 (E.D.N.Y. 2007) ........................................... 6

*Sosa v. DIRECTV, Inc.,*
 437 F.3d 923 (9th Cir. 2006) ...................................................... 47

*S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.,*
 84 F.3d 629, 636 (2d Cir. 1996) .................................................. 35

*Stahlex-Interhandel Trustee, Reg. v. Western Union Fin. Services Eastern Europe Ltd.,*
 No. 99-2246, 2002 WL 31359011 ................................................ 38

*State Farm Mutual Automobile Ins. Co. v. Mallela,*
 175 F. Supp. 2d. 401 (E.D.N.Y. 2001) .......................................... 34, 35

*State of N.Y. v. Hendrickson Bros., Inc.,*
 840 F.2d 1065 (2d Cir. 1988) ..................................................... 6

*Terminate Control Corp. v. Horowitz,*
 28 F.3d 1335 (2d Cir.1994) ....................................................... 29

*Thomson-CSF, S.A. v. American Arbitration Ass'n,*
 64 F.3d 773 (2d Cir. 1995) ........................................................ 38

*TRW, Inc. v. Andrews,*
 534 U.S. 19 (2001) ................................................................... 5

*Turkish v. Kasenetz,*
   27 F.3d 23 (2d Cir. 1994)................................................................................. 26

*U.S. v. Bestfoods,*
   524 U.S. 51 (1998)......................................................................................... 37

*USS-POSCO v. Indus. v. Contra Costa County Bldg. & Constr. Trades Council,*
   31 F.3d 800, 810-11 (9th Cir. 1994) ........................................................... 47-48

*Uni\*Quality, Inc. v. Infotronx, Inc.,*
   974 F.2d 918 (7th Cir. 1992) ........................................................................ 25

*United States v. Indelicato,*
   865 F.2d 1370 (2d Cir.).................................................................................. 18

*Vista Co. v. Columbia Pictures Indus.,*
   725 F. Supp. 1286 ......................................................................................... 23

*Wadlington v. Credit Acceptance Corp.,*
   76 F.3d 103 (6th Cir. 1996) ........................................................................... 11

*Welker v. Law Office of Daniel J. Horwitz,*
   626 F. Supp. 2d 1068 ..................................................................................... 46

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,*
   933 F.2d 131 (2d Cir. 1991)............................................................................ 39

*Worch v. Wolpoff & Abramson, LLP,*
   477 F. Supp. 2d 1015 (E.D. Mo. 2007)............................................................ 14

**State Cases**:

*Dolan v. Linnen,*
   753 N.Y.S. 2d 682 (Civ. Ct. 2003) ................................................................ 32

*First Bank of Am. v. Motor Car Funding, Inc.,*
   690 N.Y.S.2d 17 (1st Dep't 1999)................................................................... 42

*Gaidon v. Guardian Life Ins. Co. of America,*
   94 N.Y.2d 330, 704 N.Y.S.2d 177 (1999) ...................................................... 34

*Laba v. Carey,*
   29 N.Y.2d 302, 327 N.Y.S.2d 613 (1971) ...................................................... 45

*McCoy v. Feinman,*
   99 N.Y.2d 295, 755 N.Y.S.2d 693 (2002) ...................................................... 45

*Morris v. NYS Dep't of Taxation and Fin.,*
   82 N.Y.2d 135, 140, 603 N.Y.S.2d 807, 810 (1993) ...................................... 37

*National Convention Corp. v. Cedar Bldg. Corp.*,
  23 N.Y.2d 621, 298 N.Y.S.2d 499 (1969) .................................................... 45

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
  85 N.Y.2d 20, 623 N.Y.S.2d 529 (1995) .......................................... 34, 35

*Sexter & Warmflash, P.C. v. Margrabe*,
  828 N.Y.S.2d 315 (1st Dep't 2007) ...................................................... 46

*Taylor v. U.S. Casualty Co.*,
  269 N.Y. 360, 199 N.E. 620 (1936) ...................................................... 45

*Walkovszky v. Carlton*,
  18 N.Y.2d 414, 276 N.Y.S.2d 585 (1966) .................................... 37in

**Federal Statutes**:

15 U.S.C. § 1640(e) ......................................................................... 2, 6

15 U.S.C. § 1692 .................................................................... *passsim*

18 U.S.C. § 1341 .............................................................................. 22

18 U.S.C. § 1962 .............................................................................. 17

 **Federal Rules**:

Fed. R. Civ. P. 12 .............................................................................. 2

Fed. R. Civ. P. 12(b)(1) .................................................................. 43

Plaintiffs Monique Sykes, Ruby Colon, Rea Veerabadren, Fatima Graham, Kelvin Perez, Saudy Rivera, Paula Robinson and Enid Roman, on behalf of themselves and thousands of other victims of Defendants' illegal enterprise (collectively, "Plaintiffs"), submit this memorandum of law in opposition to the motions to dismiss filed by: (1) Leucadia National Corporation, its shell and alter ego debt buying companies and their principals (the "Leucadia Defendants"); (2) the Leucadia Defendants' joint venture partner, Mel S. Harris and Associates LLC, a debt collection law firm and its principals (the "Mel Harris Defendants"); and Samserv, Inc., a process serving company, its principals and its process servers (the "Samserv Defendants").

## PRELIMINARY STATEMENT

As detailed in the Second Amended Class Action Complaint ("Complaint"), this action challenges Defendants' massive (and massively successful) scheme to fraudulently obtain and enforce default judgments against unsuspecting consumers. Each set of individual defendants had a material and unique role in advancing the scheme, and a time-worn motive – avarice.

Defendants' scheme begins when the Leucadia and Mel Harris Defendants, as joint venture partners, purchase large portfolios of "charged off" debt for pennies (or fractions of pennies) on the dollar. Because the debt is sold for almost nothing and has usually cycled through numerous prior debt-buyers, it does not include sufficient information for a debt-buyer to commence a court action and obtain a judgment. Undeterred, Defendants commence actions anyway. They avoid their fatal proof problem in two ways. First, they intentionally engage in "sewer service" to ensure that the victims never appear to defend against the action, if at all, until *after* their bank accounts have been frozen or their wages garnished. Second, in order to secure an otherwise legally unobtainable judgment on default, Defendants fraudulently swear to the courts that they have actually served their victims, when they have not, and that they have admissible proof that a debt is owed, when they do not.

Armed with fraudulently obtained judgments, Defendants wreak havoc on consumers' lives. They freeze bank accounts, garnish wages, and threaten other enforcement measures in order to pressure victims to agree to unconscionable payment plans. As a result of Defendants' scheme, Plaintiffs have suffered damages in the form of bank fees, lost wages, high-interest loans to cover expenses, and damaged credit and its collateral consequences. Defendants' scheme is illegal. It violates the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), New York General Business Law § 349 ("GBL § 349"), and New York Judiciary Law § 487 ("the Judiciary Law"). Yet, consistent with their aversion to litigating claims on the merits, each of the three groups of Defendants now move to dismiss under Fed. R. Civ. P. 12. Defendants assert a raft of inapplicable arguments and technical doctrines. None of these have merit.

Plaintiffs' claims under the FDCPA are strong. None are time–barred, because the very heart of Defendants' fraudulent scheme is the intentional concealment of Defendants' misconduct through the systematic use of "sewer service." Thus, Plaintiffs' FDCPA claims did not accrue until they discovered that a default judgment had been entered against them. And, even if the doctrine of fraudulent concealment did not apply, most of Plaintiffs' FDCPA claims were commenced within the limitations period in any event. Moreover, the Leucadia and Samserv Defendants are both "debt collectors" within the meaning of the FDCPA. The Leucadia Defendants are not "creditors," because they regularly purchase debts allegedly owed to others, as opposed to debts they originated. The Samserv Defendants cannot avail themselves of the exemption for those "serving or attempting to serve" legal process, because they do nothing of the sort; instead they do nothing more than file perjurious affidavits of service. This is illegal under the FDCPA, whether done by someone "pretending" to be a process server or anyone else.

Defendants' motions to dismiss Plaintiffs' RICO claims fare no better.  Ignoring the standard for dismissal under Rule 12 and controlling legal authorities, Defendants contend that Plaintiffs experienced only "nominal" injuries, and that the three groups of Defendants just "happened" to be working together in a pattern of obtaining fraudulent default judgments and that, thus, there is no basis for the allegation that Defendants worked together and aided and abetted one another in carrying out a fraudulent enterprise.  Whether Defendants' lock-step pattern of conduct is a mere coincidence is a question of fact.  It cannot be resolved on a motion to dismiss.  The Complaint vividly describes Defendants' scheme, precisely detailing each Defendant's role.  It also explains exactly how Plaintiffs experienced cognizable civil RICO injuries as a result of Defendants' activities and the nature of the RICO enterprise, and the unique role of each defendant in carrying out the fraudulent scheme.  It is more than sufficient.

Plaintiffs' GBL § 349 claim is unassailable.  Defendants' activities have detrimentally affected hundreds of thousands of New Yorkers.  That is why this case is brought as a class action.  This handily meets the requirement that Defendants' acts of misconduct cause harm to the public at large.  And, unlike Plaintiffs' RICO claims, which are predicated on mail and wire fraud and thus require reliance on a fraudulent statement or omission *by someone* (but not necessarily Plaintiffs themselves), GBL § 349 has no reliance requirement at all.

Plaintiffs' well pleaded Complaint should be sustained.  Defendants' motions should be denied in their entirety, so that Defendants' abhorrent practices can be stopped once and for all.

**ARGUMENT**

**I.      DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' FDCPA CLAIMS SHOULD BE DENIED**

**A.      The FDCPA Claims Are Timely**

Defendants incorrectly argue that Plaintiffs' FDCPA claims are time-barred.

The Mel Harris and Samserv Defendants argue that Plaintiffs' claims, to be timely, must have accrued on or after October 6, 2008.  (Mel Harris Br. at 12; Samserv Br. at 9.)  These Defendants concede that Plaintiffs Rivera, Robinson, and Roman timely filed their FDCPA claims, but assert that the claims of Plaintiffs Sykes, Graham, and Perez are not timely because the underlying state court actions were filed and served prior to October 6, 2008.[1]

The Leucadia Defendants argue that *all* of Plaintiffs' FDCPA claims are time-barred, asserting that Plaintiff Sykes' claims expired before the filing of the initial Complaint; that Plaintiff Graham's claims expired before the filing of the Amended Class Action Complaint; and that Plaintiffs Perez, Rivera, Robinson, and Roman's claims expired before the filing of the Second Amended Class Action Complaint. (Leucadia Br. at 6-7.)

**1**.      **Plaintiffs' Claims Must Have Accrued On or After December 28, 2008**

An action under the FDCPA must be brought "within one year from the date on which the violation occurs."  15 U.S.C. § 1692k(d).  Plaintiffs filed the Amended Class Action Complaint on December 28, 2009.  Under the Supreme Court's doctrine in *American Pipe & Const. Co. v. Utah* the filing of the Amended Class Action Complaint tolled the statute of limitations for all putative class members.  414 U.S. 538 (1974) ("[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class.

---

[1]  The Second Amended Class Action Complaint does not allege FDCPA claims on behalf of Plaintiffs Colon and Veerabadren.  (Complaint at ¶ 337 n.*.)

. . .").  Therefore, to be timely, Plaintiffs' claims must have accrued on or after December 28, 2008.[2]

### 2.    Plaintiffs Rivera, Robinson, and Roman Have Timely Claims

The claims of Plaintiffs Rivera, Robinson, and Roman are timely because the underlying state court actions that gave rise to their claims were all commenced after December 28, 2008.

### 3.    Plaintiffs Sykes and Perez Have Timely Claims Against All Defendants Under a Fraudulent Concealment Theory

The Supreme Court has consistently held that the doctrine of fraudulent concealment tolls the statute of limitations whenever a plaintiff "has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part."  *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946); *see also TRW, Inc. v. Andrews*, 534 U.S. 19, 27 (2001) ("*Holmberg* thus stands for the proposition that equity tolls the statute of limitations in cases of fraud or concealment."); *Exploration Co. v. United States*, 247 U.S. 435, 448 (1918) ("[S]tatutes of limitations to set aside fraudulent transactions shall not begin to run until the discovery of the fraud."); *Bailey v. Glover*, 88 U.S. 342, 348 (1874) ("[W]here the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered.").

In the Second Circuit, the doctrine of fraudulent concealment operates to toll a statute of limitations where a plaintiff shows: "(1) that the defendant concealed from [the plaintiff] the existence of his cause of action, (2) that [plaintiff] remained ignorant of that cause of action until some point within [the applicable statute of limitations for] the commencement of his action, and (3) that his continuing ignorance was not attributable to a lack of diligence on his part."  *New*

---

[2] The timing is slightly different for Plaintiff Sykes.  Ms. Sykes filed the original Complaint, which contained her FDCPA claims, on October 6, 2009.  Accordingly, her FDCPA claims must have accrued on or after October 6, 2008, not December 28, 2008.  This difference is immaterial, however, because none of Ms. Sykes' claims arose between October 6 and December 28, 2008.

*York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).  The plaintiff may meet the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his or her claim or that the wrong itself was of such a nature as to be self-concealing.  *Id.*

The Supreme Court has further held that "[t]his equitable doctrine [of fraudulent concealment] is read into every federal statute of limitation."  *Holmberg*, 327 U.S. at 397. Though the Second Circuit has not specifically considered whether the doctrine applies to the FDCPA, courts in other circuits – and district courts within the Second Circuit – have routinely applied the doctrine to FDCPA claims.  *See, e.g.*, *Ruth v. Unifund CCR Partners*, __ F.3d __, 2010 U.S. App. LEXIS 9568 (6th Cir., May 11, 2010) (applying fraudulent concealment doctrine to FDCPA claim); *Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 939-940 (9th Cir. 2009) (tolling the statute of limitations in FDCPA action under a discovery rule); *Somin v. Total Cmty Mgmt Corp.*, 494 F. Supp. 2d 153, 158-60 (E.D.N.Y. 2007) (stating that "[a]s with any statute of limitations, the FDCPA is subject to equitable tolling in appropriate circum-stances," such as fraud or concealment); *Foster v. D.B.S. Collection Agency*, 463 F. Supp. 2d 783, 799 (S.D. Ohio 2006) (tolling the statute of limitations in FDCPA case under a fraudulent concealment theory).  Many circuit courts have also applied the doctrine to claims under the Truth in Lending Act (TILA), a similar statute with an almost identical statute of limitations provision.  *See, e.g.*, *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 706 (11th Cir. 1998); *Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499 (3d Cir. 1998); *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1166-67 (7th Cir. 1997); *King v. California*, 784 F.2d 910, 914-15 (9th Cir.1986); *Jones v. Trans Ohio Sav. Ass'n*, 747 F.2d 1037, 1039-43 (6th Cir. 1984); *compare* 15 U.S.C. § 1692k(d) (FDCPA) *with* 15 U.S.C. § 1640(e) (TILA).

The doctrine plainly applies to Plaintiffs Sykes and Perez.  As the Complaint sets forth in

detail, Defendants have engaged in an elaborate scheme to secure default judgments against

Plaintiffs through fraudulent means.  To that end, Defendants filed lawsuits against Plaintiffs,

failed to serve Plaintiffs, and then filed false affidavits and affirmations with the court in order to

obtain default judgments against Plaintiffs without their knowledge.  (Complaint ¶¶ 119-140,

221-252.)  Plaintiffs had no knowledge of the lawsuits until Defendants began efforts to collect

the fraudulently obtained default judgments:  Plaintiff Sykes first learned of the fraud in July

2009, when she received a marshal's notice of execution, and Plaintiff Perez first discovered the

fraud in September 2009, when Defendants restrained his bank account.  (Complaint ¶¶ 137,

239.)  Nor did Plaintiffs have any reason to suspect the fraud at any earlier point in time, as

Defendants' actions were of the type that is inherently self-concealing.[3]

As the Supreme Court recently noted, equitable tolling of the statute of limitations is

"needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from

even knowing that he or she has been defrauded.  Otherwise, 'the law which was designed to

prevent fraud' could become 'the means by which it is made successful and secure.'" *Merck &*

*Co. v. Reynolds*, __ U.S. __, 2010 U.S. LEXIS 3671, at *19 (Apr. 27, 2010) (quoting *Bailey*, 88

U.S. at 348).  As Plaintiffs Sykes and Perez filed suit within one year of their discovery of their

FDCPA claims, and could not have discovered their claims any earlier than they did, the Court

should find that all of their FDCPA claims are timely filed.

---

[3] Defendants' speculations to the effect that Plaintiffs Sykes and Graham must have received notice of the lawsuits
from some other source are irrelevant and inappropriate at this stage of the litigation.  (Mel Harris Br. at 14.)  The
Complaint precisely pleads the dates and circumstances under which Plaintiffs Sykes and Perez first learned of the
state court actions.  (Complaint ¶¶ 137, 239.)  On a motion to dismiss, the court must assume the truth of these facts
and may not speculate as to matters outside the pleadings.

4.      **Plaintiffs Sykes, Graham, and Perez Have Timely Claims Against the Mel Harris and Leucadia Defendants Based on their Attempts to Collect on Fraudulently Obtained Default Judgments**

Defendants contend that the claims of Plaintiffs Sykes, Graham, and Perez are untimely based on the dates when the underlying state court actions against them were filed and served. Plaintiffs, however, do not assert FDCPA violations based solely, or even primarily, on the *filing* of the state court lawsuits.  Instead, Plaintiffs allege that Defendants violated the FDCPA, for example, by preparing and filing false affidavits of service, affidavits of merit, and attorney affirmations; seeking and obtaining default judgments on the basis of these false affidavits and affirmations; and actively collecting or attempting to collect the fraudulently obtained default judgments. (Complaint at ¶ 337.) These acts are independent of the filing of the lawsuits and separately actionable under the FDCPA.

Courts have routinely found debt collectors liable for FDCPA violations arising out of state court litigation, even when claims based on the filing of the state court suit would have been time-barred.  For example, in *Schuh v. Druckman & Sinel, L.L.P.*, 602 F. Supp. 2d 454 (S.D.N.Y. 2009), the court held that FDCPA claims based on defendants' efforts to collect on a foreclosure judgment were not time-barred even though the underlying foreclosure action was filed years before the FDCPA action.  In *Campos v. Brooksbank*, 120 F. Supp. 2d 1271, 1274 (D.N.M. 2000), the court found that defendants could be held liable for false affidavits filed during the course of a state court debt collection lawsuit, even though claims based on the filing of the state court suit were time-barred; *see also Judy v. Blatt, Hasenmiller, Leibsker, and Moore, LLC,* No. 09-1226, 2010 U.S. Dist. LEXIS 8027, at *15 (N.D. Ill. Jan. 29, 2010) (holding that claims that plaintiff's attorney was forced to file a summary judgment motion and make five court appearances to dispose of state court debt collection action were distinct from claims related to the wrongful filing of the action, and therefore not time-barred).

8

The cases cited by Defendants, *Sierra v. Forster & Garbus*, 48 F. Supp. 2d 393, 395 (S.D.N.Y. 1999), and *Calka v. Kucker, Kraus & Bruh, LLP*, No. 98-0990, 1998 U.S. Dist. LEXIS 11868, 1998 WL 437151 (S.D.N.Y. Aug. 3, 1998), are not to the contrary.  Both *Sierra* and *Calka* involved claims arising out of misrepresentations made in the complaints filed in state court actions.  In both cases, the state court action was filed more than one year before the subsequent FDCPA lawsuit.  In both cases, the court found the claims time-barred, but did so precisely because the plaintiffs had not alleged independent violations of the FDCPA that arose within the limitations period.  *See Sierra*, 48 F. Supp. 2d at 395 ("This is not a case where defendants have sent a series of threatening letters, each of which violate the FDCPA and only some of which are time-barred."); *Calka*, 1998 U.S. Dist. LEXIS 11868, at *9 ("Nor does Calka allege that the amended complaint and summary judgment motions contained any new misrepresentation of the amount due not in the original complaint. . . .").  Courts have routinely distinguished *Sierra* and *Calka* from cases like this one, in which Plaintiffs alleged additional violations separate from and independent of the filing of the state court complaints.  *E.g.*, *Schuh*, 602 F. Supp. 2d at 466; *see also Puglisi v. Debt Recovery Solutions, LLC*, No. 08-50242010, U.S. Dist. LEXIS 6120, at *9 (E.D.N.Y. Jan. 26, 2010) (distinguishing *Sierra* and *Calka* because later violations "may be considered separate, discrete violations . . . and accordingly, the statute of limitations has not run on those claims"); *Ehrich v. RJM Acquisitions, LLC*, No. 09-2696, 2009 U.S. Dist. LEXIS 113929, at *8 (E.D.N.Y. Dec. 4, 2009) (distinguishing *Sierra* and *Calka* because "separate communications that violate the FDCPA can create separate causes of action").  *Sierra* and *Calka* simply do not stand for the proposition that once a state court suit is filed, no subsequent act can independently violate the FDCPA.

In *Foster*, the court found that defendants could be held liable for FDCPA claims arising from efforts to collect on improperly obtained default judgments:

> Defendants incorrectly assume that the filing dates for their underlying state court complaints were the last actionable events, and that the statute of limitations began to run on those filing dates. Defendants' actions after the state courts' judgments, however, such as collecting on the allegedly invalid state court judgments or garnishing class members' wages, could also be actionable events that are relevant for statute of limitations purposes.

463 F. Supp. 2d at 799. Similarly, Plaintiffs here have alleged timely claims based on Defendants' efforts to collect on fraudulently obtained default judgments. The Complaint cites numerous examples of unlawful collection activity undertaken by Defendants against Plaintiffs Sykes, Graham, and Perez after December 28, 2008. For example, Plaintiffs allege that Defendants caused a New York City Marshal to send Plaintiff Sykes a notice of execution in July 2009; restrained Plaintiff Graham's bank account in February 2009 and caused a New York City Marshal to send her a notice of execution in December 2009; and restrained Plaintiff Perez's bank account in September 2009, falsely threatened him with criminal charges in September 2009, and in December 2009 falsely represented in court papers that he had been properly served and did not deny responsibility for the underlying debt. (Complaint ¶¶ 137, 212, 213, 218, 239, 240, 241, 248, 249, 250.) Each of these acts constitutes a separate violation of the FDCPA, and Plaintiffs' claims based on these violations are timely filed.

## B.    The Leucadia Defendants Are Debt Collectors

The Leucadia Defendants argue that Plaintiffs have not alleged sufficient facts to establish that the Leucadia Defendants are debt collectors. (Leucadia Br. at 7-8.) Plaintiffs disagree. The definition of a "debt collector" under the FDCPA is extremely broad, and includes "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to

collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).

The Leucadia Defendants are incorrect in their assertion that they should be considered "creditors," and not "debt collectors."  Every circuit court to consider the issue has concluded that debt buyers like the Leucadia Defendants are indeed properly classified as "debt collectors" and not "creditors."  The question arose most recently in *Federal Trade Comm'n v. Check Investors, Inc.*, 502 F.3d 159 (3d Cir. 2007).  There, the court explained that "one cannot be both a 'creditor' and a 'debt collector,' as defined in the FDCPA, because those terms are mutually exclusive."  *Id.* at 173.  To determine whether an entity that acquired a debt is a "creditor" or a "debt collector," the court must look to the status of the debt at the time it was acquired.  Specifically, "one attempting to collect a debt is a 'debt collector' under the FDCPA if the debt in question was in default when acquired.  Conversely, . . . an entity is a creditor if the debt it is attempting to collect was not in default when it was acquired."  *Id.*; *see also Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003) ("[T]he Act treats assignees as debt collectors if the debt sought to be collected was in default when acquired by the assignee, and as creditors if it was not); *Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 106 (6th Cir. 1996) (finding defendant was a "creditor" because debt was not in default at the time it was assigned); *Perry v. Stewart Title Co*., 756 F.2d 1197, 1208 (5th Cir. 1985); *Kinel v. Sherman Acquisition II, LP*, No. 05-3456, 2006 U.S. Dist. LEXIS 97073 (S.D.N.Y. Feb. 28, 2006).

Plaintiffs have alleged sufficient facts for this Court to find that the Leucadia Defendants are, indeed, debt collectors.  Specifically, Plaintiffs alleged:

- Defendants Leucadia National Corporation, L-Credit, LR Credit, LLC, and LR Credits 10, 12, 14, 18, and 19 are purchasers and collectors of defaulted consumer debts.  (Complaint ¶¶ 29-34.)

- The Leucadia Defendants, including Leucadia National Corporation, have formed

joint ventures with the Mel Harris Defendants to purchase portfolios of defaulted debts for collection through litigation and other means.  (Complaint ¶ 97.)

- Since 2006, the Leucadia Defendants have filed more than 100,000 debt collection lawsuits in the New York City Civil Court.  (Complaint ¶ 3, 96.)

- Defendants LR Credit 10, 12, 14, 18, and 19 were the named plaintiffs in the debt collection lawsuits filed against the named Plaintiffs in this case.  In each case, the LR Credit entity claimed that it was the assignee and purchaser of a debt originally owed to another.  (Complaint ¶¶ 120-21, 142-43, 164-65, 194-95, 222-23, 254-55, 277-78, 298-99.)

- The LR Credit entities, with the assistance of the other Defendants, sought and obtained default judgments against the named Plaintiffs on the basis of false and deceptive affidavits and affirmations.  (Complaint ¶¶ 136, 158, 180, 211, 238, 270, 293, 314.)

- The LR Credit entities, with the assistance of the Mel Harris Defendants, then took action to collect the fraudulently obtained default judgments by restraining and levying funds from Plaintiffs' bank accounts and causing New York City Marshals to send Plaintiffs notices of property and income executions.  (Complaint ¶¶ 137, 159, 181, 187, 189, 212, 218, 239, 271, 294, 315.)

- LR Credits 10, 12, 14, 18, and 19 are wholly-owned subsidiaries of Defendant LR Credit, LLC, which is a wholly-owned subsidiary of Defendant L-Credit, LLC.  All of these entities are subsidiaries of Leucadia National Corporation.  (Complaint ¶¶ 29-32.)

- Defendant L-Credit, LLC's name also appears on the legal pleadings filed by the Leucadia Defendants against the named Plaintiffs.  (Complaint ¶¶ 30, 32.)

- All of the Leucadia Defendants share the same address and the same corporate officers.  (Complaint ¶¶ 29-34.)

- The LR Credit companies are mere shell entities of Leucadia National Corporation.  Leucadia has complete control over the LR Credit companies' debt collection activities, and all of the profits of the LR Credit entities flow directly to Leucadia. (Complaint ¶ 29.)

These facts are sufficient for the Court to conclude that each of the Leucadia Defendants "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  There can be no doubt that acting as a plaintiff in tens of thousands of debt collection cases constitutes regular efforts to collect or attempt to collect consumer debts.

The Supreme Court, the Second Circuit, and the district courts in New York have all found litigation to be a form of debt collection governed by the FDCPA.  *Heintz v. Jenkins*, 514 U.S. 291, 297 (1995) (stating, in the context of interpreting FDCPA, "litigating . . . seems simply one way of collecting a debt."); *Goldman v. Cohen*, 445 F.3d 152, 155 (2d Cir. 2006) (finding "a consumer debt collector's initiation of a lawsuit in state court seeking recovery of unpaid consumer debts is" governed by the FDCPA); *Kinel*, 2006 U.S. Dist. LEXIS 97073, at *20-25 (finding debt buyers that hired other agencies and attorneys to collect debts on their behalf liable under FDCPA and cataloguing cases).

Furthermore, the FDCPA does not exempt investors or holding companies of debt collectors from liability.  *See*, *e.g.*, *Herkert v. MRC Receivables Corp.*, 655 F. Supp. 2d 870, 880-881 (N.D. Ill. 2009) (rejecting a holding company's argument that it could not be considered a debt collector because it was not directly involved in the collection activities pertaining to the case); *Miller v. Midland Credit Mgmt, Inc.*, 621 F. Supp. 2d 621, 635 (N.D. Ill. 2009) (finding that a holding company's SEC filings sufficiently documented its activities as a debt collector).

*Schuh v. Druckman & Sinel, LLP*, 602 F. Supp. 2d 454 (S.D.N.Y. 2009), relied upon by Defendants, is distinguishable. (Leucadia Br. at 8.) In that case, the plaintiffs alleged that a company called HSBC Mortgage Services, Inc. was collecting a debt for its affiliates, HSBC Bank USA and HSBC Finance Corporation.  *Id.* at 457-58.  The court rightly concluded that the facts as alleged in the complaint established that HSBC Mortgage Services was a creditor and not a debt collector, and thus not subject to FDCPA liability.  *Id.* at 462-63.  Here, Plaintiffs allege that the Leucadia Defendants are companies that bought portfolios of defaulted debts for the purpose of collection and filed more than 100,000 debt collection lawsuits. (Complaint ¶ 96-97).  This is more than sufficient to show that the Leucadia Defendants are debt collectors.

## C.       The Samserv Defendants Are Debt Collectors

The Samserv Defendants argue that they cannot be considered "debt collectors" within

the meaning of the FDCPA because they are process servers, and thus exempt from coverage

under the Act. (Samserv Br. 10-13).  Plaintiffs disagree.

The FDCPA defines a debt collector to include any person "who regularly collects or

attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due

another."  15 U.S.C. § 1692a(6).  The definition does not include "any person while serving or

attempting to serve legal process on any other person in connection with the judicial enforcement

of any debt."  *Id.* § 1692a(6)(D).[4]  However, the process server exemption is narrowly construed:

"[T]he language of § 1692a(6)(D) extends the exemption to a person *only* 'while serving or

attempting to serve legal process.'"  *Romea v. Heiberger & Assoc.,* 163 F.3d 111, 117 (2d Cir.

1998) (emphasis added). The exemption covers only "those individuals whose involvement in a

debt collection communication was limited to serving the communication on the consumer – in

effect, to being messengers."  *Id.*  Here, Plaintiffs have alleged that the Samserv Defendants

specifically did *not* serve the communication on the consumer, *i.e.*, act as messengers, but

instead engaged in sewer service, which does not fall within the process server exemption.[5]

---

[4] The fact that Congress felt it necessary to create a special exception for process servers itself demonstrates that process serving would normally fall under the general definition if not specifically exempted.  *C.f. Kimber v. Federal Fin. Corp.*, 668 F. Supp. 1480 (M.D. Ala. 1987) ("There would be no need to exclude creditors – those who collect debts for themselves – from the general definition of debt collector unless that general definition included those who collect debts for themselves.").

[5]  For this reason, the cases cited by Samserv Defendants are inapplicable, as they all concern FDCPA claims against process servers who actually served legal process.  *See McNall v. Credit Bureau of Josephine County,* No. 07-3075, 2010 U.S. Dist. LEXIS 11359, at *32 (D. Or. Feb. 5, 2010); *Byrd v. Law Offices of John D. Clunk, Co.*, No. 1:09-CV-076, 2010 U.S. Dist. LEXIS 20636, at *12 (S.D. Oh. Mar. 8, 2010); *Worch v. Wolpoff & Abramson, LLP*, 477 F. Supp. 2d 1015, 1017 (E.D. Mo. 2007).  In all three cases, the court found that the process servers simply acted as messengers and thus were entitled to claim the process server exemption.  *McNall*, 2010 U.S. Dist. LEXIS 11359, at *33 ("[T]here is no evidence before the court which shows that the process server went beyond the role of messenger in serving the complaint on plaintiffs."); *Byrd*, 2010 U.S. Dist. LEXIS 20636, at *15-18 (process server exemption applied to court-appointed process server who merely posted notice on plaintiff's door); *Worch v. Wolpoff & Abramson, LLP*, 477 F. Supp. 2d at 1018 (process server exemption applied where plaintiff claimed only that process server acted in an aggressive manner by coming to her home to serve legal process).

14

(Complaint ¶¶ 99, 100, 101, 124-127; 197-202; 225-229; 257-261; 280-284; 301-305).

A process server who "goes beyond merely being a messenger in serving legal process and engages in prohibited abusive or harassing activities" may not claim the protection of the statutory exemption. *Flamm v. Sarner & Assoc*., No. 02-4302, 2002 U.S. Dist. LEXIS 22255, at *17 (E.D. Pa. Nov. 6, 2002); *see also McNall*, 2010 U.S. Dist. LEXIS 11359 at *30-31; *Andrews v. S. Coast Legal Services, Inc*. 582 F. Supp. 2d 82, 88 (D. Mass. 2008).  Here, Plaintiffs have alleged that the Samserv Defendants not only failed to effect service, but also prepared and filed false affidavits of service, all as part of a fraudulent scheme to secure default judgments against Plaintiffs and tens of thousands of similarly situated individuals. (Complaint ¶ 318-372).  This behavior obviously falls outside of the narrow scope of the process server exemption. *Andrews*, 582 F. Supp. 2d at 88 (holding that defendants could not avail themselves of process server exemption where complaint alleged that they "prepared false and misleading documents, made demands for fees to which they were not entitled, and engaged in other conduct that smacks of a harassing and coercive kind of debt collecting) (internal quotations omitted).

The Complaint sets forth the following factual allegations:

- When the Leucadia and Mel Harris Defendants file debt collection lawsuits, they frequently hire Defendant Samserv, Inc. to "serve process," or, more accurately stated, to provide an affidavit of service that Defendants know is highly likely to be false.  (Complaint ¶ 98.)

- The Samserv Defendants frequently engage in sewer service, after which they file fraudulent affidavits with the Civil Court, claiming to have served Plaintiffs with legal process when Defendants have not, in fact, done so.  (Complaint ¶¶ 99-100.)

- The Civil Court, relying on these fraudulent affidavits of service, enters tens of thousands of default judgments every year against unsuspecting individuals like Plaintiffs and the putative class members.  (Complaint ¶ 117.)

- Defendants Samserv, Mlotok, and Lamb failed to serve legal process on Plaintiffs Sykes, Graham and Robinson, after which they prepared fraudulent affidavits and submitted them to the Civil Court, leading the court to enter default judgments against Plaintiffs.  (Complaint ¶¶ 123-128, 136, 197-203, 211, 280-285, 293.)

15

- Defendants Samserv, Mlotok, and Mosquera failed to serve legal process on Plaintiffs Colon and Veerabadren, after which they prepared fraudulent affidavits and submitted them to the Civil Court, leading the court to enter default judgments against Plaintiffs.  (Complaint ¶¶ 145-150, 158, 166-171, 180.)

- Defendants Samserv, Mlotok, and Andino failed to serve legal process on Plaintiff Perez, after which they prepared a fraudulent affidavit and submitted it to the Civil Court, leading the court to enter a default judgment against him.  (Complaint ¶¶ 225-230, 238.)

- Defendants Samserv, Mlotok, and Al-Atrash failed to serve legal process on Plaintiff Rivera, after which they prepared a fraudulent affidavit and submitted it to the Civil Court, leading the court to enter a default judgment against her.  (Complaint ¶¶ 257-262, 270.)

- Defendants Samserv, Mlotok, and Abdelrahman failed to serve legal process on Plaintiff Roman, after which they prepared a fraudulent affidavit and submitted it to the Civil Court, leading the court to enter a default judgment against her.  (Complaint ¶¶ 301-306, 314.)

- The Leucadia and Mel Harris Defendants then sought to collect against Defendants using the default judgments obtained through the Samserv Defendants' fraudulent conduct.  (Complaint ¶¶ 137, 159, 181, 187, 189, 212, 218, 239, 271, 294, 315.)

Notably, Plaintiffs did not allege that any of the Samserv Defendants were actually engaged in "serving or attempting to serve legal process."  Thus, the Samserv Defendants cannot avail themselves of the process server exemption.

The Complaint makes clear that the Samserv Defendants have an integral role in the fraudulent debt collection scheme described in the Complaint, and thus are properly considered "debt collectors" under the FDCPA.  *See Andrews*, 582 F. Supp. 2d at 88 (holding process servers liable as "debt collectors"); *Flamm v. Sarner & Assoc.,* 2002 U.S. Dist. LEXIS 22255, at *17-18(same).  The Samserv Defendants' acts of creating false affidavits of service and then submitting those affidavits of service to the Civil Court in tens of thousands of debt collection lawsuits certainly fall under the rubric of "regularly collecting or attempting to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  *See, e.g., Midland*

16

*Funding v. Brent*, 644 F. Supp. 2d 961 (N.D. Oh. 2009) (holding that filing false affidavits in state court debt collection actions violates the FDCPA). Thus, the Samserv Defendants are properly considered "debt collectors" under the FDCPA.[6]

## II.   DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' RICO CLAIMS SHOULD BE DENIED

In arguing that Plaintiffs' RICO claims should be dismissed, Defendants disingenuously ignore key portions of the Complaint and well established law. Plaintiffs have alleged in detail how they experienced cognizable civil RICO injuries as a result of Defendants' activities, and have also alleged that Defendants formed a RICO enterprise, with each entity carrying out its own role in the fraudulent scheme. This is more than sufficient to grant Plaintiffs the opportunity to prove their allegations on the merits.

To state a claim under RICO, Plaintiffs need only allege, "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *OSRecovery, Inc. v. One Groupe Intern., Inc.* 354 F.Supp.2d 357, 365 (S.D.N.Y. 2005). Plaintiffs handily satisfy each element of this standard.

### A.   Plaintiffs Have Alleged A Violation Of The RICO Statute

Section 1962(c) of the RICO Act provides in part that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . . " The

---

[6] Defendants' reliance on *Laubach v. Arrow Service Bureau, Inc.*, 987 F. Supp. 625 (N.D. Ill. 1997), is misplaced. In *Laubach*, the Court considered whether Lason, a company to which a debt collection agency had outsourced the job of printing and mailing collection letters, was itself a debt collector. The Court concluded that Lason was not a debt collector because it was simply a printing and mailing service; it did not draft the letters it sent, its name did not appear on the papers, and it had no direct connection with the consumers who received the mailings. *Id.* at 631. The factual circumstances in *Laubach* are simply not analogous to this case, in which Plaintiffs have alleged that the Samserv Defendants prepared fraudulent affidavits of service and filed them with the court as part of an illegal scheme to obtain fraudulent default judgments against tens of thousands of New Yorkers.

elements necessary to establish a violation of 1962(c) are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.")  *Int'l Bhd. of Teamsters v. Carey,* 297 F.Supp.2d 706, 713 (S.D.N.Y. 2004) (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 481-82 (1985); *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 520 (2d Cir. 1994)).

### 1.      Plaintiffs Have Alleged An Association-In-Fact Enterprise

"The Supreme Court has explained that a RICO enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct,' the existence of which is proven 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'"  *First Capital Asset Mgmt v. Satinwood, Inc.,* 385 F.3d 159, 173 (2d Cir. 2004) (quoting *United States v. Turkette,* 452 U.S. 576, 581-82 (1981)).

"Courts in the Second Circuit must look to the 'hierarchy, organization, and activities' of an association-in-fact to determine whether 'its members functioned as a unit.'" *First Nationwide Bank v. Gelt Funding Corp.,* 820 F. Supp. 89, 97 (S.D.N.Y. 1993) (quoting *United States v. Coonan,* 938 F.2d 1553, 1560-61 (2d Cir. 1991)). In making this determination, "[the Second Circuit] construes the enterprise element of RICO liberally: '[T]he language and the history [of RICO] suggest that Congress sought to define the term as broadly as possible.'" *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 454 (S.D.N.Y. 1998) (quoting *United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir. 1989) (*en banc*)).  "For an association of individuals to constitute an 'enterprise,' the individuals must 'share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.'" *First Nationwide Bank,* 820 F. Supp. at 97 (quoting *Moll v. U.S. Life Title Ins. Co.,* 654 F. Supp. 1012, 1031 (S.D.N.Y. 1987)).

"Common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure.  Thus, . . . proof

of various racketeering acts may be relied on to establish the existence of the charged

enterprise." *Nichols v. Mahoney,* 608 F.Supp.2d 526, 532 (S.D.N.Y. 2009) (quoting *United

States v. Coonan,* 938 F.2d 1553, 1559-60 (2d Cir.1991)).  In order to withstand a motion to

dismiss, the Complaint must merely "allege facts that permit an inference that such an

association exists."  *Id.* (internal quotation omitted).

       The Complaint more than adequately alleges facts that permit an inference that an

association-in-fact existed, and that Defendants worked together to carry out fraudulent activity.

It alleges that the Samserv, Leucadia, and Mel Harris Defendants are distinct groups of legal

entities, which joined together over a number of years in a scheme to obtain and enforce

fraudulent default judgments.  The Leucadia and Mel Harris Defendants formed joint ventures to

purchase debt portfolios, file lawsuits and seek default judgments; the Leucadia Defendants

acted as plaintiffs in the cases; the Mel Harris Defendants represented the Leucadia Defendants

in court and provided false affirmations in support of the default judgment applications; and the

Samserv Defendants ensured that Plaintiffs and other putative class members did not receive

notice of the court cases by creating and filing false affidavits of service stating that Plaintiffs

had been served when they had not.  (Complaint ¶¶ 94-317, 345-46.)  Each Defendant had a

distinct role in the enterprise, and each worked with the others to make a profit.  The Complaint

also alleges that each defendant was motivated by a common fraudulent purpose, and worked in

concert with the others, or aided and abetted one another, to achieve that purpose.  (Complaint ¶¶

356-59.)

       In *Nichols,* the court recently held that similar allegations sufficiently pled the existence

of an association-in-fact.  608 F. Supp. 2d at 532-33.  As *Nichols* explained, an enterprise was

sufficiently alleged where each of the defendants "had a stake in the success of the

other, because their ability to make money depended on the efforts of each party."  *Id.*  (internal

quotation omitted).  *See also Napoli v. United States,* 45 F.3d 680 (2d Cir. 1995) (upholding the

RICO convictions of "private investigators employed by or affiliated" with a single law firm who

engaged in a scheme to prepare false witnesses and fabricate evidence); *In re Sumitomo,* 995 F.

Supp. at 454 (RICO enterprise alleged sufficiently based on coordinated illegal activity by

defendants).  The allegations in the Complaint more than suffice to meet the Second Circuit's

"liberal" construction of the association-in-fact enterprise.  *Id.*

      Defendants' contentions that the Complaint fails to set forth sufficient allegations

regarding the structure of the enterprise are completely without merit, and the cases cited are

inapplicable.  (Leucadia Br. at 15.)  The Complaint precisely explains the relationships between

the three groups of Defendants and how they work together to achieve a common purpose.  This

case is thus not like *First Nationwide Bank v. Gelt Funding Corp.*, in which the complaint

alleged that "disparate parties were associated in fact by virtue of their involvement in the real

estate industry in the 1980s," 820 F. Supp. at 98; or *Moll v. U.S. Life Title Ins. Co.*, in which the

complaint alleged that the defendants were associated "by virtue of their involvement in the real

estate settlement industry in Rockland and Orange Counties in New York and in light of their

various dealings with US Life," 654 F. Supp. 1012, 1032 (S.D.N.Y. 1987); or *Cedar Swamp

Holdings, Inc. v. Zaman*, in which the complaint alleged that "a common defendant perpetrated

various independent frauds, each with the aid of a different co-defendant." 487 F. Supp. 2d 444,

450 (S.D.N.Y. 2007).

      The Leucadia Defendants' argument that an enterprise cannot consist of a parent and its

subsidiaries (Leucadia Br. at 13) is beside the point.  The enterprise alleged in the Complaint is

comprised of three distinct groups of individuals and legal entities, and only one of those groups

of Defendants even contains a parent and its subsidiaries: the Leucadia Defendants.[7]

### 2.    Defendants Participated In The Operation Or Management Of The Enterprise

Each Defendant argues that the Complaint fails to allege that Defendant's participation in the operation or management of the enterprise, which is a necessary component of a RICO claim. *See Reves v. Ernst & Young*, 507 U.S. 170, 177-79 (1993).  Defendants' arguments are baseless. "In this Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *First Capital Asset Management v. Satinwood*, 385 F.3d 159, 176 (2d Cir. 2004) (citing *Baisch v. Gallina,* 346 F.3d 366, 377 (2d Cir. 2003)); *see also De Falco v. Bernas,* 244 F.3d 286, 309 (2d Cir. 2001).  Under the "operation or management" test, "[l]iability is not limited to those primarily responsible for an enterprise's affairs, in upper management, or who occupy a formal position in the enterprise, but may attach even to 'lower-rung participants in the enterprise who are under the direction of upper management.'"  *In re Sumitomo,* 995 F. Supp. at 454 (citing *Reves*, 507 U.S. at 183-84).

In *Sumitomo*, the court, reasoning that the defendants provided "at a minimum, 'substantial assistance'" to the overall scheme, held that:  "At this early stage, these allegations are sufficient to satisfy Reves."  *Id.* 995 F. Supp. at 454 (quoting *Napoli*, 45 F.3d at 683).

There can be no doubt that the Samserv Defendants provided "substantial assistance" to

---

[7] Even though the enterprise alleged here consists of three distinct entities, it is worth noting that, contrary to the Leucadia Defendants position, under the law of this Circuit, an enterprise *may* in fact consist solely of a parent and its wholly owned subsidiaries.  In *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995), the RICO defendant was an entrepreneur and two organizations controlled by that entrepreneur.  When the defendants sought to raise precisely the same objection that the Leucadia Defendants now raise, the Second Circuit roundly rejected their claim that there was no association-in-fact.  The court noted that:  "Kalon and Andra were two separate and distinct corporations. While Schnabolk was an officer or agent of each corporation, each was an independent entity that could benefit from his nefarious activities. . . . [E]ven if Schnabolk owned 100% of the shares of each corporation, the corporations would be separately existing legal entities capable of constituting an association-in-fact enterprise," because both corporations "benefited from the illicit activities of their agents," and undertook fraudulent activities to enhance their business interests.  *Id.* at 263.  Thus, the fact that the LR Credit entities are wholly owned subsidiaries of Leucadia is of no legal relevance for purposes of establishing a RICO association-in-fact.

the overall scheme and are therefore "involved in playing a part in the direction of the affairs of the enterprise within the meaning of *Reves*."  *Napoli*, 45 F.3d at 683.  As the Complaint alleges, the Samserv Defendants had sole responsibility for providing the fraudulent affidavits of service at the heart of Defendants' scheme.  The provision of perjurious affidavits of service is *crucial* to the functioning of the entire enterprise, as Defendants could not have obtained tens of thousands of default judgments without Samserv's assistance.  Their motion to dismiss on this ground should be denied.

As for the Leucadia and Mel Harris Defendants, the Complaint demonstrates that they participated in the operation and control of the enterprise.  After all, they were the parties who formed joint ventures to purchase the debts, file lawsuits, and obtain default judgments through fraudulent means.  As the client, the Leucadia Defendants bore the ultimate responsibility for the litigation; as the attorney, the Mel Harris Defendants had primary responsibility for the day-to-day management of Defendants' debt collection efforts.  Any suggestion that the Leucadia and Mel Harris defendants did not participate "in the conduct of such enterprise's affairs," 18 U.S.C. § 1962(c), is ludicrous.

### 3.  Plaintiffs Have Sufficiently Alleged Mail/Wire Fraud For Each Defendant

Mail fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do." 18 U.S.C. § 1341.  The gravamen of the offense is the scheme to defraud, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element." *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2138 (2008).

### a.      Plaintiffs Have Satisfied Rule 9(b)'s Particularity Requirement

Plaintiffs have fully complied with Fed. R. Civ. P.  9(b)'s requirement that a "[c]omplaint must adequately specify the statements it claims were false or misleading, give particulars as to

the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480, 484 (S.D.N.Y. 1997) (internal citations omitted); *see also Vista Co. v. Columbia Pictures Indus.,* 725 F. Supp. 1286, 1301 (S.D.N.Y. 1989) (internal citations omitted) (explaining that complaint should "explain[] for each allegation what defendants said, the time frame in which the statements were made, how the statements were misleading, and how the defendants benefited."). Essentially, this standard serves the purpose of "assur[ing] the defendant of 'fair notice of what the plaintiff's claim is and the grounds upon which it rests," while also guarding against baseless claims. *Ross v. A.H. Robins Co.,* 607 F.2d 545 (2d Cir. 1979) (quoting *Denny v. Barber,* 576 F.2d 465, 469 (2d Cir. 1978)).

Here, the Complaint provides Defendants with notice of the exact statements that Plaintiffs allege are fraudulent. Specifically, the Complaint details, for each Plaintiff:

- That the Samserv Defendants prepared and filed fraudulent affidavits of service with the court, the specific aspects of the affidavits of service that are false, the identities of the specific individuals who signed and notarized the false affidavits, and the dates that the affidavits were filed with the court. (Complaint ¶¶ 125-27, 147-49, 168-70, 200-02, 227-29, 259-61, 282-84, 303-05.)

- That the Mel Harris Defendants prepared and filed false attorney affirmations with the court, the specific aspects of the affirmations that are false, and the identities of the specific individuals who signed the affirmations. (Complaint ¶¶ 129, 151, 172, 204, 263, 286, 307.)

- That the Mel Harris and Leucadia Defendants prepared and filed false affidavits of merit with the court, the specific aspects of the affidavits that are false and misleading, the identities of the individuals who signed and notarized the false affidavits, and the dates the affidavits were filed with the court. (Complaint ¶¶ 132-35, 154-57, 175-78, 207-10, 248-50, 266-69, 289-92, 310-13.)

- That the Mel Harris and Leucadia Defendants sought and obtained default judgments on the basis of the false affidavits and affirmations described above. (Complaint ¶¶ 128, 136, 150, 158, 171, 180, 203, 211, 230, 238, 262, 270, 285, 293, 306, 314.)

Likewise, the Complaint details no fewer than 34 known, specific instances when Defendants

23

used the mail or wires for the purpose of executing their scheme,[8] and it further alleges that Defendants used the mail or wires "on tens, if not hundreds, of thousands of other occasions that Plaintiff cannot identify at this time but are known to defendants."  (Complaint  ¶¶ 351-54.)   The Complaint also alleges that Defendants worked in concert and aided and abetted one another in pursuing their scheme.  (Complaint ¶ 359.)  These allegations are more than sufficient to make out a claim for mail and wire fraud.  *See Cohen v. Koenig,* 25 F.3d 1168 (2d Cir. 1994) (holding that plaintiffs complied with Rule 9(b) where they identified specific misrepresentations, stated who made false statements, and stated the dates and places of meetings where the false statements were made).

The Leucadia Defendants argue that Plaintiffs' RICO claim should be dismissed because parts of the Complaint are pleaded on information and belief.  They are wrong for two reasons.  First, the complaint in the case they rely upon, *DiVittorio v. Equidyne Extractive Industries, Inc.,* was pled entirely on information and belief, except for the identity of the plaintiff, and contained no "allegation[s] specifically linking any of [the defendants] in a specific way to any fraudulent misrepresentation or omission."  822 F.2d 1242, 1249 (2d Cir. 1987).  Here, of course, the Complaint identifies exactly where, when, and how defendants submitted false affidavits and affirmations to fraudulently obtain default judgments.

In general, the cases cited by Leucadia Defendants (Leucadia Br. at 10) are inapposite, as they involve poorly drafted or vague complaints which were pled virtually entirely on information and belief.  *See DeVittorio.* 822 F.2d 1242; *Gross v. Waywell*, 628 F.Supp.2d  475, 476 (S.D.N.Y. 2009) (stating that the complaint generally alleged mail and wire fraud, but nowhere specified which defendants allegedly committed which acts of mail and wire fraud);

---

[8]  The Mel Harris Defendants' claims that the Complaint only alleges the *absence* of the use of the mail or wires is therefore without support and is contradicted by the plain language of the Complaint.

*Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 924 (7th Cir. 1992) (noting that the allegations against defendants "are not nearly detailed enough" because "they do not even hint at the identity of those who made the misrepresentations, the time the misrepresentations were made, or the places at which the misrepresentations were made.")  No such deficiencies exist in this case.

Second, the Leucadia Defendants ignore the context in which Plaintiffs' RICO claims arise.  "While pleadings of fraud generally cannot be based *solely* upon information and belief, this rule is not 'rigidly enforced' where 'much of the factual information needed to fill out plaintiffs complaint lies peculiarly within the opposing parties' knowledge.'" *Id.* (emphasis supplied) (quoting *DiVittorio,* 822 F.2d at 1248; *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972)). "Under these circumstances, the pleader must still allege the facts upon which his belief is founded." *Id.*  In *Vista,* the court held that since "virtually every one of plaintiffs' allegations involves [defendants'] willful failure to disclose information or efforts to conceal, it is safe to say that the factual information lies particularly within defendants' knowledge." *Id.*  The court also held that "facts relating to [defendants'] business are far more likely to have been within the knowledge of the defendants' than the plaintiffs." *Id.*  Likewise, in this instance, the facts necessary to establish how the Leucadia Defendants organized, funded, and advanced their scheme lies particularly within the Leucadia Defendants' knowledge.  Plaintiffs have alleged a good faith basis for their beliefs, based on the information available to them, and cannot be expected to make more specific allegations about Leucadia's corporate and funding structure without discovery.

        **b.**     **Plaintiffs Have Shown That The Mel Harris Defendants, And The Other Defendants, Had The Requisite Fraudulent Intent**

Incredibly, the Mel Harris Defendants assert that Plaintiffs have not alleged that they

possessed a fraudulent intent and characterize Plaintiffs' allegations against them as "scarce and benign." (Mel Harris Br. at 17.)  Plaintiffs have amply met their burden of demonstrating Defendants' fraudulent intent, and their allegations in regard to Mel Harris's conduct are far from "benign."

"Great specificity [is] not required with respect to . . . allegations of . . . scienter" because "[a] plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Connecticut Nat. Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987).  Plaintiffs need only plead "'factual allegations [which] give rise to a strong inference that the defendants possessed the requisite fraudulent intent.'" *Turkish v. Kasenetz,* 27 F.3d 23, 28 (2d Cir. 1994) (quoting *Beck v. Manufact. Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir. 1987)).  "[One] method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so." *Turkish,* 27 F.3d at 28

> In *Turkish,* the court explained:
>
> First, defendants had a motive for committing the alleged fraud – a desire to avoid repaying the loans and to end the earlier litigation. Second, as fiduciaries of various trusts and owners of a controlling interest in the family business, defendants had a clear opportunity to engage in fraud. Defendants' intent is further evidenced by their actions after they signed the Settlement Agreement, when they allegedly attempted to conceal the underpayment from plaintiffs.

*Id.*

Here, Plaintiffs have plainly alleged a motive for each of the Defendants to commit fraud. The Mel Harris and Leucadia Defendants, who formed a joint venture to purchase portfolios of defaulted debts, have a profit motive to fraudulently obtain default judgments; indeed, the Complaint alleges that Defendants lack the ability to prove that a debt is owed (which in part accounts for the fact that they purchase this debt for fractions of a penny on the dollar), and thus can *only* make a profit if purported debtors do not contest the underlying debt.  (Complaint ¶ 82.)

The Samserv Defendants likewise have an economic motive to engage in "sewer service," because, as the Complaint alleges, the LR Credit and Mel Harris Defendants pay Defendant Samserv no more than $20 per completed service, and do not pay at all for attempted service. (Complaint ¶¶ 106, 98.)  That the Samserv Defendants may have been propelled by their *own* economic motives, rather than Leucadia's, is irrelevant.  *See Turkish,* 27 F.3d at 28 (an economic motive is itself sufficient to establish intent).  The Complaint also alleges that defendants had ample opportunity to engage in fraud, as each defendant entity had the ability and the incentive to submit false affirmations and affidavits.  *See Cohen v. Koenig,* 25 F.3d 1168, 1174 (2d Cir. 1994); *see also Fluor Corp.,* 808 F.2d at 962 (dismissing a complaint for failure to sufficiently allege fraudulent intent where it was in the defendant's economic interest not to commit fraud).

The Complaint alleges sufficient facts to establish that Defendants had motive and opportunity to commit mail and wire fraud, and did in fact do so.  Defendants' motions to dismiss should be denied.

### B.     The Complaint Alleges Cognizable RICO Injuries

 "The language of the civil RICO provision . . . broadly permits recovery by any person injured in his business or property by reason of a violation of the Act's substantive restrictions." *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451 (2006) (internal citations omitted).  In order to allege an injury under civil RICO, a plaintiff need only allege "an injury to business or property." *OSRecovery, Inc. v. One Groupe Intern., Inc.,* 354 F.Supp.2d 357, 365 (S.D.N.Y. 2005).

The Complaint states in detail how each plaintiff has been injured in his/her business or property as a result of defendants' fraudulently obtaining and enforcing default judgments. Specifically, the Complaint alleges:

- Plaintiff Monique Sykes, a stay-at-home mother with no income of her own, was forced to go to court to contest the default judgment that Defendants fraudulently obtained against her, which created economic costs associated with travel to court and

- Plaintiff Ruby Colon's bank account was frozen after Defendants fraudulently obtained a default judgment against her.  Ms. Colon could not use her bank account and was forced to incur high fees from a government debit card after she could no longer write checks. (Complaint ¶ 162.)

- Plaintiff Rea Veerabadren's bank account was frozen and her account levied after Defendants fraudulently obtained a default judgment against her.  She was charged a $125 legal processing fee as a result of the bank restraint, lost the use of her levied funds for nearly one year, incurred costs associated with transportation to and from court and her lawyer's office, and had to miss several days of work to go to court and her lawyer's office. (Complaint ¶ 192.)

- Plaintiff Fatima Graham's bank account was frozen for *ten months* after Defendants fraudulently obtained a default judgment against her, during which time she had to pay for all of her expenses with expensive money orders, was forced to borrow money at a high interest rate, and fell behind in her rent, resulting in a suit by her landlord. (Complaint ¶¶ 213-217.)

- Plaintiff Kelvin Perez's bank account was frozen for several months after Defendants fraudulently obtained a default judgment against him. As a result, he was forced to use an expensive check-cashing service, and he was denied housing as a result of his negative credit rating.  (Complaint ¶¶ 240, 242, 244, 246, 252.)

- Plaintiff Saudy Rivera, who is disabled and receives only Social Security disability as income, was charged a legal processing fee by her bank after Defendants fraudulently obtained a default judgment against her. She temporarily lost the use of her restrained funds and incurred costs going to court and contesting the default judgment. (Complaint ¶¶ 253, 275.)

- Plaintiff Paula Robinson lost wages as a result of taking time off work to contest the default judgment wrongfully entered against her and also incurred costs associated with going to court. (Complaint ¶¶ 296.)

- Plaintiff Enid Roman, a single mother, was at risk of having her wages garnished after Defendants fraudulently obtained a default judgment against her. She incurred costs going to court to contest the default judgment.  (Complaint ¶ 317.)

The Leucadia Defendants dismiss these injuries as merely "*nominal* fees and expenses."

(Leucadia Br. at 17.)  That Defendant Leucadia dismisses its own seizure of Plaintiffs' bank

accounts for *months* on end, and describes lost wages, high bank fees, and other high fees

incurred to secure alternative funding for basic necessities  – as *nominal* – displays precisely the

28

cavalier attitude toward Plaintiffs' rights that led to the allegations in the underlying Complaint.

Defendant Leucadia's argument – essentially, that Plaintiffs' injuries are not serious enough to warrant this Court's time – is wrong on every level.  First, Plaintiffs' injuries speak for themselves.  There is no possible basis for describing the seizure of a person's own bank account as not constituting a harm to business or property.  And, even supposedly "lesser" injuries, such as being forced to seek money from third parties, and incurring costs associated with traveling to court and to lawyers' offices – are serious, cognizable injuries.  Indeed, the Complaint alleges that defendant Leucadia's "business model" is nothing more than a cynical bet on Plaintiffs' unwillingness or inability to incur these supposedly "nominal" costs, such that they will instead "choose" to settle the debts, even when they do not recognize them and were never served with notice of them, and where Leucadia cannot, in fact, prove that a debt is owed.

Second, nothing in the text of RICO, or the thousands of cases interpreting this important statute, so much as hints at a minimum damages requirement.  To the contrary, any plaintiff who alleges harm to business or property may recover under civil RICO.[9]  *See, e.g.*, *Curley v. Cumberland Farms Dairy, Inc.,* 728 F. Supp. 1123, 1140 (D.N.J. 1989) (holding that plaintiffs' allegation that they incurred expenses relating to interviewing and travel were sufficient to state a claim under civil RICO).  *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335 (2d Cir. 1994) (stating that lost profits/income constitute business injury). Defendants' argument that Plaintiffs experienced no cognizable injury not only is callous, but is wrong on the facts and on the law.  It should be rejected.

## C.     Defendants' RICO Violations Proximately Caused Plaintiffs' Injuries

The Samserv and Leucadia Defendants argue that Plaintiffs fail to allege that their

---

[9] Insofar as the Complaint seeks relief for threat of future injuries, *e.g.*, that plaintiffs are at risk of being sued and subject to improper service once again because the actions against them were dismissed "without prejudice," plaintiffs do not seek treble damages for this injury under RICO.

injuries were proximately caused by Defendants' acts.  (Leucadia Br. at 16; Samserv Br. at 15-

16.)  They are wrong.  Proximate causation, generally and under RICO, requires only "some

direct relation between the injury asserted and the injurious conduct alleged."  *Holmes v. Sec.*

*Investor Protection Corp.* 503 U.S. 258, 268 (1992).  "'Central to the notion of proximate cause

[under RICO] is the idea that a person is not liable to all those who may have been injured by his

conduct, but only to those with respect to whom his acts were a substantial factor in the sequence

of responsible causation, and whose injury was 'reasonably foreseeable or anticipated as a

natural consequence.'"  *Baisch v. Gallina,* 346 F. 3d 366, 374 (2d Cir. 2003) (quoting *Lerner v.*

*Fleet Bank,* 318 F.3d 113, 123 (2d Cir. 2003)).  Foreseeability is the essence of proximate

causation.  Thus, causation is established whenever injury to a plaintiff is the foreseeable result

of a defendant's RICO violation.

The Complaint alleges in detail how Defendants worked in concert, and aided and abetted

one another, to obtain and enforce default judgments through a pattern of racketeering activity.

Specifically, the Leucadia and Mel Harris Defendants filed debt collection lawsuits against

Plaintiffs and hired the Samserv Defendants to provide affidavits of service for filing with the

Civil Court.  The Samserv Defendants, on behalf of the Leucadia and Mel Harris Defendants,

swore that they lawfully served Plaintiffs and putative class members, when in fact they did no

such thing.  Because Plaintiffs did not know about the lawsuits against them, they did not appear

in court to defend themselves, giving Defendants the opportunity to apply to the Civil Court for

default judgments against Plaintiffs.  (Complaint ¶ 99.)  Defendants submitted a series of

fraudulent affidavits and affirmations to the Civil Court, which in turn relied on those false

statements to enter default judgments against Plaintiffs.  Plaintiffs then suffered cognizable

RICO injuries, as described above, when Defendants took action to enforce the judgments.  It

was entirely foreseeable to all of the Defendants that Plaintiffs would be injured as a result of

Defendants' actions.  Indeed, this was precisely the *objective* of Defendants' fraudulent scheme.

The Samserv Defendants assert that intervening acts serve to break the chain of causation between their actions and Plaintiffs' injuries: namely, that the Mel Harris Defendants and the court clerks are required to mail additional notices before entry of a default judgment.  (Samserv Br. at 15-16.)  These arguments are beside the point.  First, in the Complaint, all but one of the Plaintiffs expressly deny actual notice of the debt collection actions in Civil Court.[10]  Insofar as the Samserv Defendants misguidedly believe that actual notice is a defense to this action, the time to present a defense that contests Plaintiffs' testimony would be at trial, not on a motion to dismiss.

Second, and more importantly, the Samserv Defendants mischaracterize causation under RICO.  Plaintiffs need not allege that they were harmed as a proximate result of the Samserv Defendants' failure to serve them (although they were); rather, Plaintiffs must allege that their harm proximately resulted from the Samserv Defendants' violation of the RICO statute, that is, from Defendants' participation in the conduct of the enterprise's affairs through a pattern of racketeering activity.  *See* 18 U.S.C. § 1962(c); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006); *Sedima, S. P. R. L. v. Imrex Co.*, 473 U.S. 479, 495-97 (1985) ("If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under *§ 1964(c)*").  Here, the Complaint plainly alleges that the Samserv Defendants played a key role in the enterprise by engaging in sewer service and that Defendants' racketeering activity harmed Plaintiffs in the numerous, and eminently foreseeable, ways

---

[10]  Plaintiff Graham alleged that she received a copy of the summons and complaint in the mail, but that she did not respond to it because she did not understand it.  (Complaint ¶ 199).  Nevertheless, even in her case, as in all the other cases, Defendants filed a false affidavit of service, false attorney affirmation, and false affidavit of merit, and thus obtained a default judgment against her through fraudulent means.

discussed above.[11]   Plaintiffs have thus properly alleged that the Samserv Defendants proximately caused their injuries.

*Bridge v. Phoenix Bond & Indem. Co.,* 128 S. Ct. 2131 (2008), a case focused primarily upon standing and third-party reliance, roundly rejected the Samserv Defendants' approach.  In *Bridge*, a county had a procedure in place designed to prevent parties from monopolizing public lien auctions.  *Id.* at 2135.  Those seeking to participate in the auctions were required to provide statements swearing that they would submit bids only in their own names, and that they did not have any agents or other actors submitting bids on their behalf. *Id.*  The defendants allegedly submitted false attestations of compliance, and the county relied on those false attestations in allowing the defendants to participate in the auction, where they received a disproportionate share of liens.  *Id.* at 2136.  Subsequently, competing bidders brought a RICO claim predicated on various acts of mail fraud, alleging that they were harmed as a result of Defendants' actions. *Id.*

In *Bridge,* the Supreme Court held that the plaintiffs had sufficiently alleged that even though the *county* was the entity deceived by the false statements, it was *plaintiffs* who experienced injury, and that the plaintiffs' injuries were proximately caused by the defendants' actions.  Proximate causation was established because it was foreseeable that the county would rely on defendants' false representations and thus allow them to participate in the auction, which,

---

[11] The Samserv Defendants' argument that engaging in sewer service carries no foreseeable risk of injury betrays a profoundly flawed understanding of constitutional due process prerequisites for notice and jurisdiction. As courts have held time and again, default judgments are disfavored, precisely because they have nothing to do with the merits of the dispute and admit the possibility that a defendant may have been denied their day in court.  *See, e.g., Pecarsky v. Galaxiworld.com Ltd.* 249 F.3d 167, 175 (2d Cir. 2001) ("It is well established that default judgments are disfavored. A clear preference exists for cases to be adjudicated on the merits.").  This is why CPLR 3215 establishes a series of procedural requirements that must be met before a default judgment can be entered.  *See* Complaint ¶¶ 86-92.   These procedures, *taken together,* were designed to provide the constitutional due process minimum for adequate notice and an opportunity to be heard.  *See, e.g., Dolan v. Linnen,* 753 N.Y.S. 2d 682, 703 (Civ. Ct. 2003) (stating that the CPLR procedure must satisfy due process).   By the Samserv Defendants' lights, however, the requirements are nothing more than an a la carte menu of options that they can ignore completely with impunity, as long as someone somewhere *may* comply with one of them somewhere along the line.

in turn, would cause economic harm to others.  *Id.* at 2139.  Similarly, here, the Civil Court

relied on Defendants' false statements to enter default judgments against Plaintiffs, which, in

turn, caused Plaintiffs injury when Defendants took action to collect the judgments.  The

connection between Defendants' fraudulent misrepresentations to the Civil Court and Plaintiffs'

injuries was direct and foreseeable.  Thus, in light of *Bridge*, the Leucadia Defendants' argument

that the state courts, not Plaintiffs, were injured as a result of Defendants' actions has no merit.

      **D.**     **The Leucadia Defendants Have Stated No Reason**
                 **For Dismissing Plaintiffs' Conspiracy Claim**

      The Leucadia Defendants assert that the RICO conspiracy claim fails simply because

Plaintiffs have alleged no facts sufficient to support their substantive claims.  "A RICO

conspiracy claim must fail . . . if the substantive claims themselves are deficient," and are pled in

a conclusory fashion.  *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F.Supp.2d 565,

581 (S.D.N.Y. 1999).  In this case, however, there are no deficiencies in the substantive claims,

and Plaintiffs have offered more than sufficient support for each of their allegations at this stage

in the proceedings.  Because Plaintiffs have sufficiently pled their substantive claims, Defendant

Leucadia's motion to dismiss the conspiracy claim is entirely without basis.

**III.**    **PLAINTIFFS' GBL § 349 CLAIM SHOULD NOT BE DISMISSED BECAUSE**
         **DEFENDANTS ENGAGED IN DECEPTIVE ACTS AND PRACTICES**

      Defendants' assertions that their conduct did not violate General Business Law § 349,

New York's deceptive acts and practices law, are entirely unpersuasive.   Defendants argue that

the claim fails because Plaintiffs do not allege harm to the public interest or that Defendants are

engaged in "consumer oriented" conduct. (Leucadia Br. at 19-20; Samserv Br. at 19-21.)  The

Samserv Defendants also argue that Plaintiffs do not allege that Defendants' conduct misled

them, but that at best, Defendants' conduct of filing allegedly false affidavits of service misled

the court.[12]   (Samserv Br. at 21-22.) The Leucadia Defendants also argue that any claim for damages is moot because the underlying default judgments were vacated. (Leucadia Br. at 20.)

GBL § 349(a) declares unlawful: "[d]eceptive acts or practices in the conduct of any business."  A GBL § 349 claim has three elements: "(1) the defendant's challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way, and (3) the plaintiff must have sustained injury as a result." *Cohen v. J.P. Morgan Chase & Co.*, 498 F.3d 111 (2d Cir. 2007) (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).  Although reliance is not an element of the statute, a plaintiff must show defendant's deceptive act caused him or her actual harm. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 533 (1995). A deceptive act or practice may be an affirmative representation, or, importantly, an omission, as long as it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Gaidon v. Guardian Life Ins. Co. of America*, 94 N.Y.2d 330, 344, 704 N.Y.S.2d 177, 183 (1999) (quotations omitted).

To assert a claim under GBL § 349, a plaintiff "must demonstrate that the [defendant's] acts or practices have a broader impact on consumers at large." *Oswego* , 85 N.Y.2d at 25, 623 N.Y.S.2d at 533.  Courts have held that claims meet the consumer-orientation requirement of the statute if "some harm to the public at large is at issue." *Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 179 (W.D.N.Y. 2003); *see also State Farm Mutual Automobile Ins. Co. v. Mallela*, 175 F. Supp. 2d. 401 (E.D.N.Y. 2001) ("Consumer-oriented [is] defined as conduct that 'potentially affect[s] similarly situated consumers.'") (citing *S.Q.K.F.C., Inc. v. Bell Atlantic*

---

[12] The Samserv Defendants also seem to argue that that the Mel Harris and Leucadia Defendants, who were the consumers of Samserv's business, were the only entities that could have been deceived by their conduct, however, the Complaint alleges that *all* of the Defendants conspired to obtain default judgments against Plaintiffs.  Any argument that the Mel Harris and Leucadia Defendants were somehow "deceived" by the Samserv Defendants' fraud is wholly without merit.

*TriCon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996)).  "Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute."  *Oswego*, 85 N.Y.2d at 25, 623 N.Y.S.2d at 533.  The types of transactions that the *Oswego* court described as private contractual disputes not covered by GBL § 349 are arm's-length business transactions that do not involve injury to consumers.  As one example, the court cited the transaction in *Genesco Entertainment v. Koch*, 593 F.Supp. 743, 752 (S.D.N.Y. 1984), in which a corporation sued the City over a lease agreement for Shea Stadium, as the type of "single shot transaction" not covered by the Act.  *Oswego*, 85 N.Y.2d at 25, 623 N.Y.S.2d at 533.

    The Defendants' practices are precisely the type of conduct proscribed by GBL § 349. Plaintiffs are indisputably members of the consuming public and Defendants' actions unquestionably affect the public interest as a whole.  Plaintiffs' allegations in the Complaint do not involve individual disputes about the alleged underlying debts, but instead pertain to the deceptive business practices and acts that Defendants deliberately employ to collect debts unlawfully from New Yorkers.  Unlike a private dispute among individual parties, the actions alleged impact Plaintiffs as well as tens of thousands of other consumers sued in New York City Civil Court.

    The Samserv Defendants failed to effect service on Plaintiffs and countless other consumers, signed affidavits swearing to untrue facts, and filed them with the court, knowing full well that proper service had not been completed.  The Mel Harris and Leucadia Defendants hired the Samserv Defendants, often providing them what they knew were old addresses of defendants; only paid Samserv Defendants if service was effected; paid a process server fee far too low to provide actual service; and deliberately turned a blind eye to the inflated rates of successful service by Samserv, especially compared to the extraordinarily high rate of default judgments entered against defendants in LR Credit lawsuits.  The Leucadia and Mel Harris Defendants then

used the fraudulent affidavits of service as part of their default judgment applications to the court.  These default judgment applications also contained false affidavits of merit attesting to the basis for the debt – based on personal knowledge and supposed review of records that they simply did not have – and false military affidavits and attorney affirmations.

These deceptive acts were intended to, and had the effect of, directly misleading Plaintiffs, causing them great harm.  Because they were not served, Plaintiffs were materially misled into believing that there were no court cases pending against them.  As a result of this deception, perpetuated by the Defendants' sworn statements of service, they did not and could not defend themselves in court. Defendants were then able to obtain default judgments against the Plaintiffs without their knowledge.  When Defendants enforced the judgments, they caused great harm to Plaintiffs, for example, by denying them access to their limited resources, forcing them to pay bank fees and to otherwise spend money to correct problems over which they had no control; by causing them to lose wages to fight the default judgments in court; and by damaging their credit.

As detailed in the Complaint, Plaintiffs suffered actual damages as a result of Defendants' deceptive acts and also are entitled to statutory damages under GBL § 349,[13] therefore, any argument that their damages claim is "moot" because the defaults improperly entered against them as a result of Defendants' business scheme have since been vacated is absurd.  Based on the allegations in the Complaint and Defendants' extensive pattern of deceptive acts against Plaintiffs and others, Plaintiffs' actions violated GBL § 349.

---

[13] Pursuant to *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010), which recently held that New York's prohibition on class actions seeking to recover penalties (CPLR § 901(b)) does not govern federal class actions under Rule 23, Plaintiffs will seek liquidated and  treble damages on their GBL§ 349 claims.

IV.    **THE LEUCADIA PARENT CORPORATIONS ARE PROPER PARTIES AND SHOULD REMAIN IN THIS CASE AND BE HELD ACCOUNTABLE FOR THE UNLAWFUL ACTS OF THEIR SUBSIDIARIES AND THEIR PRINCIPALS**

Despite their arguments to the contrary (Leucadia Br. at 20), all of the Leucadia Defendants should remain in this case as proper parties because the corporate entities and principals can and should be held responsible for certain acts against Plaintiffs, based on their extensive involvement in Defendants' debt collection activities or, alternatively, under the theory of "piercing the corporate veil."

Generally, corporations are protected from the acts of their subsidiaries and are not liable for their unlawful behavior.  *See, e.g., United States v. Bestfoods*, 524 U.S. 51, 61 (1998). However, "courts will disregard the corporate form," or "pierce the corporate veil," whenever necessary to "prevent fraud or to achieve equity."  *Morris v. New York Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 140, 603 N.Y.S.2d 807, 810 (1993) (citing *Walkovszky v. Carlton*, 18 N.Y.2d 414, 417, 276 N.Y.S.2d 585, 587 (1966)) (quotations omitted).  The Second Circuit has noted that "a parent corporation and its subsidiary lose their distinct corporate identities when their conduct demonstrates a virtual abandonment of separateness."  *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 778 (2d Cir. 1995).

Under choice of law principles, the law of the state of incorporation determines what law applies to a veil-piercing analysis.  *See Moses v. Martin*, 360 F. Supp 2d 533, 541 n.33 (S.D.N.Y. 2004).  The Leucadia Defendants include both New York and Delaware companies; however, the veil-piercing inquiry is substantially similar in these two states.  In fact, some courts, recognizing the substantial similarities between New York's and Delaware's veil-piercing analysis, have applied New York law in actions where the company was incorporated in

37

Delaware.[14]  *See, e.g.*, *Stahlex-Interhandel Trustee, Reg. v. Western Union Fin. Services Eastern Europe Ltd.*, No. 99-2246, 2002 WL 31359011 (S.D.N.Y. Oct. 21, 2002); *S.J. Berwin & Co. v. Evergreen Entertainment Group, Inc.*, No. 92-6209, 1995 WL 606094, at *2 (S.D.N.Y. Oct. 12, 1995).

Under New York law, to pierce the corporate veil or establish that a parent company is in fact the alter ego of a subsidiary requires fulfilling two prongs: "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."[15]  *Morris*, 82 N.Y.2d at141, 603 N.Y.S.2d at 811; *see also Thompson-CSF*, 64 F.3d at 777 (holding that courts will pierce the corporate veil where a parent dominates and controls a subsidiary and to prevent fraud or other wrong).

To show "domination" by the parent company requires a weighing of certain factors, including:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate

_____

[14] Under Delaware law, in determining whether to pierce the corporate veil, courts consider whether separate entities are in fact alter egos of the other.  *See Harper v. Delaware Valley Broadcasters, Inc.*, 743 F.Supp. 1076, 1085 (D.Del. 1990).  To establish an alter ego claim under Delaware law, it must be shown that the defendants operate as a single economic entity and that there exists an "overall element of injustice or unfairness."  *Id.*  The factors to be weighed in determining whether a subsidiary and parent act as a single economic entity include "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a façade for the dominant shareholder."  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. Civ. A. 1331, 1989 WL 110537, at *5 (Del. Ch. Sept. 19, 1989)).

[15] The Leucadia Defendants rely on *Mike Building & Contracting, Inc. v. Just Homes, LLC*, 2010 WL 457303 (Sup. Ct. Kings Cty 2010) to assert that under New York case law, the traditional standard for piercing the corporate veil is heightened in applying the analysis to a limited liability company.  Though the court in *Mike Building* noted that the formalities required for the management of an LLC are more flexible than for a corporation, the court did not state that the plaintiff's burden is heavier in seeking to pierce the veil of an LLC; instead, it engaged in the same two-pronged analysis described above.  Significantly, an important factor in the court's decision to grant the defendants' motion for summary judgment on the veil-piercing claim in that case was that the plaintiffs had not alleged any fraudulent or illegal purpose by the defendants, which is an essential piece of any veil-piercing inquiry.  That is not the case here.

records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991); *see also DeGraziano v. Verizon Comm., Inc.*, 325 F. Supp. 2d 238, 246 (E.D.N.Y. 2004). Importantly, "[n]o one factor is decisive" when conducting a veil-piercing analysis. *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1053 (2d Cir. 1997).

Plaintiffs' allegations address numerous of these factors, showing that Defendant Leucadia National Corporation ("Leucadia") exercises dominant control over all of its co-defendant subsidiaries. The allegations include that Leucadia is the parent company of the other LR Credit Defendants (Complaint ¶ 29); that L-Credit is the sole corporate owner of Defendant LR Credit, LLC (*Id*. ¶ 30); that LR Credit, LLC is in turn the sole owner of the LR Credit numerical entities; (*Id*. ¶ 31); that in legal pleadings, the LR Credit entities list their address as "c/o L-Credit, LLC" (*Id*. ¶ 30); and that any profits from the subsidiary entities flow directly back to the parent company (*Id*. ¶ 82). This corporate and profit structure reveals each subsidiary's lack of independence and makes unlikely that each of the subsidiaries engages in its own formal corporate activities, keeps its own corporate records, and has its own independent sources for capitalization.

In addition, Plaintiffs have alleged an "overlap in ownership, officers, directors, and personnel," *i.e.*, that Defendant Joseph A. Orlando is vice president and chief executive officer of Leucadia, as well as president of LR Credit LLC and president of LR Credits 10, 12, 14, 18 and 19 (*Id*. ¶ 33); and that Defendant Philip M. Cannella is assistant vice president and director of

taxes of Leucadia, as well as vice president of LR Credit, LLC and vice president of LR Credits 10, 12, 14, 18, and 19. (*Id.* ¶ 34.)[16]  Plaintiffs have also alleged that Leucadia, L-Credit LLC, LR Credit, LLC, and LR Credits 10, 12, 14, 18, and 19 all have a "common office space" and "address" at 315 Park Avenue South, New York, New York 10010.  (*Id.* ¶¶ 29-32.)

Having no independent corporate formalities, office space, or personnel, the LR Credit entities appear to be mere instrumentalities of Leucadia that do not engage in arm's length activities with the parent.  Moreover, the individual LR Credit entities engage in no independent observable or reported business activities other than serving as named plaintiffs on debt collection lawsuits filed by the Mel Harris Defendants.

The Leucadia Defendants' corporate filings, along with the pleadings in the underlying state court actions, leave little room to doubt that:  (i) Leucadia funded the purchase of large charged-off debt portfolios by its wholly-owned subsidiaries; (ii) each of those subsidiaries exists solely for the purpose of using Leucadia's money to purchase and collect charged-off debt portfolios along with their partners, the Mel Harris Defendants; (iii) their profits from the joint venture are funneled back to Leucadia; and (iv) Leucadia wholly controls each of the subsidiaries because the same two high-ranking Leucadia officers, defendants Orlando and Canella, are identified as the individual officers for each of the subsidiaries.  In short, Leucadia has financed the alleged fraudulent debt collection scheme and reaped the profits, and its high-ranking officers, along with the Leucadia John Doe defendants, have been the ones orchestrating it.

After demonstrating complete domination by a parent corporation, "some showing of a wrongful or unjust act toward plaintiff" resulting in the plaintiff's injury is also required. *Morris*, 82 N.Y.2d at 141-142, 603 N.Y.S.2d at 811; *see also Aekyung Co., Ltd. v. Intra & Co.,*

---

[16] Though not alleged in the Complaint, Thomas Mara and Rocco Nittoli are, respectively, Executive Vice President and Vice President/Treasurer of Leucadia, as well as "representatives" of L-Credit LLC, LR Credit LLC, and LR Credits 10, 12, 14, 18 and 19, with knowledge of the companies' activities, according to the Leucadia Defendants' Rule 26 disclosures.

*Inc.*, No. 99 Civ. 11773, 2008 WL 4974424, at *2 (S.D.N.Y. Nov. 19, 2008) ("New York law will not allow the corporate veil to be pierced in the absence of a showing that this control was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights, and that the control and breach of duty proximately caused the injury complained of.") (internal quotations and citations omitted).

Plaintiffs have sufficiently alleged that Leucadia used its control over its subsidiaries to commit wrongful or unjust acts toward Plaintiffs resulting in injuries to them.  As set forth in the Complaint, the Leucadia Defendants have created a business model that entails purposefully and unlawfully obtaining default judgments as a means of collecting debts.  Instead of engaging in any traditional business or debt collection activities (for example, making calls or writing letters to debtors) that would entail hiring or paying employees, utilizing office space and resources, such as computers and phones, paying business expenses, or keeping track of their own profits and losses, the LR Credit entities have systematically appeared as named plaintiffs in more than 100,000 debt collection lawsuits filed by the Leucadia Defendants in the New York City Civil Court, serving as pawns for the Leucadia principals and owners to turn a profit on people's alleged defaulted debt.  (Complaint ¶ 3.)  Leucadia then employed its control over the LR Credit entities to obtain, and then enforce, improper default judgments.

With fraudulently obtained default judgments in hand, the Leucadia Defendants injured Plaintiffs by, among other things, restraining Plaintiffs' bank accounts, garnishing their wages, and seizing their property.  (*See*, *e.g.*, Complaint ¶¶ 187, 212, 218, 294.)  As a result of Defendants' enforcement actions, Plaintiffs were forced to pay bank fees, lose wages, borrow money to cover living expenses, and pay various expenses to defend their cases, as well as suffering damaged credit.  (*See*, *e.g.*, Complaint ¶¶ 140, 162, 192, 214, 216, 243, 275, 296, 317.)  Plaintiffs have obviously been harmed by Leucadia's using its control over its subsidiaries to

commit dishonest, illegal, and unjust acts in contravention of Plaintiffs' legal rights.  This is a clear instance where, in the interest of equity, it is appropriate for the Court to pierce Leucadia's corporate veil and hold the parent company, which is the driving force behind the harm inflicted on Plaintiffs, accountable for its subsidiaries' harmful actions.

Alternatively, if the Court determines that the Complaint lacks the necessary detail to sustain allowing the corporate veil to be pierced, the Court should allow the parties to engage in expedited discovery on this issue.  As this Court noted in *Network Enterprises, Inc. v. APDB Offshore Productions, Inc.,* No. 01 Civ. 11765, 2002 WL 31050846, at *4 (S.D.N.Y. Sept. 12, 2002), other courts in this circuit "have taken a generous view of claims based on the corporate veil piercing doctrine, and have refused to dismiss claims" where the complaint lacked extensive detail.  In *Network Enterprises*, the Court found that, given the fact-intensive nature of the veil-piercing analysis, the plaintiff's allegations, though not detailed, were "sufficient at this pre-discovery stage to withstand dismissal…"  *Id.*  Because veil-piercing requires facts about defendants that may not be readily accessible, "before dismissal can be granted, the plaintiff is generally 'entitled to obtain necessary discovery to ascertain whether there are grounds to pierce the corporate veil.'"  *Robles v. Copstat Sec., Inc.*, No. 08 Civ. 9572, 2009 WL 4403188, at *2 (S.D.N.Y. Dec. 2, 2009) (quoting *First Bank of Am. v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 22 (1st Dep't 1999)).  "Accordingly, a complaint seeking to pierce the corporate veil should not be dismissed unless it 'is totally devoid of solid, nonconclusory allegations.'"  *Id.* (quoting *Moses*, 360 F.Supp.2d 533, 541).  Because of Leucadia's and its subsidiaries' lack of transparency, discovery would reveal further details about Leucadia's operations, personnel, business practices, and its interface and control over the other Leucadia Defendants.

## V.      PLAINTIFFS STATE A CLAIM UNDER JUDICIARY LAW § 487

The Mel Harris Defendants argue that Plaintiffs' Judiciary Law claim, alleging that the

Mel Harris Defendants deceived or colluded "with intent to deceive the court or any party," fails

because Plaintiffs do not adequately allege facts in support of Defendants' fraudulent or deceitful

conduct.  (Mel Harris Br. at 23-24.)  However, as recounted above, Plaintiffs allege numerous

instances of the Mel Harris Defendants engaging in or consenting to deceit or collusion, with the

intention to deceive the courts and Plaintiffs.  (*See*, *e.g.*, Complaint ¶¶ 100, 105, 109, 110, 113,

115, 117.)  The Mel Harris Defendants' argument is therefore entirely without merit.

## VI.     THE ROOKER-FELDMAN DOCTRINE DOES NOT BAR THIS ACTION

The Leucadia Defendants are incorrect that this action should be dismissed for lack of

subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) because of the Rooker-Feldman

doctrine.  (Leucadia Br. at 3-4.)

In 2005, the Supreme Court clarified the scope of the *Rooker-Feldman* doctrine,

explaining that it is "confined" to "cases brought by state-court losers complaining of injuries

caused by state court judgments rendered before the district court proceedings commenced and

inviting district court review and rejection of those judgments."  *Exxon Mobil Corp. v. Saudi*

*Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *see also Hoblock v. Albany County Bd. of*

*Elections,* 422 F.3d 77, 85 (2d Cir. 2005) (noting that *Exxon-Mobil* "pared back the *Rooker-*

*Feldman* doctrine to its core").  As the Leucadia Defendants acknowledge, four requirements

must be met before *Rooker-Feldman* can apply: "the federal plaintiff (1) must have lost in state

court; (2) complain of injuries caused by the state-court judgment; (3) invite review and rejection

of the judgment in federal court; and (4) commence the federal action after the state court

judgment was rendered."  (Leucadia Br. at 4 (citing *Hoblock*, 422 F.3d at 84)).  If *any one* of

these requirements is not met, *Rooker-Feldman* does not apply, and the court retains jurisdiction.

It is clear that neither the first nor third requirement is met in this case.

None of the Plaintiffs "lost in state court." Though each Plaintiff did "lose" initially on default – the inevitable result of Defendants' unlawful conduct – each of those default judgments was later vacated, and each state court action was thereafter discontinued or dismissed. Absent an extant final judgment, Plaintiffs cannot be said to have "lost in state court."

Further, Plaintiffs plainly do not invite the Court's "review and rejection" of any final state court judgments. The Leucadia Defendants make the patently false statement that Plaintiffs "ask this Court to review the validity of and declare the default judgment invalid" (Leucadia Br. at 4); however, nowhere in the Complaint do Plaintiffs seek a judgment declaring invalid the default judgments entered against them. The only declaratory relief sought by Plaintiffs is "judgment declaring that Defendants have committed the violations of law alleged in this action." (Complaint at ¶¶ 80-81.) Moreover, though the Complaint seeks prospective injunctive relief on behalf of the putative class, it decidedly does *not* seek to vacate existing state court default judgments. Rather, in pertinent part, the Complaint seeks an order directing Defendants "to locate class members and notify them that a default judgment has been entered against them and that they have the right to file a motion with the court to re-open their case, and to provide each class member with a copy of the affidavit of service filed in their action." *Id.*

Because the requirements of Rooker-Feldman are not met, the Leucadia Defendants' motion to dismiss on this ground should be denied.

## VII. THE STIPULATION IN THE UNDERLYING CIVIL COURT CASE DOES NOT BAR PLAINTIFF RUBY COLON'S CLAIMS

The Leucadia Defendants incorrectly assert that Plaintiff Ruby Colon's claims should be dismissed pursuant to the December 10, 2009 stipulation in the underlying Civil Court case. They attempt to justify that contention by selectively referencing paragraph four, which states

that the stipulation "is intended as a complete settlement of all issues related to or arising out of this matter." (Leucadia Br. at 19; Goldfarb Decl., Ex. D.) Defendants erroneously argue that the stipulation should be treated as a "release" barring Plaintiff Colon from bringing her claims.

The stipulation, as a contract, must be interpreted according to settled principles of contractual interpretation. *McCoy v. Feinman*, 99 N.Y.2d 295, 302, 755 N.Y.S.2d 693, 698 (2002). In interpreting a contract, each word and phrase must be given its plain meaning, and all parts of the contract must be reconciled in order to avoid any inconsistency. *Laba v. Carey*, 29 N.Y.2d 302, 307-308, 327 N.Y.S.2d 613, 618 (1971); *see also National Convention Corp. v. Cedar Bldg. Corp.*, 23 N.Y.2d 621, 625, 298 N.Y.S.2d 499, 502 (1969). A court should not interpret a contract in a way that will operate to "leave a provision of a contract without force and effect."[17] *Laba*, 29 N.Y.2d at 308, 327 N.Y.S.2d at 618.

When read as a whole and when each provision in the stipulation is given meaning, it is clear that the December 10, 2009 stipulation does not bar Ms. Colon's claim. To begin with, nowhere in the title or in the individual provisions of the stipulation – including paragraph four – do the parties use the term "release," which would indicate a mutual release of liability barring any future claims. Moreover, and more importantly, the Leucadia Defendants completely ignore paragraph three of the stipulation, which states that the matter is "discontinued *without prejudice*" and that "any counterclaims asserted herein or potentially asserted are similarly discontinued *without* prejudice" (emphasis added). If paragraph four were interpreted to mean that the parties were barred from bringing any future action against each other, paragraph three, which specifically leaves *open* the right of the party to bring such an action, would be rendered

---

[17] Moreover, any ambiguity in the terms of a contract, under the principle of *contra preferentum*, must be resolved against the drafter of the agreement. *Taylor v. United States. Casualty Co.*, 269 N.Y. 360, 364, 199 N.E. 620, 622 (1936). Because LR Credit 12, LLC's attorneys appear to have drafted the stipulation, as evidenced by the presence of the text "MSH FILE NO. 737217-1" in the bottom left hand corner of the agreement, even if the terms as set forth in the stipulation were ambiguous, any ambiguity must be resolved against the Leucadia Defendants.

meaningless.  Such a reading runs contrary to well established principles of contractual interpretation, and should be disregarded.

## VIII.   THE LITIGATION PRIVILEGE DOES NOT BAR PLAINTIFFS' CLAIMS

The Leucadia Defendants argue that Plaintiffs' claims are barred by the litigation privilege.  This contention is wholly without merit.  The litigation privilege grants to participants in judicial proceedings "immunity from liability for an otherwise defamatory statement to which the privilege applies."  *Sexter & Warmflash, P.C. v. Margrabe*, 828 N.Y.S.2d 315, 322 (1st Dep't 2007).  Plaintiffs have not alleged that Defendants defamed them.  Furthermore, the defense does not apply to situations in which a party subverts the judicial process to disseminate false statements.  *Bridge C.A.T. Scan Assocs. v. Ohio-Nuclear, Inc.*, 608 F. Supp. 1187, 1194 (S.D.N.Y. 1985).

Defendants have cited no cases in which the litigation privilege has been applied to bar claims under the FDCPA, RICO, or GBL § 349.  Nor can they.  Federal statutes are not subject to state law immunity claims.  *Martinez v. California*, 444 U.S. 277, 284 n.8 (1980); *see also Heintz*, 514 U.S. at 299 (1995) (holding that defendants could be held liable under FDCPA for statements made during litigation); *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1021-22 (7th Cir. 1992) (holding that statements made during litigation can qualify as predicate acts under RICO if they constitute mail or wire fraud); *Schuh*, 602 F. Supp. 2d at 468 (refusing to apply litigation privilege to FDCPA claims); *Welker v. Law Office of Daniel J. Horwitz*, 626 F. Supp. 2d 1068, 1071 (S.D. Ca. 2009) (same); *Nutter v. Messerli & Kramer, P.A.*, 500 F. Supp. 2d 1219, 1223 (D. Minn. 2007) (same); *Florida Evergreen Foliage v. E.I. DuPont de Nemours & Co.*, 135 F. Supp. 2d 1271, 1285 (S.D. Fla. 2001) (refusing to apply litigation privilege to RICO claim).  As for Plaintiffs' claims under GBL § 349, no court in New York has held that such claims would or could be preempted by the litigation privilege.

## IX.    THE NOERR-PENNINGTON DOCTRINE DOES NOT APPLY

The Leucadia Defendants' eleventh and final gambit is to argue that plaintiffs' RICO

claims are barred by the Noerr-Pennington Doctrine.[18]  (Leucadia Br. at 24-25.)  The Leucadia

Defendants' argument relies exclusively[19] on the decision of a Ninth Circuit panel in *Sosa v.*

*DIRECTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006).  Under the *Noerr-Pennington* doctrine, those

who petition any department of the government for redress are generally immune from statutory

liability for their petitioning conduct.  *Id.* at 929.  Although "the doctrine as initially developed

protected only actual petitioning of the government, it has been extended to cover attempts to

petition the government through litigation in the courts."  *ICOS Vision Syst. Corp. v. Scanner*

*Technologies Corp.*, No. 05 Civ. 6322 (DC), 2006 WL 838990, at *4 (S.D.N.Y. Mar. 29, 2006).

In *Sosa*, a case brought under RICO, the Ninth Circuit extended *Noerr-Pennington* to

immunize defendants from liability for fraudulent, litigation-related, statements "that do not

amount to a sham."  437 F.3d at 942.  The court did not consider – because plaintiff "declined to

argue" – whether "the allegedly unlawful conduct 'consists of making intentional

misrepresentations to the court.'"  *Sosa*, 437 F.3d at 938-39 (citing *USS-POSCO v. Indus. v.*

---

[18]  Although the Leucadia Defendants' brief is not a model of clarity on this point, it appears that their Noerr-Pennington argument is limited to Plaintiffs' "attempt to create liability for fraud and RICO based the actions of the Leucadia Defendants in the state courts."  (Leucadia Br. at 25.)  Insofar as the Leucadia Defendants intended to argue that Noerr-Pennington also bars plaintiffs' FDCPA claims, that argument fails for the reasons stated above *and* because courts that have considered the applicability of Noerr-Pennington to FDCPA claims have universally rejected it.  *See, e.g., Hartman v. Great Seneca Financial Corp.*, 569 F.3d 606, 615-16 (6th Cir. 2009) (rejecting Noerr-Pennington defense in FDCPA action); *Basile v. Blatt, Hasenmiller, Liebsker & Moore LLC*, 632 F.Supp.2d 842, 845-46 (N.D. Ill. 2009) (same); *Berg v. Blatt, Hasenmiller, Leibsker & Moore LLC*, No. 07 C 4887, 2009 WL 901011, at *6 (N.D. Ill. June 24, 2009) (same); *Gerber v. Citigroup, Inc.*, No. CIV S-07-0785, 2009 WL 248094 , at *4 (E.D. Cal. Jan. 29, 2009) (same); *Sial v. Unifund CCR Partners*, No. 08 CV 0905, 2008 WL 4079281 at *3 (S.D. Cal. Aug. 28, 2008) (same).

[19]  To be sure, the Leucadia Defendants make a notably weak attempt to bolster their argument for extending *Noerr-Pennington* to litigation related fraud under RICO by citing two Second Circuit cases.  Leucadia Br. at 24.  The first, *Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*, No. 00-7302, 2000 WL 1508873 (2d Cir. Oct. 11, 2000), is an unpublished summary order which would "not have precedential effect" even now under Second Circuit IOP 32.1.1, but cannot be cited at all because it was issued prior to January 1, 2007.  The second, *Hirschfeld v. Spankos*, 104 F.3d 16 (2d Cir. 1987) is a "*c.f.*" citation to a case that assumed without deciding the application of *Noerr-Pennington* to – of all things – a claim under the First Amendment, but then rejected the defense based on collateral estoppel and the sham exception.

*Contra Costa County Bldg. & Constr. Trades Council*, 31 F.3d 800, 810-11 (9th Cir. 1994)).

Although no sham was claimed, the court explained that the "sham exception" to Noerr-

Pennington applies when "'a party's knowing fraud upon, or its intentional misrepresentations to,

the court deprive the litigation of its legitimacy.'" *Id.* at 938 (citing *Liberty Lake Investments,*

*Inc. v. Magnuson*, 12 F.3d 155, 159 (9th Cir. 1993)).  There "is no constitutional value in false

statements of fact."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (defamation case).

Here, the Defendants' "knowing fraud upon," and "intentional misrepresentations to, the

court," are the heart of Plaintiffs' claims.  The Leucadia Defendants, through their agents – the

Mel Harris Defendants and the Samserv Defendants, respectively – submitted affidavits to the

courts fraudulently attesting to the merits of their claims and the adequacy of service of process.

Unlike the plaintiffs in *Sosa*, Plaintiffs here assert the sham exception.  Indeed, this is a

quintessential sham exception case.  Defendants' knowing fraud upon the courts gives rise to

liability under the FDCPA, RICO, the GBL and the Judiciary Law.  It is independently

sanctionable.  Indeed, it is likely criminal.  It is not protected by the Petition Clause.  Any

attempt to invoke the protections of the First Amendment should be rejected.

**CONCLUSION**

Defendants' motions to dismiss should be denied in their entirety.


Dated: May 28, 2010
      New York, New York


                    EMERY CELLI BRINCKERHOFF
                     & ABADY LLP

                    By: _____/s/_____
                    Matthew D. Brinckerhoff (MD 3552)
                    Eisha Jain (EJ 5057)
                    75 Rockefeller Plaza, 20th Floor
                    New York, New York 10019
                    212-763-5000


                    NEIGHBORHOOD ECONOMIC
                    DEVELOPMENT ADVOCACY PROJECT
                    (NEDAP)

                    By: _____/s/_____
                    Susan Shin (SS 5494)
                    Claudia Wilner (CW 1995)
                    Josh Zinner (JZ 4332)
                    176 Grand Street, Suite 300
                    New York, NY 10013
                    212-680-5100


                    MFY LEGAL SERVICES, INC.

                    By: ____/s/_____
                    Carolyn E. Coffey (CC 6741)
                    Andrew Goldberg (AG 1530)
                    Anamaria Segura (AS 4847)
                    Of Counsel to Christopher D. Lamb, Esq.
                    299 Broadway, 4th Floor
                    New York, New York 10007
                    212-417-3701

                    *Attorneys for Plaintiffs*