McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
88 Pine Street
24th Floor
New York, New York 10005
Telephone:   (212) 483-9490
Facsimile:   (212) 483-9129
Attorneys for Defendants, Leucadia National Corporation, L-Credit, LLC, LR Credit, LLC, LR
Credit 10, LLC, LR Credit 14, LLC, LR Credit 18, LLC, LR Credit 21, LLC, Joseph A. Orlando
and Phillip M. Cannella

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONIQUE SYKES; REA VEERABADREN; KELVIN PEREZ; and CLIFTON ARMOOGRAM, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MEL S. HARRIS AND ASSOCIATES, LLC; MEL S. HARRIS; MICHAEL YOUNG; DAVID WALDMAN; KERRY LUTZ; TODD FABACHER; MEL HARRIS JOHN/JANE DOES 1-20; LEUCADIA NATIONAL CORPORATION; L-CREDIT, LLC; LR CREDIT, LLC; LR CREDIT 10, LLC; LR CREDIT 14, LLC; LR CREDIT 18, LLC; LR CREDIT 21, LLC; JOSEPH A. ORLANDO; PHILIP M. CANNELLA; LR CREDIT JOHN/JANE DOES 1-20; SAMSERV, INC.; WILLIAM MLOTOK; BENJAMIN LAMB; MICHAEL MOSQUERA; JOHN ANDINO; and SAMSERV JOHN/JANE DOES 1-20, <br><br> Defendants. | Civil Action No. 09-8486 (DC) <br><br><br> **DECLARATION OF COUNSEL IN OPPOSITION TO THE MOTION BY PLAINTIFFS FOR CLASS CERTIFICATION** |

I, Lewis H. Goldfarb, hereby certify and declare under penalty of perjury pursuant to

section 1746 of Title 28 of the United States Code:

1.      I am an attorney at law of, among other jurisdictions, the State of New York, and Of Counsel of the law firm of McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys for Defendants Leucadia National Corporation, L-Credit, LLC, LR Credit, LLC, LR Credit 10, LLC, LR Credit 14, LLC, LR Credit 18, LLC, LR Credit 21, Joseph A. Orlando and Phillip M. Cannella in the matter referenced above. I am fully familiar with this matter and make this Declaration based on my personal knowledge of this litigation.

2.      I make this Declaration in opposition to the motion by Plaintiffs, Monique Sykes, Rea Veerabadren, Kelvin Perez and Clifton Armoogam (collectively, "Plaintiffs"), for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

A.      Exhibits Referenced in the Leucadia Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification

3.      Attached hereto as Exhibit "A" are true and accurate copies of public records regarding Plaintiff Sykes, as referenced on page 12, footnote 4, of the Leucadia Defendants Memorandum of Law, that I obtained from the New York State Unified Court System, WebCivil Local, e-Courts, on June 10, 2011. The first three pages, titled "Case Search Results," are documents that I obtained by searching for persons with the last name of Sykes as a defendant in Bronx County Civil Court. The third of the first three pages shows that Plaintiff Sykes was sued by The Education Resources Institute, Inc. in Bronx County Civil Court. The "Case Status," as noted on the third page, is marked "Disposed." The fifth page, titled "Appearance Detail," eveals that the case was "Discontinued."

5.      Attached hereto as Exhibit "B" is a true and accurate copy of Plaintiff Armoogam's Affidavit in Support of his motion to dismiss the complaint in *LR Credit 21, LLC v. Armoogam*. In the affidavit, Plaintiff Armoogam claims identity theft. The documents were produced by Plaintiffs under Bates stamp F001057-59.

B.      Unpublished Decisions Referenced in the Leucadia Defendants' Memorandum of Law in
        Opposition to Plaintiffs' Motion for Class Certification

        6.      Attached hereto as Exhibit "C" is a true and accurate copy of *Burley v. City of
N.Y.*, 2005 WL 668789 (S.D.N.Y. Mar. 23, 2005), to which the Leucadia Defendants cite on
page 7 of their Memorandum of Law.

        7.      Attached hereto as Exhibit "D" is a true and accurate copy of *Hovespain v. Apple,
Inc.*, 2009 WL 5069144 (N.D. Cal. Dec. 17, 2009), to which the Leucadia Defendants cite on
page 15 of their Memorandum of Law.

        8.      Attached hereto as Exhibit "E" is a true and accurate copy of *Villari v.
Performance Capital Mgmt.*, 1998 WL 414932 (S.D.N.Y. July 22, 1998), to which the Leucadia
Defendants cite on page 15 of their Memorandum of Law.

        9.      Attached hereto as Exhibit "F" is a true and accurate copy of *JPMorgan Chase &
Co. Shareholder Derivative Litig.*, 2008 WL 4298588 (S.D.N.Y. Sept. 19, 2008), to which the
Leucadia Defendants cite on page 17 of their Memorandum of Law.

        10.     Attached hereto as Exhibit "G" is a true and accurate copy of *CE Design Ltd. v.
King Architectural Metals, Inc.*, 2011 WL 938900 (7th Cir. Mar. 18, 2011), to which the
Leucadia Defendants cite on page 18 of their Memorandum of Law.

        11.     Attached hereto as Exhibit "H" is a true and accurate copy of *Coyle v. Hornell
Brewing Co.*, 2011 WL 2147218 (D.N.J. May 26, 2011), to which the Leucadia Defendants cite
on pages 18 of their Memorandum of Law.

        12.     Attached hereto as Exhibit "I" is a true and accurate copy of *Lightfoot v. District of
Columbia*, 2011 WL 63904 (D.D.C. Jan. 10, 2011), to which the Leucadia Defendants cite on
pages 21-23 of their Memorandum of Law.

13.    Attached hereto as Exhibit "I" is a true and accurate copy of *Agostino v. Quest Diagnostics, Inc.*, 2010 WL 5392688 (D.N.J. Dec. 22, 2010), to which the Leucadia Defendants cite on page 25 of their Memorandum of Law.

I hereby certify and declare under penalty and perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.  I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

Dated: June 13, 2011            By:      /s/ LEWIS H. GOLDFARB
                                          LEWIS H. GOLDFARB

# EXHIBIT A





## WebCivil Local - Case Search Results

29 Case(s) Match Your Search.  **Page 1 of 2 pages**

[First Page] [Next Page] [Previous Page] [Last Page] Select Records Range: [　　] [New Search]
[Edit Search]

Please scroll down to see more cases.

| | Court | Index Number | Case Status | Plaintiff | Plaintiff Firm | Defendant | Defendant Firm | Appearance Date | Judge/Part |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Bronx County Civil Court | TS-040131-99/BX | Disposed | GURMEET KAUR | | JASBIR SINGH | | | |
| 2 | Bronx County Civil Court | CV-048440-00/BX | Disposed | GENERAL ELECTRIC CAPITAL CORP | | SIMONE SYKES | | | |
| 3 | Bronx County Civil Court | CV-053587-01/BX | Active - Pending Further Review | ERIN SVCS CO, LLC | Eltman Eltman & Cooper PC | DONELY SYKES | | 10/30/2001 | [31] |
| 4 | Bronx County Civil Court | CV-058445-01/BX | Disposed | SEARS, ROEBUCK & CO | Sharinn & Lipshie PC | WILLIAM SYKES | | | |
| 5 | Bronx County Civil Court | CV-087413-03/BX | Disposed | UNIFUND CCR PARTNERS | ERIC STREICH ESQ | WILLIAM A SYKES | | | |
| 6 | Bronx County Civil Court | CV-099567-03/BX | Disposed | RAB PERFORMANCE RECOVERIES LLC | | WILLIAM A. SYKES | | | |
| 7 | Bronx County Civil Court | CV-030953-04/BX | Disposed | NEW CENTURY FINANCIAL SERVICES INC | MEL S. HARRIS ESQ. | WILLIAM A SYKES | | | |
| 8 | Bronx County Civil Court | CV-039293-04/BX | Disposed | PRA III, LLC | Malen & Associates PC | LORI SYKES | | | |
| 9 | Bronx County Civil Court | CV-044221-04/BX | Active - Pending Further Review | JAMES SAXBY | | ANN SYKES | | 02/02/2006 | Part 12 - Inquest |
| 10 | Bronx County Civil Court | CV-055754-04/BX | Disposed | ERIN SERVICES CO., LLC | Eltman Eltman & Cooper PC | DONELY SYKES | | | |
| 11 | Bronx County Civil Court | CV-029790-05/BX | Disposed | RUSHMORE RECOVERIES X, LLC | MEL S. HARRIS ESQ. | CYLETHIA SYKES | | | |
| 12 | Bronx | CV-071531-05/BX | Active | ERIN CAPITAL | Eltman Eltman | CYLETHIA | | | |

| | Court | Index Number | Status | Plaintiff | Attorney | Defendant | | Date | Notes | |
|---|---|---|---|---|---|---|---|---|---|---|
| | County Civil Court | | | MANAGEMENT, LLC | & Cooper PC | SYKES | | | | |
| 13 | Bronx County Civil Court | CV-006584-06/BX | Disposed | MRC RECEIVABLES CORP. | RUBIN & ROTHMAN | WILLIAM SYKES | | | | |
| 14 | Bronx County Civil Court | CV-006586-06/BX | Disposed | MRC RECEIVABLES CORP. | RUBIN & ROTHMAN | WILLIAM SYKES | | | | |
| 15 | Bronx County Civil Court | CV-037984-06/BX | Disposed | PALISADES COLLECTION, L.L.C. | PRESSLER & PRESSLER | TERRENCE SYKES | | | | |
| 16 | Bronx County Civil Court | CV-026864-06/BX | Disposed | KMT ENTERPRISES, INC. | KIRSCHENBAUM & PHILLIPS, P.C. | WILLIAM SYKES SR | | | | |
| 17 | Bronx County Civil Court | CV-090280-06/BX | Active | FORD MOTOR CREDIT COMPANY | RUBIN & ROTHMAN | QUANDA SYKES | | | | |
| 18 | Bronx County Civil Court | CV-051249-07/BX | Post Disposition | NY FINANCIAL SERVICES,LLC | MULLOOLY, JEFFREY, ROONEY & FL | MONIQUE SYKES | | 08/26/2008 | Honorable Elizabeth A. Taylor Part 34 - Procedural Motions - Self Represented Litigant | M |
| 19 | Bronx County Civil Court | CV-073027-07/BX | Disposed | MIDLAND FUNDING LLC | Cohen & Slamowitz, LLP | JOSEPH SYKES | | | | |
| 20 | Bronx County Civil Court | CV-086689-07/BX | Disposed | LR Credit 14, LLC | Mel S. Harris & Associates LLC | NICOLE SYKES | | | | |
| 21 | Bronx County Civil Court | CV-005464-08/BX | Disposed | CAPITAL ONE BANK | Rubin & Rothman LLC | TYIFSHA R SYKES | | 04/23/2008 | Honorable Francis M. Alessandro Part 11 - Self Represented Non-Jury | |
| 22 | Bronx County Civil Court | CV-055929-08/BX | Post Disposition | LR CREDIT 18, LLC | Mel S. Harris & Associates LLC | MONIQUE S SYKES | | 07/31/2008 | Honorable Fernando Tapia Part 34 - Procedural Motions - Self Represented Litigant | M |
| 23 | Bronx County Civil Court | CV-056837-08/BX | Disposed | NY FINANCIAL SERVICES, LLC | Mullooly, Jeffrey, Rooney & Flynn, LLP | WILLIA SYKES | | | | |
| 24 | Bronx County Civil Court | CV-061043-08/BX | Disposed | CAPITAL ONE BANK (USA), N.A | Maior & Associates PC | NICOLE SYKES | | | | |
| 25 | Bronx County Civil Court | CV-065252-08/BX | Disposed | CAPITAL ONE BANK (USA) , N.A. | Maior & Associates PC | WILLIA SYKES | | | | |

[First Page]  [Next Page]  [Previous Page]  [Last Page]  Select Records Range: [___] ▼  [New Search]
[Edit Search]



# New York State Unified Court System



## *WebCivil Local – Case Search Results*

29 Case(s) Match Your Search.  **Page 2 of 2 pages**

[First Page] [Next Page] [Previous Page] [Last Page]  Select Records Range: [ ___ ] [New Search] [Edit Search]

Please scroll down to see more cases.

| | Court | Index Number | Case Status | Plaintiff | Plaintiff Firm | Defendant | Defendant Firm | Appearance Date | Judge/Part |
|---|---|---|---|---|---|---|---|---|---|
| 26 | Bronx County Civil Court | CV-020229-09/BX | Disposed | THE EDUCATION RESOURCES INSTITUTE, INC. | Goldman Warshaw & Parcha PC | MONIQUE SYKES | | 06/19/2009 | Honorable Nelida Malave-Gonzalez Part 11 - Self Represented Non-Jury |
| 27 | Bronx County Civil Court | CV-046562-10/BX | Disposed | CAPITAL ONE BANK (USA), N.A. | Rubin & Rothman LLC | DAMON D SYKES | | | |
| 28 | Bronx County Civil Court | CV-065650-10/BX | Post Disposition | FIFTH AVENUE SURGERY CENTER | Angell and Blitzer | ARLENE SYKES | | 10/18/2010 | Honorable Jose M A. Padilla Part 34 - Procedural Motions - Self Represented Litigant |
| 29 | Bronx County Civil Court | CV-033920-11/BX | Active | National Collegiate Student Loan Trust 2004-2 | Forster & Garbus LLP | Monique Sykes | | 06/27/2011 | Part 11C - Non-Jury - Self-Represented - Consumer Debt |

[First Page] [Next Page] [Previous Page] [Last Page]  Select Records Range: [ ___ ] [New Search] [Edit Search]





*WebCivil Local - Case Detail*

Court: **Bronx County Civil Court**
Index Number: **CV-005464-08/BX**
Case Name: **CAPITAL ONE BANK vs. SYKES, TYIESHA R**
Case Type: **Civil**
Classification: **Consumer Credit**
Filing Date: **01/23/2008**
Disposition Date: **10/06/2008**
Calendar Number:
Jury Demand: **No**
Judge Name:

Attorney/Firm(s) For Plaintiff - CAPITAL ONE BANK:

**Rubin & Rothman LLC**                        Attorney Type: **Firm**
**1787 Veterans Highway Suite 32**
**P.O.Box 9003**
**Islandia, New York  11749-**
**(631) 234-1500 ext:**

Attorney/Firm(s) For Defendant - TYIESHA R SYKES:
**Self-Represented Litigant**

Close | Show All Appearances | Add to eTrack





## WebCivil Local - Appearance Detail

Court: **Bronx County Civil Court**
Index Number: **CV-005464-08/BX**
Case Name: **CAPITAL ONE BANK vs. SYKES, TYIESHA R**
Case Type: **Civil**

**Appearance Information:**

| Appearance Date | Time | Purpose | Appearance Outcome | Judge / Part | Motion Seq |
|---|---|---|---|---|---|
| 04/23/2008 | 10:30 AM | Conference: Pretrial | Settled | Honorable Francis M. Alexandro Part 11 - Self Represented Non-Jury | |
| 03/11/2008 | 10:30 AM | Conference: Pretrial | Adjourned | Clerk's Office Part 11 - Self Represented Non-Jury | |

Close

EXHIBIT B

COPY

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF QUEENS

_____

LR CREDIT 21, LLC

                                           *Plaintiff*

            *against*

CLIFTON D. ARMOOGAM

                                           *Defendant*

_____

Index No. 65383/10

**NOTICE OF MOTION**

On Trial Calendar for 5/2/11
S-11-QU-009712

PLEASE TAKE NOTICE that upon the affidavit of Clifton D. Armoogam, dated April 4, 2011, the affirmation of Claudia Wilner, dated April 12, 2011, the exhibits thereto, and upon all the proceedings had in this action, a motion will be made to this Court, located at 89-17 Sutphin Boulevard, Jamaica, NY 11435, Part 32C, Room 102, on the 4th day of May, 2011, at 9:30 a.m. or as soon thereafter as counsel may be heard, for an Order pursuant to CPLR 3211(a)(8) dismissing the Complaint on the grounds of lack of personal jurisdiction, and granting attorney's fees, costs, disbursements, and such other and further relief as this Court deems just and proper.

The above-entitled action arises out of an alleged consumer credit transaction.

Pursuant to CPLR 2214(b), answering papers, if any, shall be served at least seven (7) days in advance of the motion date.

Dated: April 12, 2011
New York, NY

                                    _____
                                    Claudia Wilner, Esq.
                                    NEIGHBORHOOD ECONOMIC
                                    DEVELOPMENT ADVOCACY PROJECT
                                    (NEDAP)
                                    Attorneys for Defendant
                                    176 Grand Street, Suite 300
                                    New York, NY 10013
                                    212-680-5100

To:
Mel S. Harris and Associates LLC
Attorneys for Plaintiff
5 Hanover Square, 8th floor
New York, NY 10004
212-571-4900

PAPERS RECEIVED
SPECIAL TERM

1

P001051

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF QUEENS

---

LR CREDIT 21, LLC

                          *Plaintiff*

   *against*

CLIFTON D. ARMOOGAM

                        *Defendant*

Index No. 65383/10

**AFFIRMATION IN SUPPORT**

---

      CLAUDIA WILNER, an attorney duly licensed to practice law in the Courts of the State of New York, hereby affirms the following facts under penalty of perjury, except as to those matters stated upon information and belief. As to those matters, I believe them to be true based upon information provided to me by my client and a review of the files maintained within my office.

      1.      I am Senior Staff Attorney with the Neighborhood Economic Development Advocacy Project (NEDAP), 176 Grand Street, Suite 300, New York, NY, 10013, attorneys for defendant Clifton D. Armoogam herein, and as such I am fully familiar with all the facts and circumstances of this case.

      2.      I make this affirmation in support of Mr. Armoogam's motion for an order dismissing the Complaint on the grounds of lack of personal jurisdiction, and granting attorney's fees, costs, disbursements, and such other and further relief as this Court deems just and proper.

### Factual Background

      3.      Plaintiff commenced this action on May 27, 2010. A copy of the Summons and Complaint is attached hereto as **Exhibit D**. Plaintiff obtained a default judgment in the amount of $6,264.88 on September 15, 2010. A copy of the judgment is attached hereto as **Exhibit E**.

1

P001052

4.    Mr. Armoogam then filed a *pro se* Order to Show Cause, returnable March 24, 2011, to vacate the default judgment. Prior to his court date, he retained NEDAP to represent him in this lawsuit. On March 24, 2011, the Court granted Mr. Armoogam's Order to Show Cause, vacating the default judgment and deeming his Proposed Answer filed. A copy of the Court's Decision/Order is attached hereto as **Exhibit F**.

5.    Mr. Armoogam has sworn that his first notice of this lawsuit was in or around February or March 2011, when he learned that his sister had received a Marshal's Notice of Execution addressed to him at her address, where Mr. Armoogam has never lived.

6.    Mr. Armoogam has also sworn that he was never served in accordance with the claims in the Affidavit of Service; that he has never lived at the address at which the process server, Michael Mosquera, allegedly served process; and that he does not know anyone named "Shanice," the alleged person to whom the process server gave the papers. A copy of the Affidavit of Service is attached hereto as **Exhibit G**.

7.    Upon information and belief, the process server, Michael Mosquera, did not, in fact, properly serve Mr. Armoogam with a Summons and Complaint in this case, and his Affidavit of Service contains false statements.

8.    The New York City Department of Consumer Affairs, which licenses process servers who serve process in New York City, recently denied Michael Mosquera's application to renew his process server license on the basis that he "lack[s] the integrity, honesty, and fair dealing required of Department licensees," and consequently Mr. Mosquera is no longer authorized to serve process in New York City. A copy of the letter from the New York City Department of Consumer Affairs denying Mr. Mosquera's license renewal application is attached hereto as **Exhibit H**.

P001053

9.      In addition to his personal jurisdiction defense, Mr. Armoogam has numerous
meritorious defenses, including that he has never had any credit cards, let alone the Chase credit
card alleged in this lawsuit; has never had a business relationship with Plaintiff; disputes that he
owes the alleged debt; and believes that the alleged debt is the result of identity theft.

## Legal Argument

10.      Mr. Armoogam did not receive notice of this lawsuit by any statutorily authorized
means. This Court therefore lacks personal jurisdiction over Mr. Armoogam and should dismiss
the complaint pursuant to CPLR 3211(a)(8).

11.      Plaintiff's Affidavit of Service alleges substitute service pursuant to CPLR §
308(2). This provision requires that service of process be made "by delivering the summons
within the state to a person of suitable age and discretion *at the actual place of business, dwelling
place or usual place of abode of the person to be served* and by either mailing the summons to
the person to be served at his or her last known residence or by mailing the summons by first
class mail to the person to be served at his or her actual place of business in an envelope bearing
the legend 'personal and confidential'…" (emphasis added).

12.      In this case, Plaintiff's process server claims to have served Mr. Armoogam at an
address at which Mr. Armoogam has never resided.

13.      Plaintiff's process server, Michael Mosquera, claims to have delivered a copy of
the Summons and Complaint to a "MS. SHANICE" at 10455 108th St., South Richmond Hill,
NY 11419 and then to have mailed another copy to this same address. The process server
describes "MS. SHANICE" as a female with brown hair and brown skin, 14-20 years old, 5'0"-
5'3" tall, and weighing 100 to 130 lbs. See, Exhibit G.

3

P001054

14.     However, Mr. Armoogam has sworn that 1) he was never served with the Summons and Complaint; 2) he has never lived at this address, and that instead this is his sister's address; 3) he knows no one named "Shanice"; 4) his sister's name is not "Shanice" and she does not live with anyone named "Shanice"; 5) neither his sister nor anyone she lives with fits the description in the Affidavit of Service; and 6) he first learned of this lawsuit only when his sister received a Marshal's Notice of Execution in the mail addressed to him at her address, where he has never lived.  He has also submitted with this motion documents showing his residence at a different address at the time of the alleged service.

15.     An affidavit of service does not constitute prima facie evidence of personal jurisdiction when there is "a detailed and specific contradiction of the allegations in the process server's affidavit." Bankers Trust Co. of California, N.A. v. Tsoukas, 303 A.D.2d 343, 344, 756 N.Y.S. 2d 92 (2d Dept. 2003).  Sworn, non-conclusory denials of specific assertions in an affidavit of service are sufficient to overcome any presumption of proper service.  OCI Mortg. Corp. v. Omar, 232 A.D.2d 462, 648 N.Y.S.2d 175 (2d Dept. 1996).

16.     Mr. Armoogam has adduced facts which squarely contradict the process server's claims and call the veracity of Plaintiff's Affidavit of Service into question. Friedman v. Ramlal, 282 A.D.2d 499, 722 N.Y.S.2d 882 (2d Dept. 2001); Kaneris v. Mantikas, 271 A.D. 2d 652, 706 N.Y.S.2d 719 (2d Dept. 2000).  Thus, the Affidavit of Service is neither prima facie evidence of personal jurisdiction nor presumptive of proper service.  See, OCI Mortg. Corp., 232 A.D.2d 462.

17.     Moreover, the New York City Department of Consumer Affairs recently denied Michael Mosquera's application to renew his process server license on the basis that he "lack[s]

P001055

the integrity, honesty, and fair dealing required of Department licensees," which further calls the veracity of Plaintiff's Affidavit of Service into question. See, Exhibit H.

18.    The Court should dismiss the Complaint because Plaintiff failed to serve Mr. Armoogam in a manner authorized by CPLR § 308. Feinstein, 48 N.Y.2d 234 (affirming dismissal for lack of personal jurisdiction because of a defect in service); Ben-Amram v. Hershowitz, 14 A.D.3d 638, 789 N.Y.S.2d 313 (2d Dept. 2005) (complaint should have been dismissed where any purported service pursuant to CPLR § 308 was ineffective); Mayers v. Cadman Towers, 89 A.D.2d 844, 453 N.Y.S.2d 25 (2d Dept. 1982) (where a court has not acquired personal jurisdiction over the defendant, it is without authority to take any action other than to dismiss the complaint). If the Court does not dismiss the Complaint outright, Mr. Armoogam's sworn denials of specific facts alleged in the Affidavit of Service require a traverse hearing. See, Elliott v. Butler, 8 N.Y.3d 972, 836 N.Y.S.2d 544 (N.Y. 2007) (parties' submissions on the motion to dismiss raised issues of fact requiring a traverse hearing); Kopman v. Blue Ridge Ins. Co., 296 A.D.2d 479, 745 N.Y.S.2d 472 (2d Dept. 2002) (ordering a hearing when the defendant swore that there were discrepancies between the physical characteristics of his co-habitant and the description of the person allegedly served with process).

19.    Mr. Armoogam has not previously requested the relief sought herein.

WHEREFORE, we respectfully request, on behalf of Defendant, that the Court dismiss the Complaint; lift any and all restraints and executions; and grant attorney's fees, costs, disbursements, and such other and further relief as this Court deems just and proper.

Dated: April 12, 2011
       New York, NY

CLAUDIA WILNER

5

P001056

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF QUEENS
_____

LR CREDIT 21, LLC                                          Index No. 65383/10

                                          *Plaintiff*

          *against*                                        **AFFIDAVIT IN SUPPORT**

CLIFTON D. ARMOOGAM
                                          *Defendant*
_____

STATE OF NEW YORK    )
                     )  ss.:
COUNTY OF NEW YORK   )


          CLIFTON D. ARMOOGAM, being duly sworn, deposes and says:

          1.      I am the defendant in this lawsuit. I reside at 116-17 127th Street, South Ozone

Park, NY 11420, though I will soon be moving to 115-37 120th Street, South Ozone Park, NY

11420.

          2.      I submit this affidavit in support of my motion for an order dismissing the

Complaint on the grounds of lack of personal jurisdiction, and granting attorney's fees, costs,

disbursements, and such other and further relief as this Court deems just and proper.

          3.      I was never served with the Summons and Complaint or the Judgment in this

lawsuit.

          4.      Instead, my first notice of this lawsuit was in or around early March 2011, when

my sister called and said she had received some mail for me at her address. This turned out to be

a Marshal's Notice of Execution against my personal property. A copy is attached hereto as

**Exhibit A.**

          5.      I then filed a *pro se* Order to Show Cause to vacate the default judgment. A copy

of my Order to Show Cause is attached hereto as **Exhibit B.** In March 2011, prior to my court

<center>1</center>

P001057

date of March 24, 2011, I retained NEDAP to represent me in this lawsuit. I understand that the Court granted my Order to Show Cause and vacated the judgment.

6. I understand that Plaintiff's process server, Michael Mosquera, claims that on Monday, June 14, 2010, at 8:26 a.m., he gave a copy of the Summons and Complaint to a "MS. SHANICE" at 10455 108th St., South Richmond Hill, NY 11419, and that "MS. SHANICE" was a female with brown hair and brown skin, 14-20 years old, 5'0" to 5'3" tall, and weighing 100 to 130 lbs.

7. However, I have never lived at 10455 108th St., South Richmond Hill, NY 11419. Instead, this is my sister's address. Also, I do not know anyone named "Shanice." My sister's name is not "Shanice" and she does not live with anyone named "Shanice." Also, neither my sister nor anyone she lives with fits the description given by the process server. My sister also would not have been home at 8:26 a.m. on a Monday, because she would have already left for work by then.

8. The process server also claims that he mailed a copy of the Summons and Complaint to 10455 108th St., South Richmond Hill, NY 11419 on June 21, 2010, but again, I was not living and have never lived at this address. Also, my sister never received this in the mail. If she had, she would have told me, just as she told me about the mail that turned out to be a Marshal's Notice of Execution.

9. In June 2010, at the time of the alleged service, I was living at a different address, 116-17 127th Street, South Ozone Park, NY 11420. I have lived at this address since March 2007. I have attached hereto as **Exhibit C** a copy of a letter dated January 8, 2010 from my former landlord, and a letter dated March 30, 2011 from TransUnion, confirming my residence at this address.

P001058

10.   Besides my personal jurisdiction defense, I have numerous meritorious defenses. I understand that Plaintiff claims that I owe money on a Chase credit card, but I have never had any credit cards, let alone a Chase credit card. I have never had a business relationship with Plaintiff. I dispute that I owe the alleged debt. I believe that the alleged debt is the result of identity theft.

11.   I have not previously requested the relief sought herein.


WHEREFORE, I respectfully request that the Court dismiss the Complaint, and grant attorney's fees, costs, disbursements, and such other and further relief as this Court deems just and proper.

CLIFTON D. ARMOOGAM

Sworn to before me on the
4th day of April, 2011

NOTARY PUBLIC

SUSAN SHIN
Notary Public, State of New York
No. 02SH6170241
Qualified in New York County
Commission Expires: July 2, 2011

3

P001059

# Exhibit C

Westlaw.

Not Reported in F.Supp.2d, 2005 WL 668789 (S.D.N.Y.)
(Cite as: 2005 WL 668789 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court.
S.D. New York.
Erica BURLEY, et al., Plaintiffs,
v.
THE CITY OF NEW YORK, et al., Defendants.

No. 03 Civ.735(WHP).
March 23, 2005.

Jonathan C. Moore, New York, New York, for Plaintiffs.

Christine C. Burgess, Office of Corporation Counsel, New York, New York, for Defendants.

*MEMORANDUM AND ORDER*
PAULEY, J.

*1 This putative class action concerns the arrest of demonstrators during the 2002 World Economic Forum ("WEF") in New York City. Plaintiffs assert federal civil rights claims for violations of their First, Fourth and Fourteenth Amendment rights. Plaintiffs also assert pendent state law claims pursuant to 28 U.S.C. § 1367. Plaintiffs move to certify two proposed classes pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. The proposed classes consist of: (1) WEF demonstrators arrested for minor offenses who were eligible for desk appearance tickets ("DATs") but were detained for significant periods of time for arraignment (the "DAT Class"); and (2) demonstrators arrested for petty offenses who were subjected to excessive handcuffing (the "Handcuff Class"). For the following reasons, plaintiffs' motion is granted in part and denied in part.

*BACKGROUND*
In the wake of the September 11th terrorist attacks, the WEF selected New York City for its 2002 annual gathering of world leaders and corporate executives. (Declaration of Christine C. Burgess, dated Jul. 27, 2004 ("Burgess Decl.") Ex. A: Deposition of New York City Police Inspector Thomas Graham, dated Jan. 30, 2003, at 11-12; Ex D: Barry, Dan, "Forum in New York: Protests; A Little Violence and

Lots of Police Equal 150 Arrests," *N.Y. Times*, Feb. 4, 2004.) In late January 2002, demonstrators from various protest groups converged on Manhattan for the WEF. (Burgess Decl. Ex. D; Ex. E: Police Report Concerning WEF Arrests.)

Plaintiffs were arrested during two different incidents on February 3, 2002: an animal rights march that ended with arrests at Third Avenue and Sixtieth Street and a "snake march" that ended with arrests in the vicinity of Second Avenue and Fourteenth Street. They were charged with disorderly conduct, unlawful assembly and parading without a permit, and transported to the Brooklyn Naval Yard or 120 Schermerhorn Street in Brooklyn for processing. (Affirmation of Jonathan C. Moore, dated June 11, 2004 ("Moore Aff.") Exs. 1-2: arrest records; Burgess Decl. Ex. E; First Amended Complaint ("Complaint" or "Compl.") ¶¶ 97, 99.)

According to the Complaint, plaintiffs were held in custody for over twenty-four hours, and some were detained for as long as sixty hours. (Compl.¶ 101.) Plaintiffs maintain, however, that they should have been released within a few hours pursuant to the New York City Police Department's DAT policy. (Compl.¶¶ 81, 85.) Under that policy, persons arrested on minor charges who are carrying proper identification and have no outstanding arrest warrants are eligible to receive a DAT. (Compl.¶ 81.) People who receive DATs typically spend only a few hours in custody, and are required to appear in court at a later date. (Compl.¶ 81.) By contrast, arrestees held for arraignment are typically detained for at least twenty-four hours. (Compl.¶¶ 81, 83.)

Plaintiffs maintain that they were not considered for DATs because a Departmental policy prohibited their issuance "for any offense committed at or in connection with a demonstration or similar event at which more than twenty people are participating. All persons arrested at such events must be processed on line [i.e., detained for arraignment]." (Compl.¶ 87.) According to the Complaint, the policy was directed at individuals arrested during political demonstrations. (Compl.¶¶ 81, 83.) Therefore, plaintiffs assert that they were singled out because they participated in a political protest. (Compl.¶ 100.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 668789 (S.D.N.Y.)
**(Cite as: 2005 WL 668789 (S.D.N.Y.))**

*2 Plaintiffs also allege that they were hand-cuffed with plastic manacles behind their backs, which "result[s] in tighter cuffing and as a result more physical pain to the person cuffed." (Compl.¶ 105.) Plaintiffs further allege that they remained handcuffed even after they were confined to cells, with many arrestees handcuffed for ten hours or more. (Compl.¶ 105.) They assert that the excessive handcuffing was part of a policy or practice that penalized political demonstrators. (Compl.¶ 72, 76.)

### DISCUSSION

#### I. Class Certification Standard

Rule 23 of the Federal Rules of Civil Procedure governs class actions. *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 18 (2d Cir.2003); *accord Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 162 (S.D.N.Y.2003). The Supreme Court has instructed that district courts are to conduct a "rigorous analysis" to ascertain whether the requirements of Rule 23 have been satisfied. *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982); *accord Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir.1999). Although Rule 23 must be liberally construed, *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir.1997), the party seeking to certify a class bears the burden of establishing the prerequisites of Rule 23. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Caridad*, 191 F.3d at 291.

There are two prerequisites for a class action. *See* Fed.R.Civ.P. 23. First, the party seeking class certification must demonstrate that the proposed class meets the four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132-33 (2d Cir.2001); *Caridad*, 191 F.3d at 291; *Benner*, 214 F.R.D. at 162. Second, the party seeking class certification must show that the proposed class action falls within one of the types maintainable under Rule 23(b) because: (1) prosecution of separate actions by individual parties would create a risk of either inconsistent adjudications or would be dispositive of the interest of those members not parties to the

adjudication; (2) defendants have acted or refused to act on grounds generally applicable to the class; or (3) questions of law or fact common to members of the class predominate, and a class action is superior to other available methods for adjudication. Fed.R.Civ.P. 23(b); *Visa*, 280 F.3d at 133; *Caridad*, 191 F.3d at 292; *Benner*, 214 F.R.D. at 163.

In considering a motion for class certification, courts must accept the allegations in the complaint as true. *See Shelter Realty Corp. v. Allied Maint. Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir.1978) ("[I]t is proper to accept the complaint allegations as true in a class certification motion."); *accord Benner*, 214 F.R.D. at 163. A court may not examine the merits of the case in a motion for class certification. *Visa*, 280 F.3d at 133 (citing *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177 (1974)); *Caridad*, 191 F.3d at 291. However, a court may consider material outside the pleadings in determining whether class certification is appropriate. *Fox v. Cheminova, Inc.*, 213 F.R.D. 113, 121-22 (E.D.N.Y.2003); *Kaczmarek v. Int'l Bus. Mach. Corp.*, 186 F.R.D. 307, 311 (S.D.N.Y.1999) (citing *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir.1982)). But, notwithstanding a court's ability to look beyond the pleadings, its resolution of a class certification motion may not become "a preliminary inquiry into the merits of the action." *Eisen*, 417 U.S. at 177. "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen*, 417 U.S. at 178 (internal quotations omitted).

#### II. The DAT Class: Rule 23(a) Requirements

##### 1. Numerosity

*3 Plaintiffs bear the burden of showing that the proposed class is so numerous that joinder of all members is impracticable. *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993). Impracticable does not mean impossible but, rather, merely inconvenient or difficult. *See Robidoux*, 987 F.2d at 935; *Reynolds v. Giuliani*, 118 F.Supp.2d 352, 388 (S.D.N.Y.2000). Additionally, plaintiffs do not need to provide a precise number of putative class members. *See Robidoux*, 987 F.2d at 935; *Pecere v. Empire Blue Cross and Blue Shield*, 194 F.R.D. 66, 69 (E.D.N.Y.2000) (noting that plaintiffs need not pro-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 668789 (S.D.N.Y.)
**(Cite as: 2005 WL 668789 (S.D.N.Y.))**

vide "a precise quantification of their class," and may "make common sense assumptions" to support a finding of numerosity); *In re Laser Arms Corp. Sec. Litig.*, 794 F.Supp. 475, 494 (S.D.N.Y.1989) ("Since the numerosity requirement speaks in terms of impracticability rather than impossibility, plaintiffs need not enumerate the precise number of potential plaintiffs in the class when reasonable estimates will suffice.").

Here, the DAT Class allegedly consists of more than 200 demonstrators arrested during the WEF and detained for significant periods of time despite being eligible for DATs. On its face, the proposed DAT Class satisfies the numerosity requirement because, in this Circuit, a class of forty or more persons is presumptively sufficient. *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995); *see also Korn v. Franchard Corp.*, 456 F.2d 1206 (2d Cir.1972) (70 class members sufficient); *Mathis v. Bess*, 138 F.R.D. 390, 393 (S.D.N.Y.1991) ("Plaintiffs' identification of at least 120 putative class members demonstrates that the proposed class is so numerous that joinder of all plaintiffs in a single action would be impractical.").

Relying on *University Calvary Church v. City of New York*, 177 F.R.D. 181 (S.D.N.Y.1998), defendants argue that the proposed DAT Class is not so numerous that joinder is impracticable. The court in *Calvary Church* held that a class of 217 persons was not so numerous as to render joinder impracticable because all members of the proposed class could be readily identified. *See Calvary Church*, 177 F.R.D. at 183. Here, in contrast, many of the potential class members are not readily identifiable because defendants redacted their names from police records during discovery. (*See* Burgess Decl. Ex. G.) Thus, *Calvary Church* is inapposite. Because the proposed DAT Class exceeds the Second Circuit's forty-person threshold and the identities of many potential class members cannot easily be ascertained, this Court finds that the DAT Class satisfies the numerosity requirement.

*2. Commonality and Typicality*

Although enumerated as separate thresholds, "[t]he commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Marisol A.*, 126 F.3d at 376. These requirements en-

sure that "maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Marisol A.*, 126 F.3d at 376 (quoting *Falcon*, 457 U.S. at 157 n. 13).

*\*4* The commonality test is satisfied if the plaintiffs' claims share a common question of law or fact. *See Marisol A.*, 126 F.3d at 376. The "typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability ... irrespective of minor variations in the fact patterns underlying the individual claims." *Robidoux*, 987 F.2d at 936-37. Commonality does not require that each class member have identical claims, only that at least one common question of fact or law exists. *See In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 562 (S.D.N.Y.2004). Minor factual variations in the class claims do not necessarily preclude a finding of commonality. *See Robidoux*, 987 F.2d at 937; *Currency Conversion*, 224 F.R.D. at 562.

Here, plaintiffs allege several questions of law and fact common to all members of the putative DAT Class, namely: (1) whether the City had a policy or practice of denying DATs to political protestors; and (2) if defendants had such a policy or practice, whether it violated plaintiffs' First, Fourth and Fourteenth Amendment rights. (Compl.¶¶ 69, 81, 83, 87.) Additionally, these policy and practice claims arise from a single set of operative facts: the arrests of demonstrators during the WEF in New York City between January 31 and February 4, 2002. (Compl.¶ 69.) Those allegations weigh in favor of finding commonality and typicality. *See Daniels v. City of New York*, 198 F.R.D. 409, 418 (S.D.N.Y.2001) (stating that because "the injuries complained of by the named plaintiffs allegedly resulted from the same unconstitutional practice or policy that allegedly injured or will injure the proposed class members ... the commonality requirement is satisfied."); *see also Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir.1994) ("[C]lases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement.").

Citing police intake logs, defendants maintain

Not Reported in F.Supp.2d, 2005 WL 668789 (S.D.N.Y.)
**(Cite as: 2005 WL 668789 (S.D.N.Y.))**

that plaintiffs and potential class members were considered for DATs and in some cases received them. (Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("Defs.Mem.") at 18; Burgess Decl. Ex. G: intake logs.) However, plaintiffs only seek to certify a class of arrestees who were not considered for DATs, not a class of all persons arrested during the WEF. (Hearing Transcript, dated Oct. 1, 2004 ("Tr.") at 6-7.) Moreover, it is well settled that minor factual variations in the claims of individual plaintiffs do not undermine the commonality and typicality requirements. *See Robidoux,* 987 F.2d at 937; *Currency Conversion,* 224 F.R.D. at 562.

Defendants also contend that the named plaintiffs' claims are not typical of the potential class members' claims because the arrests took place at different times and arrestees were processed at two different facilities. (Defs. Mem. at 24-25.) That argument is without merit. Plaintiffs claim that "their injuries derive from a unitary course of conduct by a single system," namely, application of the alleged DAT policy to individuals who engaged in political protests during the WEF. *See Daniels,* 198 F.R.D. at 418 (stating that commonality is met "if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members.") (internal quotations omitted); *see Baby Neal,* 43 F.3d at 56 (same for typicality).

*5 Finally, defendants maintain that plaintiffs cannot prove that the alleged DAT policy concerning political protestors existed. Whether plaintiffs will be able to carry their burden of demonstrating the existence of an unlawful policy or practice is a merits question that is beyond the scope of plaintiffs' motion for class certification. *See Eisen,* 417 U.S. at 177; *Visa,* 280 F.3d at 133.

Because the Complaint alleges questions of law and fact common to all members of the proposed DAT Class, which arise from the same course of events, this Court finds that plaintiffs' allegations satisfy the commonality and typicality requirements.

*3. Adequacy of Representation*
The adequacy requirement entails a two-part inquiry. Plaintiffs must show that: (1) "class counsel is qualified, experienced, and generally able to conduct

the litigation," *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 290 (2d Cir.1992); and (2) the interests of the named plaintiffs are not antagonistic to those of the class members. *See Amchem Prods.,* 521 U.S. at 625-26; *In re Drexel Burnham,* 960 F.2d at 290; *Hirschfeld v. Stone,* 193 F.R.D. 175, 183 (S.D.N.Y.2000).

The parties do not dispute the competence of plaintiffs' counsel. As to the second element, the named plaintiffs contend they are adequate representatives because they were subjected to the same unconstitutional DAT policy or practice as potential class members. (Plaintiffs' Memorandum of Law in Support of Motion for Class certification ("Pls.Mem.") at 19.) Where the named plaintiffs and class members were allegedly subject to the same unlawful conduct, the named plaintiffs would adequately represent the class. *See Hirschfield,* 193 F.R.D. at 183.

Defendants counter that the named plaintiffs' interests are necessarily inimical to the interests of class members who: (1) received DATs; or (2) failed to provide personal identification; or (3) filed separate actions against the City but alleged no DAT policy; or (4) were taken to precincts, rather than the Brooklyn locations, for processing. (Defs. Mem. at 26-27.)

The Second Circuit has held that "not every potential disagreement between a representative and class members will stand in the way of a class suit." *Visa,* 280 F.3d at 145. Rather, "the conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be *fundamental.*" *Visa,* 280 F.3d at 145 (emphasis added). While defendants state that there are several potential conflicts, they do not articulate why, specifically, the named plaintiffs' interests are at odds with those of the class members mentioned above. The Second Circuit has cautioned that, at the class certification stage, "speculative conflict should be disregarded." *Visa,* 280 F.3d at 145; *accord Cokely v. New York Convention Ctr. Operating Corp.,* No. 00.4637(CBM), 2004 WL 1152531, at *7 (S.D.N.Y. May 21, 2004).

*6 Defendants' conclusory assertions raise a hypothetical, rather than an actual, conflict. *See Daniels,* 198 F.R.D. at 419 ("[I]t is well settled that the mere existence of individualized fact questions

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 668789 (S.D.N.Y.)
**(Cite as: 2005 WL 668789 (S.D.N.Y.))**

with respect to a named plaintiff's claims will not bar class certification."); *see also In re Joint Eastern and Southern Dist. Asbestos Litig.*, 78 F.3d 764, 778 (2d Cir.1996) (rejecting inadequacy of representation argument where there was no showing that plaintiffs' claims were antagonistic to those of other class members). Moreover, should a conflict between the named plaintiffs and any class members later become apparent, these class members will have the ability to opt out under Rule 23(c)(2)(B). *See County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1304-05 (2d Cir.1990) (stating that the district court retains discretion to allow class members to opt out "to facilitate the fair and efficient conduct of the action.")

This Court concludes that both class counsel and the named plaintiffs are adequate representatives for the DAT Class.

III. *The DAT Class: Rule 23(b)(3) Requirements*
Rule 23(b)(3) allows for certification of a class if:

the court finds that the questions of law or fact common to the members of the class pre-dominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

1. *Predominance*
"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. 632; *Visa*, 280 F.3d at 136. "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individual-

ized proof." *Visa*, 280 F.3d at 136 (internal quotations omitted). "The predominance requirement calls only for predominance, not exclusivity, or common questions." *Shelter Realty*, 75 F.R.D. at 37. Predominance is generally satisfied along with typicality unless "it is clear that individual issues will overwhelm the common questions." *In re NASDAQ Market-Makers, Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y.1996).

There is an issue of fact common to the DAT Class; namely, whether defendants employed a policy or practice of failing to consider political protestors eligible for DATs. *See supra* Section II, 2. A common question of law also exists: whether such a policy or practice violated plaintiffs' First, Fourth and Fourteenth Amendment rights. *See supra* Section II, 2. These common questions of law and fact satisfy Rule 23(b)(3)'s predominance requirement. *See Hirschfeld*, 193 F.R.D. at 184 ("This lawsuit centers around defendants' practice regarding Fitness Reports and the types of information contained therein; the specific facts regarding each plaintiff contained in those reports are secondary."); *see also Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 39-40 (D.D.C.2003) (predominance requirement satisfied where plaintiffs raised "one common question of fact (whether defendant had detained the class members later than their scheduled release date) and at least one common question of law (whether these alleged overdetentions violate the Fourth, Fifth, and Eighth Amendments).").

*7 Defendants argue that predominance is lacking because some potential class members were considered for DAT's and several others actually received them. (Defs. Mem. at 28-29.) While defendants' contention may undermine the merits of some putative class members' claims, it is not fatal to predominance. The Second Circuit has held that "the fact that a defense 'may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.'" *Visa*, 280 F.3d at 138 (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir.2000)). The core issue is whether the police decided that persons arrested at the WEF protests would be ineligible for DATs. (Tr. at 8.) The pervasiveness of that issue satisfies the predominance requirement. *See Maneely v. City of Newburgh*, 208 F.R.D. 69, 78 (S.D.N.Y.2002) ("There is a common issue at the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 668789 (S.D.N.Y.)
**(Cite as: 2005 WL 668789 (S.D.N.Y.))**

core of this case-whether defendants maintained an unconstitutional ... search policy.... Whether defendants are collaterally estopped from arguing that they maintained a constitutional policy ... also presents a common legal issue. I find that these common issues represent 'a sufficient constellation of common issues bind[ing] the class members together." ") (quoting *Visa*, 280 F.3d at 138).

2. *Superiority*

For certification under Rule 23(b)(3), a court must be convinced that maintaining the action as a class action is superior to other methods of adjudication. *See* Fed.R.Civ.P. 23(b)(3); *Hirschfeld*, 193 F.R.D. at 184. Courts consider four non-exclusive factors for superiority: (1) the interest of the class members in individually controlling the prosecution or defense of separate actions; (2) the extent of litigation concerning similar issues already commenced by or against members of the class; (3) the desirability of litigating the action in this forum; and (4) difficulties in managing the case as a class action. *See* Fed.R.Civ.P. 23(b)(3).

Plaintiffs argue that individual class members have little incentive and face considerable hurdles in prosecuting their claims on an individual basis. (Pls. Mem. at 24.) This Court agrees, "[C]lass treatment is appropriate in situations such as the present case, in which the individual claims of many of the putative class members are so small that it would not be economically efficient for them to maintain individual suits." *Bynon*, 214 F.R.D. at 40; *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("[C]lass actions ... permit the plaintiffs to pool claims which would be uneconomical to litigate individually."); *Anderson v. Cornejo*, 199 F.R.D. 228, 243 (N.D.Ill.2000) (finding class action superior in case where, if liability was proven, many of the plaintiffs would not be entitled to large amount of damages).

Defendants contend that a class action would not be a superior means of adjudication, as demonstrated by the fact that a number of potential class members have filed separate actions arising out of the 2002 WEF demonstrations. (Defs. Mem. at 30.) However, those actions do not challenge the existence or unconstitutionality of the DAT policy. (Pls. Mem. at 24; Defs. Mem. at 30-31.) Accordingly, the interest of putative DAT Class members in individually control-

ling the prosecution of separate actions does not undermine the efficacy of continuing this proceeding as a class action. Therefore, this Court finds that plaintiffs have satisfied the superiority requirement of Rule 23(b)(3).

*8 For the foregoing reasons, plaintiffs' motion to certify the DAT Class pursuant to Rules 23(a) and (b)(3) is granted.

III. *The Handcuff Class*

In addition to the express requirements for class certification discussed above, Rule 23 contains an implicit requirement that the proposed class be "precise, objective and presently ascertainable." *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir.1981) ("It is axiomatic that for a class action to be certified a 'class' must exist."); *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir.1970) (holding that it is "elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."). "Thus, a proposed class must be clearly defined so that it is 'administratively feasible for a court to determine whether a particular individual is a member." ' *Daniels*, 198 F.R.D. at 414 (quoting *Rios v. Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y.1983)). This implicit condition is often referred to as the "definiteness requirement." *See Nunson v. Monroe County, Fla.*, 198 F.R.D. 554, 557 (S.D.Fla.2000). That requirement is critical to the calculus of whether a class should be certified "because it 'identifies the persons (1) entitled to relief, (2) bound by the judgment, and (3) entitled to notice in a Rule 23(b)(3) action." ' *Anderson v. Capital One Bank*, 224 F.R.D. 444, 450 (W.D.Wis.2004) (quoting *Manual for Complex Litigation* § 30.14 (3d ed.1999)).

Defendants contend that plaintiffs have failed to define the putative Handcuff Class with sufficient precision to satisfy the definiteness requirement. (Tr. at 14-15.) This Court agrees. The Complaint defines the Handcuff Class to include arrestees who were subject to excessive handcuffing with "plastic cuffs, not the metal cuffs normally assigned to police officers of the NYPD." (Compl.¶ 105.) Plaintiffs assert that the handcuffing to which they were subject was unreasonable and excessive because of the "manner in which the handcuffs were applied and the length of time in which [they] and the members of the plaintiff class were handcuffed." (Compl.¶ 105-06.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 668789 (S.D.N.Y.)
(Cite as: 2005 WL 668789 (S.D.N.Y.))

    That amorphous description provides no clear definition for what is meant by "unreasonable" or "excessive" handcuffing. Indeed, plaintiffs' counsel was unable to refine the definition in response to the Court's inquiry concerning the contours of "unreasonable" cuffing:

    I think it is not really a question of time as much as was there something about the whole way that these arrests were processed that resulted in a longer time than therein otherwise would have been for other arrests.

    (Tr. at 22.) Plaintiffs' counsel continued that whether the handcuffing was unreasonable "is a function of time and tightness." (Tr. at 22.) Such an elastic definition requires this Court to delve into the specific conditions under which plaintiffs were handcuffed, as demonstrated by their suggestion that this Court allow expert discovery on the issue. (Tr. at 23-24.) The necessity for such an inquiry is at odds with the definiteness requirement. See Daniels, 198 F.R.D. at 414 ("The court must be able to make [the definiteness] determination without having to answer numerous fact-intensive questions." (internal quotations omitted)).

    *9 Plaintiffs' definition for the Handcuff Class is also subjective, as it requires potential class members to assess whether they were cuffed so tightly as to make the police's actions unreasonable. (See Compl. ¶ 105; Tr. at 22.) A class whose definition hinges on subjective determinations is incompatible with Rule 23's definiteness requirement. See Earnest v. Gen. Motors Corp., 923 F.Supp. 1469, 1474 (N.D.Ala.1996) ("Because the class definition offered by the plaintiffs could potentially mean anything the plaintiffs want it to mean at any particular time, it would be virtually impossible to determine membership in the class."); see also DeBremaecker, 433 F.2d at 734 (holding that class defined as "residents of this State active in the 'peace movement' who have been harassed and intimidated as well as those who fear harassment and intimidation in exercising their First Amendment right of free expression in the form of passing out leaflets in furtherance of their cause ... does not constitute an adequately defined or clearly ascertainable class.").

    Accordingly, plaintiffs' motion to certify the Handcuff Class is denied because it is too vague to be clearly ascertainable.

*CONCLUSION*
    For the foregoing reasons, plaintiffs' motion to certify the DAT Class is granted. The DAT Class is defined as: "WEF demonstrators arrested for minor offenses who were eligible for Desk Appearance Tickets but were detained for significant periods of time for arraignment." Plaintiffs' motion to certify the Handcuff Class is denied.

S.D.N.Y.,2005.
Burley v. City of New York
Not Reported in F.Supp.2d, 2005 WL 668789 (S.D.N.Y.)

END OF DOCUMENT

# Exhibit D

Westlaw

Not Reported in F.Supp.2d, 2009 WL 5069144 (N.D.Cal.)
**(Cite as: 2009 WL 5069144 (N.D.Cal.))**

▷
Only the Westlaw citation is currently available.

United States District Court, N.D. California,
San Jose Division.
Aram HOVSEPIAN, Plaintiff,
v.
APPLE, INC., Defendant.

No. 08-5788 JF (PVT).
Dec. 17, 2009.

West KeySummary**Federal Civil Procedure** 170A
⬤══636

170A Federal Civil Procedure
 170AVII Pleadings and Motions
  170AVII(A) Pleadings in General
   170Ak633 Certainty, Definiteness and Par-
ticularity
    170Ak636 k. Fraud, mistake and condi-
tion of mind. Most Cited Cases
 Purchaser of personal computer failed to state a
claim for fraudulent omission against corporation
under California law. Purchaser alleged that vertical
lines appearing on his computer screen eventually
rendering the display screen unusable and that corpo-
ration knew of or recklessly ignored the existence of
the defect that caused the premature failure of the
display screens. However, purchaser failed to de-
scribe with specificity representations made by the
corporation with respect to the screen that would give
rise to a duty to disclose the defect alleged. Fed.Rules
Civ.Proc.Rules 12(b)(6), 9(b), 28 U.S.C.A.

David R. Buchanan, Seeger Weiss LLP, New York,
NY, Eric David Freed, Chicago, IL, George Kevin
Lang, Michael John Lotus, Freed and Weiss LLC,
Chicago, IL, Jonathan Shub, Brian J. Devine, Seeger
Weiss LLP, Philadelphia, PA, Kenneth Mark Seeger,
Seeger Salvas LLP, San Francisco, CA, Michael J.
Boni, Boni & Zack LLC, Bala Cynwyd, PA, Michael
D. Donovan, Donovan Searles, LLC, Philadelphia,
PA, Richard J. Burke, Richard J. Burke LLC, St.
Louis, MO, for Plaintiff.

Thomas A. Counts, Tammy Lee Kissman, Paul Hast-

ings Janofsky & Walker LLP, San Francisco, CA, for
Defendant.

ORDER [FN1] (1) GRANTING DEFENDANT'S MO-
TION TO DISMISS WITH LIMITED LEAVE TO
AMEND AND (2) GRANTING WITHOUT
PREJUDICE DEFENDANT'S MOTION TO
STRIKE

 FN1. This disposition is not designated for
publication in the official reports.

JEREMY FOGEL, District Judge.
 *1 Plaintiff Aram Hovsepian ("Hovsepian")
brings this putative class action on behalf of all per-
sons similarly situated who purchased iMAC G5 per-
sonal computers from Defendant Apple, Inc. ("Ap-
ple"). Apple moves to dismiss the second amended
complaint ("SAC") for failure to state a claim upon
which relief may be granted. Apple also moves to
strike Hovsepian's class allegations. The Court heard
oral argument on December 4, 2009. For the reasons
set forth below, the motion to dismiss will be granted,
with limited leave to amend. The motion to strike
also will be granted, without prejudice.

**I. BACKGROUND**
 Hovsepian, a Florida resident, purchased an
iMac in October 2006. Hovsepian SAC ¶ 17. Hovse-
pian alleges that vertical lines began to appear on the
display screen in March 2008, eventually causing a
visual obstruction that rendered the display screen
unusable. Id. ¶¶ 1, 17. He claims that Apple knew of
or recklessly ignored the existence of the defect that
caused premature failure of the display screens, and
that Apple failed to take remedial action or remove
the defective computers from the marketplace. Id. ¶¶
2-3. Hovsepian alleges that Apple has chosen not to
take remedial action because the defect tends to arise
after the expiration of the product's one-year express
warranty. See id. ¶ 13. Finally, Hovsepian claims that
"thousands" of purchasers have experienced this
problem and that Apple is well aware of the issue. Id.
¶ 9.

 Hovsepian seeks to bring claims on behalf of a
class comprised of all persons and entities in the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5069144 (N.D.Cal.)
**(Cite as: 2009 WL 5069144 (N.D.Cal.))**

United States who made original purchases of an iMac computer. *Id.* ¶ 42. He asserts the following claims for relief under California law: (1) violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ.Code § 1750; (2) unfair, unlawful, or fraudulent business practices in violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code § 17200 *et seq.*; (3) fraudulent omission; (4) unjust enrichment; and (5) a judicial declaration, pursuant to 28 U.S.C. § 2201, that Apple's one-year limitation on warranty claims is void, invalid and unenforceable.

## II. LEGAL STANDARD
### A. Standard of Review for a Motion to Dismiss

A complaint may be dismissed for failure to state a claim upon which relief may be granted if a plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Allegations of material fact must be taken as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir.1997). *See also Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir.1998). However, the Court need not accept as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001). *See also Twombly*, 550 U.S. at 561 ("a wholly conclusory statement of [a] claim" will not survive motion to dismiss).

*2 On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.1983). However, under the "incorporation by reference" doctrine, the Court also may consider documents which are referenced extensively in the complaint and which are accepted by all parties as authentic. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999). Leave to amend should be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir.1995).

### B. Standard of Review for a Motion to Strike

Federal Rule of Civil Procedure 12(f) provides that the Court may strike from any pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Pro. 12(f). "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial [.]" *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir.1993) (citations omitted), *overruled on other grounds, Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

Under Rules 23(c)(1)(A) and 23(d)(1)(D), as well as pursuant to Rule 12(f), this Court has authority to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained. In order to certify a class, the class must be ascertainable. *Bishop v. Saab Auto. A.B.*, 1996 U.S. Dist. LEXIS 22890, at *13-14, 1996 WL 33150020 (C.D.Cal. Feb. 16, 1996). In addition, the requirements under Federal Rule of Civil Procedure 23(a) must be satisfied.[FN2] Finally, Plaintiff must satisfy one of the more stringent prerequisites set forth in Rule 23(b).

> FN2. Fed.R.Civ.P. 23(a): One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

## III. DISCUSSION
### A. Hovsepian's SAC

As a threshold matter, the parties disagree with respect to whether Hovsepian's CLRA and UCL claims are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b). This issue recently was addressed by the Ninth Circuit in *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir.2009), which reiterated that "Rule 9(b)'s heightened pleading standards apply to claims for violations of the CLRA and UCL" where such claims are based on a fraudulent course of conduct. *Id.* at 1124 (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102-05 (9th Cir.2003)). Because Hovsepian's CLRA and UCL claims are predicated on allegedly fraudulent omissions by Apple, those claims are subject to the plead-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing requirements of Rule 9(b). *See Kearns,* 567 F.3d at 1124; *Vess,* 317 F.3d at 1103-04 (if "the claim is said to be 'grounded in fraud' or to 'sound in fraud,' [then] the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).").

*1. CLRA Claim*

Hovsepian alleges that Apple actively concealed material facts with respect to the alleged defect in violation of Cal. Civ.Code § 1770(a)(5) and § 1770(a)(7). Hovsepian SAC ¶ 87. Apple contends that the facts as currently alleged fail to state a cognizable claim under the CLRA, citing *Daugherty v. American Honda Motor Co., Inc.,* 144 Cal.App.4th 824, 51 Cal.Rptr.3d 118 (2006). In *Daugherty,* the plaintiff alleged that an auto manufacturer knowingly concealed a latent defect that arose only after the expiration of the express warranty, and that such allegations formed a cognizable claim under the same provisions of the CLRA at issue in the instant action. *Id.* at 833-34, 51 Cal.Rptr.3d 118. However, the Court of Appeal concluded that "although a claim may be stated under the CLRA in terms constituting fraudulent omissions, to be actionable the omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Id.* at 835, 51 Cal.Rptr.3d 118. *See also Bardin v. DaimlerChrysler Corp.,* 136 Cal.App.4th 1255, 1276, 39 Cal.Rptr.3d 634 (2006) (CLRA claim requires allegations that manufacturer was " 'bound to disclose' [the defect] ... or allege[ ] facts showing [that the manufacturer] ever gave any information of other facts which could have the likely effect of misleading the public").

*3 Like the original complaint and FAC, Hovsepian's SAC does not state with sufficient particularity when and where Apple made an affirmative representation, if any, that contradicts its alleged omissions. Instead, the operative pleading makes conclusory allegations as to Apple's course of conduct. SAC ¶ 37 ("Apple has responded by implementing a corporate policy of concealing and uniformly denying in all public forums the existence of the Defect and to 'running [sic] out the clock' on the warranties that accompanied the iMac."). Such generalized allegations do not provide the " 'the who, what, when, where, and how' of the misconduct charged." *Vess,* 317 F.3d at 1106 (citation omitted). Accordingly, Hovsepian has not stated a cognizable CLRA claim based upon statements made in contradiction to a fraudulent omission.

Hovsepian nonetheless argues that the second theory of liability discussed in *Daugherty*-based upon an affirmative duty to disclose-is alleged adequately. A plaintiff may "successfully pursue a CLRA claim [based on a fraudulent omission], despite *Daugherty* and *Bardin,* if [the manufacturer] was 'obliged to disclose' the potential for problems." *Falk v. Gen. Motors Corp.,* 496 F.Supp.2d 1088, 1094 (N.D.Cal.2007). A duty to disclose exists if one of the following four circumstances is present: (1) the defendant is in a fiduciary relationship with the plaintiff; (2) the defendant has exclusive knowledge of material facts not known to the plaintiff; (3) the defendant actively conceals a material fact from the plaintiff, or (4) the defendant makes partial representations but also suppresses some material facts. *LiMandri v. Judkins,* 52 Cal.App.4th 326, 337, 60 Cal.Rptr.2d 539 (1997). Hovsepian argues that he has alleged adequately the second and third *LiMandri* factors, both of which "require the existence of a material fact." *Falk,* 496 F.Supp.2d at 1095. Materiality exists if the omitted information would cause a reasonable consumer to behave differently if he or she were aware of the information. *See Oestreicher v. Alienware Corp.,* 544 F.Supp.2d 964, 971 (N.D.Cal.2008). *See also Falk,* 496 F.Supp.2d at 1095 ("Materiality, for CLRA claims, is judged by the effect on a 'reasonable consumer.' ") (citation omitted).

Again, the SAC fails to comply with Rule 9(b). The pleading contains only generalized allegations with respect to exclusive knowledge and active concealment. Moreover, generalized allegations with respect to consumer expectations also are insufficient to meet Rule 9(b)'s heightened pleading requirements, especially when the alleged defect has manifested itself more than one year after the expiration of the express warranty. *See Oestreicher,* 544 F.Supp.2d at 971 ("consumer expectations are ... subjective and likely unreliable, and ... usage will greatly vary from consumer to consumer.").

The weight of applicable case law casts doubt on the basic viability of Hovsepian's CLRA claim. *See id.* at 972. The SAC represents Hovsepian's third attempt to articulate a cognizable claim and he has failed to do so despite express guidance from the Court. As a result, the claim will be dismissed with-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5069144 (N.D.Cal.)
(Cite as: 2009 WL 5069144 (N.D.Cal.))

out leave to amend.[FN3]

FN3. Hovsepian relies heavily on *Falk* for the proposition that an allegation of a disappointed consumer expectation will defeat a motion to dismiss a CLRA claim. However, as discussed by the *Oestreicher* court in some detail, knowledge that a product is likely to fail at some point cannot give rise by itself to an actionable claim because "[s]uch knowledge is easily demonstrated by the fact that manufacturers must predict rates of failure of particular parts in order to price warranties and thus can always be said to 'know' that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations in warranty coverage." *Oestreicher,* 544 F.Supp.2d at 972 (quoting *Abraham v. Volkswagen of Am., Inc.,* 795 F.2d 238, 250 (2d Cir.1986)). *Falk* involved the failure of vehicle speedometers, an essential safety feature that a manufacturer may have a duty to disclose. *See id.* ("policy reasons militate against following *Falk* in this situation-where a duty to disclose is being imposed on a manufacturer for a latent non-safety related defect in its product.").

*2. UCL Claims*

**\*4** The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Civ.Code § 17200, *et seq.* Accordingly, "[a]n act can be alleged to violate any or all of the three prongs of the UCL-unlawful, unfair, or fraudulent." *Berryman v. Merit Prop. Mgmt., Inc.,* 152 Cal.App.4th 1544, 1554, 62 Cal.Rptr.3d 177 (2007). For an action based upon an allegedly unlawful business practice, the UCL "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Comme'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). A UCL claim predicated upon unfair business practices may be grounded upon a violation of a statute, *see Freeman v. Time, Inc.,* 68 F.3d 285, 289 (9th Cir.1995), or be a "standalone" claim based on an alleged act that "violates established public policy or

if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *McKell v. Wash. Mut., Inc.,* 142 Cal.App.4th 1457, 1473, 49 Cal.Rptr.3d 227 (2006). *See also Cel-Tech,* 20 Cal.4th at 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 ("[A] practice may be deemed unfair even if not specifically proscribed by some other law."). A claim based upon the fraud prong may be brought based upon conduct akin to common-law fraud or an alleged course of conduct that is likely to deceive the public. *Bardin,* 136 Cal.App.4th at 1274, 39 Cal.Rptr.3d 634 ("A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only necessary to show that members of the public are likely to be deceived.").

As discussed above, to the extent that Hovsepian's UCL claim is grounded on a course of fraudulent conduct, the pleading is subject to Rule 9(b). *See Kearns,* 567 F.3d at 1125. Moreover, *Kearns* held that a UCL claim based on an alleged omission is subject to Rule 9(b), and if a complaint alleges a fraudulent course of conduct, the plaintiff cannot avoid Rule 9(b) by attempting to allege consumer deception without pleading additional allegations. *See id.* at 1126-27. The same rule applies to any claim brought under the unfair prong of the UCL. *See id.* at 1127 ("Because Kearns's [complaint] alleges a unified fraudulent course of conduct, his claims against Ford are grounded in fraud. His entire complaint must therefore be pleaded with particularity. Thus, the [complaint] was properly dismissed and no error was committed by not separately analyzing his claims under the unfairness prong of the UCL."). Similarly, and for the reasons discussed above in Section III.A.1, a derivative UCL claim based on a CLRA violation has not been pled adequately here.

Even assuming that Hovsepian may assert a claim under the unfair prong of the UCL without being subject to Rule 9(b) pleading requirements, the operative complaint fails to state a claim. A standalone claim under the unfair prong of the UCL requires that "the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." *Daugherty,* 144 Cal.App.4th at 839, 51 Cal.Rptr.3d 118. However, "[t]he failure to disclose a

Not Reported in F.Supp.2d, 2009 WL 5069144 (N.D.Cal.)
**(Cite as: 2009 WL 5069144 (N.D.Cal.))**

defect that might, or might not, shorten the effective life span of [a product] that functions precisely as warranted throughout the term of its express warranty cannot be characterized as causing a substantial injury to consumers, and accordingly does not constitute an unfair practice under the UCL." *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1026-27 (9th Cir.2008) (quoting *Daugherty,* 144 Cal.App.4th at 839, 51 Cal.Rptr.3d 118). In the instant action, the display screens did operate properly during the one-year express warranty period. Generalized allegations with respect to consumer expectations, *see* Hovsepian SAC ¶ 23 ("Many current studies suggest that an average LCD screen should last at least 5 years of normal usage without significant screen degradation.") or a statement that Apple "knew" that the screens would fail at some point, *id.* ¶ 25, 51 Cal.Rptr.3d 118, are not sufficient. *See Bardin,* 136 Cal.App.4th at 1273, 39 Cal.Rptr.3d 634 ("the 'right' upon which plaintiffs actually rely here-the right to have a vehicle containing an exhaust manifold that lasts as long as an 'industry standard' cast-iron exhaust manifold-is one based on a contract such as a warranty, not on a legislatively declared policy. No law generally requires a manufacturer to use the most expensive or most durable materials in the manufacture of its products."). Accordingly, the UCL claim will be dismissed without leave to amend.

### 3. *Fraudulent Omissions*

\*5 Under California law, the elements of a common-law claim for fraudulent omission are: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would have acted differently if he had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression the plaintiff sustained damage. *See Hahn v. Mirda,* 147 Cal.App.4th 740, 748, 54 Cal.Rptr.3d 527 (2007).

As discussed earlier, the SAC fails to describe with specificity representations made by Apple with respect to the LCD that would give rise to a duty to disclose the defect alleged. However, because the elements of a common law fraud claim may be somewhat easier to satisfy than those of Hovsepian's statutory claim, this claim will be dismissed with leave to amend for further elaboration as to whether

such a duty existed and as to the means by which Apple actively concealed a known defect from its customers.

### 4. *Unjust Enrichment*

Hovsepian's claim for unjust enrichment is premised on the same alleged course of conduct that underlies his CLRA, UCL, and fraudulent omission claims. *See* SAC ¶ 95 (incorporating by reference previous allegations); ¶ 99 ("Defendant has been unjustly enriched at the expense and detriment to Plaintiff and the Class by wrongfully collecting money to which Defendant, in equity, is not entitled."). In other words, the claim for unjust enrichment cannot stand alone as an independent claim for relief. *See Jogani v. Superior Court,* 165 Cal.App.4th 901, 911, 81 Cal.Rptr.3d 503 (2008) ("unjust enrichment is not a cause of action. Rather, it is a general principle underlying various doctrines and remedies, including quasi-contract.") (citation omitted). *See also Melchior v. New Line Prods., Inc.,* 106 Cal.App.4th 779, 793, 131 Cal.Rptr.2d 347 (2003) ("there is no cause of action in California for unjust enrichment. The phrase "Unjust Enrichment" does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so.' ") (quoting *Lauriedale Assocs., Ltd. v. Wilson,* 7 Cal.App.4th 1439, 1448, 9 Cal.Rptr.2d 774 (1992)). Because Hovsepian again has failed to allege a substantive claim for relief, the claim for unjust enrichment also will be dismissed without leave to amend. *See Oestreicher,* 544 F.Supp.2d at 975 ("since plaintiff's fraud-based claims have been dismissed, plaintiff has no basis for its unjust enrichment claim."). *See also Sanders v. Apple Inc.,* No. C 08-1713, 2009 WL 150950, at \*9 (N.D.Cal. Jan.21, 2009) ("[unjust enrichment] claim will depend upon the viability of the Plaintiffs' other claims .").

### 5. *Declaratory Relief*

An action for declaratory relief requires an actual case or controversy. *See Williams v. Alioto,* 549 F.2d 136, 141 n. 4 (9th Cir.1977). Because the Declaratory Judgment Act "merely provides an additional remedy in cases where jurisdiction is otherwise established," *Staacke v. U.S. Secretary of Labor,* 841 F.2d 278, 280 (9th Cir.1988), and the Hovsepian SAC again does not state an independent claim for relief, Apple's motion to dismiss the claim for declaratory relief will be granted with leave to amend.

Not Reported in F.Supp.2d, 2009 WL 5069144 (N.D.Cal.)
(Cite as: 2009 WL 5069144 (N.D.Cal.))

**B. Apple's Motion to Strike Class Claims**
    *6 Apple seeks to strike the class allegations
from Hovsepian's SAC pursuant to Fed.R.Civ.P.
12(f) because the class as currently defined fails to
meet the requirements of Fed.R.Civ.P. 23. Hovse-
pian's SAC represents his third attempt to plead a
putative class. Like the original complaint and FAC,
the SAC fails to state a valid class claim against Ap-
ple.

    First, the class is not ascertainable because it in-
cludes members who have not experienced any prob-
lems with their iMac display screens. Such members
have no injury and no standing to sue. Second, the
class is not maintainable under Rule 23(b)(3) because
it includes members who can have no claim against
Apple. For example, the putative class includes
members who (a) did not purchase the particular
iMac model or the type of iMac screen that Hovse-
pian alleges is defective and (b) experienced the al-
leged defect after their warranty expired. Finally, the
class is not maintainable under Rules 23(b)(1) or
Rule 23(b)(2). These types of class actions are not
suitable for actions where recovery of money dam-
ages is the primary relief sought by the plaintiff. The
purpose of this lawsuit is money damages. These
pleading deficiencies are present despite the fact that
Hovsepian has been given two opportunities to
amend his complaint. Accordingly, the class allega-
tions will be struck without prejudice, pending
amendment of Hovsepian's common law fraudulent
concealment claim.

## IV. ORDER
    Good cause therefor appearing, the motion to
dismiss the Hovsepian SAC is GRANTED, with lim-
ited leave to amend the complaint to provide further
factual specificity in support of its claim that under
common law Apple had a duty to disclose the alleged
defect to its customers and, assuming that it did, that
it actively concealed the alleged defect from its cus-
tomers. Apple's motion to strike the class allegations
is GRANTED without prejudice.

N.D.Cal.,2009.
Hovsepian v. Apple, Inc.
Not Reported in F.Supp.2d, 2009 WL 5069144
(N.D.Cal.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit E

Westlaw

1998 WL 414932
(Cite as: 1998 WL 414932 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Patricia VILLARI, on behalf of herself and all others
similarly situated, Plaintiffs,
v.
PERFORMANCE CAPITAL MANAGEMENT,
INC., Defendant.

No. 97 Civ. 7580(LMM).
July 22, 1998.

MEMORANDUM AND ORDER
MCKENNA, J.

*1 Plaintiff Patricia Villari ("Villari") moves for an order declaring that this action brought under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., ("the FDCPA") is properly maintainable as a class action and certifying Villari as the class representative. In addition, Villari moves for partial summary judgment on the issue of whether she is entitled to statutory damages under the FDCPA. Defendant Performance Capital Management, Inc. ("PCM") cross-moves for leave to amend its answer to plead an additional defense, namely the bona fide error defense which is available under 15 U.S.C. § 1692k(c). For the reasons set forth below, Villari's motions for class certification and for partial summary judgment are denied and PCM's cross-motion for leave to amend its answer is granted.

I.

PCM is in the business of purchasing debts in default in groups referred to as portfolios. PCM is engaged in no business other than the purchase and resolution of accounts in such portfolios. (Pl.Mem.Ex.D).

On July 3, 1997, PCM purchased from The Chase Manhattan Bank ("Chase") a portfolio of about 8,417 credit-card accounts. (Anthony Aff. ¶ 4). The portfolio included an account shown as owing to Chase from Villari in the amount of $857.67. (Id.) PCM proceeded to attempt to collect that amount from Villari. (Id. ¶ 5). In furtherance of its attempt to collect the amount due to PCM, it sent Villari two

letters. The first letter, dated July 9, 1997, stated the following:

Please be advised that the creditor indicated above [Chase] has sold your credit card account to [PCM]. We are not a collection agency. We are a financial asset management company, therefore we have the ability to remove the entire balance from your credit report and consider this account paid in full for a one time payment, in certified funds, of the "Principal Bal" amount shown above.

This settlement offer expires thirty-one (31) days from the date of this letter. If we do not hear from you or receive your settlement payment by then, we will proceed with any actions legally available and deemed necessary. This is an attempt to collect a debt and any information obtained will be used for that purpose. If you need to arrange payment terms, or would like to find out how you may lower your interest rate from 21% to 10% call us toll free at 1-800-757-7700.

Remember: (1) We are a financial asset management company and can assist you in restoring your credit. (2) Unless you, within 30 days after receipt of this notice, dispute the validity of the debt, or any portion thereof, the debt will be assumed to be valid; (3) If you verifiably notify us in writing within the thirty (30) day period that the debt, or any portion thereof, is disputed, we will obtain verification of the debt, or a copy of the judgment against you and a copy of such verification or judgment will be mailed to you along with the name and address of the original creditor.

*2 (Pl.Mem.Ex.A). The second letter, dated September 16, 1997, offered Villari the opportunity to retire her debt owed to PCM, by agreeing to the following settlement:

PCM is offering to have the principal balance of the debt, plus 10% per annum, paid equally and added to your next 24 monthly billing statements for telecommunications services provided by Performance Telecom (PT). This will be accomplished by combining the debt payment and the payment for service into one monthly sum.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1998 WL 414932
**(Cite as: 1998 WL 414932 (S.D.N.Y.))**

To accomplish said debt repayment, the under-signed agrees to subscribe to PT for the Phone Plus service for a period of twenty-four (24) months.

(Pl.Mem.Ex.B). The letter does not state that PCM is a debt collector. It does state, however, that the agreement was intended to retire the "above referenced debt owed by the undersigned to [PCM]." (*Id.*)

In October 1997, Villari filed this action against PCM, alleging that PCM's letters violated the FDCPA. Thereafter, PCM filed an answer which included a counterclaim for the amount PCM believed was stilled owed by Villari. Villari, in turn, filed a motion to dismiss the counterclaim, in which she alleged that the amount PCM sought to collect had been paid.

After Patricia Anthony ("Anthony"), an attorney in the legal department of PCM, investigated Villari's allegation, she learned that Villari's obligation to Chase had been satisfied before Chase sold the account to PCM in July 1997. Arthur Hall, an attorney in the legal department for Chase, admitted to Anthony that Chase should not have included Villari's account in the portfolio it sold to PCM on July 3, 1997. (Anthony Aff. ¶ 9). Given the foregoing, PCM consented to the dismissal of PCM's counterclaim for the amount Villari had owed Chase.

Villari now seeks to have the action certified as a class action and to have herself named as the class representative. Villari also moves for partial summary judgment. PCM cross-moves to amend its answer to include an additional affirmative defense, namely the bona fide error defense that is available under 15 U.S.C. § 1692k(c).

II.

The FDCPA is designed to eliminate abusive debt collection practices, to insure that debt collectors who refrain from using abusive collection practices are not competitively disadvantaged, and to promote consistent state action to protect consumers against debt collection abuses. *See* 15 U.S.C. § 1692(e). The FDCPA is remedial in nature and should be liberally construed. *Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 27 (2d Cir.1989). Proof of one violation is sufficient to support recovery under the statute. *See*

15 U.S.C. § 1692k; *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir.1993).

*A. Motion for Leave to Amend*

Leave to amend an answer "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In the absence of "undue delay, bad faith or dilatory motive on the part of the movant," permission to amend should be granted unless it would unduly prejudice the opposing party. *Foman v. Davis* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Although leave to amend is to be freely given, it may be denied if the amendment would be futile. *S.S. Silberblatt Inc. v. East Harlem Pilot Block Bldg. 1 Housing Dev. Fund. Co.*, 608 F.2d 28, 42 (2d Cir.1979); *Chan v. Reno*, 916 F.Supp. 1289, 1302 (S.D.N.Y.1996).

*3 PCM moves for leave to amend its answer to plead that "[t]he violations alleged in the complaint ... were not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." (Barthold Aff.Ex. A). This bona fide error defense is provided for under 15 U.S.C. § 1692k(c), which states that:

A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. § 1692k(c). PCM argues that because Chase mistakenly sold PCM an account that had already been satisfied, PCM unintentionally and mistakenly sent Villari the above-mentioned collection letters.

Villari contends that PCM's motion should be denied because the proposed amendment is futile and prejudicial to Villari. In essence, Villari claims that PCM is not entitled to plead the bona fide error defense because the alleged violations of the FDCPA are not contingent upon the validity of the underlying debt.

PCM's motion to amend its answer to include the bona fide error defense is granted. The undisputed facts included in defense counsel's affidavits demon-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1998 WL 414932
(Cite as: 1998 WL 414932 (S.D.N.Y.))

state that PCM did not intentionally pursue collection efforts against Villari. Had PCM been aware that Chase mistakenly sold it Villari's debt, which had already been satisfied, PCM would not have sent Villari the collection letters at issue in this litigation, and thus, not violated the statute. It is also important to note that PCM sought to amend its answer shortly after it learned that Villari's account had been satisfied, and as a result, it may be entitled to rely upon the bona fide error defense. As such, PCM may amend its answer to include the bona fide error defense. See *Smith v. Transworld Systems, Inc.* 953 F.2d 1025, 1032 (6th Cir.1992).

However, Villari correctly notes that PCM has failed to demonstrate that its procedures are "reasonably adapted to avoid any such error." *See* 15 U.S.C. § 1692k(c). To prevail on a bona fide error defense, a defendant must prove both the existence of a bona fide error and the existence of procedures reasonably adapted to avoid such error. Nevertheless, PCM does not need to meet this burden at this stage of the litigation. Accordingly, PCM's motion for leave to amend its answer to include the bona fide error defense is granted.

### B. *Motion for Class Certification*

Villari moves for class certification of all counts of her Class Action Complaint ("the complaint"), pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a plaintiff class "consisting of all persons in the United States to whom [PCM], and its agents, sent communications in the form of the July 9, 1997, and September 16, 1997, notices sent to [Villari] in an attempt to collect a consumer debt, as reflected by [PCM's] records, on or after July 9, 1996." (Pl.Mem, at 4.) The motion is denied.

\*4 In order for a class to be certified pursuant to Rule 23, a plaintiff must satisfy the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). Rule 23(a) provides that members of a class may sue as representative parties only if the following requirements are met: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

Fed.R.Civ.P. 23(a).

All of the prerequisites to a class action have been met here except the requirement of Rule 23(a)(3). Because Villari's claim is subject to PCM's bona fide error defense, her claim is no longer typical of those of the class. The Second Circuit has stated the following:

While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, ... class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation ... [because] there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith,* 903 F.2d 176, 180 (2d Cir.1990), *cert. denied,* 489 U.S. 1025 (1991). Because PCM may assert the bona fide error defense against Villari, and presumably not against most other potential class members, Villari's motion for class certification must be denied. The bona fide error defense, because it is an affirmative defense, may very well become the focus of the litigation, and thus, the danger would exist that absent class members would suffer if Villari became preoccupied with such a defense. Accordingly, Villari's motion for class certification is denied.

### C. *Motion for Partial Summary Judgment*

Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All facts, inferences, and ambiguities must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1998 WL 414932
**(Cite as: 1998 WL 414932 (S.D.N.Y.))**

Once the moving party meets his burden, the non-moving party has the burden of presenting "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*5 Villari moves for partial summary judgment on the issue of whether she is entitled to statutory damages under the FDCPA. A disputed material issue of fact exists, however, with respect to whether PCM is entitled to rely upon the bona fide error defense. Consequently, the Court is precluded from entering summary judgment in Villari's favor. Accordingly, Villari's motion for summary judgment on her FDCPA claims is denied.

III.

For the foregoing reasons, Villari's motion for class certification and her motion for partial summary judgment are denied. PCM's cross-motion for leave to file an amended answer is granted.

SO ORDERED.

S.D.N.Y.,1998.
Villari v. Performance Capital Management, Inc.
1998 WL 414932

END OF DOCUMENT

# Exhibit F

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2008 WL 4298588 (S.D.N.Y.)
(Cite as: 2008 WL 4298588 (S.D.N.Y.))

C
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re JPMORGAN CHASE & CO. SHARLHOLDER
DERIVATIVE LITIGATION.
This Document Relates to: All Actions.

Master File No. 08 Civ. 974(DLC).
Sept. 19, 2008.

Deborah Clark-Weintraub, Joe R. Whatley, Jr.,
Whatley, Drake & Kallas, LLC, New York, NY, for
Plaintiff Robert L. Garber.

Sharon L. Nelles, Gerald Leroy Black, Jr., Sullivan &
Cromwell, LLP, New York, NY, for Nominal Defen-
dant JPMorgan Chase & Co. and Defendants James
Dimon et al.

### OPINION AND ORDER
DENISE COTE, District Judge.

*1 On August 15, 2008, nominal defendant
JPMorgan Chase & Co. ("JPMorgan") and several of
its officers and directors (collectively, "Defendants")
moved to dismiss this consolidated shareholder de-
rivative action pursuant to Rule 23.1, Fed.R.Civ.P.
Defendants argue, in sum, that plaintiff Robert L.
Garber ("Garber")-the sole remaining plaintiff in this
action-"does not fairly and adequately represent the
interests of shareholders" of JPMorgan, and therefore
"may not ... maintain" this derivative action. Rule
23.1(a), Fed.R.Civ.P. For the following reasons, the
motion to dismiss is granted.

BACKGROUND

I. PRELIMINARY PROCEEDINGS

Garber is the second plaintiff who has sought to
pursue this derivative litigation in federal court, and
he is now represented by his third set of attorneys. To
assess properly the merits of this motion to dismiss, it
is necessary to describe the chain of events which led
the first plaintiff and Garber's prior counsel to with-
draw from this litigation.

On January 30, 2008, two identical shareholder
derivative complaints were filed in this district
against the Defendants. The first complaint, assigned
number 08 Civ. 974, was filed by Leigh Lasky
("Lasky") of the New York firm of Lasky & Rifkind,
Ltd. ("Lasky & Rifkind"), and Brian J. Robbins
("Robbins"), Jeffrey P. Fink ("Fink"), George C.
Aguilar ("Aguilar"), and Daniel R. Forde of the San
Diego law firm of Robbins Umeda & Fink, LLP
("Robbins Umeda"), as counsel for plaintiff James R.
Shroff ("Shroff"). The Shroff complaint was verified
by Gregory E. Del Gaizo, a member of Robbins Um-
eda, who represented that he was making the verifica-
tion "because plaintiff is absent from the County of
San Diego where I maintain my office." The second
complaint, assigned number 08 Civ. 975, was filed
solely by Lasky as counsel for Garber, and was veri-
fied by Garber.

As the docket numbers assigned to these actions
indicate, the complaints were filed, in essence, simul-
taneously. The complaints allege, *inter alia*, that the
officer and director defendants, through various acts
and omissions related to the recent subprime mort-
gage crisis, violated the Securities Exchange Act of
1934, breached their fiduciary duties to JPMorgan,
wasted corporate assets, and unjustly enriched them-
selves at the expense of JPMorgan and its sharehold-
ers. [FN1]

> FN1. The next day, January 31, 2008, two
> additional derivative complaints were filed
> against the Defendants in New York State
> Supreme Court. The complaints in these
> state actions-the first filed by the New York
> firm Murray, Frank & Sailer LLP ("Murray
> Frank"), and the second filed by Murray
> Frank and the Dallas firm of Provost Um-
> phrey-are identical to the two complaints
> filed in this District, with the sole difference
> being the omission of allegations under the
> federal securities laws. Although Fink stated
> at the July 9, 2008 conference held in this
> action that he did not have "firsthand
> knowledge" of how Murray Frank obtained
> a copy of the complaints filed in this Dis-
> trict, Aguilar stated that Murray Frank had

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4298588 (S.D.N.Y.)
**(Cite as: 2008 WL 4298588 (S.D.N.Y.))**

contacted Robbins Umeda about derivative litigation related to JPMorgan, and Fink opined that it "would not be uncommon" for Robbins Umeda to have shared a copy of such a complaint with another firm. Fink did confirm, however, that Robbins Umeda drafted the complaints filed in this District.

On April 22, 2008, counsel for the Defendants, Shroff, and Garber submitted a stipulation and proposed order consolidating these two actions.[FN2] Under the proposed order, Robbins Umeda would be named "Lead Counsel," and Lasky & Rifkind would be named "Liaison Counsel," in a consolidated action. The stipulation and proposed order, however, were not supported by submissions regarding the qualifications of Robbins Umeda to act as Lead Counsel.

> FN2. Garber's action, 08 Civ. 975, was initially assigned to the Honorable Robert W. Sweet. On April 25, 2008, that action was transferred to this Court as a related action.

A joint initial pretrial conference for the two actions was held on May 7. Fink attended on behalf of Shroff, and an attorney from Lasky & Rifkind appeared on behalf of both Shroff and Garber. At the conference, the Court asked Fink for basic biographical information about Shroff. In response, Fink indicated that he had never met Shroff, did not know how Shroff was employed, and did not know when Shroff had purchased his shares in JPMorgan. He could only report that he had spoken with Shroff by telephone, that Shroff was a long-term shareholder of JPMorgan, and that Shroff still held shares in JPMorgan (and thus had standing to maintain the derivative action). Reciting the Rule 23.1 standard-namely, that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association"-the Court pointed out that it would need sufficient information to find that the plaintiff and counsel in these derivative actions meet that standard. Accordingly, an Order of May 8 directed Robbins Umeda to provide, by May 16, documentation regarding (1) its qualifications to act as Lead Counsel, and (2) Shroff's qualifications to maintain this derivative action under Rule 23.1, Fed.R.Civ.P. (A separate Order of May 8 consoli-

dated the two actions, but did not address Robbins Umeda's application to be appointed Lead Counsel.) [FN3] The May 8 Order also set a schedule for further proceedings in the now-consolidated action: A consolidated complaint was to be filed on July 16, and any motion to dismiss was to be filed by August 29, 2008.[FN4]

> FN3. At the conference, the Court declined to appoint "Liaison Counsel," although Lasky & Rifkind was advised that local counsel could provide ministerial assistance if out-of-town Lead Counsel were appointed.

> FN4. Fink represented that there was and would be no demand made upon JPMorgan, and that its opposition to any motion to dismiss would not request an opportunity to make a demand. Defendants indicated that they would be making a motion to dismiss on this issue.

*2 On May 16, 2008, Robbins Umeda submitted a declaration from Fink regarding the firm's qualification to act as Lead Counsel, accompanied by a 35-page firm resume. In his declaration, Fink described Robbins Umeda's "extensive experience in litigating shareholder derivative cases," and noted that this expertise "has been recognized on numerous occasions by courts who have appointed us to leadership positions" in such cases.

A letter from Aguilar accompanying these submissions, however, informed the Court that "due to scheduling difficulties," Robbins Umeda was currently "unable to procure Mr. Shroff's declaration at this time," but would do so on May 21. Despite this deficiency in its May 16 submission, on May 19, Robbins Umeda submitted a new proposed order appointing (1) Robbins Umeda as Lead Counsel in the consolidated action, and (2) Shroff as "Lead Plaintiff."

By letter dated May 23, Fink changed course, indicating that Robbins Umeda no longer intended to submit a declaration from Shroff, but rather would be moving to dismiss Shroff from this action. Fink explained that "[a]fter speaking with Mr. Shroff regarding the status of the case and [Robbins Umeda's] application for appointment as Lead Plaintiff's Counsel,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4298588 (S.D.N.Y.)
**(Cite as: 2008 WL 4298588 (S.D.N.Y.))**

Mr. Shroff–an elderly investor–determined that he does not have the time necessary to devote to this litigation." The letter further states that Robbins Umeda would be filing a notice of appearance on behalf of Garber (previously represented solely by Lasky & Rifkind), and would submit a declaration from Garber supporting the firm's application to be appointed as Lead Counsel.

That same day, Robbins Umeda filed a notice of appearance on behalf of Garber and a declaration from Garber stating, *inter alia,* that he had previously retained Robbins Umeda in three shareholder derivative actions brought between 2005 and 2008, and that he was satisfied with the quality of their representation. Garber added that he is a citizen of Pennsylvania, that he owns shares of JPMorgan, and that he is aware that JPMorgan is a Delaware corporation, but did not otherwise identify himself or further address whether he could fairly and adequately represent the interests of the corporation and its shareholders.

The submissions and representations made by Robbins Umeda to this point raised serious concerns about the ability of Garber and Robbins Umeda to maintain this action in keeping with the requirements of Rule 23.1. These concerns were intensified when, in conducting an independent review of Robbins Umeda's qualifications to act as Lead Counsel, the Court discovered an opinion issued on February 4, 2008, by the Honorable Ben F. Tennille of the Superior Court of North Carolina, *Egelhof v. Szulik,* No. 04 CVS 11746, 2008 WL 352668 (N.C.Super.Ct. Feb. 4, 2008)–an opinion unmentioned in Robbins Umeda's submissions regarding its qualifications to serve as Lead Counsel in this action–indicating that Robbins Umeda's conduct in this litigation was not without precedent.

*3 As summarized by Judge Tennille:

This is a purported shareholder derivative action in which the failure of counsel to communicate with their client in violation of the Rules of Professional Conduct, the failure of the client to communicate with counsel in contravention of his fiduciary duties, the needless rush to file a complaint, the filing of defective pleadings, and the solicitation of a plaintiff unqualified to fulfill the significant duties of a plaintiff in a shareholder derivative action all

converged to create a situation in which neither the firm nor the client fulfilled their duties and obligations.

*Egelhof,* 2008 WL 352668 at *1. In *Egelhof,* as here, the derivative complaint (against Red Hat, Inc. and its officers and directors) was filed by local counsel, but drafted by Robbins Umeda, who took the lead–through Robbins, Fink, and an associate, Steven R. Wedeking ("Wedeking")–in representing the plaintiff, Andrew Egelhof ("Egelhof"). As was also true in the case before this Court, Judge Tennille found that when he questioned Fink and Wedeking about their client, "[i]t was clear ... that neither of them had ever met Mr. Egelhof nor knew anything about him. Mr. Wedeking did not know how many shares Mr. Egelhof owned, and Mr. Fink incorrectly represented to the Court that he owned hundreds of shares." *Id.* at *2. Having discovered that counsel from Robbins Umeda "knew absolutely nothing about" their ostensible client, Judge Tennille "requested that Mr. Wedeking at least find out how many shares of Red Hat stock his client owned. That request obviously prompted some inquiry which produced the information that Mr. Egelhof was no longer a shareholder, a fact communicated to the Court and counsel by e-mail." *Id.*

As a result of Egelhof's loss of standing to maintain the derivative action, the case was dismissed. Defendants then moved for attorney's fees and sanctions, in connection with which Judge Tennille ordered that Egelhof's deposition be taken. *Id.* That deposition–defended by Robbins and Fink–revealed that Egelhof did not possess "a significant ownership interest in Red Hat," or, more importantly, "the knowledge, background or experience to fulfill his fiduciary duties" as a derivative plaintiff. *Id.* at *4-5.[FN5] The deposition also made clear that "Mr. Egelhof played no significant role in the litigation process," that he "had never met Mr. Robbins or Mr. Fink until the night before his deposition related to the sanctions motion," and that he and Robbins Umeda did not communicate with one another regarding developments in the case, Egelhof's stock holdings, or even Egelhof's whereabouts. *Id.* at *5.

FN5. As described by Judge Tennille, Mr. Egelhof was a "Kansas resident [who] responded to an Internet solicitation from a California law firm looking for a plaintiff in

Not Reported in F.Supp.2d, 2008 WL 4298588 (S.D.N.Y.)
**(Cite as: 2008 WL 4298588 (S.D.N.Y.))**

a North Carolina action." He "was twenty-four years old, had worked in various information technology roles at Kansas State University, and had a degree in business administration," but had "little investing experience, no experience in litigation, no prior connection with the San Diego law firm, no personal knowledge of Red Hat and its operations, and a minor criminal record." *Egelhof*, 2008 WL 352668 at *5.

Based on this record, Judge Tennille concluded that Robbins Umeda

> treated the lawsuit as its own, made all litigation decisions without input from the client, and failed to keep the client and the Court informed of facts which were relevant to Mr. Egelhof's standing to pursue the litigation. While there is no evidence that the firm knew that Mr. Egelhof had sold his stock and hid that information, it is clear that they made no effort to stay in touch with him and discern whether anything had happened which would have affected his standing.

*4 *Id.* at *6. As a result of this course of conduct, Robbins Umeda-and Robbins and Fink specifically-were sanctioned and, *inter alia*, barred from appearing *pro hac vice* in the state courts of North Carolina for five years. *Id.* at *7.

Having reviewed the *Egelhof* decision as well as Robbins Umeda's submissions in this action, the Court issued an Order of June 9 that (1) required the Defendants to depose Garber regarding his qualifications to maintain this action under Rule 23.1, the history of his involvement in this litigation, and the history of his relationship with Robbins Umeda; [FN6] (2) allowed the Defendants to depose Shroff-whose motion to be voluntarily dismissed from this action was still pending-on similar subjects, and (3) directed Robbins Umeda to submit a list of cases in which it or its members had been sanctioned in the last ten years.[FN7] The June 9 Order also scheduled a conference for July 9 to discuss these issues.

> FN6. This portion of the Order cited the *Egelhof* decision, as well as a memorandum endorsed letter from *Carmona v. Paulson*, No. 05 Civ. 9327 (S.D.N.Y. Nov. 6, 2007), in which Robbins Umeda was permitted to

substitute Garber as "nominal shareholder representative" in another shareholder derivative action in this District, the same maneuver for which the firm sought the Court's approval in this action.

> FN7. On behalf of his firm, Robbins submitted a letter of July 2, in which he reported that the *Egelhof* decision was being appealed, and that, "[a]fter inquiry and to the best of my knowledge and belief, neither Robbins Umeda nor any member (or associate) of Robbins Umeda has been sanctioned during the last ten years except for the sanctions issued in the *Egelhof* case."

## II. THE SHROFF AND GARBER DEPOSITIONS AND SUBSEQUENT PROCEEDINGS

As permitted by the Order of June 9, Defendants deposed both Shroff and Garber. At his deposition, Shroff recounted that following Robbins Umeda's representation of him in a lawsuit against a company called ESS Technology (in connection with which Shroff said he received $4,000 [FN8]), he was "asked by a secretary to present [Robbins Umeda] with a list of [his] stocks," which he did. Based upon this knowledge of Shroff's holdings, Robbins Umeda contacted him sometime in early 2008 about bringing a derivative lawsuit against JPMorgan. Shroff subsequently signed an agreement with Robbins Umeda providing that the firm would represent him in a derivative action against JPMorgan. (The agreement is dated January 28, 2008, but bears a signature from Shroff dated February 12, nearly two weeks after the complaint bearing his name was filed in this District.[FN9]) Although the agreement contains, *inter alia*, a short exhibit describing the "Duties of a Shareholder Representative" in a derivative action, he testified that he did not understand this document when he signed it.[FN10] Indeed, his testimony as a whole indicated that he was not aware of the basic nature of a shareholder derivative action,[FN11] and he specifically responded "No" when asked "Do you understand what a derivative lawsuit is?"

> FN8. As subsequently clarified at the July 9 conference, Shroff received this $4,000 in connection with the settlement of derivative litigation regarding ESS Technologies in California State Court. An Order of October 1, 2007 issued by the Honorable Bonnie Sa-

Not Reported in F.Supp.2d, 2008 WL 4298588 (S.D.N.Y.)
(Cite as: 2008 WL 4298588 (S.D.N.Y.))

braw approved such a payment to the three named plaintiffs in that action as "ESS's way of thanking the named [p]laintiffs for their efforts in pursuing claims on its behalf" and "to compensate the named plaintiffs ... for assuming the responsibilities of prosecuting this action." (Shroff is not mentioned by name, but Aguilar stated that Shroff was indeed one of the three named plaintiffs.)

FN9. Shroff's verification of his complaint was also signed on February 12, and was not filed with the Court.

FN10. Shroff testified that he "figured this was a follow-up" to the list of stocks he submitted.

FN11. At one point, Shroff testified, "[t]his lawsuit was against JPMorgan and subprime derivatives, and for the longest time my feeling of a derivative was playing options, whether they were put or call. I had no concept what derivatives meant."

Finally, Shroff also testified that, in May 2008, he decided that he no longer wished to participate in this litigation "[b]ecause [he] didn't think the subprime rational[e] was valid" [FN12]—i.e., because he did not think that this action had any merit-and not because, as Fink represented in his May 23 letter, that Shroff "determined that he [did] not have the time necessary to devote to this litigation." [FN13] Moreover, questioning from Shroff's counsel during the deposition further indicated that his qualms about the litigation were likely first expressed to Robbins Umeda when Robbins called Shroff on May 15 in order to obtain Shroff's declaration in support of Robbins Umeda's application to be appointed Lead Counsel. Thus, it may be assumed that Shroff's lack of desire to remain a plaintiff in this action would not have been discovered had this Court not-like the court in *Egelhof*-directed Robbins Umeda to obtain information from its client.

FN12. Shroff testified that he reached this conclusion after speaking to the manager of a JPMorgan Chase branch that he frequented.

FN13. Although Shroff also indicated that

he did not want to have to travel to New York to participate in the litigation, it is apparent that the potential need for Shroff to travel did not arise until June 9, when this Court ordered that Shroff could be deposed, and thus after Shroff's May discussion with Robbins indicating that he did not believe that the case had merit.

*5 Garber's deposition, in turn, revealed that he is an attorney in Pennsylvania with a solo practice focusing on family law, personal injury litigation, and asserted business litigation. [FN14] Unlike Shroff's, Garber's testimony indicated familiarity with the nature of a derivative action, as well as knowledge of the factual basis for the instant action. He also stated that he currently owns 165 shares of JPMorgan stock, and that his total investment portfolio is worth over $2 million and contains investments in roughly 200 companies.

FN14. Garber did state, however, that his legal practice was not his primary means of support, but that his investments were.

He testified that his involvement in this action commenced when his friend and fellow attorney Alfred Yates ("Yates")-to whom Garber had given online access to his list of stock holdings-"made [Garber] aware" that Garber owned JPMorgan stock and that litigation against its officers and directors might be appropriate. Yates then, Garber believed, undertook an investigation, concluded that such an action "should be pursued," and conferred with Lasky regarding the filing of a complaint. As described by Garber, although he did not retain Yates as his attorney in this case, [FN15] "[i]t was my understanding that [Lasky] was the contact to discuss [the complaint] with Al Yates, and Al and I would discuss it."

FN15. Nevertheless, during the course of the deposition Garber asserted attorney-client privilege when asked about conversations between him and Yates. Garber stated that although "[i]n this specific action [Yates] is not counsel of record ... I do consult him as a lawyer."

Garber testified that while he eventually spoke to Lasky directly (by telephone), this took place after Yates had conferred with Lasky. Garber further testi-

Not Reported in F.Supp.2d, 2008 WL 4298588 (S.D.N.Y.)
(Cite as: 2008 WL 4298588 (S.D.N.Y.))

fied that his "primary conversations" regarding this action were and have been "with ... Al Yates," but that he would on occasion have "follow-up" conversations with Lasky or Fink.[FN16] Thus, for example, when Robbins Umeda wanted Garber to submit a declaration on May 23 in support of the firm's application to be appointed Lead Counsel, "Yates brought it to [Garber's] office," he and Yates "discussed it," and Garber then signed it.

> FN16. Garber testified that he never signed a retention agreement with Lasky & Rifkind, and did not sign such an agreement with Robbins Umeda until the day of his deposition.

Garber also revealed that he is or has been a named plaintiff in approximately twenty-five other actions against corporations and their officers, and that Yates generally referred him to the law firms who would then initiate these actions on Garber's behalf. Garber stated that Yates also monitors Garber's stock portfolio to ensure that Garber does not sell any stock involved in a lawsuit in which Garber is a named plaintiff. Garber testified that Yates does this because they are "friends," and that he has no knowledge of any compensation that Yates receives from the firms to which he refers Garber. Garber did report, however, that he and Yates, in their respective legal practices, "handle cases ... on a referral basis," and also "handle cases jointly."

Although Garber could recall, when prompted by questions, some of the cases in which he is or was a named plaintiff, he generally could not recall basic information about those cases, such as where they were filed, what subjects they concerned, who represents him in these actions (i.e., whether Yates or another firm is his attorney of record), or, in some instances, which corporations were involved as defendants. For example, when asked, "Have you brought a lawsuit against Macy's," Garber could only reply, "I may have, I don't have a recollection at this time."[FN17] In explaining this inability to recall basic facts about these cases, Garber explained that Yates "is the person that I go through in these cases," regardless of whether Yates is, in fact, attorney of record for Garber in a particular action.[FN18]

> FN17. During a subsequent portion of the deposition, Garber was shown a newspaper

article discussing a class action filed in Garber's name against Macy's.

> FN18. Garber later clarified that he receives "about half" of his updates about his pending litigations directly from Yates. When questioned about how he heard about specific developments in the various cases in which he is a plaintiff, however, Garber almost invariably replied that, while he did not recall specifically, he would have heard about them through Yates.

*6 Regarding his attention to this action, Garber testified that he spent "somewhere between ten to fifteen hours" on the JPMorgan litigation, and another "ten hours or so" preparing for his deposition. He further stated that he believed that he had been doing "what is appropriate as representative" for the shareholders by "adhering to, absorbing, following, [and] discussing advice with counsel," and that he believed that he had also done so in the other twenty-five actions in which he was involved. When questioned, however, it appeared that he had generally not seen the orders issued in this case, and that the preparation for his deposition, and that he was also not specifically aware of Shroff's complaint until Yates informed him that Shroff was seeking to be dismissed from the case. He did state that the Court's June 9 Order was shown to him "almost immediately" by Yates, and that they discussed it "at length," including the concerns raised in the Order regarding Robbins Umeda's lack of contact with Shroff. Garber also stated that Yates was present, along with Aguilar and Lasky, during the preparation for his deposition.

Following the completion of the depositions, counsel for the Defendants submitted a letter of July 3, in which they called into question Garber's ability to represent fairly and adequately the interests of the shareholders in this action.[FN19] The letter also raised questions as to whether Garber had properly invoked the attorney-client privilege in refusing to answer questions concerning Yates and requested an opportunity to depose Yates and to redepose Garber on their relationship and conversations.

> FN19. Defendants reviewed Garber's testimony and "respectfully submit [ted]" that that testimony was "relevant to the Court's inquiry into whether Mr. Garber" satisfied

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4298588 (S.D.N.Y.)
(Cite as: 2008 WL 4298588 (S.D.N.Y.))

the Rule 23.1 standard.

Garber's counsel replied on July 7, contending that the deposition testimony confirmed that Garber satisfies the Rule 23.1 standard. It asserted that the attorney-client privilege had been properly invoked by Garber and protected his communications with Yates. It opposed the application to depose Yates or to redepose Garber.

Accordingly, at the July 9 conference, the Court-after a review of the proceedings to that point-set a schedule for the instant Rule 23.1 motion, and stayed the previously scheduled date for the filing of the consolidated complaint. The Court expressed doubt that the attorney-client privilege had been properly invoked in response to questions exploring whether Garber could fairly and adequately represent the class, but suggested that the parties brief the motion on the basis of the record as it then stood. Defense counsel agreed to that proposal but noted that Robbins Umeda should address in a declaration "whether there is some undisclosed relationship between Mr. Yates and [Robbins Umeda] for remuneration based on any outcome in this case."

On July 15, Aguilar wrote to the Court on behalf on Robbins Umeda, stating that "[i]t has become increasingly evident ... that Robbins Umeda's original interest in service as lead plaintiff's counsel in this matter has led to unfortunate distractions in the litigation for the Court and the parties." Aguilar thus requested an extension of time on the briefing schedule for the Rule 23.1 motion to allow Garber to find new counsel. That request was granted on July 16; the Order dismissing Shralf was also signed on that date.

*7 On August 6, new counsel for Garber, from the firm of Whatley, Drake & Kallas, LLC ("Whatley Drake"), filed a notice of appearance, along with a Declaration Regarding the Adequacy of Whatley Drake & Kallas, LLC to Serve as Counsel for Plaintiff Robert L. Garber. The declaration-like Fink's submission of May 16-recounts Whatley Drake's experience in litigating "significant complex class action and derivative litigation," and is accompanied by a 30-page firm resume. The declaration does not mention anything about the attorney-client relationship between Whatley Drake and either Garber or Yates. It includes no information on how Whatley Drake was selected to represent Garber or whether a

Whatley Drake attorney had ever met with or spoken to Garber.

New counsel having appeared for Garber, both Lasky & Rifkind and Robbins Umeda requested to withdraw from the action; those requests were granted on August 8. This motion followed on August 15. In opposition to the motion, Yates submitted a declaration representing that he has not and will not receive payment or compensation of any kind for participation in this litigation.

DISCUSSION

When a shareholder brings a derivative action "to enforce a right that the corporation or association may properly assert but has failed to enforce," such an action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders ... who are similarly situated in enforcing the right of the corporation." Fed.R.Civ.P. 23.1(a). Where a plaintiff is found to have been an inappropriate representative of the shareholders, a judgment entered in that derivative litigation will not preclude a later-filed derivative action brought by a shareholder who can fairly represent the shareholders. As explained by the Court of Appeals, the

rationale for binding nonparty stockholders by a judgment in a derivative action is that a plaintiff-stockholder represented their interests in that litigation. If nonparty stockholders are to be conclusively bound by the results of an action prosecuted by a stockholder ostensibly representing their interests, however, fundamental considerations of fairness and justice demand that the representation be adequate.

Papilsky v. Berndt, 466 F.2d 251, 260 (2d Cir.1972).

The requirement of fair and adequate representation is analogous to the requirement that a representative party in a class action must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(1); see also Papilsky, 466 F.2d at 260(stating that in derivative suit context "[o]ne of the principal criteria for adequacy of representation is that the representation must be of such character as to insure the vigorous prosecution of the claim" (citing to class action cases)); see generally 7C Charles

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4298588 (S.D.N.Y.)
(Cite as: 2008 WL 4298588 (S.D.N.Y.))

Wright, Arthur Miller, & Mary Kay Kane, Federal Practice and Procedure § 1833, at 147 (2007) ("Many of the factors that are considered when determining adequacy of representation in a class action under Rule 23 also apply in the context of derivative suits.").

*8 In the context of class representative status, the issue of the "adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Securities Corp., 222 F.3d 52, 60 (2d Cir.2000) (citation omitted). Thus, "class representative status may properly be denied where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." Id. at 61 (citation omitted). The class representative's knowledge, however, need not be extensive. Id. (class representative's reliance on his father and lawyer for advice did not disqualify him (citing Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 370-374 (1966)).

"Inherent in any class action is the potential for conflicting interests among the class representatives, class counsel, and absent class members." Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077 (2d Cir.1995). Thus, "[t]he ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court." Id. at 1078. See also Baffa, 227 F.3d at 61. In the context of a derivative suit under Rule 23.1, courts have generally found that the defendant has the burden of showing that the plaintiff is an inadequate representative. See, e.g. Smallwood v. Pearl Brewing Co., 489 F .2d 579, 592 n. 15 (5th Cir.1974); see generally 7C Charles Wright, Arthur Miller, & Mary Kay Kane, Federal Practice and Procedure § 1833, at 159 (2007). But see Spira v. Nick, No. 94-cv-7066(LAK), 1997 WL 793052, at *1, *4 (S.D.N.Y. Dec. 29, 1997) (court sua sponte ordered party to show cause why action should not be dismissed for lack of adequate representation under Rule 23.1 and noted that "burden of establishing adequacy of representation in representative actions like this is on the proposed representative party").

The Defendants have shown that Garber cannot be trusted to represent the interests of the shareholders in this litigation fairly and adequately. From the start, this litigation has been controlled by counsel with absentee plaintiffs. Despite the startling record created by the proceedings to date, neither Garber nor his latest counsel of record have taken this final opportunity to provide information that would permit this Court to conclude that Garber will indeed fulfill his responsibilities to the shareholders and the corporation.

Robbins Umeda initiated this litigation and entirely controlled it at its inception. It drafted and circulated a complaint filed in four separate lawsuits over two days purportedly by four different plaintiffs and law firms. For the lawsuit it filed as counsel of record it proffered an elderly plaintiff who understood neither the nature of a derivative action nor his duties as the named plaintiff in such litigation. It did not consult with him about critical events in the life of the case, and when it began to consult with him in response to the Court's inquiries learned that the plaintiff wanted to withdraw from the case because he doubted that it had any merit.[FN20] But for this Court's inquiries, this scandalous situation may never have come to light.

> FN20. Instead of disclosing Shroff's disaffection with the merits of the litigation, Robbins Umeda advised the Court that Shroff wished to withdraw because he did not have the time to serve as lead plaintiff.

*9 Robbins Umeda then tendered another plaintiff, Garber, who had been represented by Lasky as his counsel of record. This substitution replaced one problematic plaintiff with another. Garber is a professional plaintiff whose services are at the beck and call of his friend and fellow attorney Yates. Yates monitors Garber's investments and decides when Garber will serve as a plaintiff in derivative litigation. Yates has made such arrangements in at least twenty-five cases to date. It was Yates who contacted both Lasky and Robbins Umeda in this case. And it is Yates who was the "conduit"-using Garber's term-for the information that Garber has received in this case. Garber never even met with a Lasky & Rifkind or Robbins Umeda lawyer regarding this litigation until the day before his courtordered deposition; he never signed a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4298588 (S.D.N.Y.)
**(Cite as: 2008 WL 4298588 (S.D.N.Y.))**

retainer agreement with Lasky & Rifkind and he didn't sign a retainer agreement with Robbins Umeda until the day of his deposition.

Yates, Robbins Umeda lawyers, and Lasky spent ten hours to prepare Garber for his deposition in this litigation. While Garber demonstrated during the course of that deposition knowledge of the issues at stake in this lawsuit and of the duties he has purported to undertake as a named plaintiff in a derivative action, that prepared recitation cannot erase more telling facts. First, Yates remains central to Garber's participation in this litigation, and yet he has insulated himself from scrutiny. He is not counsel of record and his communications with Garber are shielded by an assertion of the attorney-client privilege. Thus, a key decision-maker in this litigation is beyond scrutiny by the Court. Second, Garber does not exert himself to become informed about the litigations in which he serves as named plaintiff unless his performance is being closely examined. He is appallingly ignorant of the many derivative actions that have been filed in his name. This ignorance is a fairer measure of the diligence with which he will perform his duties than the knowledge demonstrated after intensive preparation for a court-ordered deposition.

As for Whatley Drake, despite the very troubling history in this lawsuit, a lawsuit whose progress has been stymied by the search for an appropriate plaintiff and counsel to represent him, it has chosen to present virtually no information about how it came to be chosen as plaintiff's counsel in this litigation and its relationship with Garber. We know from Yates' August 21 declaration that he has conferred with Whatley Drake, but we do not know if Garber and Whatley Drake have conferred or met.[FN21] Given that Garber's adequacy as a plaintiff has been at issue since at least June 9, information like this should have been submitted with Whatley Drake's application to be accepted as his counsel on August 6, and should certainly have been included in its opposition to the motion to dismiss. But, perhaps tellingly, it was not. To be fair, even if Whatley Drake had proffered such basic information, it could not erase the fundamental doubts that exist about Garber's adequacy to serve as a derivative action plaintiff here.

FN21. Robbins Umeda represented in its July 25 letter that Garber had "identified"

Whatley Drake as potential counsel for him in this litigation and that they planned to meet soon in Pittsburgh, Pennsylvania to discuss the case.

*10 Concern over the phenomenon of the professional plaintiff has already led to statutory reform in the class action field. The findings that prompted that legislative action have resonance for derivative litigation as well. The Senate Report accompanying the Private Securities Litigation Reform Act of 1995 ("PSLRA") stated that "[a]ll too often, the same 'professional' plaintiffs appear as name plaintiffs in suit after suit" and that an explicit goal of the PSLRA was to "combat[ ]" such "abuses." S.Rep. No. 104-98, at 4 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679, 683. The Senate Report explained in detail the problem with the use of professional plaintiffs:

Lawyers typically rely on repeat, or "professional," plaintiffs who, because they own a token number of shares in many companies, regularly lend their names to lawsuits. Even worse, investors in the class usually have great difficulty exercising any meaningful direction over the case brought on their behalf. The lawyers can decide when to sue and when to settle, based largely on their own financial interests, not the interests of their purported clients.

S.Rep. No. 104-98, at 6 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679, 685. Similarly, the House Report stated:

Professional plaintiffs who own a nominal number of shares in a wide array of public companies permit lawyers readily to file abusive securities class action lawsuits. Floor debate in the Senate highlighted that many of the "world's unluckiest investors" repeatedly appear as lead plaintiffs in securities class action lawsuits.... These individuals do not adequately represent other shareholders ....

H.R.Rep. No. 104-369, at 32-33 (1995) (Conf.Rep.), *as reprinted in* 1995 U.S.C.C.A.N. 730, 731-32.

The PSLRA was thus enacted because of Congress's belief "that the lead plaintiff-not lawyers-should drive the litigation. As one witness testified: 'One way of addressing this problem is to restore lawyers and clients to their traditional roles by making it harder for lawyers to invent a suit and then at-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4298588 (S.D.N.Y.)
(Cite as: 2008 WL 4298588 (S.D.N.Y.))

tach a plaintiff.' " S.Rep. No. 104-98, at 10 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679, 689. To that end, the PSLRA has several provisions addressing the problem of professional plaintiffs, including the rule that a "person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period," 15 U.S.C.A. § 78u-4(a)(3)(B)(vi).

While this five-action/three-year rule has no counterpart for derivative actions, it is nonetheless instructive in the case of a professional plaintiff like Garber who is so demonstrably ignorant of the many lawsuits to which he has lent his name as a favor to his friend and colleague Yates. The very abuses that led to the reform embodied by the PSLRA permeate the world of derivative litigation as well. In both contexts there is a need to have plaintiffs who can adequately represent other shareholders and exercise a meaningful role in critical decisions such as whether to file suit or to settle. Otherwise, it is the attorneys who will completely control the litigation and make these decisions based on their own financial interests rather than the interest of the corporation and its shareholders. Thus, based on the entire record in this consolidated derivative litigation, the Defendants have shown that Garber should not be permitted to maintain this litigation and that it must as a result be dismissed.

*11 In opposing this motion to dismiss, Garber's counsel has relied heavily on two court decisions. Neither of them alters the preceding analysis and conclusion. Garber first points to *Surowitz*, 383 U.S. 363, to support his argument that a plaintiff in derivative litigation need have only limited involvement and control over the litigation, and may rely on a trusted, qualified advisor. The plaintiff in *Surowitz* was a Polish immigrant with limited English and little formal education. She had relied on her well-educated and knowledgeable son-in-law in making her investment decision and later for advice about how to respond to the corporation's notice of its intent to repurchase its stock and about whether to sue the corporation in a derivative action. *Id.* at 368-70. In response to a motion to dismiss, the son-in-law and plaintiff's attorney submitted detailed affidavits about the circumstances which led to the filing of the lawsuit. *Id.* at 367-68. After a lengthy discussion of the

information revealed in those affidavits, the Court observed that the plaintiff "was not interested in anything but her own investment made with her own money," that "this is not a strike suit or anything akin to it," and that it is "not easy to conceive of anyone more in need of protection ... than little investors like" the plaintiff, *id.* at 371-72, and then reversed the dismissal of the suit.

The *Surowitz* decision has few parallels with the Garber litigation. Garber does not pretend to be a vulnerable plaintiff who needs the assistance of an advisor (such as a trusted and better educated relative) in addition to his attorney of record. Nor did his advisor, Yates, submit an affidavit forthrightly disclosing his role in this litigation. To the contrary, Yates has relied on the invocation of the attorney-client privilege to shield his communications and motivations from discovery. And, of course, Garber is a professional plaintiff. Thus, nothing in the decision issued herein should be read as limiting the ability of uneducated or otherwise vulnerable plaintiffs to rely on relatives and close friends to assist them in bringing and maintaining derivative litigation.

Garber's counsel next argues that in our judicial system a lawyer should take the dominant role in the litigation, citing *In re Fuqua Indus., Inc. Sholder Litig.*, 752 A.2d 126, 135 (Del. Ch.1999). In the eighth year of litigation, the defendants in *Fuqua* moved to disqualify the two named plaintiffs for their alleged unfamiliarity with the facts and allegations in the lawsuit. *Id.* at 127. One of the plaintiffs, Mrs. Abrams, had fallen ill during the lawsuit, and relied on her husband, who was a retired trial attorney and who had made investment decisions with her, to communicate with counsel. The second plaintiff, Mr. Freberg, had filed seven other lawsuits and his knowledge of the *Fuqua* litigation was described as "elliptical" at best. *Id.* at 128-29.

*12 Again, the principle for which Garber cites *Fuqua*-that an attorney should take the dominant role in litigation-is not implicated by the decision to dismiss the instant action. To represent fairly and adequately the interests of other shareholders and the corporation in whose name a derivative action plaintiff has filed suit, the plaintiff need not usurp the customary role of attorneys in litigation. But, the plaintiff must be the one to authorize the suit, and must be sufficiently well informed, diligent, and independent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4298588 (S.D.N.Y.)
**(Cite as: 2008 WL 4298588 (S.D.N.Y.))**

(with the support where necessary of appropriate ad-
visors) to protect the interests of the shareholders and
corporation from the potentially competing interests
of the attorneys. *See Baffa*, 222 F.3d at 61. The De-
fendants have shown that Garber cannot be relied
upon to protect the interests of other shareholders and
the corporation in this manner.

CONCLUSION

The Defendants' August 15, 2008 motion to dis-
miss this consolidated derivative litigation is granted.

SO ORDERED:

S.D.N.Y.,2008.
In re JPMorgan Chase & Co. Shareholder Derivative
Litigation
Not Reported in F.Supp.2d, 2008 WL 4298588
(S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit G

Westlaw

637 F.3d 721
(Cite as: 637 F.3d 721)

H

United States Court of Appeals,
Seventh Circuit.
CE DESIGN LIMITED, on its own behalf and that of
a class, Plaintiff–Respondent–Appellee.
v.
KING ARCHITECTURAL METALS, INC., Defen-
dant–Petitioner–Appellant.

No. 10–8050.
Submitted Jan. 18, 2011.
Decided March 18, 2011.

**Background:** Recipient of unsolicited facsimile ad-
vertisements brought action alleging that manufac-
turer violated Telephone Consumer Protection Act
(TCPA). The United States District Court for the
Northern District of Illinois, Elaine E. Bucklo, J., 271
F.R.D. 595, granted recipient motion for class certifi-
cation. Court of Appeals granted defendant's petition
to be allowed to appeal.

**Holding:** The Court of Appeals, Posner, Circuit
Judge, held that district court had to reconsider its
ruling that named plaintiff was adequate class repre-
sentative.

Vacated and remanded.

West Headnotes

**[1] Federal Courts 170B ⟨key⟩817**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk817 k. Parties; pleading. Most
Cited Cases

Review of a decision to certify a class is deferen-
tial, but "deferential" does not mean "abject."
Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**[2] Federal Courts 170B ⟨key⟩947**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(L) Determination and Disposition
of Cause
            170Bk943 Ordering New Trial or Other
Proceeding
                170Bk947 k. Further evidence, findings
or conclusions. Most Cited Cases

On remand, district court had to reconsider its
ruling that named plaintiff was adequate class repre-
sentative of class of unconsenting recipients of faxes,
in action alleging violation of TCPA, where record
raised serious doubts concerning truthfulness of prin-
cipal of named plaintiff on key question of whether
named plaintiff had invited or permitted faxed adver-
tisements about which it now complained and named
plaintiff was vulnerable to defense of invitation or
permission. Telephone Consumer Protection Act of
1991. § 3(a), 47 U.S.C.A. § 227(a)(5); Fed.Rules
Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[3] Federal Courts 170B ⟨key⟩763.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent
on Nature of Decision Appealed from
                    170Bk763.1 k. In general. Most
Cited Cases

The merits are not before the appellate court
when the court is reviewing the district court's certifi-
cation of the class; the only question an appellate
court can consider is whether, however meritorious
the suit itself may be, the claim of the class represen-
tative may be subject to a defense that makes it an
inappropriate representative of the class because
other class members may not be subject to the same
defense, or perhaps to any defense. Fed.Rules
Civ.Proc.Rule 23, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⟨key⟩164**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

637 F.3d 721
**(Cite as: 637 F.3d 721)**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak164 k. Representation of class;
typicality. Most Cited Cases

The presence of even an arguable defense pecu-
liar to the named plaintiff or a small subset of the
plaintiff class may destroy the required typicality of
the class as well as bring into question the adequacy
of the named plaintiff's representation; the fear is that
the named plaintiff will become distracted by the
presence of a possible defense applicable only to him
so that the representation of the rest of the class will
suffer. Fed.Rules Civ.Proc.Rule 23(a)(3), 28
U.S.C.A.

**[5]** Federal Civil Procedure 170A ⬡➞164

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak164 k. Representation of class;
typicality. Most Cited Cases

A named plaintiff who has serious credibility
problems or who is likely to devote too much atten-
tion to rebutting an individual defense may not be an
adequate class representative. Fed.Rules
Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[6]** Federal Civil Procedure 170A ⬡➞164

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak164 k. Representation of class;
typicality. Most Cited Cases

For an assault on the class representative's credi-
bility to succeed, the party mounting the assault must
demonstrate that there exists admissible evidence so
severely undermining plaintiff's credibility that a fact
finder might reasonably focus on plaintiff's credibil-
ity, to the detriment of the absent class members'
claims. Fed.Rules Civ.Proc.Rule 23(a)(3, 4), 28
U.S.C.A.

*722 Anthony J. Anscombe, Attorney, Sedgwick,
Detert, Moran & Arnold LLP, Chicago, IL, for De-
fendant–Petitioner Appellant.

James M. Smith, Attorney, Bock & Hatch, Chicago,
IL, for Plaintiff–Respondent–Appellee.

Before POSNER, MANION, and HAMILTON, Cir-
cuit Judges.

POSNER, Circuit Judge.
We have decided to grant the defendant's petition
to be allowed to appeal from the district judge's certi-
fication of a class, in this suit under the Telephone
Consumer Protection Act (as amended by the Junk
Fax Prevention Act of 2005), 47 U.S.C. § 227. See
Fed.R.Civ.P. 23(f). The petition presents a suffi-
ciently novel and important issue concerning class
action practice to justify our allowing the appeal. And
because the petition and the response are adequate
substitutes for *723 briefs and there is a voluminous
record, compiled in the district court, to assist us in
our consideration of the appeal, we shall not delay
the litigation further by requesting additional brief-
ing.

[1] Review of a decision to certify a class is def-
erential, Ervin v. OS Restaurant Services, Inc., 632
F.3d 971, 976 (7th Cir.2011), but "deferential" does-
n't mean "abject." Parker v. Astrue, 597 F.3d 920,
921 (7th Cir.2010). A class "may only be certified if
the trial court is satisfied, after a rigorous analysis,
that the prerequisites of Rule 23(a) have been satis-
fied." General Telephone Co. v. Falcon, 457 U.S.
147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)
(emphasis added); see also, e.g., In re Schering
Plough Corp. ERISA Litigation 589 F.3d 585, 595-
96 (3d Cir.2009). Certification as a class action can
coerce a defendant into settling on highly disadvanta-
geous terms regardless of the merits of the suit. 1998
Advisory Committee Notes to Fed.R.Civ.P. 23(f)
("an order granting certification ... may force a de-
fendant to settle rather than incur the costs of defend-
ing a class action and run the risk of potentially rain-
ous liability"); Blair v. Equifax Check Services, Inc.,
181 F.3d 832, 834 (7th Cir.1999) ("a grant of class
status can put considerable pressure on the defendant
to settle, even when the plaintiff's probability of suc-
cess on the merits is slight"); Hartford Accident &
Indemnity Co. v. Beaver, 466 F.3d 1289, 1294 (11th

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

637 F.3d 721
**(Cite as: 637 F.3d 721)**

Cir.2006); *In re Visa Check/MasterMoney Antitrust Litigation,* 280 F.3d 124, 145 (2d Cir.2001). This is a useful reminder in the present case because, as we'll see, the Telephone Consumer Protection Act makes violators strictly liable for cumulatively very heavy statutory penalties.

The need for rigorous analysis of a motion to certify a class is for the protection not of defendants alone but of the class members as well, especially given our court's recent movement toward allowing a prospective class only one real chance for the class to be certified; for we have directed district courts that have denied certification to enjoin efforts in other jurisdictions to certify essentially the same classes. *Thorogood v. Sears, Roebuck & Co.,* 624 F.3d 842, 850–52 (7th Cir.2010). Denial of certification may be as heavy a blow to the class as grant of certification is to the defendant.

So far as relates to this case, the Telephone Consumer Protection Act forbids "unsolicited" fax advertisements. 47 U.S.C. § 227(b)(1)(C). Such advertisements ("junk faxes," as they are called) consume the recipient's paper and ink without his consent and are thus a source of irritation that has given rise to the statutory prohibition. *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.,* 407 F.3d 631, 639 (4th Cir.2005); *Missouri ex rel. Nixon v. American Blast Fax, Inc.,* 323 F.3d 649, 654–55 (8th Cir.2003); *Destination Ventures, Ltd. v. FCC,* 46 F.3d 54, 56 (9th Cir.1995). CE Design—a small civil-engineering firm in the Chicago area that, unusually for a business firm, is an avid class-action plaintiff—has filed at least 150 class action suits under the Telephone Consumer Protection Act, according to its president, John J. Pezl. Every time CE receives what it considers an unsolicited fax advertisement, Pezl sends it to the class action firm with which he works (and which represents CE in other matters as well).

It seems odd that a business firm would want to bring junk-fax suits, and especially odd that a civil engineering firm would want to sue a manufacturer of metal building components (King Architectural Metals, the defendant) for advertising its building components to the firm. Civil engineers advise their customers on such products and thus are indirect customers of companies like King. And it's not as if *724 King inundated CE with faxed ads; there were only two, each of only one page. But CE's business

model combines selling civil engineering services with filing class action junk-fax suits, and it's not unlawful to be a professional class action plaintiff. *Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 954 (7th Cir.2006). Indeed, an experienced plaintiff in such an action may be able to ensure that class counsel act as faithful agents of the class. *Id.* That is a common problem in class action litigation because often no member of the class has a significant financial stake—which may be the very reason that the suit is being brought as a class action.

What is a matter for concern is that Pezl, who has been deposed in (so far as he can recall) 20 of his company's suits, has engendered doubts about his truthfulness. *CE Design v. Beaty Construction, Inc.,* No. 07 C 3340, 2009 WL 192481, at *6, *7 n. 3 (N.D.Ill. Jan. 26, 2009). He did so in the present suit. Although the district judge remarked that what she euphemistically called a "discrepancy" in Pezl's deposition was "immaterial" to the issue of certification, it was immaterial just to the view she took of it; Pezl couldn't have known what that view would be when he testified to having been unaware that by giving CE's fax number to the *Blue Book* (of which more shortly) he had expressly authorized the other subscribers, who include King, to "communicate" with CE by fax. The accuracy of that testimony is, as we shall see, an important issue in deciding whether he is a proper representative of the class; the district judge missed its importance.

During a period of about a month in 2009, King faxed some 500,000 ads; it was its first fax marketing campaign (and, we're guessing, its last). The certified class includes those recipients who had not given express permission to receive faxed advertisements, unless they had been King's customers or had an established business relationship with it. CE contends that the vast majority of the faxes do not fall within any exception created by the Act. If that is true, then because statutory damages are $500 per violation, 47 U.S.C. § 227(b)(3)(B) and can be trebled if the court finds that the violation was willful or knowing, § 227(b)(3)(C)—King is facing a very large potential liability. (Some statutes, such as the Fair Debt Collection Practices Act and the Truth in Lending Act, cap damages, 15 U.S.C. §§ 1640(a)(2)(B), 1692k(a)(2)(B)(ii). The Telephone Consumer Protection Act does not.) That is relevant, as explained earlier, to the need for a rigorous analysis of whether to

637 F.3d 721
**(Cite as: 637 F.3d 721)**

certify a class.

King makes a number of arguments against certi-
fication, but only those relating to the linked issues of
the typicality of CE's claim (see Fed.R.Civ.P.
23(a)(3); *Harper v. Sheriff of Cook County*, 581 F.3d
511, 513 (7th Cir.2009); *Muro v. Target Corp.*, 580
F.3d 485, 492 (7th Cir.2009)), and the adequacy of
CE's representation of the class, have sufficient merit
to warrant discussion.

A class is disserved if its representative's claim is
not typical of the claims of the class members, for
then if his claim fails, though claims of other class
members may be valid, the suit will at the least be
delayed by the scramble to find a new class represen-
tative. Alternatively, a class representative's atypical
claim may prevail on grounds unavailable to the
other class members, leaving them in the lurch.

[2][3] In many cases, including this one, the re-
quirement of typicality merges with the further re-
quirement that the class representative "will fairly
and adequately protect the interests of the class,"
Fed.R.Civ.P. 23(a)(4); see *J.H. Cohn & Co. v.
American Appraisal Associates, Inc.*, 628 F.2d 994,
999 (7th Cir.1980). In light of *725 the statement in
*Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th
Cir.1996), that "typicality under Rule 23(a)(3) should
be determined with reference to the company's ac-
tions, not with respect to particularized defenses it
might have against certain class members," we'll fo-
cus our analysis on adequacy. CE cannot be an ade-
quate representative of the class of unconsenting re-
cipients of King Architectural Metals' faxes if it is
subject to a defense that couldn't be sustained against
other class members, as in *Koos v. First National
Bank of Peoria*, 496 F.2d 1162, 1164–65 (7th
Cir.1974), or if Pezl is not credible on the key ques-
tion of whether CE invited or permitted the faxed
advertisements about which it now complains. (If it
did, its claim fails.) But it is important to distinguish
between adequacy of representation and the merits of
the suit. The merits are not before the appellate court
when the court is reviewing the district court's certifi-
cation of the class. *Schleicher v. Wendt*, 618 F.3d
679, 686–88 (7th Cir.2010); *Murray v. GMAC Mort-
gage Corp., supra*, 434 F.3d at 954. The only ques-
tion we can consider is whether, however meritorious
the suit itself may be, the claim of the class represen-
tative may be subject to a defense (that of consent to

be faxed ads) that makes it an inappropriate represen-
tative of the class because other class members may
not be subject to the same defense, or perhaps to any
defense.

The Act defines an "unsolicited advertisement"
as "any material advertising the commercial avail-
ability or quality of any property, goods, or services
which is transmitted to any person without that per-
son's prior express invitation or permission, in writ-
ing or otherwise." 47 U.S.C. § 227(a)(5). King argues
that CE gave it "express invitation or permission" to
fax advertisements to it. CE posted its fax number on
its website, and next to it the phrase "Contact Us."
More important, it signed a form that both authorized
the publication of its fax number in the *Blue Book of
Building and Construction*—a print and (mainly)
online directory similar to the Yellow Pages but
aimed at firms in the building industry—and author-
ized the other subscribers to the *Blue Book*, such as
King, to "communicate" with it, including via fax.
For the *Blue Book* states that "by supplying The Blue
Book with your fax and e-mail address, you agree to
have The Blue Book *and users of The Blue Book* ser-
*vices* communicate with you *via fax* or e-mail" (em-
phasis added).

Whether the website plus the *Blue Book* form
added up to CE's consenting for King to fax adver-
tisements to it presents a question that neither the
statute nor the case law, nor the interpretation of the
statute by the Federal Communications Commission,
answers. The only appellate decision dealing with the
question appears to be *Travel 100 Group, Inc. v.
Mediterranean Shipping Co. (USA) Inc.*, 383
Ill.App.3d 149, 321 Ill.Dec.516, 889 N.E.2d 781,
788–90 (2008). It interprets "express invitation or
permission" broadly enough to support King's posi-
tion, but the facts were quite different from those of
this case.

Civil engineering firms are direct or indirect cus-
tomers of sellers of building components, and why
else would those sellers want to "communicate" with
civil engineers by fax except to advertise their wares
to them? In this age of email and other Internet com-
munication systems, faxes are used by businesses for
little else besides advertising. King claims without
contradiction that many of its faxed advertisements
were faxed to companies or individuals that had
asked it for catalogs and other sales materials. Cata-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

637 F.3d 721
**(Cite as: 637 F.3d 721)**

logs and other mailed sales materials are just other advertising media. They don't use the recipient's paper and ink, but a recipient who is in the building business probably doesn't **\*726** care about the form in which potential suppliers communicate with it or the expense of receiving a fax. Fax paper and ink used to be expensive but are no longer.

[4][5] "The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation. The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *J.H. Cohn & Co. v. American Appraisal Associates, Inc., supra,* 628 F.2d at 999 (citation omitted). A named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative. See, e.g., *Koos v. First National Bank of Peoria, supra,* 496 F.2d at 1164–65; *Schleicher v. Wendt,* 2009 WL 761157, at \*3 (S.D.Ind. March 20, 2009), affirmed on other grounds, 618 F.3d 679 (7th Cir.2010).

By giving its fax number to the *Blue Book* for publication, CE publicized the number to the *Blue Book's* other subscribers. The *Blue Book* brings together companies in construction, civil engineering, and architecture to facilitate their marketing to one another. Pezl's testimony that he was unaware that he had authorized publication of CE's fax number in the *Blue Book* is both difficult to credit, as the district judge acknowledged, and, if disbelieved, could be thought evidence of Pezl's fearing that the publication of CE's fax number could indeed be construed as permission to fax ads to that number. The legend "Contact Us" next to CE's fax number on the company's website could be thought to reinforce an inference of permission from the publication of the fax number in the *Blue Book. Compare Murray v. GMAC Mortgage Corp., supra,* 434 F.3d at 954. And notice that the invitation or permission required by the statute for authorizing faxed ads may be "in writing or otherwise" —no specific form of invitation or permission is specified. The district judge did not give adequate consideration to the cumulative significance of Pezl's testimony, the publication of CE's fax number in the *Blue Book,* and its publication on CE's website,

in ruling that CE was an adequate representative of the class.

A 2003 regulation of the Federal Communications Commission on which the judge relied states that the mere fact of publication of one's fax number in a directory or a website is not express permission to fax advertisements to that number. But it adds that "given the variety of circumstances in which such numbers may be distributed (business cards, advertisements, directory listings, trade journals, or by membership in an association), it [is] appropriate to treat the issue of consent in any complaint regarding unsolicited facsimile advertisements *on a case-by-case basis* " and that "express permission to receive a faxed ad requires that the consumer *understand* that by providing a fax number, he or she is agreeing to receive faxed advertisements." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 18 F.C.C.R. 14014, 14129 (F.C.C.2003), 2003 WL 21517853 (emphases added). A more recent regulation states that "the fact that [a] facsimile number was made available in a directory, advertisement or website does not *alone* entitle a person to send a facsimile advertisement to that number." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 21 F.C.C.R. 3787, 3796 (F.C.C.2006), 2006 WL 901720 (emphasis added). The words we've italicized in these two passages create uncertainty about the application \*727 of "express invitation or permission" to CE's conduct.

The uncertainty is reinforced by the deposition of the *Blue Book's* editor, taken by one of CE's lawyers in an earlier suit under the Telephone Consumer Protection Act but made a part of the record in the present case. The editor described the *Blue Book* succinctly as a "buying guide for the construction industry," and the following exchange with the lawyer ensued:

Q. Okay. And what I understand is that in terms of people or entities that put their name and address into the Blue Book, is that basically for companies to advertise to get work and submit bids for potential business from this potential client base that might not necessarily be in the Blue Book itself but in the database? [objection and clarification omitted]

637 F.3d 721
**(Cite as: 637 F.3d 721)**

A. Yes. People advertise and list themselves in the Blue Book because they are looking to get exposure. The mission of the Blue Book is to bring buyers and sellers together. So we have this unlisted circulation base or user base that they want to get in front of, and they also want to get in front of the companies that are listed in the Blue Book.

. . . . .

Q. Is the underlying purpose of the Blue Book for companies to get exposure to advertise to get work and submit bids for potential business for their particular company?

A. That's correct.

. . . . .

A. The Blue Book is distributed so people in the construction industry can contact each other. So they have a directory. It's like a yellow page of construction. They can find whatever service, product, equipment that they're looking for, and they're able to easily contact that company.

Q. Exactly. And they're looking to contact that company to see if that company will do business for them? [objection omitted]

A. Well, they contact them for a variety of reasons. They do contact them to see if they can work for them or if they can purchase their things. Or many times they contact them to promote their company to them to let them know that, hey, I'm in business in this region, you know, kind of like the GC Showcase. Can you put me on your vendor list? They use it to introduce themselves to other people in the industry.

The editor's testimony suggests that subscribers to the *Blue Book* expect and consent to receive ads, including by fax since they are required to publish their fax number in the *Blue Book* if they subscribe and since no business, as distinct from a consumer, is likely to care whether an ad that it wants to receive comes by email, snail mail, or fax.

The record raises serious doubts concerning the truthfulness of Pezl's testimony about his familiarity

with the terms of the contract with the *Blue Book*. The district court erred in treating the subject as immaterial; express consent to communications by fax and email from *Blue Book* subscribers raises a substantial question. The contractual "consent" to communications among a community of businesses involved in the construction industry seems to have no point other than to provide the consent required by this federal law and perhaps similar state laws. The credibility problem and the consent defense are vital in assessing CE Design's adequacy as a class representative. We conclude that, as in *In re Schering Plough Corp. ERISA Litigation, supra,* 589 F.3d at 600, and *Beck v. Maximus, Inc.,* 457 F.3d 291, 300 (3d Cir.2006), the district court must reconsider its ruling that the *728 named plaintiff is a proper class representative.

[6] We don't want to be misunderstood, however, as extending an invitation to defendants to try to derail legitimate class actions by conjuring up trivial credibility problems or insubstantial defenses unique to the class representative. Serious challenges to typicality and adequacy must be distinguished from petty issues manufactured by defendants to distract the judge from his or her proper focus under Rule 23(a)(3) and (4) on the interests of the class, as emphasized in *Dubin v. Miller,* 132 F.R.D. 269, 272 (D.Colo.1990), where the judge, while decertifying the class, remarked that "few plaintiffs come to court with halos above their heads; fewer still escape with those halos untarnished. For an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." See also *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 200 (S.D.N.Y.1992); and compare the denial of class certification in *Koos v. First National Bank of Peoria, supra,* 496 F.2d at 1164–65; *Savino v. Computer Credit, Inc.,* 164 F.3d 81, 87 (2d Cir.1998), and *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990), with its grant in *Randolph v. Crown Asset Mgmt., LLC,* 254 F.R.D. 513, 518 (N.D.Ill.2008); *In re Farmers Ins. Co. FCRA Litigation,* 2006 WL 1042456, at *6 (W.D.Okla. Apr. 13, 2006); *Nelson v. IPALCO Enterprises, Inc.,* 2003 WL 23101792, at *6 (S.D.Ind. Sept. 30, 2003), and *Rodger v. Electronic Data Systems Corp.,* 160 F.R.D. 532, 539

637 F.3d 721
**(Cite as: 637 F.3d 721)**

(E.D.N.C.1995).

Should the court decide that CE is not a proper
class representative, that would not conclude the
question whether the suit should be allowed to pro-
ceed as a class action. CE's law firm might be able to
find a class member who would substitute for CE—a
member less vulnerable to the defense of invitation or
permission. King markets its product to consumers as
well as to businesses. See www. kingmetals. com
(visited Feb. 28, 2011). We do not know whether any
consumers received the faxed advertisements but if
some did, and any of those who did clearly hadn't
authorized King to fax advertisements to them (con-
sumers do not subscribe to the *Blue Book* ), one or
more of them would be potential class representatives
not subject to the defense that King could raise
against CE's claim.

Another possibility, should CE be forced to ab-
dicate as class representative, might be certification
of separate classes: a class of recipients of King's
faxed ads who are potentially subject to a defense of
invitation or permission and a class of recipients who
are not. The merits of the consent defense based on
the terms of the *Blue Book* contract—win or lose—
might well be suitable for determination on a class-
wide basis.

We vacate the class certification and remand for
further proceedings consistent with this opinion.

VACATED AND REMANDED.

C.A.7 (Ill.),2011.
CE Design Ltd. v. King Architectural Metals, Inc.
637 F.3d 721

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit H

Westlaw

Slip Copy, 2011 WL 2147218 (D.N.J.)
**(Cite as: 2011 WL 2147218 (D.N.J.))**

Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
Lauren COYLE, on behalf of herself and all others
similarly situated, Plaintiff,
v.
HORNELL BREWING CO., et al., Defendants.

Civil No. 08–2797 (JBS–JS).
May 26, 2011.

Daniel R. Lapinski, Esq., Philip A. Tortoreti, Esq.,
Wilentz, Goldman & Spitzer, Woodbridge, NJ, and
Michael D. Halbfish, Esq., Law Office Of Michael D.
Halbfish, Esq., Piscataway, NJ, for Plaintiff.

Robert P. Donovan, Esq., McElroy, Deutsch, Mul-
vaney & Carpenter, LLP, Newark, NJ, for Defen-
dants.

*OPINION*
SIMANDLE, District Judge.
**I. INTRODUCTION**
    **\*1** This matter comes before the Court on the
motion for class certification of Plaintiff Lauren
Coyle. [Docket Item 122]. Plaintiff alleges that she
was misled by labels on bottles of Defendants' Ari-
zona brand beverages touting "All Natural" ingredi-
ents and thereby induced into buying bottles of Ari-
zona beverages that contained High Fructose Corn
Syrup ("HFCS"), which she claims is not "natural".
Plaintiff is currently before the Court seeking to cer-
tify, pursuant to Fed.R.Civ.P. 23(b)(2), a class of
consumers who purchased similarly labeled Arizona
beverages that contained HFCS, seeking only de-
claratory and injunctive relief. Plaintiff proposes to
certify her New Jersey Consumer Fraud Act
("NJCFA") claim on behalf of:

    All persons who, within the state of New Jersey
    from April 21, 2002 to present, purchased for per-
    sonal consumption and not for resale or assign-
    ment, an Arizona brand beverage marketed, adver-
    tised, and promoted as "All Natural," "100% Natu-
    ral," or "100% All Natural" but that contained high
    fructose corn syrup.

    Plaintiff's putative class would seek to enjoin
Defendants from claiming that their products contain-
ing HFCS are "all natural."

    For the reasons set forth in detail below, the
Court denies Plaintiff's motion for class certification
because Plaintiff cannot satisfy the adequacy re-
quirement of Rule 23(a)(4).

**II. BACKGROUND AND PROCEDURAL HIS-
TORY**
    The factual and procedural record in this case is
confused on at least one key question: whether Plain-
tiff's qualifying purchase occurred before or after she
concluded that Arizona beverages containing HFCS
were not natural as labeled. As this question has bear-
ing on the Court's assessment of Ms. Coyle's (and her
attorneys') adequacy to represent a 23(b)(2) class, the
Court will detail the facts in the record on this point
before turning to the analysis of the Rule 23 factors
below.

    Plaintiff's original Complaint in this action, and
her subsequent Amended Complaint [Docket Item
72] and Second Amended Complaint [Docket Item
135], allege that on March 30, 2008, Ms. Coyle pur-
chased a bottle of Arizona "Rx Stress" iced tea. (Sec-
ond Am. Compl. ¶ 42.) All three Complaints also
allege, generally, that Plaintiff had been purchasing
other Arizona products on "numerous other occa-
sions" for the previous six years. (Id. ¶ 43.) Plaintiff
alleges that on each of these occasions, she purchased
the product "because she thought, based upon Defen-
dants' representations, that the beverages were all
natural." (Id. ¶ 46.) The only purchase of Arizona
products for which Ms. Coyle has supplied a date and
place of purchase was the March 30, 2008 event.

    During the course of discovery of this case,
Plaintiff produced for Defendants a retainer agree-
ment she signed in anticipation of this lawsuit.
(Donovan Decl. Ex. C.) In the agreement, Michael
Halbfish, Esq., one of Ms. Coyle's current attorneys
in this litigation, agreed to represent Ms. Coyle in an
anticipated class action seeking damages and injunc-
tive relief against the Defendants in this matter for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 2147218 (D.N.J.)
(Cite as: 2011 WL 2147218 (D.N.J.))

their deceptive practices in marketing beverages containing HFCS as "all natural." (*Id.* ¶ 1.2.) The agreement was signed on August 9, 2007, more than seven months *before* Plaintiff has alleged that she was misled by Defendants' "all natural" labeling in her purchase on March 30, 2008. (*Id.* ¶ 10.1.)

*2 Other discovery documents produced by Plaintiff and her attorneys repeated the specific allegations about her March 30, 2008 purchase. Specifically, Plaintiff's responses to interrogatories on January 26, 2009 and October 19, 2009 repeated the allegation of the March 2008 purchase, and alleged specific details of her Arizona purchases only with respect to the March 30, 2008 purchase. (Donovan Decl. Ex. D, response to question 4; Donovan Decl. Ex. E, response to question 10.)

On February 16, 2010, Plaintiff was deposed by Defendants' counsel. (Donovan Decl. Ex. A.) Plaintiff was there confronted with questions over whether she had been incorrect in her allegation of the date of her purchase, or whether she had purchased the product on March 30, 2008, but with an awareness that she considered the "all natural" label to be false.

Q: So at the time you signed these Interrogatories you believed this answer [that she purchased the product on March 30, 2008, for a premium price based on a belief that the product was "all natural" because of the label] to be true?

A: Yes.

Q: And now you're saying you suppose not, that that's not true. What's not true?

A: Given the timeline that we have established here, that would make the date not, the time of the purchase would have been after the time that I had discovered the labeling.

Q: So when did you purchase the Arizona [R]x Stress herbal iced tea?

A: My best guess would be on that date.

Q: March 30, 2008?

A: Yep.

Q: So is it true that you purchased it on March 30, 2008?

A: I suppose it is.

(Coyle Dep. 64:1–17, Feb. 26, 2010, Donovan Decl. Ex. A.)

Nearly two months after her deposition, Plaintiff produced a signed declaration to Defendants that contradicts her deposition testimony, prior answers to interrogatories and the allegations in both her original Complaint and subsequent Amended Complaints. (Coyle Decl., Apr. 7, 2010, Donovan Decl. Ex. G.) In this declaration, Plaintiff states unequivocally that she has not purchased any Arizona product since the summer of 2007, and that her testimony and allegation in her Complaints filed in this case were incorrect; she meant to claim the alleged purchase occurred in March of 2007 rather than on March 30, 2008. (*Id.* ¶¶ 6, 10.) She offers no explanation for why she had previously alleged the March 30, 2008 date in her Complaints and in certified answers to interrogatories.

The present motion to certify a class of similarly situated purchasers of Arizona beverages to pursue injunctive relief pursuant to the NJCFA was later filed on December 15, 2010. The Court held oral argument on this motion on April 6, 2011.

**III. DISCUSSION**

**A. Standard**

"District courts have discretion under Rule 23 to certify a class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir.2006). To certify a class, the Court must find that the proposed class meets the prerequisites to a class action; "plaintiffs must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met." *In re Chiang*, 385 F.3d 256, 264 (3d Cir.2004). "The burden of proving each of the requisite elements of Rule 23 rests with the party seeking certification." *Jones v. Goord*, 190 F.R.D. 103, 111 (S.D.N.Y.1999) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). However, "it is not necessary for the plaintiffs to establish the merits of their case at the class certification stage, and ... in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 2147218 (D.N.J.)
**(Cite as: 2011 WL 2147218 (D.N.J.))**

determining whether a class will be certified, the substantive allegations of the complaint must be taken as true." *Chiang*, 385 F.3d at 262. "Depending on the circumstances, [however,] class certification questions are sometimes 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action,' and 'courts may delve beyond the pleadings to determine whether the requirements for class certification are satisfied,' " *Beck*, 457 F.3d at 297 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir.2001)).

*3 The Third Circuit recently reiterated the "rigorous analysis" that the district court evaluating a motion to certify a class must undertake. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir.2008). Specifically, the Third Circuit held that a district court must make findings "that each Rule 23 requirement is met." *Id.* at 310. Thus, Plaintiff has the burden of proof by a preponderance of the evidence that she has met each element of Rule 23.

**B. The Rule 23(a) Elements**
Rule 23(a), Fed.R.Civ.P., provides:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Because a plaintiff seeking to certify a class must meet the requirements of all four elements of Rule 23(a), the Court will begin its analysis of Plaintiff's motion with the element it considers most problematic: Adequacy.

*1. Adequacy*
Rule 23(a)(4) seeks to ensure "that the representatives and their attorneys will competently, responsibly, and vigorously prosecute the suit and that the relationship of the representative parties' interests to those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir.1977). Factors to be considered when determining adequacy of the named plaintiff are: "(a)

the plaintiff's attorney must be qualified, experienced and generally able to conduct the proposed litigation; and (b) the plaintiff must not have interests antagonistic to those of the class." *Weiss v. York Hosp.*, 745 F.2d 786, 811 (3d Cir.1984).

On the question of whether the plaintiff has interests antagonistic to those of the class, courts often evaluate attacks on the named plaintiff's credibility. *See CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 2011 WL 938000 at *3 (7th Cir. Mar. 18, 2011) (explaining that the credibility of the named plaintiff is potentially a unique defense that might render plaintiff's interests adverse to the class; reversing class certification because of questions of credibility); *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir.1998) (affirming denial of certification on credibility grounds); *Kamuth v. Rodale, Inc.*, Civ. No. 03–742, 2005 WL 747251 at *3 (E.D.Pa., Mar. 30, 2005); *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 397 (D.N.J.1998) ("problems of credibility, when sufficiently serious, can prevent a named plaintiff from being certified as a class representative").

Defendants argue that Plaintiff's inconsistent allegations and testimony regarding the date of her qualifying purchase of an Arizona product render her an inadequate class representative. Defendants cite *Friedman–Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 159 (S.D.N.Y.2010) for the proposition that significant or core misrepresentations by the named plaintiff undermines the adequacy of that plaintiff to represent the class. Defendants suggest that, by either misrepresenting the date of her March 30, 2008 purchase in two separate complaints [FN1], two responses to interrogatories, and a deposition, or by falsely changing her story after the fact in order to salvage her claim, Plaintiff has demonstrated a significant lack of credibility that undermines her adequacy to represent absent class members.

FN1. Plaintiff's Second Amended Complaint was filed after Defendants filed opposition to the instant motion to certify.

*4 Plaintiff responds that mere "inconsistencies" in deposition testimony are not disqualifying. *See Kronfeld v. Trans World Airlines, Inc.*, 104 F.R.D. 50, 59 (S.D.N.Y.1984). Additionally, Plaintiff seeks to distinguish *Friedman–Katz* on the basis of the ex-

Slip Copy, 2011 WL 2147218 (D.N.J.)
**(Cite as: 2011 WL 2147218 (D.N.J.))**

tent and severity of the misrepresentations. Specifically, Plaintiff argues that disqualification of the named plaintiff on credibility grounds should be reserved for cases where the Court finds that Plaintiff has intentionally lied, rather than innocently erred. *See, e.g.,* *Kaplan v. Pomerantz,* 132 F.R.D. 504, 510 (N.D.Ill.1990) (denying class certification to plaintiff found to have lied in deposition because "[a] plaintiff's honesty and integrity are important considerations in allowing him to represent a class.") (*citing* *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 549 (1949)). Secondly, Plaintiff argued before the Court at oral argument that, to the extent that Defendants have raised a problem of Plaintiff's credibility, such a credibility question is one for the jury to decide; it would be improper for the Court to make a credibility determination on the factual dispute of when Plaintiff last purchased an Arizona product at this stage in the litigation. *See* *Weikel v. Tower Semiconductor,* 183 F.R.D. at 397 ("[a]t this stage of the matter [class certification], however, attacks on credibility are not often given much weight.").

The Court begins by holding that Plaintiff is incorrect that questions of credibility at this stage should be ignored and reserved for the factfinder. It is true that the factual question of whether Plaintiff made purchases of Defendants' products after concluding that, because they contain HFCS, Arizona products are not "natural" would, were the case to proceed to trial, be a proper merits question for the factfinder, as it would bear on the question of whether she had suffered an ascertainable loss as required by the NJCFA. However, this Court has an independent obligation at the class certification stage to made findings on whether the named Plaintiff satisfies each of the Rule 23 elements. *In re Hydrogen Peroxide,* 522 F.3d at 316 ("[a]n overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met."). Thus, the Court must make a determination at this stage whether the credibility problems raised by Plaintiff's contradictory testimony and subsequent declaration render her an inadequate class representative.

Second, the Court holds that it need not, necessarily, find Plaintiff to have intentionally lied to hold that she does not meet the adequacy element of Rule 23(a)(4). The issue is not simply whether Plaintiff in fact lied, but whether her inconsistent testimony makes her vulnerable to a unique defense not faced by other class members, thereby rendering her interests potentially antagonistic to the interests of the other class members. *Karnuth v. Rodale,* 2005 WL 747251 at *3 ("To deny certification, a court need not conclude that credibility problems would ultimately defeat the class representative's claim; rather, the court may deny class treatment if that unique defense is even arguably present").

*5 In the instant case, the Court finds that Plaintiff's factual inconsistencies raise sufficiently grave credibility problems as to prevent her from serving as an adequate class representative. First, the Court finds that Plaintiff filed three separate Complaints alleging with specificity that she was misled by Defendants' labeling and purchased an Arizona beverage in March, 2008, when she had retained an attorney seven months previously. Her first Complaint alleging the March 30, 2008 purchase was filed just three weeks thereafter, on April 21, 2008, when the information was presumably fresh in the minds of Plaintiff and her attorney who signed the Complaint, who was Lynne Kizis, Esq. Ms. Coyle repeated these claims in at least two answers to interrogatories, again assisted by counsel, and again repeated the claim in her sworn deposition, even after being confronted with the inconsistency of such a claim. Her subsequent declaration, in which she attempts to "clarify" the timeline in her deposition, does not explain how she had repeatedly asserted the "incorrect" date in her Complaints and interrogatories.[FN2] This level of inconsistency must, logically, demonstrate either (1) an intentional effort to disguise the fact that she did purchase the Arizona Rx Stress beverage in 2008 as alleged, but for the sole purpose of bringing this lawsuit, or (2) a significant carelessness about the specific highly material facts she has alleged in the case. Under either scenario, the Court would be required to find that Plaintiff is not an adequate class representative.

FN2. Defendants argue that the Court should disregard the April 2010 Declaration as a "sham affidavit." *See* *Jiminez v. All Am. Rathskeller, Inc.,* 503 F.3d 247, 254 (3d Cir.2007). The Court concludes that it need not decide the issue here, as the standard for summary judgment, in which the "sham affidavit" doctrine principally applies under Rule 56, Fed.R.Civ.P., does not apply under

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 2147218 (D.N.J.)
**(Cite as: 2011 WL 2147218 (D.N.J.))**

Rule 23(a). The Court merely finds that, in the circumstances presented in this case, the credibility of the proposed class representative as to the essential transaction of her claim is in such stark dispute, and raises issues unique to her, that she cannot adequately represent the class.

These credibility problems are significantly worse than those of *Kronfeld* or *Weikel*, where the inconsistencies were ancillary to the plaintiffs' claims or arose in less crucial documents than in the instant case. *See Kronfeld*, 104 F.R.D. at 52 (determining that plaintiff's credibility problems were "not of such a nature as to unduly burden the class 'by' diverting attention from the substance of the basic claim advanced on behalf of the class"). By contrast, in the instant case, were the Plaintiff to be certified as class representative, she would be required to address Defendants' argument that she made her only documented purchase of Arizona Rx Stress Iced Tea in March of 2008 solely for the purpose of bringing the instant lawsuit and therefore suffered no ascertainable loss. This argument would divert attention from the substance of the basic claim advanced on behalf of the class, namely, whether Defendants' products containing HFCS can be truthfully labeled "all natural," and whether such labeling induced the purchases by class members.

As Defendants point out, Plaintiff's April 7, 2010 declaration does not explain how such a serious and central mistake could have inadvertently been included in the Complaints and discovery materials in this case, but seems, instead, as an effort to paper over the problem. *See Johnson v. Geico Cas. Co.*, 673 F.Supp.2d 255, 279 (D.Del.2009) (holding that named plaintiff's misrepresentations regarding previous litigation involvement, and failure, when confronted with misrepresentations, to "address any of these cases when directly asked" defeated plaintiff's motion to certify on the basis of adequacy). To certify a class with Ms. Coyle as the sole representative, under these highly questionable circumstances, risks the distinct possibility that the class could fail in its claim because its representative will be unable to prove she made a qualifying purchase. This would not be fair to class members who may individually have meritorious claims.

*6 Finally, the Court finds, as an alternative ba-

sis to deny class certification, that Plaintiff's counsel's adequacy is brought into question though the existence of these material discrepancies. Under the most charitable interpretation of these facts, Plaintiff's counsel submitted three separate Complaints to the Court alleging a date of purchase that at least one of them (Mr. Halofish) personally knew to be incorrect, and returned at least two answers to interrogatories repeating the same purportedly incorrect purchase date. This is evidence that Plaintiff's counsel are too careless about key facts to effectively represent the interests of a class of potentially tens of thousands of absent class members. *See Grasso v. Amalgamated Clothing & Textile Workers Union, AFL-CIO, CLC*, 828 F.2d 123, 129 (3d Cir.1987), *overruled in part on other grounds by Reed v. United Transp. Union*, 488 U.S. 319, 329-33 (1989) (noting that district court could, on remand, make findings of inadequacy of class counsel based on counsel's failure to comply with briefing schedule). Thus, even were Plaintiff's credibility not brought into question through these discrepancies, the carelessness of Plaintiff's counsel demonstrated in this case is an independent reason to deny class certification on the basis of adequacy.[FN3]

> FN3. Defendants raise other arguments about Plaintiff's adequacy, regarding her "abandonment" of class damages. Because the Court has already concluded that Plaintiff has not satisfied the adequacy element of Rule 23(a)(4), the Court need not address these arguments.

### 2. *Remaining Rule 23(a) and 23(b) Elements*

Because the Court has concluded that Plaintiff fails to meet her burden of proving adequacy, it must deny Plaintiff's motion to certify, and therefore need not address the Parties' arguments regarding the remaining Rule 23 elements. *See In re Hydrogen Peroxide*, 552 F.3d at 397 (district court must find "that each requirement of Rule 23 is met" in order to certify class).

### IV. CONCLUSION

For the reasons stated above, the Court finds that Plaintiff has proved neither that she nor her counsel will adequately represent the proposed class. Consequently, the Court must deny Plaintiff's motion for class certification in this case because she fails to meet the requirements of Rule 23(a). The accompanying Order will be entered.

Slip Copy, 2011 WL 2147218 (D.N.J.)
**(Cite as: 2011 WL 2147218 (D.N.J.))**

D.N.J.,2011.
Coyle v. Hornell Brewing Co.
Slip Copy, 2011 WL 2147218 (D.N.J.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.