1ABSSYKES

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MONIQUE SYKES, et al.,

4                Plaintiffs,

5           v.                        09 Civ. 8486

6   MEL S. HARRIS and ASSOCIATES
    LLC, et al.,
7
                 Defendants.
8
    ------------------------------x
9
                                     October 11, 2011
10                                   10:30 a.m.

11  Before:

12                     HON. DENNY CHIN,

13                                   District Judge

14                       APPEARANCES

15  CLAUDIA E. WILNER, ESQ.
    JOSHUA ZINNER, ESQ.
16       NEIGHBORHOOD ECONOMIC DEVELOPMENT
         ADVOCACY PROJECT
17       Attorneys for Plaintiffs

18  EMERY, CELLI, BRINCKERHOFF & ABADY, LLP
         Attorneys for Plaintiffs
19  BY:  MATTHEW D. BRINCKERHOFF
         EISHA JAIN
20
    CAROLYN E. COFFEY, ESQ
21  ANAMARIA SEGURA, ESQ.
         MFY LEGAL SERVICES, INC.
22       Attorneys for Plaintiffs

23  KAUFMAN, DOLOWICH, VOLUCK & GONZO
         Attorneys for Defendants
24  BY:  BRETT A. SCHER

25

1ABSSYKES

```
 1   McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
          Attorneys for Defendants
 2   BY:  LEWIS H. GOLDFARB
          JORDAN SKLAR
 3

 4

 5

 6

 7                           - - -

 8

 9

10

11           (Case called)

12           MR. BRINCKERHOFF:  Matthew Brinckerhoff for the

13   plaintiffs.

14           MS. WILNER:  Claudia Wilner for the plaintiffs.

15           MS. COFFEY:  Carolyn Coffey for the plaintiffs.

16           MS. SEGURA:  Anamaria Segura for the plaintiffs.

17           MS. JAIN:  Eisha Jain for the plaintiffs.

18           MR. ZINNER:  Josh Zinner for the plaintiffs.

19           THE COURT:  A lot of lawyers for the plaintiffs.

20           MR. GOLDFARB:  Lewis Goldfarb for the Leucadia

21   defendants.

22           MR. SKLAR:  Jordan Sklar for Leucadia.

23           MR. SCHER:  Brett Scher on behalf of the Mel Harris

24   defendants.

25           MS. VOLIK:  Heather Volik for non-party MFY, Ms.
```

1ABSSYKES

 1   Segura and Ms. Coffey.

 2           THE COURT:  Good morning.

 3           We have a number of items.  We have the subpoenas.  I

 4   don't know if there are other discovery disputes, I don't

 5   recall.  I know there is a question about extending the cutoff

 6   and then we have the class certification motions.

 7           Was there anything else?

 8           MS. COFFEY:  The subpoena question is both the

 9   non-party subpoena and a motion to quash pending as well.

10           THE COURT:  Would they be related?

11           MS. COFFEY:  They are not related.

12           THE COURT:  They are not related.  Okay.

13           Are they the same subpoenas?

14           MS. COFFEY:  No.

15           THE COURT:  Okay.  Why don't we do the non-party

16   subpoenas first.

17           What is the dispute?

18           MR. SCHER:  Your Honor, Brett Scher on behalf of Mel

19   Harris.

20           There are actually two non-party subpoenas that are

21   the subject here.  The first one is with respect to subpoenas

22   that the defendants served on MFY and two individuals that are

23   listed as being responsible for preparing a report that MFY

24   released to the public called Justice Is Served.  MFY has

25   objected to that subpoena and has refused to appear, and the

1ABSSYKES

1   two individuals for those depositions.

2           The reason those depositions were sought and the

3   information that was requested therein is that Justice Is

4   Served report was quoted in the third amended complaint as

5   evidence of my client's and the other defendants' participation

6   in the sewer service scheme that they have alleged.  In the

7   report itself is refers to questionable patterns of process

8   serving they discovered.  They found that New Yorkers generally

9   had taken legal notice as seriously and always responded and

10  went to court; that the defendants in these debt collection

11  cases did not appear on behalf of these cases because they were

12  not served and not because of my other reason.  So to the

13  extent it has been quoted in the third amended complaint and

14  then as actually used and --

15          THE COURT:  Wouldn't you object at trial to the

16  introduction of that on hearsay grounds among other things?

17          MR. SCHER:  Yes, your Honor.  The problem is it has

18  already been used to defeat the motion to dismiss and used in

19  the class certification notice.  There was no reason to put it

20  in there.  They kept it in there through three amendments of

21  the client and we are entitled as part of the fact finding

22  discovery to find out what was the basis, what was the

23  methodology used and where they came up with these conclusions,

24  and specifically to the extent that it attacks my clients and

25  the manner in which they handled their legal cases I think I am

1ABSSYKES

1    entitled to ask those questions.

2              THE COURT:  Let me hear from the recipients of the

3    subpoenas.  There is no question about service or anything like

4    that.  What is the objection?

5              MS. VOLIK:  The objection is these depositions are to

6    depose the attorneys that are in this case.  Normally discovery

7    is given a broad leeway.  However, I think it's clear that

8    these subpoenas are simply to harass the attorneys in this

9    matter.  As you said before, --

10             THE COURT:  The report was drafted by the attorneys or

11   someone else, by a non-attorney?

12             MS. VOLIK:  The report was drafted by MFY and the

13   attorneys were part of it.  However --

14             THE COURT:  Are they MFY attorneys?

15             MS. VOLIK:  Yes.  However, the report is not evidence

16   of the case.  The report is not at issue.  It's the underlying

17   actions that the report discusses.  In fact, over a year ago

18   MFY was served a subpoena for documents related to the report.

19   They produced those documents and those documents relate to the

20   actions that are alleged in the report and, in fact, most of

21   the documents and most of the documentation are actually

22   documents that were prepared by defendants in their court cases

23   in the state courts.

24             THE COURT:  The objection is the subpoenas are

25   harassing?

1ABSSYKES

1          MS. VOLIK:  The objection is the subpoenas are looking

2     for evidence that is not related to the action or it could be

3     used as evidence.  Because the subpoenas are towards attorneys

4     that are actually active in this matter it should be looked at

5     for all of the circumstances that are there.

6          THE COURT:  Do the plaintiffs intend on trying to

7     offer the report itself?

8          MR. BRINCKERHOFF:  That is our understanding, your

9     Honor.  We have no objection to introducing or attempting to

10    introduce it.  It was background information to fill out a

11    rather complex web of facts.  But we don't intend to rely on

12    anything in the report, to introduce the report, to use the

13    report in any way and, of course, we are talking about

14    depositions of the attorneys who represent the plaintiffs in

15    this putative class.

16         THE COURT:  Again, I missed that fact.  The subpoenas

17    are served on lawyers who actually are counsel in the case?

18         MR. BRINCKERHOFF:  Defendants are seeking to depose

19    plaintiffs' counsel in this case -- Ms. Segura.

20         THE COURT:  Okay.

21         MR. SCHER:  If I can add, on the report itself the two

22    attorneys who are listed here are listed as the people who we

23    were supposed to contact if we have any information.  It wasn't

24    a selection on our part.  They were listed as the two attorneys

25    that apparently were involved in the report.  That is why it

1ABSSYKES

1    was sought, not to harass.

2              THE COURT:  The subpoenas on MFY and MFY attorneys are

3    quashed with the understanding that the plaintiffs will not be

4    permitted to introduce the report itself.  The plaintiffs will

5    not be permitted to call the lawyers as witnesses obviously.

6    To the extent there are any other documents I think they are

7    fair game if there are any others, but it sounds like the

8    underlying documents have already been produced.  That is a

9    different story.  But the report itself, the conclusions, the

10   language will be inadmissible at trial.

11             Next.

12             MR. SCHER:  Your Honor, the second set of party

13   depositions relates to the 5 plaintiffs who accepted offers of

14   judgment and the reason we have sought those individuals, that

15   offer of judgment was based upon a nonadmission of liability.

16   The issue that we have is that after those plaintiffs accepted

17   the offers of judgment the plaintiffs then amended their

18   complaint and continued to rely on the facts asserted by those

19   plaintiffs as evidence in this case.  And that appears at

20   paragraphs 217 to 331 of the third amended client.  So almost a

21   third of the allegations or a third of the paragraphs in the

22   complaint relate directly to these individuals.  Plaintiffs'

23   counsel, from what I understand, agreed to accept service of

24   the subpoenas but now the dispute is that as of today we have

25   not gotten a response that these people will be produced.

1ABSSYKES

1          THE COURT:  You want to depose the plaintiffs who

2    accepted offers of judgment.

3          MR. SCHER:  Correct.

4          THE COURT:  What is the objection?

5          MR. BRINCKERHOFF:  Judge, I didn't realize we would be

6    discussing that today but I am happy to discuss any and all

7    things that come up.

8          The back and forth is that I have offered to

9    Mr. Scher, since we are going to be needing to amend the

10   complaint at some point soon anyway, that we would remove any

11   facts related to the judgment defendant or the former

12   plaintiffs who accepted offers of judgment.  He explained he

13   did not find that to be acceptable.  To me this is a bit of a

14   piece and similar to the other issue.

15         THE COURT:  It's more than just removing them from the

16   complaint.  I assume you would also not offer any of the facts

17   relating to those 5 plaintiffs, any evidence relating to those

18   5 plaintiffs.

19         MR. BRINCKERHOFF:  Correct.

20         THE COURT:  Are you relying on them in your class

21   certification motion?

22         MR. BRINCKERHOFF:  We are not, Judge.

23         THE COURT:  The only conceivable relevance I can think

24   of, in light of those representations, is an argument that

25   somehow undercuts the other plaintiffs' arguments.  I am not

1ABSSYKES

1  sure what the conceivable relevance is given that they are not

2  going to rely on any of the facts relating to those 5

3  plaintiffs.

4        MR. SCHER:  Your Honor, obviously the issue we have is

5  that the motion for class certification has been fully briefed

6  and submitted.  To the extent that there would be any reference

7  in there and the court would be looking at the third amended

8  complaint and rendering its decision, we would be troubled by

9  the fact that we had not had the opportunity to question those

10 people.  The plaintiffs had every opportunity to remove those

11 individuals and purposely changed them to representative

12 non-party facts and went ahead and proceeded to put them out

13 there.

14        THE COURT:  We might be able to wait for that.  But

15 let me do this:  The subpoenas were already served.  You

16 accepted service?

17        MR. BRINCKERHOFF:  Yes.

18        THE COURT:  Those subpoenas are quashed; that is, as

19 to the 5 plaintiffs who accepted offers of judgment, again on

20 the condition that none of the facts relating to those 5

21 plaintiffs whatsoever will be permitted as evidence at trial or

22 on the class certification motion.  I have read the papers.  I

23 don't recall whether these 5 are relied on or not but before I

24 rule I will make sure that I revisit that part.  And so on

25 those bases, those subpoenas are quashed as well.

1ABSSYKES

1          What other discovery issues?

2          MS. COFFEY:  There is also another non-party subpoena

3     dispute.  Plaintiff served subpoenas on non-party process

4     servers to examine their log books and defendant Samserv, they

5     filed a motion to quash as improper because it's a non-party

6     subpoena and there is absolutely no right of privilege in the

7     contents of the log.

8          THE COURT:  Why do you want those log books?

9          MS. COFFEY:  We believe the log books will provide

10    some information that was raised in the class cert. motion

11    where we examined Samserv's data base which contains several

12    instances of questionable service by process servers.

13         THE COURT:  As a comparator.  In essence, you want to

14    see how other process servers do in terms of percentages of

15    successful personal service, that kind of thing?

16         MS. COFFEY:  Some of the process servers who are

17    actually all in the data base that was provided, so they are

18    all process servers who used to or currently do process for

19    Samserv and --

20         THE COURT:  Are we talking about individuals?

21         MS. COFFEY:   Individual process servers.

22         THE COURT:  Not companies.

23         MS. COFFEY:  Independent contractors not employed by

24    Samserv and never were.

25         THE COURT:  But who did?

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ABSSYKES

| | |
|---|---|
| 1 | MS. COFFEY:  Did work and some still work for Samserv. |
| 2 | THE COURT:  And I gather from reading the class |
| 3 | certification papers that process servers are required by law |
| 4 | to maintain log books and we are talking about individuals as |
| 5 | well as -- |
| 6 | MS. COFFEY:  Just individuals, your Honor.  Only |
| 7 | individuals are required to maintain log books as a |
| 8 | responsibility and they have to remain licensed in New York |
| 9 | City. |
| 10 | THE COURT:  For how long? |
| 11 | MS. COFFEY:  They are required to keep them for 2 |
| 12 | years.  We did ask for any log books they have going back to |
| 13 | December 2005, which is the length of our class definition, |
| 14 | proposed definition, but to the extent process servers don't |
| 15 | have them for that long, that is fine.  Whatever they have we |
| 16 | want to look at. |
| 17 | I want to add the defendants did indicate in their |
| 18 | papers that there were several errors that may have occurred in |
| 19 | the actual data base and that the information in the data base |
| 20 | may not be accurate, but the log books are contemporaneous |
| 21 | records and we want to compare them. |
| 22 | THE COURT:  What is the objection? |
| 23 | MR. SKLAR:  The objection is it's tremendously |
| 24 | overbroad.  There is no limitation or relationship to the |
| 25 | class.  They are not looking for people who work for Mel Harris |

1ABSSYKES

1    and other people who did work with the Leucadia defendants.

2    They make, it's gratifying to hear the reference to 2 years

3    now.  In their papers they suggested there is a requirement to

4    maintain log books for 6 years which is simply not the case.

5    It's essentially overbroad and they are harassing of people who

6    currently or may or may not or haven't worked for Samserv for a

7    long time.

8              MS. COFFEY:  If I may --

9              THE COURT:  Is there a way to limit this to people who

10   work for either Mel Harris or Samserv or Leucadia?

11             MS. COFFEY:  The nature of log books is you are

12   supposed to report contemporaneous records of each attempt and

13   completed service.  So it would be very surprising to find that

14   someone had a log book that only related to Mel Harris cases.

15             THE COURT:  In terms of the individuals you have

16   identified, how many are there?

17             MS. COFFEY:  26, your Honor.

18             THE COURT:  And these are people who at one point or

19   another served process for Samserv?

20             MS. COFFEY:  Correct.

21             THE COURT:  And you are saying unless the log books

22   are broken down by client it's more trouble to try to redact

23   them?

24             MS. COFFEY:  The log books don't record clients.  They

25   only record the actual index number, the name of the case, who

1ABSSYKES

1    was served and whether it's by substitute service or not, a

2    description of the person served.  So I am not even sure how

3    that would be helpful for individual process servers to go

4    through their log books and figure out which case applied to

5    Mel Harris.  All we are asking for is composition books.  They

6    are just books that --

7              THE COURT:  Are they usually manually kept?  They are

8    not computerized?

9              MS. COFFEY:  They are supposed to be manually kept in

10   bound composition notebook and written in.  There are all the

11   rules about how they are supposed to be kept.

12             THE COURT:  In theory I think it could be relevant.

13   It could lead to relevant evidence.  There ought to be a way to

14   somehow limit it so that it's reasonable.

15             MS. COFFEY:  I am not sure what the reasonable problem

16   is.  If it's a number of log books we would be happy to

17   discuss --

18             THE COURT:  How many years did the request cover?

19             MR. SKLAR:  Back to 2005.

20             THE COURT:  When the class started?

21             MS. COFFEY:  Right.  To the extent someone has log

22   books going back that far and it was burdensome to bring them

23   to our office we could certainly work something out.

24             THE COURT:  I don't see it as being a burdensome issue

25   other than you have to photocopy these things for production,

1ABSSYKES

 1    but as for these individual process servers they either have

 2    the books or they don't.  If they have them they have to turn

 3    them over.  I don't see that as a burdensome issue.  It would

 4    be more burdensome to go through and try to figure out which

 5    ones -- and that can be the plaintiffs' problem, but it seems

 6    to me it doesn't make a lot of sense to try to redact them now,

 7    to redact ones that aren't relevant because you would have to

 8    look up every index number, figure out who the parties were and

 9    then white it out.  It seems to me --

10         MS. COFFEY:  These entries should reflect affidavits

11    of service that are filed with the clerk so all the information

12    in there may not be publicly available in the log book but the

13    information we are talking about is not subject to privacy.

14         THE COURT:  Assuming there is a protective order in

15    place with respect to these, is there a privacy issue?

16         MR. SKLAR:  There may be a privacy issue.  With the

17    confidentiality order we can manage but if we get limitation on

18    time, again the requirement is 2 years of maintaining these.

19         THE COURT:  I think if they have them -- if it's a

20    matter of handing over a bound book it's not that big a deal.

21    If they don't have them and they are not required by law to

22    have them, then that is it.  They don't have to make them up.

23    They don't have to compile them now.  It seems to me I don't

24    see that as a significant issue in terms of burden.  I think it

25    could be relevant, particularly if you look at log books versus

1ABSSYKES

1   the affidavits of service if there is a contradiction that is

2   something.  So the objection is overruled as to these.

3              What else?

4              MS. WILNER:  Your Honor, there are a number of other

5   outstanding discovery issues.  Our office had sent -- we faxed

6   a letter on Friday to the court.  It sounds like maybe you

7   didn't receive it.

8              THE COURT:  I might have received it but I didn't read

9   it.  Tell me what it is.

10             MS. WILNER:  We are prepared to walk through the

11   issues if that is all.

12             THE COURT:  These are all at issue?

13             MS. WILNER:  Yes, they primarily relate to issues with

14   the Mel Harris defendants.

15             THE COURT:  Go ahead.

16             MS. WILNER:  The first one is that we have requested

17   that they provide their payments to process serving agencies,

18   both to Samserv and other agencies that were used to serve

19   process in cases involving the Leucadia defendants.  And this

20   is a really important part.

21             THE COURT:  You want to know the amounts?

22             MS. WILNER:  Exactly.  The Mel Harris defendants have

23   refused to provide this.  At first they refused completely to

24   provide the information.  Then they said they would provide it

25   for Samserv but they haven't actually provided it.  It has been

1ABSSYKES

1    over a month since they said they would produce it and they

2    have not produced it.

3           THE COURT:  You want it for everyone?

4           MS. WILNER:  For everyone because we definitely need

5    it for Samserv but we also think it's important for comparative

6    purposes to compare what was paid to Samserv with what was paid

7    to other process-serving agencies doing essentially the same

8    job.  The scope is limited times the period of the class and we

9    are looking only for service that was done on behalf of the

10   Leucadia defendants.

11          THE COURT:  You are looking for documents or this

12   would be in the nature of an answer to an interrogatory?

13          MS. WILNER:  We look for documents reflecting

14   payments.

15          THE COURT:  But what you are interested in is the

16   amount per service?

17          MS. WILNER:  Exactly, yes.

18          MR. SCHER:  Your Honor, I think you hit it on the head

19   that the issue we have is that the demand as originally phrased

20   is you give us all billing and accounting records and they

21   narrowed it down to all payments ever paid to Mel Harris in 6

22   years to any process server we ever used.  Mel Harris -- the

23   case we are talking about the plaintiffs are defining for just

24   Leucadia alone is 100,000.  They want every single document

25   containing every payment with anything to do with a bill or

1ABSSYKES

1    invoice.  If what they are looking for is simply an answer

2    under oath of generally how much do you pay for this type of

3    service or that type of service, it's a lot easier to do it in

4    an interrogatory than to come back and say we want every single

5    paper you have concerning how much you paid to a process server

6    and going beyond Samserv and asking for other cases where it's

7    a clear fishing expedition.  These other process servers are

8    not part of the case.  There is no issue of service of these

9    other process servers.

10         MS. WILNER:  Your Honor, I don't know that it's so

11   clear that there are no issues concerning service with other

12   process servers.  It relates to another issue that we would

13   like to discuss a little later, but Mel Harris used other

14   process servers in addition to Samserv on behalf of the

15   Leucadia defendants and all of that information is relevant to

16   our claims.

17         THE COURT:  We have to put some kind of restraint on

18   this.  The objections are sustained in part, overruled in part.

19         The request for every piece of paper relating to

20   payments is too broad.  I think there should be information

21   provided only with respect to Samserv, not other process

22   servers, and answers to questions of what Mel Harris paid

23   Samserv.  I am not striking the request for all documents.  For

24   example, if there is a contract or a document or something that

25   lays out the relationship in terms of the prices, the pricing,

1ABSSYKES

1    that should be produced.  I think something that advises of the

2    overall amounts, I think that could be relevant and should be

3    produced.  But we don't need every individual check or invoice

4    or letter back and forth for transmittal.  And I think for the

5    class period also.

6          Next.

7          MS. WILNER:  We have requested from the Mel Harris

8    defendants their communications with the Leucadia defendants,

9    with the Samserv defendants, and with two other companies,

10   Rushmore Recovery Management, which is a non-party but it's the

11   third partner in the joint venture, and Metcap Securities,

12   which is the broker that was involved in the purchasing of the

13   portfolios, and the Mel Harris defendants have simply refused

14   to turn over any of their communications with co-defendants or

15   these other two companies.

16         MR. SCHER:  Your Honor, first I would say that is

17   inaccurate.  With respect to the objection, the objection has

18   always been that we have asked the plaintiffs' counsel for

19   months to narrow it down, not simply ask for every single

20   communication we ever had with each of these entities.  To the

21   extent they limited it and they did -- for example, they asked

22   for all communication between Mel Harris and Leucadia

23   concerning the financials.  We produced thousands of pages of

24   excel spread sheets detailing every single payment on a weekly

25   basis that went back and forth, detailing which debtors paid

1ABSSYKES

1    their bills that month, how much was collected, how much was

2    forwarded to Leucadia.  That was all in tremendous size Excel

3    spread sheets.  To say we haven't produced anything is a

4    mischaracterization of what has been produced.  They narrowed

5    it down, give us all the financial documentation showing the

6    monies, and it's highly privileged and we produced them.  They

7    were produced under the confidentiality badge but to say we

8    haven't given them anything is not right.  Narrow it down to

9    some paper other than every single piece of paper that has been

10   exchanged between these two companies is all we asked.

11          MS. WILNER:  When we asked counsel how many

12   communications there were he stated that he had not even asked

13   his clients to check how many documents there were.  We have no

14   idea if this request is even burdensome at all and our

15   understanding is it seems like there is a small group of

16   individuals at each company who are actually involved in

17   conversing with each other.

18          THE COURT:  There must be lots of communications that

19   are totally irrelevant.  Enclosed is a copy of this document

20   you requested or enclosed is a copy of -- you know, these

21   transmittal things, is there a way of -- particularly when you

22   are dealing with this kind of volume, there must be lots of

23   communications.  Is there a way of narrowing this?

24          MS. WILNER:  Your Honor, I am not even sure that there

25   is a large volume of communications at issue here and it's hard

1ABSSYKES

1  for us to narrow --

2       THE COURT:  Is there a large volume of communications?

3  Have you looked?

4       MR. SCHER:  Yes, there is.  Just the log we produced

5  was thousands of pages of documents.

6       MS. WILNER:  I don't know what is the volume aside

7  from the spread sheets that they have already produced.  It

8  might be possible for us to narrow the request but without any

9  input from them as to what is the burdensomeness problem, why

10 can't they search and produce these things?  It's very hard for

11 us to be able to narrow the request.

12      THE COURT:  I don't have a quarrel with the refusal to

13 turn over every piece of paper just because you asked for it.

14 Even if it's not hard I don't disagree with that sentiment.

15 There should be some kind of more targeted approach it seems to

16 me.

17      I think the request for every communication is overly

18 broad.  I think the plaintiffs should narrow the requests and

19 try to make them somewhat more targeted and substantive and try

20 to work something out.

21      MS. WILNER:  It may be possible to narrow the request

22 to cover, for example, the key people at each organization who

23 were responsible for the deal.

24      THE COURT:  I think it should be more than just the

25 names of the individuals.  Look, I don't know what you are

1ABSSYKES

1    going to do with all these things either.  Every transmittal

2    letter?  I mean, here are ten cases, and I don't know how it

3    works but if they send over ten cases and they say please file

4    these ten cases for us, do you want all of those?  And if that

5    happens 20 times a week, do you want all of those?  It means

6    collecting them, photocopying them, making multiple sets,

7    stamping them.  It's still a fair amount of work.  It might be

8    easier to gather them, but I don't know.

9         MS. WILNER:  It seems the transmittal letters would

10   largely accompany these spread sheets that they have already

11   produced.

12        THE COURT:  The objection is sustained on the grounds

13   that the request for every communication is overly broad.  I

14   will leave it up to you to try to narrow it and to try to work

15   it out, and if you can't you will have to come back to me, but

16   I am not going to sit here and try to imagine or rewrite the

17   requests for you.

18        Next.

19        MS. WILNER:  We have requested from the Mel Harris

20   defendants documents that they have provided in response to a

21   request for subpoenas by the U.S. Attorney's Office and the New

22   York State Attorney General's office and the basis for this is

23   that we know that the New York State Attorney General has

24   subpoenaed documents from Mel Harris in connection with their

25   ongoing investigation of sewer service among different process

1ABSSYKES

1    serving agencies and the Mel Harris defendants have responded.

2    We think that the information --

3              THE COURT:  The request is you just want whatever they

4    produced in response in these requests?

5              MS. WILNER:  Yes.

6              THE COURT:  And both organizations are conducting

7    investigations on sewer service, is that your understanding?

8              MS. WILNER:  I am really not sure of the nature of the

9    investigation by the U.S. Attorney's Office.  The New York

10   State Attorney General's investigations have centered around

11   sewer service.

12             THE COURT:  How do you know that?

13             MS. WILNER:  We have received through a FOIA through

14   the Attorney General's office information in general about the

15   investigations and some of the results of it, but a lot of the

16   information that we have received through FOIA is extremely

17   redacted and so it's not useful for us in terms of, for

18   example, comparing patterns of sewer service with the patterns

19   we see in our case.  And, also, the FOIA only covers

20   investigations that are actually completed and there may be

21   other ongoing investigations that aren't completed with the

22   U.S. Attorney's Office yet and so we would like those

23   documents.  We are not asking them to do anything new but

24   simply to produce what was already produced to these agencies.

25             THE COURT:  What is the objection?

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ABSSYKES

1          MR. SCHER:  The objection is that the demands are

2    actually -- there are two they provide in the one.  The first

3    demand was documents provided in response to any request or

4    subpoena from the U.S. Attorney's Office or the New York State

5    Attorney General and our objection to that was twofold.  One is

6    that just like the plaintiffs have objected to our subpoenas

7    that we have served and information we sought with respect to

8    background information on the plaintiffs, which your Honor

9    quashed at the beginning of the case, asking for any complaints

10   that our clients have or any request to the Attorney General

11   goes well beyond the scope of sewer service.

12          In fact, the plaintiffs, and this was a issue we had

13   in the case a few months ago, instead of serving the subpoena

14   on the Attorney General's Office they used a FOIA request,

15   didn't put us on now, but they got 3000 pages of documents from

16   the New York Attorney General.  And going through the

17   complaints you can see why they are non-responsive.  It's

18   individuals.  They are not talking about sewer service.  It's

19   in the nature of the business of being in debt collection that

20   you get people who go to the Attorney General's Office at

21   consumer frauds and complain about the fact that the bank

22   account has been attached.

23          I just went through the first 30 pages of what they

24   produced to us after we requested it and the New York Attorney

25   General's Office deals with requests saying it's not me,

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    somebody else, and they go through and say this debt does not

2    belong to me.  It was somebody else who co-signed and I am now

3    on the hook.  It has nothing to do with sewer service.

4            To the extent they are saying they have information

5    that the Attorney General is investigating my client with

6    respect to sewer service, that is news to my client because

7    they are not aware of a sewer service investigation of them by

8    the Attorney General's Office.  To the extent --

9            THE COURT:  The second objection?

10           MR. SCHER:  The second demand actually went into where

11   they said they wanted specifically documents pertaining to

12   complaints that were filed against Mel Harris' firm with

13   respect to allegations of process servers who failed to comply

14   with process-serving requirements.  To the extent we didn't

15   object to that and to the extent we don't have documents

16   because, as I just said, as far as we know Mel Harris is not

17   under investigation by the New York State Attorney General's

18   Office for sewer service.

19           THE COURT:  Are there any documents containing

20   complaints against Mel Harris regarding sewer service?

21           MR. SCHER:  As far as we know there are not.  We have

22   a stack of documents that deal with that and are not issues of

23   sewer service but debtors who are upset about the bill payment

24   collection process and don't want to pay the bills for whatever

25   reasons talking about issues beyond that.

1ABSSYKES

```
 1              THE COURT:  The objections are sustained.  I am not
 2     going to order the production of all documents submitted to the
 3     U.S. Attorney and the Attorney General's office except that to
 4     the extent there are documents that relate to complaints of
 5     sewer service they are to be produced.  If there are none, then
 6     there should be a representation from someone from Mel Harris
 7     to that effect, that a review has been conducted and that no
 8     documents relating to complaints of sewer service were produced
 9     to the two government agencies.
10              Next.
11              MS. WILNER:  I am sorry, may I ask a clarifying
12     question?
13              THE COURT:  Yes.
14              MS. WILNER:  You said that the Mel Harris defendants
15     should produce copies of complaints related to allegations of
16     sewer service?
17              THE COURT:  Correct.
18              MS. WILNER:  There is another part of our case which
19     has to do with the false affidavits of merit that the
20     defendants filed in order to get default judgments and if there
21     are complaints that relate to that, or similar allegations, we
22     would like to request those as well.
23              THE COURT:  I guess that is a little bit thornier
24     because it's murkier.  What constitutes a complaint regarding a
25     false affidavit of service?  If someone is saying I didn't owe
```

1ABSSYKES

1    the money, is that a complaint that goes to a false affidavit

2    of service?

3              MR. SKLAR:  That would be the false affidavit of

4    merit.

5              THE COURT:  I meant merit.  I meant does a client to

6    the effect that they came after me even though I didn't owe

7    them money, is that construed as a complaint regarding a false

8    declaration of merit?  I guess we should clarify that.

9              MR. SCHER:  Your Honor hit it on the head.  How do you

10   a search?  Plaintiffs have shown my clients deal with

11   complaints on a daily basis.  That is what happens.  To look

12   through and find was this one dealing --

13             THE COURT:  Let me do this:  Modified to the extent

14   that Mel Harris shall also produce any copies of documents that

15   relate explicitly to complaints about false affidavits or

16   declarations of merit, so that general complaints are not

17   construed to go to those declarations of merit.

18             What is next?

19             MS. WILNER:  I just had one more clarifying question.

20   I am sorry because I may have just missed this, but to the

21   extent that Mel Harris was served with subpoenas by the U.S.

22   Attorney's Office or the Attorney General's office and they are

23   specifically requesting documents pertaining to an

24   investigation of sewer service, you ruled that Mel Harris does

25   not have to produce those documents?

1ABSSYKES

1          THE COURT:  I have ruled that Mel Harris is obligated

2    to produce documents relating to complaints of sewer service

3    and as modified to include documents that explicitly address

4    the question of false declarations of merit that were produced

5    to the U.S. Attorney or the Attorney General in response to

6    whatever subpoenas they served.

7          MR. BRINCKERHOFF:  And any informal request?  Because,

8    as we know, governmental agencies usually because they

9    resort --

10          THE COURT:  As part of their investigation, whether

11   formal or informal, that were produced.

12          MS. WILNER:  Because much of what was produced to

13   these government agencies, as I understand it, is like a spread

14   sheet, an electronic spread sheet that has records of service.

15   Is that part of what the defendants would be required to

16   produce?

17          THE COURT:  I don't know what it is.

18          MR. SCHER:  We don't know.  If it's a spread sheet

19   that is responsive to what your Honor directed we will produce

20   it.  I wouldn't parse between electronic --

21          THE COURT:  If you have to show -- well, show me the

22   document if you can't work it out.  I have tried to give you

23   guidance.  Try to work it out.

24          What is next?

25          MS. WILNER:  With regard to one of the plaintiffs,

1ABSSYKES

1    plaintiff Armoogam, we had requested from defendants their

2    complete files concerning this plaintiff, and actually

3    concerning all the plaintiffs, and they produced complete and

4    unredacted files for three of the plaintiffs but for the fourth

5    plaintiff, Armoogam, they have not produced the collection

6    notes for their computer system and they have stated that every

7    single collection note is covered by attorney-client and/or

8    work product privilege and we think that this is overbroad.

9              THE COURT:  They were produced for the other three?

10             MS. WILNER:  They were produced for the other three.

11   Let me say at the outset that these collection notes do not

12   contain attorney-client communications.  They are internal

13   collection notes that the Mel Harris firm uses to collect

14   debts.  There is definitely no communications with clients

15   there.  It's not a computer system they used to communicate

16   with each other, and they also were not in the habit of

17   speaking with each other about individual cases, so there

18   really wouldn't be a need for communications in these files.

19             THE COURT:  What is the objection?

20             MR. SCHER:  The objection is on work product.  It

21   seems my clients since they are in the industry of debt

22   collection that they are apparently no longer a target.  What

23   they are talking about is these collection notes or or.

24             THE COURT:  Why were they produced for the other

25   three?

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ABSSYKES

1              MR. SCHER:  They were produced on closed files.  This

2     is an active file and that was before plaintiffs made the

3     demand they were going to be asking for it.  The segue is they

4     will ask for 100,000 of every one of these produced wholesale

5     of my clients attorney notes.

6              MS. WILNER:  If I may, your Honor, this is not an

7     active file.  This is also a closed file, like the other files,

8     and most of these notes are really not reflective.  I don't

9     know if any of them are reflective of opinion work product.  A

10    lot of them are automatically entered by the computer system to

11    note when an action was taken.

12             THE COURT:  The objection is overruled.  As for this

13    one individual the collection notes are to be produced.

14             MR. SCHER:  Can we clarify that is not going to be

15    used by plaintiffs as a basis to produce 100,000 other files?

16             THE COURT:  I will cross that bridge when I get there.

17    We are at a point where I am not going to expand discovery into

18    100,000 other files.

19             MS. WILNER:  That brings me to the next point, your

20    Honor.  We requested a number of documents from the Mel Harris

21    defendants' data base.  You may recall we had this discussion

22    at the last discovery conference and your Honor ordered us to

23    work out a compromise and there were four tables that we had

24    asked to be produced, one of which was the notes field.  At

25    this point the Mel Harris defendants have produced everything

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ABSSYKES

 1    except the notes field.

 2              THE COURT:  You are talking about others now?

 3              MS. WILNER:  For the class members.  I am just raising

 4    this sort of to flag the issue because we feel we might be able

 5    to do it without the notes field.

 6              THE COURT:  Let's leave it without prejudice.

 7              MS. WILNER:  Thank you very much.

 8              THE COURT:  What else?

 9              MS. WILNER:  We recently served a small amount of

10    discovery demands and the Mel Harris defendants refused to

11    produce any information in response to those demands.  One of

12    the things we asked for was communications between the Mel

13    Harris defendants and the assigners of the debt.  So, in other

14    words, the entities we purchased the debts from we would like

15    communications that pertain specifically to requesting

16    additional documentation of the debts, and this is because when

17    they buy these debts they don't buy any account documentation,

18    contracts, account statements or any of the rest of it, and

19    part of our case is an allegation that not only do they not

20    have those documents at the outset but they never get them at

21    any point of the litigation.  And the information about where

22    and under when and under what circumstances they would request

23    these documents is relevant and we have requested it and they

24    refused to produce it.  We are seeking information about how

25    often they actually requested these documents, how often they

1ABSSYKES

 1   actually received them, if ever, as well as how much they

 2   typically paid for them.

 3         THE COURT:  Any objection?

 4         MR. SCHER:  The objection is, first of all, it deals

 5   with relevance and this was part of what I hoped to discuss in

 6   a few minutes with respect to the motion for class

 7   certification in terms of the fact that there has been now a

 8   court decision talking about the issue of commencing lawsuits

 9   without documentation and using the affidavit of merit which

10   our clients used as being completely legitimate and not a

11   violation of the FDCPA.  I updated that decision, Hasbrook, out

12   of the Northern District of New York, which came out when I was

13   Shepardizing cases to prepare for this morning, and I think

14   that is privileged and I am happy to discuss that later.

15         In terms of dealing with the scope, again we are

16   dealing with 100,000 plaintiffs --

17         THE COURT:  Listen, I don't think I would order at

18   this point the production of all those documents.  I don't

19   know.  It seems to me let's leave the issue of producing the

20   documents until you have had your depositions and you can

21   inquire as to generally what kind of follow-up there is, how

22   requests for additional documents are made, how they are

23   responded to, what the volume is of such requests, and let's

24   see where we are.

25         In part we will get there in a bit, but I do have

1ABSSYKES

1   serious questions about class certification and so let's see

2   where we wind up.

3          So the request for documents is denied -- these

4   additional communications with assigners of the debt regarding

5   requests for additional documents -- without prejudice to

6   renewal later on, but if you have depositions the plaintiffs

7   are free to inquire as to the general practices.

8          What is next?

9          MS. WILNER:  One last item with the Mel Harris

10  defendants, and that is we had requested in an interrogatory

11  the identities of other process-serving agencies that they used

12  to serve process on behalf of the Mel Harris defendants and

13  also the number of cases that were assigned to each agency and

14  this is just an effort to learn.  We know that Samserv is not

15  the only agency that was used to serve process, but who were

16  the other agencies and were they used frequently or only some

17  of the time, and defendants have refused to provide this

18  information.

19         MR. SCHER:  Again, your Honor, it's a fishing

20  expedition.  The other process servers are not part of this

21  case.  To identify these process servers so plaintiffs can drop

22  subpoenas on them and harass them, it's a harassment issue at

23  this point.

24         THE COURT:  The objection is overruled in part and

25  sustained in part.  At deposition you can inquire into

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ABSSYKES

1  generally the use of other process servers, how many are used,

2  percentage of cases, Samserv versus the others.  I am not going

3  to require that they be identified at this time without

4  prejudice to renewal at a later point.

5          What else?

6          MS. WILNER:  There are a number of outstanding issues

7  with the Leucadia defendants and the Samserv defendants.

8  However, the parties have conferred and I think we have reached

9  agreement on all of them that the defendants are looking for

10  documents and they are going to produce them if found.

11          Our only issue is that some of these requests have

12  been outstanding now for 6 months and we haven't actually seen

13  the production.  We are just requesting a date certain by which

14  defendants will produce documents and we are happy to hear from

15  the defendants on how long they think they need to do that.

16          MR. SKLAR:  That is not 100 percent accurate, your

17  Honor, because even referring to the letter, which I assume is

18  plaintiffs' last word on the subject, they are still asking for

19  some of the same issues that your Honor just overruled in

20  connection with the Mel Harris defendants.

21          THE COURT:  Unless there is a reason to distinguish,

22  my rulings would apply to the other defendants as well.

23          MR. SKLAR:  Thank you, your Honor.

24          THE COURT:  I don't know if there is any reason to

25  distinguish on any of my particular rulings.

1ABSSYKES

```
1          MR. GOLDFARB:  On behalf of the Leucadia defendants I
2     thought Ms. Wilner and I actually worked out an understanding
3     with regard to the document requests that began in March of
4     this year.  There was a disagreement as to the breadth of it.
5          THE COURT:  She suggested it was worked out except for
6     a date.
7          MR. GOLDFARB:  These are not overdue by months.
8          THE COURT:  When can you produce these additional
9     documents?
10         MR. GOLDFARB:  There are several different categories
11    and there are disks with about 5,000 pages of documents.  I
12    think within the next 4 to 6 weeks, your Honor.
13         THE COURT:  4 to 6 weeks.
14         MS. WILNER:  There is not that much time in discovery.
15    We have many depositions we would like to take and we don't
16    want to take all of our depositions before getting the
17    documents, so as soon as they can be produced.
18         THE COURT:  The defendants shall produce the remaining
19    outstanding documents 4 weeks from today, no later.
20         Any other discovery issues?
21         MS. WILNER:  That is it, your Honor.
22         THE COURT:  Class certification, who is going to
23    argue?  I am listening.
24         MR. BRINCKERHOFF:  Judge, there have been a few issues
25    that have been hit upon here and I obviously don't want to just
```

1ABSSYKES

1    go over --

2              THE COURT:  Let me give you some general thoughts.

3              On the one hand the question of whether someone has

4    been served with process is a highly individualized situation

5    and usually you have an inquest.  How do you prove these things

6    individually?  It's not the type of thing that is conducive to

7    a class approach in some respects.  On the other hand, there

8    are these statistics that seem to be compelling circumstantial

9    evidence of sewer service.  Mr. Andino was in 9 different

10   places on March 29, 2007 at 4 p.m. according to what the

11   plaintiffs say; that he served process in two or more places at

12   the same time, 327 times.  The defendant Mosquera did this 124

13   times.

14             Those seem like compelling arguments that there was

15   sewer service, which tends to support class treatment.  On the

16   other hand, I think the defendants correctly point out that the

17   proposed class definition is too broad.  It includes all

18   debtors that were sued or will be sued going into the future,

19   where a default judgment was or will be obtained.  It's not

20   limited to debtors who were served by sewer service.  I think

21   that is a fair question.  But, then, how do you determine

22   whether someone was served by sewer service?

23             So my mind is not made up.  Frankly, my law clerk

24   recommended denying the class certification motion but she has

25   left me.  For better or worse she has left me.  But there are

1ABSSYKES

```
 1   decent arguments both ways.  Another question is, I can't

 2   remember his name now, but the guy who does the declarations of

 3   merit.  I haven't personally read his deposition, but should we

 4   have a hearing and should I hear from him live?  Under the IPO

 5   case we are supposed to make factual findings.

 6          Would it be more instructive, more useful for me to

 7   actually hear from him?  The same could be said of Mr. DeJesus.

 8   There is a lot that he doesn't say.  Apparently there are

 9   114,000 cases involving the Leucadia defendants.  He doesn't

10   say how many are default judgments.  He doesn't say how many

11   were Samserv.  He doesn't say in how many Mel Harris was

12   counsel.  He doesn't say how many were sewer service and there

13   is probably no way to tell.

14          How do we determine who is a class member?  Samserv is

15   the only process server named but yet -- process-serving

16   company I should say -- but apparently the proposed class would

17   pick up individuals served by others.  I don't know if that is

18   appropriate.  The defendants do a good job of pointing out how

19   the plaintiffs have offered conflicting excuses, identity

20   theft, helping Mr. Perez, and these are different situations

21   and the variety of situations doesn't lend itself to class

22   treatment.

23          So these are some of the questions that filled my head

24   as I was reading these papers over the weekend.

25          MR. BRINCKERHOFF:  If I may, Judge, I think I can
```

1ABSSYKES

1    address hopefully in a compelling way all of the questions.

2    They are understandable questions that you are raising.  But

3    the first and most important component of this that I think one

4    has to analyze is there are really two fundamental factual

5    circumstances that we are challenging and making claims upon in

6    this case.  The first one is not about service or sewer service

7    or any kind of service.  It's about what concededly from the

8    defendants' points of view, and what the record demonstrates,

9    are absolutely uniform affidavits of merit that are submitted

10   and make the same claims in each and every case.

11           THE COURT:  I guess this is the point Mr. Scher was

12   raising.  What is wrong with that?  In other words, why can't a

13   law firm rely on computerized records from a client?  The

14   client comes and says all these people owe us money.  Here is a

15   printout.  Here are the amounts.  Why can't a lawyer accept

16   that?

17           MR. BRINCKERHOFF:  And to bring a case, I think the

18   lawyer can accept that.

19           THE COURT:  And use the same affidavit.

20           MR. BRINCKERHOFF:  Let's be clear, it's an affidavit

21   after there has been a default in support of a judgment for a

22   sum certain.  It is required by the CPLR and the way that it's

23   filled out is not we think that these things may have happened,

24   although we have no actual evidence and we could never prove it

25   in court.  That is what the affidavit says.  What the affidavit

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ABSSYKES

1    says if you look at one, and it's set forth in our reply brief

2    on pages 8 and 9 as well what Mr. Fabacher says, and it applies

3    to every single person we have identified in the class and

4    defined, he says that he is fully and personally familiar with

5    and has --

6              THE COURT:  May I have a copy?

7              MR. BRINCKERHOFF:  If you look at Exhibit I, they are

8    all basically the same, if you look at my declaration dated

9    August 1, docket number 100.

10             THE COURT:  I don't have the declaration.

11             MR. BRINCKERHOFF:  I am happy to hand up a copy.

12             THE COURT:  If you have one that would be great.

13             MR. BRINCKERHOFF:  This one would be slightly

14   different but they are all materially the same.  Let me rip one

15   out here.  Hang on.

16             This is Exhibit H to my declaration, and I am going to

17   be reading from Exhibit I but they are the same.

18             MR. BRINCKERHOFF:  It's an affidavit submitted by

19   Mr. Fabacher.  The testimony is he submits the affidavit of

20   merit in each and every case.

21             THE COURT:  Just give me a moment and let me take a

22   look.  I read the briefs.  I didn't look at all the exhibits.

23             (Pause)

24             THE COURT:  He does say, "I am personally familiar

25   with and have personal knowledge of the facts and proceedings

1ABSSYKES

1    relating to the within action."  He goes on to say, it's based

2    upon a retail charge account agreement with the bank, what the

3    defendant agreed to do; that is, the defendant agreed to pay

4    all amounts charged to the account.  It remains due and owing a

5    certain amount.

6            I have read it.

7            MR. BRINCKERHOFF:  And the reason that this is

8    significant is if he put in an affidavit that said what he

9    actually had personal knowledge of they would not be able to

10   obtain a default judgment for a sum certain.

11           THE COURT:  The law requires personal knowledge?

12           MR. BRINCKERHOFF:  It requires an affidavit supporting

13   the amounts and the claims in the case as opposed to an

14   inquest.

15           THE COURT:  Does it require personal knowledge?

16           MR. BRINCKERHOFF:  He certainly claims personal

17   knowledge.

18           THE COURT:  He claims it.

19           MR. BRINCKERHOFF:  That is what is relied upon by the

20   courts.

21           THE COURT:  Is this required by a CPLR provision?

22           MR. BRINCKERHOFF:  The affidavit of merit, or

23   something like that, it's not called that but it's required by

24   the CPLR provision.  The CPLR provision is set forth in a

25   footnote on our reply brief, Footnote 5 on page 5, CPLR 3215

1ABSSYKES

1    subpart F, which requires proof of the facts constituting the

2    claim, the default, the amount due by affidavit made by a

3    party.  And so basically what Mr. Fabacher says here is that he

4    is the custodian of records for the party here, or mine is LR

5    Credit 12.  The one I handed up may be different.  He says he

6    has personal knowledge that the defendant incurred charges.

7              THE COURT:  Who is he anyway?  Who does he work for?

8              MR. BRINCKERHOFF:  He works for Mel Harris and he is

9    also, from the documents we have seen, a principal of Rushmore,

10   which is one of the two entities along with Leucadia that

11   formed the joint venture that is LR Credit.  He was produced to

12   us as a 30(b)(6) witness as the person most knowledgeable of

13   the various electronic and --

14             THE COURT:  I have his full deposition somewhere in

15   the record?

16             MR. BRINCKERHOFF:  Yes.

17             THE COURT:  So the argument is that he must be lying,

18   that in fact he does not have personal knowledge, he is not

19   personally familiar with and that this is a falsified affidavit

20   and that because he is doing this routinely every 8 minutes of

21   the day that this is a way that they are fraudulently getting

22   default judgments against people.

23             MR. BRINCKERHOFF:  That is the claim.  Two points

24   though so the court is aware.

25             The deposition is a 30(b)(6) deposition limited to

1ABSSYKES

1   processes.  We have not deposed him yet about the affidavit of

2   merit itself.  So the record is incomplete on that score.  It's

3   not that he may be lying.  There is no question from the

4   testimony we have so far, some of it in the 30(b)(6), that the

5   information that he claims to have personal knowledge of he

6   absolutely does not.  Obviously this goes to the merits of our

7   claim and if -- --

8            THE COURT:  Back to the question I was asking earlier,

9   and that is is it inconsistent with CPLR 3215(F) for someone

10  like Mr. Fabacher to be making these representations?  Can can

11  he not rely on --

12           MR. BRINCKERHOFF:  He can say I am relying on

13  information and belief.

14           THE COURT:  He doesn't.

15           MR. BRINCKERHOFF:  He doesn't.  And the claims are not

16  about whether the CPLR was violated obviously.  The question is

17  were the statements that he made that are relied upon by the

18  court but for which our clients would not be harmed, were they

19  statements that were deceptive under that FDCPA or misleading

20  under the terms of the statute?  Are they deceptive or

21  misleading under the GBO?  Are they fraudulent under the terms

22  of the mail and wire fraud statutes?  And the answer to that is

23  yes.

24           He clearly does not have any knowledge of any of this

25  information.  He says at least in mine -- and the fourth

1ABSSYKES

1  paragraph is instructive.  It says that the defendant incurred

2  charges by use of a charge account.  He has already sworn that

3  there was an account.  That account submitted were remitted to

4  the defendant.  They have no debt account statements.  They

5  have no clue whether it happened.  That he defaulted in the

6  payments.  All they have is a one-line entry on an Excel spread

7  sheet.

8           THE COURT:  Does that entry contain all the

9  information?

10          MR. BRINCKERHOFF:  It contains none of the

11  information.

12          THE COURT:  Where is he getting the information from?

13          MR. BRINCKERHOFF:  I don't know.  I honestly don't

14  know.  My surmise is he is assuming since he has been told when

15  they purchase the debt that the debt was due and owing and all

16  these other things happened, and if need be they perhaps can in

17  some circumstances get documentation that supports it and in

18  other circumstances they are prohibited from getting

19  documentation that supports it.

20          THE COURT:  I am running out of time.  Why don't you

21  sit.  I want to hear from the other side on the affidavit of

22  merit.  I want to do this issue by issue.

23          This is troubling.  First of all, he is not actually

24  affiliated with an employee or agent of the party other than

25  being affiliated with the law firm and he says I have personal

1ABSSYKES

1   knowledge.

2          MR. SCHER:  He prefaces that, and the first line of

3   the affidavit says, "I am an authorized and designated

4   custodian of records for the plaintiff."  The plaintiff is LR

5   Credit.  The plaintiff is not the underlying creditor.  It's

6   clear, and in the next paragraph he says the plaintiff, in this

7   case LR, looking at Exhibit I to our motion which attached one

8   of his affidavits, he explains that LR Credit is an assignee

9   and a purchaser of the account number that was owed to Chase

10  Bank and they are collecting on that account.  This case is a

11  right line -- I apologize I sent this to you last night.  I

12  just found it.  This Hasbrook case is directly on point with

13  these facts and the issue is is that plaintiffs are saying that

14  the affidavit of merit implies that he had statements or he had

15  individualized records.  Hasbrook goes directly into that

16  argument and the court did a great job of explaining away the

17  fact that when you look --

18         THE COURT:  I gather there are no individualized

19  records?

20         MR. SCHER:  On two of these cases there are.  The

21  plaintiffs' whole claim that we, Mel Harris, can't get back-up

22  is belied by two of the plaintiffs when we have every single

23  statement of those accounts.  They are in there.  To the extent

24  the plaintiffs claim we can't get these it's absurd.  In two of

25  the four plaintiffs they acknowledge --

1ABSSYKES

1          THE COURT:  How do you respond to the argument that

2     this is deceptive because the representation that is being made

3     to the court about all of these facts that Mr. Fabacher

4     actually knows to be true?

5          MR. SCHER:  The troubling part about that is

6     plaintiffs are not discussing that the affidavit complies with

7     what was required by the court system.  In fact, in Exhibit J

8     to our motion we attach the directive from the civil court

9     which explains the civil court's understanding.  To quote the

10    civil court's directive, it says --

11         THE COURT:  What exhibit is that?

12         MR. SCHER:  Exhibit J to my declaration.  The court

13    explains in there, to paraphrase, we understand that there is a

14    debt-buying industry.  We understand how it works.  We

15    understand these debts are bought and sold and transmitted

16    electronically and they put out and lay forth what you need to

17    do and it lays out the affidavits that need to accompany this

18    motion.  There is nothing that requires him, Mr. Fabacher, to

19    state that he has personal knowledge and what is required --

20         THE COURT:  But he does say it.

21         MR. SCHER:  Based on the records, which is electronic.

22         THE COURT:  He didn't say on information and belief.

23         MR. SCHER:  He has electronic records.  Plaintiffs'

24    issue is we don't have when we filed this case we don't have

25    the actual statements.

1ABSSYKES

| | |
|---|---|
| 1 | THE COURT:  You are saying the electronic records are |
| 2 | enough. |
| 3 | MR. SCHER:  Exactly. |
| 4 | THE COURT:  That is what Hasbrook says. |
| 5 | MR. SCHER:  Yes, I have the quote. |
| 6 | THE COURT:  I will find it. |
| 7 | MR. SCHER:  The other thing that plaintiff is ignoring |
| 8 | is what the civil court requires, starting in 2009, affidavits |
| 9 | of the debt seller and the original creditor, both of which |
| 10 | were provided with respect to the cases, which was |
| 11 | Mr. Armoogam's case.  Also, that is part of Exhibit I to my |
| 12 | motion. |
| 13 | THE COURT:  So for these others, this is a 2009 one |
| 14 | that I have. |
| 15 | MR. SCHER:  It has to deal with cases starting before. |
| 16 | THE COURT:  Got you. |
| 17 | MR. SCHER:  The problem I have is to the extent the |
| 18 | plaintiffs claim that we can't get documentation, two out of |
| 19 | the four plaintiffs we actually went and got the documentation |
| 20 | and have it.  So it's in the motion papers.  To say we couldn't |
| 21 | get it and his affidavit was false because Mel Harris can never |
| 22 | get the back-up documentation is just inaccurate and to the |
| 23 | extent that they are claiming they were misled that is an |
| 24 | issue, a legal issue we have addressed in our brief which is |
| 25 | that, first of all, each of the plaintiffs admitted during the |

1ABSSYKES

```
1   deposition they never saw the affidavit of merit.  They
2   acknowledge they never saw the document.  Even before the
3   deposition they never saw the document.
4          To the extent what plaintiffs' claim is based upon
5   that we misled the court, and that goes to the recent decision
6   in O'Rourke, which is a Seventh Circuit case, but in O'Rourke
7   the court said the FDCPA was created to protect debtors, not to
8   protect against deception on the court.  If an affidavit
9   misled, and I am not in any way conceding this affidavit was
10  misleading and as the fact that the civil court never once
11  objected to one of these affidavits and said this is a problem,
12  I think it shows there was no misconception by anyone in the
13  court system that this affidavit complied with what it needed
14  to.
15         THE COURT:  Do the defendants want to add anything at
16  this point?
17         MR. BRINCKERHOFF:  If I may, Judge, a couple of
18  points.  One, the most salient one being this is exactly why
19  this case needed to be brought.  It is going to be resolved.
20  We believe very strongly these are affirmative
21  misrepresentations and fraudulent statements that were known to
22  be false when they were made.
23         THE COURT:  Is it true that the individual debtors do
24  not rely on these things and that --
25         MR. BRINCKERHOFF:  This is submitted to a court after
```

1ABSSYKES

1    a default.  It's true the individual alleged debtors, the

2    defendants in these cases have no knowledge of them when they

3    are made but individualized reliance is not a component of an

4    FDCPA claim, a GBL claim or a RICO claim.

5            THE COURT:  The theory is that, in fact, the

6    plaintiff, whoever the plaintiff is in these cases, does not

7    have the documentation and that it's not adequate to rely just

8    on the electronic information?

9            MR. BRINCKERHOFF:  The primary allegation is the

10   electronic information contains no support for any of the

11   material representations made in this affidavit and so it's

12   absolutely insufficient.

13           THE COURT:  Do we have a search in the record of what

14   the electronic information looks like?

15           MR. BRINCKERHOFF:  We have a description of the

16   information in the brief.  We can get you a more specific cite,

17   and we also have in, again, Mr. Fabacher's deposition, he

18   explained exactly the types of information.

19           THE COURT:  Do we have an exhibit what he looks at?

20           MR. BRINCKERHOFF:  No, because those are the --

21           THE COURT:  Does he look at anything?

22           MR. BRINCKERHOFF:  We know the universe of everything

23   they have at the time that he makes this sworn statement and we

24   know that that consists of the following:  The name of the

25   alleged debtor, the amount that is allegedly owed.

1ABSSYKES

 1              THE COURT:  Where is he getting that information?

 2              MR. BRINCKERHOFF:  It comes in an Excel file with one

 3     line containing information about each individual debt.

 4              THE COURT:  What I want to know is if there is a copy

 5     of that Excel page in the record somewhere so I can see what he

 6     looks at?

 7              MR. BRINCKERHOFF:  That has never been produced to us

 8     in discovery.

 9              THE COURT:  Is there such a thing?

10              MR. SCHER:  There is such a thing.  It's not part of

11     the motion but I would be happy to supplement it.  It has been

12     produced.  It's part of the depositions.

13              THE COURT:  I would like to see what he is looking at

14     or is he looking at anything?  Did he explain?  Is he looking

15     at something or just looking at the things handed to him to

16     sign?

17              MR. BRINCKERHOFF:  We didn't depose him on this

18     process.  We know what the factual information that the

19     plaintiff and the plaintiffs' lawyers have when this is filled

20     out.  I do not know what exactly Mr. Fabacher's process is,

21     although the speed in which it is done does create some

22     questions.

23              THE COURT:  I am curious as to when he is signing this

24     affidavit of merit what is he looking at?  What information

25     does he have?  What is he looking at in his 8 minutes per file?

1ABSSYKES

 1    If it's not in the record, it's not in the record.  But that is

 2    something that I think would be useful to me.

 3              MR. BRINCKERHOFF:  I agree it goes to the heart of the

 4    case.  It will go to the heart of whether we win or lose on

 5    this claim.

 6              THE COURT:  Let's move on to the other one.  Finish

 7    up.

 8              MR. BRINCKERHOFF:  Whether or not it's a winning claim

 9    or a losing claim is not the issue on class certification.  The

10    only question is can it be resolved in a way that is binding

11    upon everybody in the class as defined, and the answer to that

12    is absolutely yes because we defined the class to be only

13    people who had a default judgment entered against them by

14    Leucadia as a plaintiff with Mel Harris as the lawyers.  And so

15    that by itself is absolutely --

16              THE COURT:  I understand the points.  The rules have

17    changed after IPO.  In the old days if it was in the ballpark

18    you would certify.  We can't do that anymore.  Now it has to be

19    a more rigid analysis and you have got to prove it.

20              MR. BRINCKERHOFF:  We clearly have the burden to show

21    these can be resolved on a common basis and that there are

22    common questions that predominate and we have satisfied that

23    burden.  The closer question is certainly the affidavits of

24    service, which I would be happy to address if you want to move

25    on to that.

1ABSSYKES

1        THE COURT:  I want to move on.

2        MR. BRINCKERHOFF:  On the affidavit-of-service issue

3   the court is correct that depending on the circumstances of an

4   individual case this may or may not be an appropriate issue for

5   (B)(3) certification.  On (B)(2) certification I don't think

6   it's a very close call, which is why just for the record the

7   reason the class is defined with a prospective component is

8   because we are seeking prospective injunctive relief as part of

9   the relief we want for the (B)(2) class and the class under

10  (B)(1)(a) that we are also seeking concurrent certification on.

11  That is the only reason it has that forward-looking component.

12  It's not an attempt to do anything more nefarious than to make

13  sure that it's clear we are seeking that relief.

14        On the affidavits of service themselves what we have

15  found so far is that there are at least two ways that we

16  believe will make it entirely possible to resolve this for each

17  and every plaintiff in the class as it has been defined.  One

18  is that the defendants --

19        THE COURT:  For each class member you mean.

20        MR. BRINCKERHOFF:  For each class member, I am sorry.

21  The first one is that the defendants are required to keep log

22  books of each and every service of process, log books that

23  would allow us to inquire into what the contemporaneous record

24  is about service itself.  Those log books somehow have been

25  destroyed or lost or may never have existed.  There is no

1ABSSYKES

1   question that we have the right to request from the court

2   relief for spoliation on that ground that ranges from a factual

3   finding that none of the affidavits of service are reliable to

4   at least an inference that the fact finder can take into

5   consideration in determining whether or not we have made out a

6   case proving that they never --

7          THE COURT:  If --

8          MR. BRINCKERHOFF:  -- actually served process.

9          THE COURT:  When I start talking stop mid-word.

10          Is it correct that for some of the individual process

11   servers there have been zero log books produced?

12          MR. BRINCKERHOFF:  We have not seen a single log book.

13          THE COURT:  You haven't seen a single one even though

14   they are required by law?

15          MR. BRINCKERHOFF:  And even though the court ordered

16   they be produced in June.

17          THE COURT:  What is the explanation?

18          MR. SKLAR:  Class periods beyond 2005 --

19          THE COURT:  Do any exist?

20          MR. SKLAR:  The three individual servers have told me

21   they don't have the log books.  Some have not been serving

22   process for years.  There is no reason to have the log books.

23   To make the argument that the absence of evidence is evidence

24   of absence is a leap you can't make.

25          THE COURT:  So the answer is you have not produced a

1ABSSYKES

1   single log book and you are not --

2             MR. SKLAR:  I don't have a way to produce this, your

3   Honor, I don't.

4             THE COURT:  They don't exist.

5             MR. SKLAR:  The three individual process server

6   defendants have advised me --

7             THE COURT:  Only three individual process servers now?

8             MR. SKLAR:  Yes.

9             THE COURT:  Did they all stop?

10            MR. SKLAR:  I believe one of them is still working and

11  I am trying to get what his story is, your Honor.

12            THE COURT:  You agree that by law they are required to

13  maintain log books and that they must keep them for 2 years.

14            MR. SKLAR:  Yes, your Honor.  They are required to do

15  that, the individual.

16            THE COURT:  If they don't they theoretically are at

17  risk for losing their licenses.

18            MR. SKLAR:  Yes, and if there is a Travers hearing

19  then the Travers hearing may go against the plaintiff, in other

20  words, the party trying to seek the debt, nothing to do with

21  sewer service.

22            THE COURT:  The three in question worked for Samserv?

23            MR. SKLAR:  Independent contractors, some worked for

24  Samserv and others as well.

25            THE COURT:  That seems to be the general practice,

1ABSSYKES

1   that the process servers are independent contractors.

2           MR. SKLAR:  Yes, that is across the industry.

3           THE COURT:  Okay.  Go ahead.

4           MR. BRINCKERHOFF:  In June Mr. Sklar represented that

5   his clients, meaning those three defendants, did not have log

6   books and he would provide affidavits swearing they have no log

7   books.  We have received one but not any affidavit from the

8   other two.

9           THE COURT:  Let's get the affidavits from the other

10  two.

11          MR. SKLAR:  I am trying.

12          THE COURT:  You say you are trying.  Are they not

13  being cooperative?

14          MR. SKLAR:  Two of the three no longer work for

15  Samserv.

16          THE COURT:  Are you representing them?

17          MR. SKLAR:  Yes.

18          THE COURT:  Have you been in touch with them?

19          MR. SKLAR:  Intermittently, yes.  I will get them,

20  your Honor.

21          THE COURT:  It is hereby ordered that the two

22  individual process servers in question are to provide an

23  affidavit explaining what the story is with respect to the log

24  books, whether they kept them, and, if so, whether they have

25  them, and if not, why not, within two weeks from today, and

1ABSSYKES

1    write them a letter and tell them it is a court order and

2    include in the letter that the court has advised that they are

3    subject to being held in contempt, including the remedy of a

4    default judgment, if they do not respond with an affidavit.

5              MR. SKLAR:  Yes, your Honor.

6              THE COURT:  Okay.

7              MR. BRINCKERHOFF:  The other point that is related to

8    this is there is certainly a local law obligation to maintain

9    the log books because they are critical for the way the whole

10   system functions, but there is also obviously a litigation

11   reason.  We filed this case in 2009.  I am sure my able

12   adversaries sent out whole letters to make sure that no

13   documents that were relevant were destroyed.  I am sure they

14   know --

15             THE COURT:  I am sympathetic on this.  How does it

16   relate to whether I should certify the class?

17             MR. BRINCKERHOFF:  It's one of two basic points as to

18   how this issue, the affidavits-of-service issue can be resolved

19   on a group and classified basis.  The first way is based on

20   everything we know to date we don't believe there are log

21   books, that they were never kept or been destroyed, and we

22   would be entitled to a spoliation finding or at minimum an

23   adverse inference that a fact finder will be able to consider

24   in determining whether we made out a case that no process has

25   been served for any of the class members.

1ABSSYKES

1          The second reason is also set forth in our papers and

2     it involves the fact that each and every process server that

3     served process on any Mel Harris case for Leucadia that was

4     employed by Samserv as an independent contractor or otherwise,

5     they have now produced evidence that indicates that they have

6     made sworn false statements under oath to a court.  And based

7     on that evidence alone we are allowed to ask for an instruction

8     to any fact finder or fact finder as a court is allowed to take

9     into consideration repeated material false statements that are

10    filed in court in reaching the conclusion that none of the

11    statements made by any of these process servers are reliable

12    and --

13         THE COURT:  I think these things go to evidence, what

14    happens at trial.  How does it relate to class certification?

15         MR. BRINCKERHOFF:  The reason is, as I said, I agree

16    with you we understand that if the case on the affidavits of

17    service, setting aside affidavits of merits, and it was only

18    about affidavits of service, and we had to have an individual

19    hearing in each and every one of the 100 some thousand cases

20    that are involved here, that that --

21         THE COURT:  You are saying we don't need to get there

22    because the affidavits are false on their face and if they are

23    stricken the default judgment should be set aside.

24         MR. BRINCKERHOFF:  Rule 23 requires is there a way to

25    get a common resolution of the claims and the answer on this

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ABSSYKES

1    particular claim under these facts is yes and, secondly, yes,

2    IPO changed the landscape.  Yes, there have been many changes

3    under Rule 23, but certainly under Rule 23 still in the

4    portions that are cited in our brief --

5         THE COURT:  If there are 120,000 potential class

6    members you are saying I should strike 120,000 false statements

7    or false affidavits of service in one fell swoop?

8         MR. BRINCKERHOFF:  We obviously haven't completed

9    discovery.  What we know is it's probably -- we know there are

10   100 some thousand cases filed.  We are only suing the ones

11   where there were default judgments.  We don't know what the

12   rate was but it was something in the order of 60, 90 percent of

13   the cases but, yes, that is certainly a possibility.  But this

14   is an area of discovery.

15        THE COURT:  You are saying we never need to get to the

16   individualized inquest, and on the face of it it just doesn't

17   seem plausible that all these affidavits are out.  Suppose some

18   of them are truthful?

19        MR. BRINCKERHOFF:  Well, is that possible?  I don't

20   know yet.  What I know is at this stage of the litigation when

21   we are determining whether or not a class should be certified

22   and you combine the following things, you combine the fact the

23   affidavits of merit are uniform and subject to Rule 23(b)(3)

24   treatment so we should be proceeding --

25        THE COURT:  I understand the points.  We have to move

1ABSSYKES

 1 │ along.

 2 │         Let me hear from --

 3 │         MR. BRINCKERHOFF:  Your Honor --

 4 │         THE COURT:  You are not following my instruction to

 5 │ stop talking when I start talking.

 6 │         Let me hear from defense counsel.

 7 │         MR. SKLAR:  Your Honor, I will try to be brief.  The

 8 │ last word that we heard there, we don't know if the affidavits

 9 │ are correct or not and that --

10 │         THE COURT:  How do you explain it?

11 │         MR. SKLAR:  Someone being in the same place?

12 │         THE COURT:  Yes, and dozens of times, hundreds of

13 │ times.

14 │         (Continued on next page)

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

1ABSSYKES

1          MR. SKLAR:  The same --

2          THE COURT:  I thought there was a Google maps analysis

3     that would have taken 12 hours for the guy to, I lost my notes,

4     walk from point one to point two, etc., or to travel, not

5     necessarily to walk, how do you respond to that?

6          MR. SKLAR:  The same way I respond to that there are

7     entries in the database that someone served process in 1930.

8     We're not saying they served process in 1930.  There's a

9     mistake.  What we're talking about are 77,000.

10         THE COURT:  There are so many mistakes.  There seem to

11    be so many mistakes.  327 times he claimed to be in two or more

12    places at the same time.

13         MR. SKLAR:  And that is a big number.  But when it's

14    viewed in the context of 77,000 services, adding all of their

15    anomalies and aberrations and errors, you have a total of under

16    five percent.  So they're saying 95 percent of the services we

17    have no evidence there's anything wrong with them.  There are

18    five percent we may have made a mistake.  Therefore, all 100

19    percent are false.  So when they say we don't know yet if

20    they're false, but we can certify class anyway, they certify

21    class by a finding that they're all false.  So really it's a

22    tautology here.  The only way to certify a class is to find

23    that they are false.  What they're admitting, we don't know yet

24    if they're false.

25         THE COURT:  There seem to be some strong indications

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ABSSYKES

1    that there are patterns of falsity here.  Why is it not enough

2    to say let's look at this on a classwide basis?

3         MR. SKLAR:  I would respectfully suggest that what we

4    have is a pattern of an error in under five percent of the

5    cases which, what we need to do is an individualized

6    assessment.

7         THE COURT:  How is an inadvertent mistake to swear

8    under oath nine different times that you were at a certain

9    place at 4 p.m. on March 29, 2007?  You're saying it's

10   plausible that that was inadvertent.

11        MR. SKLAR:  In his logbook, if he put down --

12        THE COURT:  Maybe he doesn't have a logbook.

13        MR. SKLAR:  You're asking how it's possible.  Again,

14   I'm just a lawyer.  Less than five percent of the times,

15   whether the logbook he put down 4:15 and he should have put

16   4:25 or the person who did the data entry put in 4:25 instead

17   of 4:15, those are the individualized type of assessments, if

18   they don't have their logbooks at a Traverse hearing, out the

19   case goes, and there's no service.  But it has nothing to do

20   with the allegations.

21        THE COURT:  But the class treatment is we don't even

22   need to get to the Traverse.  The argument is this:  We don't

23   need to get to the Traverse because if indeed the affidavit of

24   service is false, you throw it out and you start back at square

25   one.  You don't need to get to the Traverse.

1ABSSYKES

1            MR. SKLAR:  Correct, but the assumption is if the

2       affidavit is false, and how do they prove or suggest or want

3       you to find that all 77,000 --

4            THE COURT:  Can I say that there's enough of a pattern

5       here to cause me to believe that there was wholesale,

6       widespread lying on these affidavits of service or these

7       affidavits of merit, such that it warrants class treatment?

8       That's the question.

9            MR. SKLAR:  Of course, your Honor.  And I suggest

10      respectfully that it doesn't.

11           THE COURT:  Why not?  Why not?

12           MR. SKLAR:  Because we're talking about in the overall

13      universe less than five percent of the pattern, which means

14      that you look at the 95 percent, which is a much larger pattern

15      where there isn't a problem.  That to me says that you don't

16      have any basis to believe that all 77,000 affidavits are made

17      up out of whole cloth.  What plaintiffs would have us believe

18      is that all the process servers sat around in the cafe and just

19      made up 77,000 lies.  There's no basis to come to that

20      conclusion, your Honor.  It's a leap of faith that makes no

21      sense.

22           For them to argue there must have been 77,000 false

23      affidavits because, Gosh, if any of these underlying defendants

24      were served, they surely would have shown up in court, as

25      alluded to in their report, that's belied by the fact that

1ABSSYKES

```
 1    they've admitted they had debts and didn't pay them at the
 2    depositions.  They've admitted, at least two of the individual
 3    plaintiffs, they would have received a scheduling letter by the
 4    court notifying them of the proceedings and they somehow
 5    ignored that also, they ignored everything until at least in
 6    one of these cases, the marshal's letter went to the same
 7    address where service was made, where the court letter went to,
 8    then when they realize they're about to lose their salary
 9    garnish, then they wake up and say a-ha, so that's not evidence
10    of sewer service, your Honor.
11                THE COURT:  Yes, go ahead.
12                MR. GOLDFARB:  A few critical points, and I don't know
13    when the record is closed before the Court with regard to class
14    certification.
15                THE COURT:  Not necessarily.  That's a question.  Do
16    the parties want a hearing?  Theoretically, you could have one
17    if you wanted one.  I don't know.  Did you want to submit more
18    evidence?  Then I would, if so, ask the plaintiffs whether they
19    object.
20                MR. GOLDFARB:  Actually, just the opposite, your
21    Honor.  I think the record is and should be closed.  Under the
22    ruling in In Re IPO, the Court has the burden to conduct a
23    rigorous analysis of the facts presented by the plaintiffs now
24    and then determine whether or not they've met the burden.
25                THE COURT:  I don't think IPO precludes me from
```

1ABSSYKES

1    holding a hearing if I want to have a hearing.  I don't know

2    that I want to, but I don't think it precludes me from doing

3    that.

4              MR. GOLDFARB:  Your Honor, speaking to the point that

5    was just discussed, whether this very limited so-called pattern

6    that's been shown by an IT consultant with no opportunity to be

7    cross-examined, we ask for the opportunity to take

8    Mr. Egleson's deposition.

9              THE COURT:  One way to do this is to have a little

10   hearing, put Fabacher on the stand, and put deJesus on the

11   stand.  We could do that.  Are the parties interested in that?

12             MR. GOLDFARB:  Your Honor, no, from the defense

13   standpoint.  But let me say this.

14             THE COURT:  The reason I ask is you were complaining

15   about not having the ability to cross-examine him.  That's all.

16             MR. GOLDFARB:  Let's assume for discussion purposes

17   that what he concluded is correct.

18             THE COURT:  Yes.

19             MR. GOLDFARB:  That is not sufficient for the

20   plaintiffs to ask this Court to certify a class as to 100,000

21   debtors who had default judgments entered against them.  That

22   is simply not sufficient under Wal-Mart.  That's exactly what

23   Betty Dukes was trying to do in Wal-Mart.  She was trying to

24   extrapolate from some number of instances of sex discrimination

25   with regard to advancement.

1ABSSYKES

```
1          THE COURT:  Wal-Mart is different.  It's such a

2   massive class.  It's nationwide, many, many, many stores all

3   around the country.

4          MR. GOLDFARB:  To us, this is a massive class, your

5   Honor.

6          THE COURT:  It's a massive class, maybe, but in a

7   different sense.  How many offices does Mel Harris have, one?

8   It's one office.  It's different.

9          MR. GOLDFARB:  It's massive in the sense that they are

10  taking a small number of instances and asking this Court to

11  extrapolate from that and say an entire class of 100,000 people

12  are entitled to relief.  I don't think the Court can do that

13  based on what the plaintiffs have put forth.

14          But, your Honor, let me move to what I think is an

15  even more important issue, which hasn't even been discussed in

16  any of the briefings by the plaintiffs, although they have a

17  responsibility to, and that is the RICO claim.  RICO's like the

18  800-pound gorilla in this case.  It's the only cause of action

19  that requires a showing of scienter.  It requires the

20  plaintiffs to show that the defendants in this case intended to

21  enter into a scheme.

22          THE COURT:  Does this impact on class certification?

23          MR. GOLDFARB:  Absolutely, your Honor.  I refer you

24  respectfully to the Agostino v. Quest Diagnostics case in the

25  Second Circuit.  Just briefly the facts in that case, the
```

1ABSSYKES

```
 1    plaintiff accused Quest and its debt collectors of engaging in
 2    a RICO conspiracy because they overcharged subscribers for
 3    Quest Diagnostics services and the court there said
 4    specifically the plaintiffs have the burden of showing scienter
 5    and the plaintiffs have not presented any classwide plan or any
 6    facts that would establish that Quest intentionally --
 7            THE COURT:  You don't think if I were to accept it
 8    that evidence of patterns of submitting false affidavits
 9    reflects scienter?
10            MR. GOLDFARB:  Actually, your Honor, no, because what
11    is involved here is an allegation that Leucadia, which is a
12    public company, Mel Harris, and Samserv conspired together and
13    each of these three companies were involved in all of these
14    activities as part of a RICO conspiracy.  There are no facts in
15    the case whatsoever, and, miraculously, your Honor, plaintiffs
16    didn't even refer to RICO in their pleading.  You indicated
17    that your Honor had read their pleadings.  There is no
18    reference whatsoever to their burden to show facts to establish
19    intent, to proceed against debtors with the intent to defraud,
20    which is the mail and wire fraud standard.  That is critical
21    and Agostino and other Second Circuit cases --
22            THE COURT:  Sounds like a motion to dismiss or a
23    motion for summary judgment.  But, in any event, I understand
24    your point.  I understand your point.
25            MR. GOLDFARB:  With all due respect, if your Honor's
```

1ABSSYKES

1    going to go ahead and certify the class, it has to exclude RICO

2    from that class cert.  We don't think it should anyway, but it

3    cannot include a RICO claim.

4                THE COURT:  I understand the point.  I am generally

5    skeptical of RICO claims, but I understand the point.

6                MR. GOLDFARB:  I was going to go on and describe the

7    facts in the record that set forth the actual relationships

8    between the parties.  If your Honor doesn't have time for

9    that --

10               THE COURT:  If you want to tell me something, go

11   ahead.  We're almost two hours at this now.

12               MR. GOLDFARB:  Your Honor, there were documents

13   provided to the plaintiffs back in February which lay out the

14   joint venture, lay out the relationships between the parties.

15   They had plenty of time to take depositions.  The nature of the

16   relationship between Leucadia and Mel Harris is simply a

17   lawyer-client relationship.  Leucadia is in a joint venture

18   with Rushmore Recovery to buy consumer debt, and they created

19   L-Credit, which then went out and hired Mel Harris, and the

20   retainer agreement sets forth very clearly the rights and

21   responsibilities.

22               THE COURT:  The allegation goes beyond an ordinary

23   lawyer-client relationship.  The allegation is that there is

24   this scheme to defraud consumers, debtors, and that your client

25   was in on it.

1ABSSYKES

1          MR. GOLDFARB:  Your Honor, the allegation does.  When

2     we were reviewing the motions to dismiss, the Court had to

3     assume as true all the allegations in the complaint.  Now the

4     plaintiffs have to come forward and back up those allegations,

5     and not only did they not, they didn't even discuss the basis

6     for the so-called conspiracy.

7          THE COURT:  I think the plaintiffs are correct, they

8     don't have to prove the claims on the merit.  They have to

9     prove that the claims should be dealt with on a classwide

10    basis.  If you win the case, if it's certified as a class and

11    then you win, that helps you in some ways.

12         MR. GOLDFARB:  Your Honor, I respectfully disagree

13    with that.  If you look at the IPO case and look at the cases

14    that have come down since the 2003 amendments to Rule 23, they

15    require that this Court conduct a rigorous analysis of the

16    facts in support of every element of Rule 23 and conclude that

17    they've met the burden by a preponderance of the evidence.

18         THE COURT:  For class certification.

19         MR. GOLDFARB:  As to each element of the law.

20         THE COURT:  Not to prove that they will win the case

21    in the end.

22         MR. GOLDFARB:  They have to establish the elements of

23    the alleged law violations, your Honor.  We can file a

24    supplemental brief on that, but that is absolutely clear under

25    the cases.

1ABSSYKES

1          THE COURT:  I'm pretty familiar with IPO.

2          MR. GOLDFARB:  And Hydrogen Peroxide.

3          THE COURT:  I've issued class certification decisions,

4     including denying.  I understand your points.

5          MR. GOLDFARB:  Thank you, your Honor.

6          THE COURT:  Brief rebuttal?

7          Did you want to add anything else, Mr. Scher?

8          MR. SCHER:  No, your Honor.  Just a quick point in

9     that obviously with respect to the issue of Samserv, the one

10    distinction that I think that's being overlooked, and it

11    dovetails with what Mr. Sklar said, we're looking at the

12    potential to certify a class that talks about all three

13    entities in this amorphous circle and to the extent, I'm very

14    friendly with Mr. Sklar, who is sitting next to me, but to the

15    extent that there's an issue with service of class, there's

16    never been a translation to that being something that was a Mel

17    Harris issue or a Leucadia issue, and I think Mr. Sklar was

18    trying to get to that point, but I just wanted to clarify.

19         THE COURT:  I understand, but the suggestion is that

20    including because of the financial arrangements, etc., etc.,

21    they're all working hand in hand.  That's the allegation, I

22    understand, and the defendants deny it.  I understand.

23         Mr. Brinckerhoff.

24         MR. BRINCKERHOFF:  Just two things.  One a point of

25    clarification, just so the record's clear, Mr. deJesus

1ABSSYKES

 1   submitted an affidavit that really only went to numerosity.

 2           Mr. Egleson submitted an affidavit that examined all

 3   of the records of affidavit of service, and I'm assuming when

 4   the Court made reference to Mr. deJesus that it involved that

 5   because Mr. deJesus is really not very critical because I don't

 6   think numerosity is seriously disputed.

 7           Secondly, I know the Mel Harris defendants cited to

 8   and submitted a case yesterday from May called Hasbrouck.

 9   Could we be allowed to submit just a little supplemental

10   authority on that exact point?

11           THE COURT:  Did they write anything, or did they just

12   submit the case?

13           MR. SCHER:  Submitted the case.

14           THE COURT:  If you want to submit any cases for me to

15   look at, you can, but no briefing.

16           MR. BRINCKERHOFF:  Just cases, like a Rule 28(j)

17   letter or something.

18           THE COURT:  Yes.  If there are other cases on point,

19   sure, but if they didn't do a letter brief, then plaintiffs

20   shouldn't do a letter brief.

21           MR. BRINCKERHOFF:  We will not.

22           THE COURT:  When can you have that?

23           MR. BRINCKERHOFF:  Tomorrow.

24           THE COURT:  Yes.

25           MR. GOLDFARB:  Your Honor, one last point.

1ABSSYKES

1       Tell me if I've said too much about this.  The law is
2  very clear, and one sentence from the Agostino case, "Proving
3  the underlying acts of racketeering requires plaintiff to
4  demonstrate that Quest participated in a scheme with specific
5  intent to defraud."

6       This is not in a summary judgment motion.  This is in
7  a Rule 23 proceeding to determine whether a court can certify a
8  class in RICO.

9       THE COURT:  I don't have the case in front of me.  My
10  understanding is the plaintiffs, if they get that far, will
11  have to prove that intent.  The question is whether the
12  plaintiff now shows by a preponderance that the class action is
13  the way to go to determine those claims on the merits.

14       MR. GOLDFARB:  With regard to each claim, your Honor.

15       THE COURT:  Yes.  I understand.  Certainly one would
16  want to analyze class certification of a RICO claim differently
17  or independently of class certification of a debt claim, a fair
18  debt claim.  There should be different analyses.  I'm not
19  fighting with you.  But I think to the extent that you are
20  suggesting that the plaintiffs must now prove their case on the
21  merits, I don't think that is accurate.

22       MR. GOLDFARB:  Your Honor, they simply have to prove
23  intent to defraud.  Your Honor, if this Court certifies a RICO
24  class action, it's all over.  These defendants could be liable
25  for as much as $100 million because they're seeking treble

1ABSSYKES

 1  damages and disgorgement, and so what happens after the class

 2  certification hearing is almost meaningless.

 3          THE COURT:  Whether they should be liable for RICO

 4  damages, I don't know.  If they committed RICO violations, so

 5  be it.  If they did, I don't know.

 6          MR. GOLDFARB:  But, your Honor, plaintiffs have to

 7  show that now.

 8          THE COURT:  That's not true.

 9          MR. GOLDFARB:  They have to show intent to defraud.

10          THE COURT:  That's not true.

11          MR. GOLDFARB:  Could I file a letter brief on that,

12  your Honor?

13          THE COURT:  No.  The answer is no.  You've made your

14  point.  You can order the transcript.  I'll have the

15  transcript.  I don't need more briefing.  I understand your

16  point.  I'm trying to respond twice.

17          Anything else today?  I'd like you to order the

18  transcript on an expedited basis so I have it.  I have five

19  Second Circuit sittings next week, but hopefully within a week

20  or so after that, I'll rule on this.

21          In terms of the discovery deadline, we will extend it.

22  Let's just wait and see what happens.  Thank you.

23          (Proceedings adjourned)

24

25