UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MONIQUE SYKES, *et al.*,

        Plaintiffs,

   - against -

MEL S. HARRIS AND ASSOCIATES LLC; *et al.*,

        Defendants.

ECF Case
No. 09 Civ. 8486 (DC)

**DECLARATION OF
MATTHEW D. BRINCKERHOFF**

   MATTHEW D. BRINCKERHOFF, an attorney duly admitted to practice in the Southern District of New York, declares under penalty of perjury:

   1.   I am a partner at Emery Celli Brinckerhoff & Abady LLP ("ECBA"), attorneys for the Plaintiffs in above-captioned matter.

   2.   I respectfully submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of the Settlement.

   3.   Attached hereto are true and correct copies of Exhibits 1-18, which are described in the annexed list of exhibits.

   4.   Subject to Court approval, the Named Plaintiffs, individually and on behalf of the class of individuals they seek to represent (collectively, "Plaintiffs"), and all Defendants (collectively, the "Parties") have settled this class action.

   5.   The Defendants will collectively pay approximately $54.5 million, and also pay the Leucadia Defendants' and Mel Harris Defendants' continuing share of collections

since settlement (which as of November 4, 2015 was $4,556,484), for a current total of over $59 million.

6.      In addition, upon preliminary approval, collection on class members' judgments and alleged debts will be suspended.   Upon final approval, the class members' judgments (which total approximately $800 million) and the alleged debts will be transferred to a non-profit entity designated by Plaintiffs and collections will stop permanently.  Plaintiffs will then work with the New York State courts to try to vacate class members' judgments.  The relevant Leucadia entities, the Mel Harris Defendants, and the Samserv Defendants have also agreed to change their business practices, as detailed further below.

7.      Because the proposed settlement satisfies all of the criteria for preliminary approval, the Parties respectfully request that the Court:

(i) grant preliminary approval of the Stipulation of Settlement as to Claims Against Certain Defendants ("Original Leucadia Agreement") and the First Amendment to the Stipulation of Settlement as to Claims Against Certain Defendants ("Leucadia Amendment" and, collectively with the Original Leucadia Agreement, the "Leucadia Agreement"), Exs. 1, 2;

(ii) grant preliminary approval of the Stipulation of Settlement as to Claims Against Mel Harris Defendants and Samserv Defendants  ("MH/SS Agreement"), Ex. 3;

(iii) grant preliminary approval to Plaintiffs' proposed plan of allocation, Ex. 4;

(iv) certify the expanded settlement classes and appoint ECBA, New Economy Project ("NEP"), and MFY Legal Services, Inc. ("MFY"), as class counsel for the expanded settlement classes;

(v) approve the form, content, and manner of notice to the settlement classes and authorize notice to be distributed in that manner, *see* Exs. 5-13 (proposed Notices); Ex. 14 (proposed Claim Forms); and

(vi) approve the payment of $500,000 as an Administrative Expense to third-party law firm Stephen Einstein & Associates (the "Einstein Firm"), pursuant to an agreement entered into between Plaintiffs and the Einstein Firm (with the approval of the Leucadia Defendants, who own the debts and retained the Einstein Firm), to have the Einstein Firm suspend the collection process immediately by notifying banks, sheriffs, marshals, and similar entities who are currently collecting approximately one million dollars a month from class members, Ex. 17.

8.      This declaration does not detail the full settlement or set out the entire history of the case.  The declaration sets out only those aspects of the litigation and settlement that are not readily apparent from other documents attached as exhibits to this declaration.

**Discovery and Information Exchange**

9.      Before filing the action, Class Counsel thoroughly investigated the underlying claims and gathered significant factual information through pre-suit research and data gathering. During discovery, Class Counsel diligently pursued all information relevant to establishing Plaintiffs' claims by propounding numerous rounds of discovery requests, subpoenaing third parties, reviewing many thousands of documents (Defendants produced over 500,000 pages of documents, 320,000 of which were produced by the Leucadia Defendants), participating in 14 depositions, defending all four Named Plaintiffs' depositions, and consulting with various experts and consultants.  The Parties also engaged in motion practice and sought the Court's intervention on disputes involving bifurcation of discovery, third-party discovery, subpoenas, privileged information, and the number of depositions, among other issues.

10.     The Parties also exchanged additional and extensive information regarding their factual and legal positions in connection with the mediation conducted in late 2012, as part of the revived settlement negotiations between Plaintiffs and the Leucadia Defendants, and as part of the settlement proceedings conducted before Magistrate Judge Ellis.

**Negotiation of the Settlements**

11.     In November 2012, shortly after the Court granted Plaintiffs' motion for class certification, the Parties agreed to mediate before former California Superior Court Judge Daniel Weinstein.  On December 5, 2012, counsel for all Parties participated in a full-day mediation session at JAMS.  At the meeting, Class Counsel made a detailed presentation to all Defendants setting out Plaintiffs' factual and legal positions regarding their claims.

12.     The Parties were unable to reach a settlement at the December 2012 session, but counsel for Leucadia Defendants and Plaintiffs had several meetings in person and by telephone regarding settlement throughout December 2012 and January 2013; Judge Weinstein also continued to work with the Parties to help reach resolution.  However, the Parties were unable to resolve their differences and, in February 2013, Class Counsel advised the Court that the Parties' settlement negotiations had reached an impasse and requested that the Court lift the stay of discovery, which the Court did in a March 5, 2013 order.

13.     In April 2013, Defendants filed Fed. R. Civ. P. 23(f) petitions with the Second Circuit seeking leave to appeal the Court's class certification order; the petitions were granted on July 19, 2013.  The Second Circuit heard oral argument on the Defendants' appeal in February 2014. In a February 10, 2015 opinion and judgment (*Sykes v. Mel S. Harris and Assocs., LLC*, 780 F.3d 70 (2d Cir. 2015)), the Second Circuit affirmed the Court's March 28, 2013 class certification order, in a 2-1 decision.

14.     In October 2014, after oral argument on the Second Circuit appeal but before a decision came down, counsel for Leucadia Defendants and Class Counsel resumed settlement discussions on behalf of their clients.  Between then and December 14, 2014, Leucadia Defendants and Class Counsel engaged in arm's-length settlement discussions, which culminated in the Term Sheet executed on December 14, 2014, Ex. 15.  The Parties did not discuss attorneys' fees in negotiating the Term Sheet, except to agree that any attorneys' fees and administrative expenses (other than specified notice expenses) would be paid from the Settlement Fund.  As part of the settlement process with Leucadia, Class Counsel consulted with bankruptcy counsel to ensure the agreement protected the class members, to the extent possible, from a bankruptcy filing and consulted with tax counsel concerning potential tax issues. The Leucadia Defendants and Class Counsel ultimately reached an agreement on all terms, which they memorialized in the Original Leucadia Agreement, dated March 18, 2015 and is attached as Exhibit 1.

15.     After signing the Term Sheet with the Leucadia Defendants, Class Counsel resumed separate settlement discussions with counsel for the Mel Harris and Samserv Defendants.  These negotiations were protracted and contentious and involved both monetary and injunctive terms.

16.     The settlement negotiations with the Samserv and Mel Harris Defendants had to address the limited financial assets of these parties, which would make impossible payment of a full judgment the Plaintiffs sought should they prevail at trial.  However, Plaintiffs and the Mel Harris and Samserv Defendants disagreed as to what those assets actually were.  In March 2015, the Parties jointly sought the assistance of the Court, which referred this case to mediation before Magistrate Judge Ronald Ellis.

17.     On April 6, 2015, the Parties met with Judge Ellis and negotiated a process in which the individual and corporate Mel Harris and Samserv Defendants would share sufficient financial information with Plaintiffs to verify their net worth and assets available from which they could satisfy a judgment.  Plaintiffs retained an accountant who was certified as a "Valuation Analyst" to review and analyze the financial information provided by the Mel Harris and Samserv Defendants.

18.     The Parties had multiple sessions and telephonic conferences amongst themselves and with Judge Ellis throughout April, May, June and July that resulted in the parties providing several rounds of financial information to Plaintiffs and exchanging settlement demands.  The Parties had a phone conference with Judge Ellis on April 28, 2015 to address with greater specificity the scope of financial information Defendants should provide.  On June 26, 2015, the Parties wrote to Judge Ellis requesting another settlement conference, which was held on July 27, 2015.

19.     On August 11, 2015, the Parties made submissions to the mediator that included an analysis by Plaintiffs' Valuation Analyst.  As a result of a subsequent request by Judge Ellis, the Parties provided written responses to each other's submissions on August 20, 2015.

20.     On September 11, 2015, Judge Ellis held a telephonic hearing in which he recommended settlement amounts to the Parties, and requested that each party communicate to him privately by September 17 whether it would accept Judge Ellis's recommendation.  On September 17, 2015, Plaintiffs reached a financial settlement with the Mel Harris Defendants, and on September 18, 2015, Plaintiffs reached a financial settlement with the Samserv Defendants.

21.     Between late September and November 12, 2015, Plaintiffs had extensive
negotiations with the Mel Harris Defendants and the Samserv Defendants concerning injunctive
relief and the terms of the lengthy settlement agreement, including its exhibits.  Class counsel
again consulted with bankruptcy counsel to ensure the agreement protected the class members, to
the extent possible, from a bankruptcy filing and consulted with tax counsel concerning potential
tax issues.

22.     Throughout the settlement discussions, Plaintiffs had demanded that any
settlement include an immediate cessation of collections.  Because the Mel Harris Defendants
had an ownership interest in the LR Credit debts, immediate cessation of collections could not
occur when there was only a partial settlement with the Leucadia Defendants.  Once, however,
there was the prospect of a settlement with the Mel Harris Defendants, the Leucadia Defendants
agreed to suspend new collections.  But affirmative action was required to stop ongoing
collections because third parties (marshals, sheriffs, banks, etc.) involved in those collections
needed to be contacted and instructed to stop such collections.  Additionally, class members
needed to be contacted and instructed to stop sending payments.

23.     Unfortunately, this aspect of the settlement was complicated by the fact that on
September 17, 2015, the law firm of Mel Harris and Associates, LLC, ceased operating.  All the
LR Credit accounts were transferred to the Einstein Firm, which served as LR Credit's counsel in
place of Mel Harris and Associates, LLC.  Consistent with the Leucadia Defendants' agreement
not to institute new collections, the Einstein Firm agreed to follow their client's direction on that
score.  However, the Einstein Firm continued to receive and process payments from class
members in the amount of approximately $1 million per month.  Although the Leucadia

Defendants' share of this money was deposited into a fund for the benefit of the class, 25% of all moneys collected were going to the Einstein Firm as a fee.

24.     Arranging for the Einstein Firm to perform the work necessary to shut down the collections operation was critical because, absent such an agreement, certain class members would be, collectively, exposed to paying approximately one million dollars per month in the aggregate for every month that passes between preliminary approval and a final approval (including exhaustion of any appeals).  Class Counsel could not perform the work to shut down the collections operation because the Einstein Firm collects debts as counsel to LR Credit—the defendants Plaintiffs have sued.  It would be a non-waivable conflict for Class Counsel to represent LR Credit in a substantially related action, even for the purpose of helping the class members by ceasing collections.

25.     The negotiations to accomplish this important goal of stopping collection were complex and protracted.  The result of those negotiations is the agreement between Plaintiffs and the Einstein Firm, Ex. 17, which provides that the Einstein Firm will immediately, upon preliminary approval, take affirmative actions to suspend all collection work.

26.     In exchange for doing the work set forth in the Einstein Agreement, if approved by the Court, the Einstein Firm will be paid a total of $500,000 as an Administrative Expense from the Leucadia Settlement Fund with $350,000 paid upon preliminary approval and the remaining $150,000 paid 90 days thereafter, provided the Einstein Firm performs its obligations under the Einstein Agreement.  There are approximately 5,200 active accounts that are being collected upon, so the $500,000 payment works out to approximately $100 per account for the work of ceasing collections.

27.     By paying $500,000 to the Einstein Firm, for every month that passes between preliminary approval and final approval of the settlement (including any appeals or the expiration of the time to appeal), or for twelve months, whichever comes first, class members will not have to pay the approximately one million dollars of monthly collections and will save the approximately $250,000 per month that is the Einstein Firm's cut of such collections. Because, at a bare minimum, the Settlement cannot become final for at least five months after preliminary approval, the Einstein Agreement will save class members a substantial sum.

28.     The Mel Harris and Leucadia Defendants will contribute their portion of debt collection proceeds beginning after settlement, but in light of the Einstein Agreement, we expect there to be little or no further debt collection proceeds.

**Transfer of Debt Portfolios and Vacating Judgments**

29.     The Leucadia Agreement provides, as injunctive relief, a mechanism by which class members' judgments and alleged debts will be relieved.  The default judgment component of the portfolios alone totals approximately $800 million (excluding post-judgment interest), so this relief is very substantial to the class.

30.     Specifically, within 30 days after the final approval becomes final (e.g. 30 days after the time to appeal has run or, if appealed, all appeals are concluded), the Leucadia Defendants, with the assistance of the Mel Harris Defendants, will transfer all debt portfolios (including but not limited to default judgments) owned by LR Credit, LLC or any of its subsidiaries to an entity designated by Plaintiffs.  This entity will immediately and permanently cease all collection efforts.  The Rolling Jubilee Fund—a non-profit 501(c)(4) organization with the exclusive mission of buying and abolishing debt—has agreed, in principle, to receive the debt portfolios.

31.     Once the debts are transferred to the Rolling Jubilee Fund, with the reasonable cooperation of the Leucadia and Mel Harris Defendants, Plaintiffs will work with the New York State Office of Court Administration ("OCA") to seek to vacate all default judgments entered against class members.  While Plaintiffs cannot guarantee that OCA will be able to vacate the judgments, Plaintiffs have had numerous conversations with OCA and believe they are likely to achieve this relief, through OCA or otherwise.

32.     Prior to engaging in settlement negotiations, Defendants sold a small minority of class members' accounts to third parties, including approximately 25,000 accounts where they had already obtained default judgments.  Because Defendants no longer own or control these accounts, they cannot stop collections on them and cannot transfer them to the entity designated by Plaintiffs, and thus Plaintiffs cannot terminate collection of these class members' debts.  With respect to those class members whose judgments were sold, Plaintiffs intend to work with OCA to try to seek vacatur of those judgments.  Plaintiffs cannot ensure the cooperation of the third party purchasers, and there is thus is more uncertainty about whether their efforts to vacate the sold judgments will be successful (for this reason, the allocation plan provides additional money to class members with sold judgments, as detailed below).  But because the sold judgments were obtained as part of the same fraudulent scheme as all the other judgments, Plaintiffs believe the sold judgments will likely be vacated as well.

33.     The settlement release and bar order does not extend to third party purchasers, so class members whose accounts were sold will also retain their ability to pursue any claims they may have against the current owners of their alleged debts.

**Allocation of the Settlement Fund**

34.     The settlement agreements create a common fund consisting of (1) from the Leucadia Defendants, $46 million, plus L-Credit LLC's share of additional moneys LR Credit and its subsidiaries received from debt portfolio assets on or after January 1, 2015 (the month after the Term Sheet was executed), which totaled $50,556,484.47 as of November 4, 2015; (2) from the Mel Harris Defendants, including their insurer, $7,975,000, plus Rushmore's share of additional moneys LR Credit and its subsidiaries receive from debt portfolio assets after November 12, 2015 (the date Plaintiffs and the Mel Harris Defendants settled), and (3) from the Samserv Defendants, including their insurer, $517,500.  In total, the Settlement Fund is approximately $59 million.  The settlement agreements do not provide for any reversion of settlement funds to defendants based on participation in the settlement, or for any other reason. All of the settlement funds will be irrevocably transferred for the benefit of the class after final approval.

35.     The Settlement Fund will cover class members' awards, service payments to Named Plaintiffs, attorneys' fees and costs, and administrative expenses (including the payment to the Einstein Firm), except that Leucadia National Corporation has agreed to pay for the costs of notice to the class (unless a separate notice is required concerning the Mel Harris/Samserv settlement).  After deducting for service payments to Named Plaintiffs, attorneys' fees and costs, and administrative expenses, the Net Settlement Fund will total at least $38.8 million.

36.     Allocations of the Net Settlement Fund will be made to class members who have submitted timely claim forms, pursuant to Plaintiffs' proposed Allocation Plan, which is attached as Exhibit 4.  The Allocation Plan is based on records Defendants have provided Class Counsel, including, for each class member, whether judgment was entered, the amount of the judgment,

the total amount paid, the date and amount of each payment, and whether their account was sold. Class Counsel will use these records to sort class members into allocation groups, as detailed in the Allocation Plan.

37.    The goals of Plaintiffs' Allocation Plan are (1) to provide as much compensation as possible to members of the Rule 23(b)(3) class who had judgments entered against them that were used to collect money from them via wage garnishment, bank account levy, or other means; (2) to provide a base level of compensation in the amount of $100 for every person who paid money to Defendants or had their default judgment sold to a non-defendant debt collector; and (3) in case the Net Settlement Fund is not sufficient to provide complete recovery to every class member who submits a timely claim form, to provide relatively more compensation to class members whose claims are timely as compared to those with fewer—or no—timely claims (based on the most generous possible accrual date).  Class members whose judgments were not sold and from whom Defendants collected no money are not entitled to monetary relief but they will receive valuable injunctive relief as detailed *infra*.

38.    Assuming that the amount of money collected from members of the Economic Loss Group (as defined in the Allocation Plan) that submit timely claim forms are uniformly distributed amongst all the claim groups, and assuming a 50% participation rate for class members entitled to $100 payments (from the Nominal Restitution, Sold Judgments, and Untimely Claims Groups, all defined in the Allocation Plan), Plaintiffs project the following amounts of recovery based on varying levels of participation in the settlement.  If 50% of the Economic Loss Group submit timely claim forms, each member of the 3 Claims Group will recover 80% of their losses, with 65% recovery for the 2 Claims Group and 50% recovery for the

1 Claim Group.[1]  If 40% of the Economic Loss group submit timely claim forms, the 3 Claim Group will receive back 98% of their losses, with 83% and 68% respectively for the 2 Claims Group and the 1 Claim Group.  If 30% submit timely claim forms, each member of the three groups will receive 100% of their losses and the group with untimely claims will receive 82% of their losses.  If 20% submit timely claim forms, every member of the Economic Loss Group, including those with untimely claims, will receive 160% of their losses.

39.     Plaintiffs aim to maximize the percentage of class members who submit claim forms.  Based on Class Counsel's experience, however, and in consultation with the Class Administrator, we do not expect more than 30% of the eligible class members to submit claim forms.  At that participation rate, all class members with timely claims who had money collected due to default judgments will recover all their money and even class members with untimely claims will see the majority of the money collected (82%) returned to them.

40.     Judge Weinstein, who served as a mediator in this case as detailed above, has reviewed and approved Plaintiffs' proposed allocation plan.

**Service Awards**

41.     Named Plaintiffs Monique Sykes, Kelvin Perez, Rea Veerabadren, and Clifton Armoogam have expressed their approval of the settlement by agreeing to the settlement agreements.

42.     In accordance with the settlement agreements, Plaintiffs will request in their Motion for Final Approval that the Court approve service awards for the four Named Plaintiffs in the amount of $30,000 each, in recognition of the services they rendered on behalf of the class. Those services included: participating over several years in fact development and discovery,

---

[1] The 3 Claims Group, 2 Claims Group, and 1 Claim Group are defined in the Allocation Plan based on each group's number of timely claims.

including being subjects of depositions; rejecting Rule 68 offers of judgment for $15,000; and, in the interest of the case, publicizing their personal experiences with debt collection.

43.     The Named Plaintiffs contributed significant time and effort to the investigation and prosecution of the case by providing Class Counsel with detailed factual information regarding their experiences with Defendants' debt collection scheme and the enforcement of default judgments against them individually.  They also helped Class Counsel prosecute their claims by responding to multiple discovery requests from all three sets of Defendants, providing hundreds of responsive documents—many of them containing personal financial information— answering and reviewing numerous sets of interrogatories, and participating in depositions that delved into sensitive questions about their credit history.  Further, the Named Plaintiffs were involved with the lengthy settlement negotiations, and made themselves readily available to communicate with Class Counsel.  The time and effort contributed by the Named Plaintiffs for the benefit of the class and the additional burdens they sustained support the requested service awards.

44.     Named Plaintiffs also deserve to be rewarded for remaining in the case instead of accepting early settlement offers and for helping to obtain relief for the entire class, which they have achieved with the settlement agreements.  All of the Plaintiffs named in the second amended class action complaint and jury demand were served with Fed. R. Civ. P. Rule 68 Offers of Judgment for $15,000.  Five of them (Ruby Cohen, Fatima Graham, Saudy Rivera, Paula Robinson, and Enid Roman) settled with the Defendants, and judgments were filed with respect to those Plaintiffs on April 18, 2011.  Three of the Plaintiffs (Monique Sykes, Rea Veerabadren, and Kelvin Perez) did not accept the $15,000 offers of judgment and chose to proceed with the case.  These Plaintiffs rejected the $15,000 offer despite knowing that their

ultimate recovery at trial might be less than $15,000 and if Plaintiffs received less than $15,000 at trial, they could be personally liable for all of Defendants' costs, under the terms of Fed. R. Civ. P. 68.

45.     All Named Plaintiffs are low-income consumers for whom the prospect of having to pay Defendants' costs was a significant risk and grave concern.  They also risked the stress and stigma of sharing their personal experience with debt collection.  Named Plaintiffs subjected themselves to sharing and publicizing their private financial information by participating in the action, including the depositions, and helping to prosecute the claims.

**Advantages of Settlement**

46.     This section of my declaration sets forth some of the factual reasons that the settlement should be approved, as well as some of the risks of the litigation.  This declaration does not discuss the many advantages of the settlement that are apparent from the face of the agreements.

47.     Defendants agreed to settle this case for a substantial amount: approximately $54.5 million, plus the Leucadia Defendants' and Mel Harris Defendants continuing share of collections since settlement, for a current total of over $59 million.  The amount represents substantial value given the attendant risks of litigation, even though recovery could theoretically be greater if Plaintiffs defeated a motion for summary judgment, and defeated motions to decertify the class; succeeded on all claims at trial; survived an appeal; and were able to collect on the judgment they obtained.

48.     Furthermore, the Settlement Fund does not represent the sole economic benefit to class members.  The Leucadia Defendants have agreed to transfer class members' default

judgments to an entity designated by Plaintiffs so that Plaintiffs may work with the New York State courts to vacate those judgments.

49.     The LR Credit judgments are worth approximately $800 million, plus 9% annual post-judgment interest.  Many of these judgments also appear on class members' credit reports, where they prevent class members from gaining access to housing and jobs, and cause them to pay more for credit than they otherwise would.  Relieving class members from these judgments—along with the attendant risk that their wages could be garnished, and their money and property seized—thus provides substantial economic benefits to class members.

50.     Moreover, class members from whom Defendants collected money will be entitled to receive refunds in the amount of hundreds or even thousands of dollars, depending on the nature and extent of their injuries.  Based on a 30% return rate (which would be a high return rate), class members with timely claims would have all money collected as a result of default judgments returned, and class members with untimely claims who had money collected as a result of default judgments would receive 82% of their losses.

51.     In addition, class members will receive the economic benefit of cessation of collections and likely vacatur of their judgments, all without having to submit a claim form, go to court, or hire an attorney.

52.     The settlement makes this monetary and injunctive relief available to class members in a prompt and efficient manner, unlike continuing litigation.  Though the case has been pending for six years, Plaintiffs have yet to depose some key witnesses from among the Defendants, and discovery is far from complete.  Following discovery, the Parties envision summary judgment motions raising many technical and novel issues of law, such as (to name just two of many examples) whether the Fair Debt Collection Practices Act applies to false

statements made to court officials, and whether the *Rooker-Feldman* doctrine bars Plaintiffs'
damages claims.

53.     If Plaintiffs succeed on summary judgment, a fact-intensive trial would likely be
necessary to determine both liability and damages.   A trial on the merits would involve
significant risks for Plaintiffs as to both liability and damages.   A trial would be lengthy and
complex, would require extensive testimony from expert witnesses, and would consume
tremendous time and resources for the Parties and the Court.    Among other things, to recover the
maximum possible damages for the maximum possible number of people, Plaintiffs would have
to prevail on their RICO claims, including establishing that each Defendant intentionally
engaged in racketeering activity.   Even if Plaintiffs succeed in proving their RICO claims,
Defendants have argued strenuously and under multiple legal theories that Plaintiffs' largest
category of damages—the money that was collected from them via the fraudulently-obtained
judgments—is not actually recoverable.   While Plaintiffs believe that they could ultimately
establish both liability and damages, this would require significant factual development,
requiring hundreds of additional hours of discovery, plus the time and resources required to
litigate dispositive motions and prevail at trial, and then prevail again on the inevitable appeal.

54.     The risk of maintaining class certification through trial is also present.
Defendants strenuously opposed class certification on the ground that too many individual issues
existed to maintain a class.   In particular, Defendants argued that damages could not be
determined on a class-wide basis because each class member's entitlement to damages would
turn on a fact-intensive inquiry as to whether that class member was served and/or owed the
alleged underlying debt.   Although Plaintiffs disagree that these questions are relevant to
determining damages, these are still open questions in the case.

55.    In addition, any judgment would likely be appealed, further extending the litigation.

56.    Even after final resolution of the litigation, class members would be unlikely to be able to immediately collect their full judgment against the Mel Harris and Samserv Defendants given those Defendants' limited resources and the magnitude of the judgment that Plaintiffs believe they would obtain if they succeed at trial.

57.    The Mel Harris and Samserv Defendants provided Plaintiffs with detailed financial information as part of the settlement discussions conducted by Magistrate Judge Ellis. Class Counsel carefully reviewed that information with their certified Valuation Analysis.  That information demonstrated to Plaintiffs' satisfaction that the Mel Harris and Samserv Defendants would be highly unlikely to be able to pay a judgment of the magnitude Plaintiffs will seek at trial.  At best, Plaintiffs will only be able to collect a portion of the judgment immediately and have to continue collection efforts, likely over a period of years—whereby the administrative costs of distributing such money to the Class will quickly overwhelm the recovery itself.

58.    Without a settlement, class members would not obtain relief for years.

59.    This settlement represents a significant percentage of the best possible recovery. The total amount of money collected from class members with default judgments to date is approximately $172 million.  Of that total, approximately $113 million was collected from class member with claims that are timely (based on accrual dates that are most favorable to members of the Rule 23(b)(3) Settlement Class).  Accordingly, the maximum total likely recovery in this action was approximately $113 million, however, class members also have claims for treble damages under RICO against all defendants and for treble damages under the N.Y Judiciary Law against the Mel S. Harris law firm and the individual Mel Harris Defendants who are lawyers.

With trebling, the maximum total recovery is $339 million.  While the maximum total potential recovery would have increased the longer this action was litigated, that increase would have been to the detriment the class.  The $59 million monetary settlement represents over 50% of the $113 million LR Credit collected from class members with default judgments who had timely claims. (As detailed above, based on expected return rates, Plaintiffs expect to be able to return or nearly all money collected as a result of default judgments back to class members.)

**Administration of the Settlement**

60.     Under the terms of the settlement agreements, Class Counsel is responsible for selecting and retaining a Class Administrator, whose fees will be paid out of the Settlement Fund, except that the Notice Expenses will be paid for separately by the Leucadia Defendants (unless separate notices must be mailed for the Mel Harris/Samserv Settlement).  Plaintiffs selected Epiq Systems ("Epiq"), which has extensive experience administering class action agreements.

61.     Pursuant to the agreement with Epiq, Epiq shall be responsible for the following tasks: locating class members as necessary; mailing notices to class members in accordance with the Court's Preliminary Approval Order; receiving and tracking opt-out statements, statements from objectors, and claim forms; establishing and administering the Settlement Fund and closing the Settlement Fund upon conclusion of the settlement process; calculating the settlement awards; distributing the settlement checks to class members, developing procedures and responding to inquiries from class members about the settlement, the notice, and the procedures contained therein; creating and operating a settlement website; creating a database of class members who have received and negotiated settlement checks; creating a database of class members who have returned opt-out statements; creating a database of objectors and providing

the Parties with all objectors' statements; providing Class Counsel's contact information to any class member who requests the same from the Class Administrator; responding to inquiries from Class Counsel concerning the settlement process; and completing any other duties and responsibilities necessary to administer the settlement.

62.     Epiq has agreed to cap Notice Expenses at $350,000, which shall be paid by the Leucadia Defendants and not out of the Settlement Fund.

63.     Epiq has agreed to cap Administration Expenses, which will be paid for out of the Settlement Fund, at $300,000 if over 30% of eligible class members file claim forms, at $275,000 if between 20% and 30% of eligible class members file claims forms, at $250,000 if between 10% and 20% of eligible class members file claim forms, and at $200,000 if less than 10% of eligible class members file claim forms.

64.     Epiq has also agreed to take numerous additional steps that go beyond the requirements of the Settlements to ensure that class members receive notice, have few difficulties filing claims, and have their questions answered, including: (1) conducting sophisticated address searches before sending the notices; (2) sending the notice in both English and Spanish to all who receive individual notice; (3) sending a pre-addressed postage-paid envelope for claim forms; (4) providing for online claim filing; (5) providing information on the web site in eight languages; and (6) having live operators who speak those languages and more available to answer class members questions.

65.     For the reasons stated above and in the accompanying Memorandum of Law and exhibits, we respectfully ask the Court to enter the proposed Preliminary Approval Order, attached as Exhibit 16 (which is the same proposed order that is attached to the Leucadia Amendment of today's date).


Dated:  November 12, 2015
        New York, New York


                                        _____/s/_____
                                        MATTHEW D. BRINCKERHOFF

**EXHIBITS TO THE DECLARATION OF MATTHEW D. BRINCKERHOFF**

*Sykes, et al. v. Mel S. Harris and Associates LLC, et al.*, 09 Civ. 8486 (DC)

<table>
<tr><td align="center"><strong><u>EXHIBIT</u></strong></td><td align="center"><strong><u>NO.</u></strong></td></tr>
<tr><td>Stipulation of Settlement as to claims against Leucadia Defendants and accompanying exhibits, dated March 18, 2015, attaching as Exhibits proposed orders and a judgment that were superseded by the November 12, 2015 First Amendment.................................................................</td><td align="center">1</td></tr>
<tr><td>First Amendment to Stipulation of Settlement as to claims against the Leucadia Defendants and accompanying exhibits, attaching proposed orders and a judgment Exhibit A (Preliminary Approval Order), Exhibit B (Approval Order), and Exhibit C (Judgment), dated November 12, 2015 ............................</td><td align="center">2</td></tr>
<tr><td>Stipulation of Settlement as to Claims against the Mel Harris Defendants and Samserv Defendants, dated November 12, 2015 and attaching Annex 1 (March 18, 2015 Stipulation of Settlement with Leucadia Defendants with exhibits) and Annex 2 (November 12, 2015 First Amendment to Stipulation of Settlement with Leucadia Defendants with exhibits).......................</td><td align="center">3</td></tr>
<tr><td>Proposed Allocation Plan ..................................................................................</td><td align="center">4</td></tr>
<tr><td>Proposed Notice #1 of the Proposed Class Action Settlement and Fairness Hearing for 3 claims, 2 claims, and 1 claim subgroups whose judgment LR Credit still owns....................................................................................................</td><td align="center">5</td></tr>
<tr><td>Proposed Notice #2 of the Proposed Class Action Settlement and Fairness Hearing for 3 claims, 2 claims, and 1 claim subgroups whose judgments LR Credit sold ........................................................................................................</td><td align="center">6</td></tr>
<tr><td>Proposed Notice #3 of the Proposed Class Action Settlement and Fairness Hearing for those with untimely claims whose judgment LR Credit sold ...........................</td><td align="center">7</td></tr>
<tr><td>Proposed Notice #4 of the Proposed Class Action Settlement and Fairness Hearing for those with untimely claims whose judgment LR Credit sold ...........................</td><td align="center">8</td></tr>
<tr><td>Proposed Notice #5 of the Proposed Class Action Settlement and Fairness Hearing for those who had no money collected and whose judgments LR Credit sold ........................................................................................................</td><td align="center">9</td></tr>
</table>

Proposed Notice #6 of the Proposed Class Action Settlement and Fairness Hearing
    for nominal restitution group whose judgment LR Credit still owns.....................   10

Proposed Notice #7 of the Proposed Class Action Settlement and Fairness Hearing
    for the nominal restitution group whose judgment LR Credit sold........................   11

Proposed Notice #8 of the Proposed Class Action Settlement and Fairness Hearing
    for Rule 23(b)(3) Class Members not entitled to money.........................................   12

Proposed Publication Notice of Proposed Class Action Settlement .................................   13

Proposed Claim Forms ......................................................................................................   14

Executed Term Sheet with Leucadia Defendants, dated December 14, 2014 ..................   15

[Proposed] Order Preliminarily Approving Settlements, Directing Notice to Class
    Members, and Scheduling Fairness Hearing, which is also attached to
    Exhibit 2 ................................................................................................................   16

Agreement between *Sykes* Plaintiffs and the law firm Stephen Einstein &
    Associates, P.C., dated November 12, 2015 (finalized but unsigned; signed
    copy to be substituted)...........................................................................................   17

Letter Agreement between *Sykes* Plaintiffs and the law firm Stephen Einstein &
    Associates, P.C., dated September 17, 2015 .........................................................   18