UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONIQUE SYKES, *et al.*,<br><br>Plaintiffs,<br><br>- against -<br><br>MEL S. HARRIS AND ASSOCIATES LLC; *et al.*,<br><br>Defendants. | No. 09 Civ. 8486 (DC) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020

NEW ECONOMY PROJECT
121 W 27th Street, Suite 804
New York, New York 10001

MFY LEGAL SERVICES, INC.
299 Broadway, 4th Floor
New York, New York 10007

## TABLE OF CONTENTS

**PAGE NO(s):**

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION .............................................................................................. 1

I.      FACTUAL AND PROCEDURAL BACKGROUND ......................................... 3

      A.     Factual Background .................................................................. 3

      B.     Procedural History .................................................................. 4

            1.     Complaints .................................................................. 4

            2.     Motion to Dismiss ....................................................... 5

            3.     Rule 68 Judgments ...................................................... 5

            4.     Class Certification and Interlocutory Appeal ................. 5

      C.     Mediation and Settlement ....................................................... 6

            1.     Mediation .................................................................. 6

            2.     Settlement with the Leucadia Defendants ...................... 7

            3.     Settlement with the Mel Harris and Samserv Defendants ............. 8

      D.     Discovery and Information Exchange ....................................... 12

II.     SUMMARY OF THE SETTLEMENT TERMS ........................................... 12

      A.     Overview ................................................................................ 12

      B.     The Overlapping Settlement Classes ....................................... 13

      C.     Equitable and Injunctive Relief for the Rule 23(b)(2) Settlement Class .. 14

            a.     Ceasing Collections ..................................................... 14

            b.     Other Equitable and Injunctive Relief ........................... 16

            c.     Releases and Opt-Out .................................................. 17

      D.     Monetary Relief for Certain Members of the Rule 23(b)(2) and Rule 23(b)(3) Settlement Classes ................................................... 18

            1.     The Settlement Fund .................................................... 18

2.    Eligibility ................................................................. 19

3.    Allocation Formula ................................................... 20

4.    Releases.................................................................... 26

E.    Service Awards, Attorneys' Fees and Costs, and Administrative Costs .. 26

1.    Service Awards ........................................................ 26

2.    Attorneys' Fees and Costs ........................................ 28

3.    Administrative Costs................................................ 29

a.    Settlement Class Administrator ........................ 29

b.    The Einstein Firm ............................................. 30

III.    PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE ... 30

A.    The Settlement is Procedurally Fair........................................ 32

B.    The Settlement is Substantively Fair ...................................... 33

1.    Litigation Through Trial Would be Complex, Costly, and Long (*Grinnell* Factor 1). ........................................................ 34

2.    The Reaction of the Class Has Been Positive (*Grinnell* Factor 2). ........................................................ 35

3.    Discovery Has Advanced Far Enough to Allow the Parties to Resolve the Case Responsibly (*Grinnell* Factor 3)...................... 36

4.    Plaintiffs Would Face Real Risks if the Case Proceeded (*Grinnell* Factors 4 and 5).................................................................... 38

5.    Maintaining the Class Through Trial Would Not Be Simple (*Grinnell* Factor 6). ........................................................ 39

6.    The Mel Harris and Samserv Defendants are unlikely to be able to withstand a greater judgment (*Grinnell* Factor 7)......................... 39

7.    The Settlement Fund is Substantial, Even in Light of the Best Possible Recovery and the Attendant Risks of Litigation (*Grinnell* Factors 8 and 9).......................................................................... 40

IV.    CERTIFICATION OF THE RULE 23 EXPANDED SETTLEMENT CLASS IS APPROPRIATE................................................................................ 43

V.      THE NOTICE PLAN AND DISTRIBUTION PROCESS ARE
        APPROPRIATE................................................................................................... 46

        A.      Notice of the Settlement........................................................................ 46

CONCLUSION.......................................................................................................................... 49

# TABLE OF AUTHORITIES

**PAGE NO(s)**:

**Cases**

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997)........................................................................ 45, 48

*Cagan v. Anchor Sav. Bank FSB*,
  No. 88 Civ. 3024, 1990 WL 73423 (E.D.N.Y. May 22, 1990)........................................ 42

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974),....................................................... 33, 42, 43

*Clark v. Ecolab, Inc.*,
  Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672, 2009 WL 6615729 (S.D.N.Y. Nov. 27, 2009) ................................................................................ 31

*Cnty. of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1422 (E.D.N.Y. 1989) .................... 45

*D'Amato v. Deutsche Bank*,
  236 F.3d 76 (2d Cir. 2011)......................................................... 32, 33

*Diaz v. E. Locating Serv., Inc.*,
  No. 10 Civ. 4082, 2010 WL 5507912 (S.D.N.Y. Nov. 29, 2010) ............................. 31, 37

*Felix v. Northstar Location Servs., LLC*,
  290 F.R.D. 397 (W.D.N.Y. 2013)....................................................... 31

*Frank v. Eastman Kodak Co.*,
  228 F.R.D. 174 (W.D.N.Y. 2005)................................................... 32, 42, 43

*Hernandez v. Merrill Lynch & Co., Inc.*,
  No. 11 Civ. 8472, 2012 WL 5862749 (S.D.N.Y. Nov. 15, 2012) ................................. 31

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012)......................................................... 45

*In re Austrian & German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000)................................................ 34, 36, 42

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
  No. 05 Civ. 10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ................................. 32

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997) .................................................... 38, 39

*In re Traffic Exec. Ass'n-E. R.Rs.*,
   627 F.2d 631 (2d Cir. 1980)............................................................ 31

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004)............................................................ 30

*Johnson v. Brennan*,
   No. 10 Civ. 4712, 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011) ..................... 37

*Khait v. Whirlpool Corp.*,
   No. 06-6381, 2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) ........................... 37

*Martens v. Smith Barney, Inc.*,
   181 F.R.D. 243 (S.D.N.Y. 1998) ...................................................... 36

*Matheson v. T-Bone Rest., LLC*,
   No. 09 Civ. 4214, 2011 WL 6268216 (S.D.N.Y. Dec. 13, 2011) ...................... 37

*Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072 (2d Cir. 1995) .............. 31

*McBean v. City of New York*,
   228 F.R.D. 487 (S.D.N.Y. 2005) ...................................................... 28

*McMahon v. Olivier Cheng Catering and Events, LLC*,
   No. 08 Civ. 8713, 2010 WL 2399328 (S.D.N.Y. Mar. 3, 2010) ...................... 37

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972).......................................................... 42

*Officers for Justice v. Civil Serv. Comm'n of City and Cnty. of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ........................................................ 42

*Roberts v. Texaco, Inc.*,
   979 F. Supp. 185 (S.D.N.Y. 1997)..................................................... 28

*Stanczyk v. City of New York*,
   752 F.3d 273 (2d Cir. 2014).......................................................... 27

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011).......................................................... 45

*Sykes v. Mel Harris & Assocs., LLC*,
   No. 09 Civ. 8486, 2012 WL 3834802 (S.D.N.Y. Sept. 4, 2012) ....................... 3

*Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010) ........... 3, 5

*Sykes v. Mel S. Harris and Assocs., LLC*, 780 F.3d 70 (2d Cir. 2015) ................ 6, 39

*Torres v. Toback, Bernstein & Reiss LLP*,
    No. 11 Civ. 1368, 2014 WL 1330957 (E.D.N.Y. Mar. 14, 2014) .................................... 42

*Vassalle v. Midland Funding, LLC*, No. 3:11 Civ. 00096, 2014 WL 5162380 (N.D. Ohio Oct. 14,
    2014) ......................................................................................................................................... 42

*Velez v. Majik Cleaning Serv., Inc.*,
    No. 03 Civ. 8698, 2007 WL 7232783 (S.D.N.Y. June 25, 2007).................................... 38

*Velez v. Novartis Pharm. Corp.*,
    No. 04 Civ. 09194, 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ................................. 28

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005).................................................................................... 30, 32

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982).................................................................................... 32

**Statutes**

CPLR § 308(2) ................................................................................................................ 17

Fed. R. Civ. P. 23 ........................................................................................................... 13

Fed. R. Civ. P. 23(a) ...................................................................................................... 43

Fed. R. Civ. P. 23(f) ......................................................................................................... 6

Fed. R. Civ. P. 68(d) ...................................................................................................... 27

Fed. R. Civ. P. 23(b) ........................................................................................... 5, 6, 13, 43

Fed. R. Civ. P. 54(d)(2) .................................................................................................. 28

## INTRODUCTION

Subject to Court approval, the Named Plaintiffs, individually and on behalf of the class of approximately 355,000 individuals they seek to represent (collectively, "Plaintiffs"), and all Defendants (collectively, the "Parties") have settled this class action. The Defendants will collectively pay approximately $54.5 million, plus the Leucadia Defendants' and Mel Harris Defendants' continuing share of collections since settlement, for a current total of over $59 million. This amount represents more than half of the approximately $113 million that was collected from class members who have timely claims as a result of default judgments. Based on a 30% return rate (which would be a high return rate), *class members with timely claims would recover all money collected as a result of default judgments*, and class members with untimely claims who had money collected as a result of default judgments would receive 82% of their losses.

In addition, upon preliminary approval, collection on class members' judgments and alleged debts will be suspended. Upon final approval, these judgments (which total approximately $800 million) and the alleged debts will be transferred to a non-profit entity designated by Plaintiffs and collections will stop permanently. Plaintiffs will then work with the courts to try to vacate class members' judgments. Defendants also agreed to reform their business practices.

Because the proposed settlement satisfies all of the criteria for preliminary approval, the Parties respectfully request that the Court:

(i) grant preliminary approval of the Stipulation of Settlement as to Claims Against Certain Defendants ("Original Leucadia Agreement") and the First Amendment to the Stipulation of Settlement as to Claims Against Certain Defendants ("Leucadia Amendment" and,

collectively with the Original Leucadia Agreement, the "Leucadia Agreement"), Declaration of

Matthew D. Brinckerhoff ("Brinckerhoff Decl.") Exs. 1, 2.[1]

      (ii) grant preliminary approval of the Stipulation of Settlement as to Claims

Against Mel Harris Defendants and Samserv Defendants ("MH/SS Agreement"), Ex. 3;

      (iii) grant preliminary approval to Plaintiffs' proposed plan of allocation, Ex. 4;

      (iv) certify the expanded settlement classes and appoint Emery Celli Brinckerhoff

& Abady LLP ("ECBA"), New Economy Project ("NEP"), and MFY Legal Services, Inc.

("MFY"), as Class Counsel for the expanded settlement classes;

      (v) approve the proposed Notices of Class Action Settlement and Claim Forms,

Exs. 5-12; and

      (vi) approve the payment of $500,000 as an Administrative Expense to third-party

law firm Stephen Einstein & Associates (the "Einstein Firm"), pursuant to an agreement entered

into between Plaintiffs and the Einstein Firm (with the approval of the Leucadia Defendants,

who own the debts and retained the Einstein Firm), to have the Einstein Firm suspend the

collection process immediately by notifying banks, sheriffs, marshals, and similar entities who

are collecting approximately one million dollars a month from class members, Ex. 17;

      A proposed order granting preliminary approval is attached to the Leucadia

Amendment, and, for ease of the Court, attached separately as Exhibit 16 to the Brinckerhoff

Declaration.

---

[1] All exhibits identified by number are attached to the Declaration of Matthew D. Brinckerhoff, dated
November 12, 2015, filed in support of this motion.

# I.      FACTUAL AND PROCEDURAL BACKGROUND

## A.  Factual Background

The facts of this case, initially filed in 2009, are well documented in various

submissions to the Court and in the Court's motion to dismiss decision (*Sykes v. Mel Harris &*

*Assocs., LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010)) and class certification decision (*Sykes v.*

*Mel Harris & Assocs., LLC*, No. 09 Civ. 8486, 2012 WL 3834802 (S.D.N.Y. Sept. 4, 2012)). In

this case, Plaintiffs allege that Defendants filed fraudulent affidavits of service and merit in tens

of thousands of debt collection lawsuits with the goal of obtaining default judgments against

consumers. Defendants then executed on those wrongly-obtained judgments by restraining

Plaintiffs' bank accounts, garnishing wages, seizing property, damaging credit, and pressuring

people—most if not all of them low-income—into unaffordable payment plans. In the process,

Defendants reaped a financial windfall.

The Named Plaintiffs and class representatives in this class action are Monique

Sykes, Rea Veerabadren, Kelvin Perez, and Clifton Armoogam. The Defendants include

Leucadia National Corporation and its debt buyer subsidiaries, including the variously numbered

LR Credit entities, and principals of those entities (the "Leucadia Defendants"); the law firm Mel

S. Harris and Associates, LLC, and various of its partners and directors (the "Mel Harris

Defendants"); and the process serving agency Samserv, Inc., its owner William Mlotok, and

three individual process servers (the "Samserv Defendants"). The proposed Rule 23(b)(2)

Settlement Class is defined as "all persons or entities who have been or could have been sued by

the Mel Harris Firm as counsel for the Leucadia Defendants LLC, including LR Credit (or by

any other counsel as directed by Mel S. Harris & Associates, LLC), in actions commenced in any

court located in the state of New York and where default judgments were or could have been

sought." The overlapping Rule 23(b)(3) Settlement Class is defined as "all persons or entities (all

of whom are also members of the Rule 23(b)(2) Settlement Class) who have been sued by the

Mel Harris Firm as counsel for the Leucadia Defendants, including LR Credit LLC (or by any

other counsel as directed by Mel S. Harris & Associates, LLC), in actions commenced in any

court located in the state of New York and where Default Judgments were obtained."

### B. Procedural History

#### 1.     Complaints

On October 6, 2009, Plaintiff Monique Sykes filed a complaint against three sets

of Defendants (the Mel Harris Defendants, the Leucadia Defendants, and the Samserv

Defendants) claiming violations of the FDCPA and the GBL in connection with the named

Defendants' attempts to collect an alleged debt from her in New York City Civil Court. Dkt. 1.

On December 28, 2009, Plaintiffs Monique Sykes, Ruby Colon, Rea Veerabadren, and Fatima

Graham filed an amended putative class action complaint and jury demand, adding certain

Defendants and claiming violations of the FDCPA, RICO and the GBL. Dkt. 2. On March 31,

2010, Plaintiffs Monique Sykes, Ruby Colon, Rea Veerabadren, Fatima Graham, Kelvin Perez,

Saudy Rivera, Paul Robinson, and Enid Roman filed a second amended class action complaint

and jury demand on behalf of themselves and all others similarly situated, adding more

Defendants, and claiming violations of the FDCPA, RICO, the GBL and, as to the Mel Harris

Defendants who are attorneys, the New York Judiciary Law. Dkt. 29. By stipulation, on May 16,

2011, Plaintiffs Monique Sykes, Rea Veerabadren, Kelvin Perez, and Clifton Armoogam filed a

third amended class action complaint and jury demand on behalf of themselves and all others

similarly situated, removing and adding certain Defendants, and claiming the same violations.

Dkt. 82.

### 2.    Motion to Dismiss

All Defendants filed motions to dismiss on May 7, 2010, challenging all of the claims made by Plaintiffs and the subject matter jurisdiction of the Court. In a decision issued December 29, 2010 (*Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010)), the Court granted Defendants' motions in part, dismissing one of Plaintiff's FDCPA claims; Plaintiffs' claims alleging distinct Leucadia, Mel Harris, and Samserv RICO enterprises; the RICO claims against certain individual Defendants; and the RICO conspiracy and GBL claims against David Waldman, Joseph Orlando and Philip Canella. The Court denied the motions to dismiss with respect to all other claims.

### 3.    Rule 68 Judgments

All of the Plaintiffs named in the second amended class action complaint and jury demand were served with Fed. R. Civ. P. Rule 68 Offers of Judgment for $15,000. Brinckerhoff Decl. ¶ 44. Five of them (Ruby Cohen, Fatima Graham, Saudy Rivera, Paula Robinson and Enid Roman) settled with the Defendants, and judgments were filed with respect to those Plaintiffs on April 18, 2011. Dkts. 73-77. Three of the Plaintiffs (Monique Sykes, Rea Veerabadren, and Kelvin Perez) did not accept the $15,000 offers of judgment and chose to proceed with the case. These Plaintiffs rejected the $15,000 offer despite knowing that their ultimate recovery at trial might be less than $15,000 and that if Plaintiffs received less than $15,000 at trial, they could be personally liable for all of Defendants' costs under the terms of Fed. R. Civ. P. 68. Brinckerhoff Decl. ¶ 44.

### 4.    Class Certification and Interlocutory Appeal

On April 15, 2011, Plaintiffs moved for certification of a class pursuant to Fed. R. Civ. P. Rule 23(b)(1)(A)(b)(2) and (b)(3). After full briefing and oral argument, on September 4, 2012 the Court issued its opinion (*Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279

(S.D.N.Y. 2012)) granting Lead Plaintiffs' motion to certify a Rule 23(b)(2) class and a Rule

23(b)(3) class and appointing ECBA, New Economy Project, and MFY as Class Counsel.

   In February 2013, the Parties sought clarification from the Court about the

wording of Plaintiffs' proposed class certification order. Dkts. 159, 161. After additional

briefing, on March 28, 2013, the Court denied Defendants' request to clarify the language

submitted by Plaintiffs and entered an order appointing Class Counsel and certifying a Rule

23(b)(2) class "of all persons who have been or will be sued by the Mel Harris defendants as

counsel for the Leucadia defendants in actions commenced in New York City Civil Court and

where a default judgment has or will be sought" and a Rule 23(b)(3) class "of all persons who

have been sued by the Mel Harris defendants as counsel for the Leucadia defendants in actions

commenced in New York City Civil Court and where a default judgment has been obtained."

Dkt. 171. This brief will refer to these certified classes as the Rule 23(b)(2) Litigation Class and

the Rule 23(b)(3) Litigation Class.

   In April 2013, Defendants filed Fed. R. Civ. P. 23(f) petitions with the Second

Circuit seeking leave to appeal the Court's class certification order; the petitions were granted on

July 19, 2013. Brinckerhoff Decl. ¶ 13. The Second Circuit heard oral argument on the

Defendants' appeal in February 2014. *Id*. In a February 10, 2015 opinion and judgment (*Sykes v.*

*Mel S. Harris and Assocs., LLC*, 780 F.3d 70 (2d Cir. 2015)), the Second Circuit affirmed the

Court's March 28, 2013 class certification order, in a 2-1 decision. *Id*.

### C. Mediation and Settlement

#### 1. Mediation

   In November 2012, shortly after the Court granted Plaintiffs' motion for class

certification, the Parties agreed to mediate before former California Superior Court Judge Daniel

Weinstein; on December 5, 2012, counsel for all Parties participated in a full-day mediation

session at JAMS. At the meeting, Class Counsel made a detailed presentation to all Defendants

setting out Plaintiffs' factual and legal positions regarding their claims. Brinckerhoff Decl. ¶ 11.

   The Parties were unable to reach a settlement at the December 2012 session, but

counsel for Leucadia Defendants and Plaintiffs had several meetings in person and by telephone

regarding settlement throughout December 2012 and January 2013; Judge Weinstein also

continued to work with the Parties to help reach resolution. *Id.* ¶ 12. However, the Parties were

unable to resolve their differences and, in February 2013, Class Counsel advised the Court that

the Parties' settlement negotiations had reached an impasse and requested that the Court lift the

stay of discovery, which the Court did in a March 5, 2013 order. Dkt. 149.

### 2.  Settlement with the Leucadia Defendants

   In October 2014, while discovery was stayed pending a decision from the Second

Circuit on Defendants' interlocutory appeal, but after oral argument on that appeal, counsel for

Leucadia Defendants and Class Counsel resumed settlement discussions on behalf of their

clients. Leucadia Defendants and Class Counsel engaged in arm's-length settlement discussions,

which culminated in the Term Sheet executed on December 14, 2014. Brinckerhoff Decl. ¶ 14 &

Ex. 15. These discussions were contentious and each term of the settlement was hard fought. *Id.*

¶ 15. The Parties did not discuss attorneys' fees in negotiating the Term Sheet, except to agree

that any attorneys' fees and administrative expenses (other than specified notice expenses) would

be paid from the Settlement Fund. *Id.* ¶ 14; *see also* Ex. 15 (Term Sheet § VIII). As part of the

settlement process with Leucadia, Class Counsel consulted with bankruptcy counsel to ensure

the agreement protected the class members, to the extent possible, from a bankruptcy filing and

consulted with tax counsel concerning potential tax issues. Brinckerhoff Decl. ¶ 14. The

Leucadia Defendants and Class Counsel ultimately reached an agreement on all terms, which

they memorialized in the Original Leucadia Agreement, dated March 18, 2015. Ex. 1.

### 3. Settlement with the Mel Harris and Samserv Defendants

After signing the Term Sheet with the Leucadia Defendants, Plaintiffs' counsel resumed separate settlement discussions with counsel for the Mel Harris and Samserv Defendants. These negotiations were protracted and contentious and involved both monetary and injunctive terms. The settlement negotiations with the Samserv Defendants and the Mel Harris Defendants had to address the limited financial assets of these parties, which would make impossible payment of a full judgment the Plaintiffs sought should they prevail at trial. However, Plaintiffs and the Mel Harris and Samserv Defendants disagreed as to what those assets actually were. In March 2015, the Parties jointly sought the assistance of the Court, which referred this case to mediation before Magistrate Judge Ronald Ellis. Brinckerhoff Decl. ¶ 16.

On April 6, 2015, the Parties met with Judge Ellis and negotiated a process in which the individual and corporate Mel Harris and Samserv Defendants would share sufficient financial information with Plaintiffs to verify their net worth and assets available from which they could satisfy a judgment. Plaintiffs retained an accountant who was certified as a "Valuation Analyst" to review and analyze the financial information provided by the Mel Harris and Samserv Defendants. *Id*. ¶ 17.

The Parties had multiple sessions and telephonic conferences amongst themselves and with the Court throughout April, May, June and July that resulted in the parties providing several rounds of financial information to Plaintiffs and exchanging settlement demands. The Parties had a phone conference with Judge Ellis on April 28, 2015 to address with greater specificity the scope of financial information Defendants should provide. On June 26, 2015, the Parties wrote to Judge Ellis requesting another settlement conference, which was held on July 27, 2015. On August 11, 2015, the Parties made submissions to Judge Ellis that included an analysis

by Plaintiffs' Valuation Analyst. As a result of a subsequent request by Judge Ellis, the Parties provided written responses to each other's submissions on August 20, 2015. On September 11, 2015, Judge Ellis held a telephonic hearing in which he recommended settlement amounts to the Parties, and requested that each party communicate to him privately by September 17 whether it would accept Judge Ellis's recommendation. On September 17, 2015, Plaintiffs reached a financial settlement with the Mel Harris Defendants, and on September 18, 2015, Plaintiffs reached a financial settlement with the Samserv Defendants. *Id.* ¶ 20.

Between late September and November 12, 2015, Plaintiffs had extensive negotiations with the Mel Harris Defendants and the Samserv Defendants concerning injunctive relief and the terms of the lengthy MS/SS Agreement, including its exhibits. Class counsel again consulted with bankruptcy counsel to ensure the agreement protected the class members, to the extent possible, from a bankruptcy filing and consulted with tax counsel concerning potential tax issues. *Id.* ¶ 21.

On November 12, 2015, Plaintiffs executed the MH/SS Agreement, Ex. 3, and the Leucadia Amendment, Ex. 2, to reflect the global nature of the settlement.

### A.  *Immediate Cessation of Collection*

While the Parties agreed to financial terms on September 18, 2015, they continued to negotiate injunctive relief. Throughout the settlement discussions, Plaintiffs had demanded that any settlement include an immediate cessation of collections. Because the Mel Harris Defendants had an ownership interest in the debts, immediate cessation of collections could not occur when there was only a partial settlement with the Leucadia Defendants. Once, however, there was the prospect of a settlement with the Mel Harris Defendants, the Leucadia Defendants agreed to suspend new collections. But affirmative action was required to stop ongoing

collections because third parties (marshals, sheriffs, banks, etc.) involved in those collections needed to be contacted and instructed to stop such collections. Additionally, class members needed to be contacted and instructed to stop sending payments. Brinckerhoff Decl. ¶ 22.

Unfortunately, this aspect of the settlement was complicated by the fact that on September 17, 2015, the law firm of Mel Harris and Associates, LLC, ceased operating. All the LR Credit accounts were transferred to the Einstein Firm, which served as LR Credit's counsel in place of Mel Harris and Associates, LLC. *Id*. ¶ 23. Consistent with the Leucadia Defendants' agreement not to institute new collections, the Einstein Firm agreed to follow their client's direction on that score. Ex. 18. However, the Einstein Firm continued to receive and process payments from class members in the amount of approximately $1 million per month. Although the Leucadia Defendants' share of this money was deposited into a fund for the benefit of the class, 25% of all moneys collected were going to the Einstein Firm as a fee. *Id.*

Arranging for the Einstein Firm to perform the work necessary to shut down the collections operation was critical because, absent such an agreement, certain class members would be exposed to paying approximately one million dollars per month in the aggregate for every month that passes between preliminary approval and a final approval (including exhaustion of any appeals).[2] The negotiations to accomplish this important goal were complex and protracted. *Id*. ¶¶ 24-25. The result of those negotiations is the agreement between Plaintiffs and the Einstein Firm, Ex. 17, which provides that the Einstein Firm will immediately, upon preliminary approval, take affirmative actions to "suspend all collection activities on behalf of defendant LR Credit," including without limitation, "directing any marshal or sheriff offices that

---

[2] Plaintiffs' counsel could not perform the work to shut down the collections operation because the Einstein Firm collects debts as counsel to LR Credit—the defendants Plaintiffs have sued. It would be a non-waivable conflict for Plaintiffs' counsel to represent LR Credit in a substantially related action, even for the purpose of helping the class members by ceasing collections.

are implementing income executions or other property levies concerning an LR Credit judgment to immediately cease until further notice; directing any banks or financial institutions that are restraining any bank accounts on behalf of LR Credit immediately to lift the restraints; and cancelling any . . . automatic withdrawals on behalf of LR Credit from bank accounts or other forms of payment automatically taken by LR Credit." *Id*. ¶ 2(a). The Einstein Agreement also provides that the Einstein Firm will return any payments received directly from class members with a letter instructing the class member to stop sending payments until further notice. *Id*. ¶ 2(c).

In exchange for doing the work set forth in the Einstein Agreement, the Einstein Firm will be paid a total of $500,000 as an Administrative Expense from the Settlement Fund with $350,000 paid upon preliminary approval and the remaining $150,000 paid 90 days thereafter, provided the Einstein Firm performs its obligations under the Einstein Agreement. *Id*. ¶ 3. There are approximately 5,200 active accounts that are being collected upon, so the $500,000 payment works out to approximately $100 per account for the work of ceasing collections. Brinckerhoff Decl. ¶ 26.

By paying $500,000 to the Einstein Firm, for every month that passes between preliminary approval and final approval of the settlement (including any appeals or the expiration of the time to appeal), or for twelve months, whichever comes first, class members will not have to pay the approximately one million dollars of monthly collections and will save the approximately $250,000 per month that is the Einstein Firm's cut of such collections. Because, at a bare minimum, the settlement cannot become final for at least five months after preliminary approval, the Einstein Agreement will save the Class a substantial sum. *Id*. ¶ 27.

### D.  Discovery and Information Exchange

Before filing the action, Class Counsel thoroughly investigated the underlying claims and gathered significant factual information through pre-suit research and data gathering. During discovery, Plaintiffs' counsel diligently pursued all information relevant to establishing Plaintiffs' claims by propounding numerous rounds of discovery requests, subpoenaing third parties, reviewing over 500,000 pages of documents (320,000 of which were produced by the Leucadia Defendants and over 5,000 by Plaintiffs), participating in 14 depositions, defending all four Named Plaintiffs' depositions, and consulting with various experts and consultants. The Parties also engaged in motion practice and sought the Court's intervention on disputes involving bifurcation of discovery, third-party discovery, subpoenas, privileged information, and the number of depositions, among other issues. The Parties also exchanged additional and extensive information regarding their factual and legal positions in connection with the mediation conducted in late 2012, as part of the revived settlement negotiations between Plaintiffs and the Leucadia Defendants and as part of the settlement proceedings conducted before Magistrate Judge Ellis. *Id.* ¶¶ 9-10.

## II.     SUMMARY OF THE SETTLEMENT TERMS

### A.     Overview

As detailed further below, pursuant to the settlement agreements, Defendants have agreed to pay nearly $54.5 million dollars ($54,492,500 to be precise) as monetary relief to class members, as follows:

- o   The Leucadia Defendants will pay $46 million.
- o   The Mel Harris Defendants will pay $7,975,000.
- o   The Samserv Defendants will pay $517,500.

In addition to the $54.5 million dollars, the Leucadia Defendants have also agreed to provide class members with any additional debt collection proceeds collected since the start of the year (shortly after the Term Sheet was signed); as of November 4, 2015, such additional proceeds total $4,556,484. Brinckerhoff Decl. ¶ 5. While the Mel Harris Defendants will also contribute their portion of debt collection proceeds beginning after settlement, in light of the Einstein Agreement, we expect there to be little or no further debt collection proceeds. *Id*. ¶ 28.

The principal injunctive relief is that debt collections will end. The Leucadia Defendants have agreed to suspend collecting LR Credit debts while the Court decides whether to approve the settlement and the Mel Harris Defendants have agreed to assist in that effort. If the settlement is finally approved, LR Credit will transfer all accounts it owns to a not-for-profit entity chosen by Plaintiffs (again with any reasonable cooperation of the Mel Harris Defendants) and Plaintiffs will work the New York State courts to try to vacate all the judgments. LR Credit and the Mel Harris Defendants have agreed not to purchase additional consumer debts and not to initiate litigation on any consumer debts they own or control. The relevant Leucadia entities, the Mel Harris Defendants, and the Samserv Defendants have also agreed to change their business practices, as detailed further below.

**B.  The Overlapping Settlement Classes**

Pursuant to the settlement agreements, the Parties have agreed to seek the preliminary certification, pursuant to Fed. R. Civ. P. 23, of the following settlement classes:

(a) A Rule 23(b)(2) class of all persons or entities who have been or could have been sued by the Mel Harris Firm as counsel for the Leucadia Defendants, including LR Credit, in actions commenced in any court located in the state of New York and where default judgments were or could have been sought ("the Rule 23(b)(2) Settlement Class"); and,

13

> (b) an overlapping Rule 23(b)(3) class of all persons or entities (all of whom are
>
> also members of the Rule 23(b)(2) Settlement Class) who have been sued by the
>
> Mel Harris Firm as counsel for the Leucadia Defendants, including LR Credit, in
>
> actions commenced in any court located in the state of New York and where
>
> Default Judgments were obtained. ("the Rule 23(b)(3) Settlement Class").

Leu. Agr. at 25 § I(A)(72), Ex. 1; MH/SS Agr. at 3 § I.A (incorporating definition), Ex. 3. The

Rule 23(b)(2) Settlement Class consists of approximately 355,000 of which approximately

190,000 persons are also members of the Rule 23(b)(3) Settlement Class. Ex. 4 ¶ 6.

### C. Equitable and Injunctive Relief for the Rule 23(b)(2) Settlement Class

#### a. Ceasing Collections

The Leucadia Agreement provides, as injunctive relief, a mechanism by which

class members' judgments and alleged debts will be relieved. The default judgment component

of the portfolios alone totals approximately $800 million (excluding post-judgment interest), so

this relief is very substantial to the class. Brinckerhoff Decl. ¶ 29.

Specifically, within 30 days after the time to appeal the final approval has run, the

Leucadia Defendants, with the reasonable cooperation of the Mel Harris Defendants, will

transfer all debt portfolios (including but not limited to default judgments) owned by LR Credit,

LLC or any of its subsidiaries to an entity designated by Plaintiffs. Leu. Agr. at 48 § III(B)(i),

Ex. 1. This entity will immediately and permanently cease all collection efforts. The Rolling

Jubilee Fund—a non-profit 501(c)(4) organization with the exclusive mission of buying and

abolishing debt—has agreed, in principle, to receive the debt portfolios. Brinckerhoff Decl. ¶ 30.

Once the debts are transferred to the Rolling Jubilee Fund, with the cooperation of

the Leucadia and Mel Harris Defendants, Plaintiffs will work with the New York State Office of

Court Administration ("OCA") to seek to vacate all default judgments entered against class

14

members. While Plaintiffs cannot guarantee that OCA will be able to vacate the judgments,

Plaintiffs have had numerous conversations with OCA and believe they are likely to achieve this

relief, through OCA or otherwise. *Id.* ¶ 31.

Additionally, pending final approval, the Leucadia Defendants have agreed to

suspend collection of the consumer debt at issue. Leu. Amend. at 4 § (B), Ex. 2. They have also

agreed, so long as the Court approves, that they will direct their counsel, the Einstein Firm, to

take direction from Class Counsel to affirmatively contact class members who are sending

payments and third-parties who are collecting the debts to inform them to suspend such activity.

*Id*. Plaintiffs entered into a separate agreement with the Einstein Firm specifying the steps the

Einstein Firm would take to ensure collection stops. Ex. 17. The Mel Harris Defendants have

agreed to assist in the efforts to immediately suspend collections, including having Mel S. Harris

remain (to the best of his ability) a licensed attorney until the Final Settlement Date (as defined

in the Agreements) and having David Waldman remain (to the best of his ability) a licensed

attorney until February 27, 2016, so they can sign any necessary documents. MH/SS Agr. at 39 §

III(c)(1)(a), Ex. 3.

Prior to engaging in settlement negotiations, Defendants sold a small minority of

class members' accounts to third parties, including approximately 25,000 accounts where they

had already obtained default judgments. Because Defendants no longer own or control these

accounts, they cannot stop collections on them and cannot transfer them to the entity designated

by Plaintiffs, and thus Plaintiffs cannot terminate collection of these class members' debts. With

respect to those class members whose judgments were sold, Plaintiffs intend to seek vacatur of

those judgments. Plaintiffs cannot ensure the cooperation of the third party purchasers, and there

is thus more uncertainty about whether their efforts to vacate the sold judgments will be

successful (for this reason, the allocation plan provides additional money to class members with sold judgments, as detailed below). But because the sold judgments were obtained as part of the same fraudulent scheme as all the other judgments, Plaintiffs believe the sold judgments will likely be vacated as well. Brinckerhoff Decl. ¶ 32.

### b.  Other Equitable and Injunctive Relief

In addition to ceasing collection, the Leucadia Defendants agree to a permanent injunction barring L-Credit, LLC, LR Credit, LLC or any of their subsidiaries from purchasing or collecting consumer debts in the future. Leu. Agr. at 50 § III(C)(3), Ex. 1. Defendants also agreed that, as of the date the Term Sheet was executed, L-Credit, LLC, LR Credit, LLC and their subsidiaries would no longer seek additional default judgments on debt portfolios they own. *Id*. § III(C)(2).

The Mel Harris Defendants agreed that the Mel Harris Firm will not engage in the practice of law and Mel Harris, Kerry Lutz, and David Waldman will not act as attorneys in any consumer debt collection proceeding initiated after the Parties' settlement—with the exception of any work done as part of their cooperation in ceasing collections against class members. MH/SS Agr. at 3 § III(C)(1)(a), Ex. 3. The individual Mel Harris Defendants also agreed to comply with all applicable debt collection laws and not to purchase any consumer debt portfolios or judgments, or initiate any litigation with respect to any consumer debt (where the Mel Harris Defendants control the entity holding the debt). *Id*. § III(C)(1)(b).

Samserv, Inc. agrees to stop serving process in consumer debt collection cases and to pay process servers for unsuccessful attempts at the same rate as for successful attempts. William Mlotok, to the extent he ever has a controlling interest in a process serving agency or is ever in a position to set policies regarding the hiring or retention of process servers, also agrees to pay process servers for unsuccessful attempts at the same rate as for successful attempts. *Id*. at

43 § III(C)(2). In addition, Samserv, Inc. and William Mlotok agree to provide a list of consumer

debt collections lawsuits filed in New York, Bronx, Kings, Queens, Richmond, and Westchester

Counties in which Samserv, Inc. served process from August 2011 to Final Approval Date and,

upon request, to provide the corresponding Affidavits of Service. *Id*. at 41-42 § III(C)(2)(b). Due

to NYC Civil Court's backlog in filing Affidavits of Service, as well as the delay in obtaining

archived files, it can take months for defendants to obtain the Affidavits of Service filed in their

cases. Accordingly, this injunctive relief will help consumers in non-LR Credit cases obtain

necessary information to vacate default judgments obtained against them. Finally, Benjamin

Lamb, Michael Mosquera, and John Andino agree that when serving process in New York City,

they will include in their records a description of the vicinity in which process was delivered

under CPLR § 308(1), and a description of the actual place of business, dwelling place or usual

place of abode at which process was delivered to a person of suitable age and description under

CPLR § 308(2). *Id*. at 43-44 § III(C)(2)(e). This information will make it more likely that they

properly serve process and will help consumer defendants determine whether they were properly

served.

### c. Releases and Opt-Out

In exchange for the equitable and injunctive relief outlined above, Rule 23(b)(2)

class members waive all claims for injunctive relief against Defendants and related entities as

detailed in the release and proposed bar order. Leu. Amend. at 57 § II(i)(c)(1), Ex. 2; MH/SS

Agr. at 52 II(i)(c)(4), Ex. 3. The release and bar order, however, does not extend to third party

purchasers, so class members whose accounts were sold will retain their ability to pursue any

claims they may have against the current owners of their alleged debts. Brinckerhoff Decl. ¶ 33.

Class members may not opt out of this aspect of the settlement. Nor will class

members receive individualized notice of this aspect of the settlement. But they will receive

publication notice as detailed below, and Rule 23(b)(2) class members who are eligible for monetary relief will receive direct notice as discussed below.

### D. Monetary Relief for Certain Members of the Rule 23(b)(2) and Rule 23(b)(3) Settlement Classes

#### 1. The Settlement Fund

The settlement agreements create a common fund consisting of (1) from the Leucadia Defendants, $46 million plus L-Credit LLC's share of additional moneys LR Credit and its subsidiaries received from debt portfolio assets on or after January 1, 2015 (the month after the Term Sheet was executed), Leu. Agr. at 32 § I(A)(88) & 44 § III(A)(ii), Ex. 1—which totaled $50,556,484.47 as of November 4, 2015, Brinckerhoff Decl. ¶ 34; (2) from the Mel Harris Defendants, including their insurer, $7,975,000, plus Rushmore's share of additional moneys LR Credit and its subsidiaries received from debt portfolio assets after the Plaintiffs and the Mel Harris Defendants settled on November 12, 2015 settlement, MH/SS Agr. at 4 § I(B)(i)(1) & 10 § I(B)(i)(28), Ex. 3;[3] and (3) from the Samserv Defendants, including their insurer, $517,500, *id.* at 25 § I(B)(51), (53) & 31-32 § III(A)(1). In total, the Settlement Fund is approximately $59 million. Brinckerhoff Decl. ¶ 34. The settlement agreements do not provide for any reversion of settlement funds to defendants based on participation in the settlement, or for any other reason. *Id.* ¶ 34. All of the settlement funds will be irrevocably transferred for the benefit of the class. *Id.*; Leu. Agr. at 48 § III(A)(4)(f), Ex. 1 (cy pres provision); MH/SS Agr. at 35 § III(A)(3)(f), Ex. 3 (same).

The settlement funds will cover Plaintiffs' awards, service payments to Named Plaintiffs, attorneys' fees and costs, and administrative expenses (including the payment to the

---

[3] In light of the Einstein Agreement, Ex. 17, which will require Einstein to take all necessary steps to suspend collections upon preliminary approval, we do not expect there to be significant additional moneys from collections on the debt portfolio assets going forward. Brinckerhoff Decl. ¶ 28.

Einstein Firm), except that Leucadia National Corporation has agreed to pay for the costs of notice to the class.[4] Brinckerhoff Decl. ¶ 35; *see also* Leu. Agr. at 52 § III(D)(4)(a), Ex. 1.

> **2.** **Eligibility**

Under Plaintiffs' proposed allocation plan, monetary relief is available to Rule 23(b)(2) and Rule 23(b)(3) class members from whom Defendants collected money via wage garnishment, bank account levy, or other means. Ex. 4 ¶¶ 3, 6-8. Approximately 75,000 class members had money collected due to a default judgment and are entitled to a portion of the Settlement Fund; each of those class members is a member of the Rule 23(b)(2) Settlement Class and the Rule 23(b)(3) Settlement Class. *Id.* ¶ 3.

Defendants' records list an additional approximately 20,000 class members from whom money was collected without a default judgment. *Id.* ¶ 6. Because no default judgment was issued, those individuals are members of only the Rule 23(b)(2) Settlement Class, and are denominated the Rule 23(b)(2) Nominal Restitution Recipients. *Id.*; Leu. Agr. at 27 § I(A)(77), Ex. 1; MH/SS Agr. at 3 § (I)(A), Ex. 3. Members of the Rule 23(b)(2) Nominal Restitution Recipients are eligible for monetary relief and will receive individual notice and an opportunity to decline the monetary component of the settlement by submitting valid and timely Nominal Restitution Declinations. *See infra* Section II.C.c.

Monetary relief is also available to about 26,000 members of the Rule 23(b)(3) Settlement Class whose judgments were sold *regardless* of whether Defendants collected money from them due to the fact that they could still have money collected from them. Ex. 4 ¶ 5.

---

[4] If the MH/SS Settlement requires a separate and distinct mailing of direct notice or publication of publication notice, such costs will not be borne by Leucadia, but will instead be allocated as an Administrative Expense under the MH/SS Settlement and paid for out of those moneys. The Parties do not expect a separate and distinct mailing to be necessary. Brinckerhoff Decl. ¶ 35.

The goals of Plaintiffs' proposed allocation plan (Ex. 4), which has been reviewed and approved by former California Superior Court Judge Daniel Weinstein,[5] Brinckerhoff Decl. ¶ 40, for the net Settlement Fund are (1) to provide as much compensation as possible to members of the Rule 23(b)(3) class who had judgments entered against them that were used to collect money from them via wage garnishment, bank account levy, or other means; (2) to provide a base level of compensation in the amount of $100 for every person who paid money to Defendants or had their default judgment sold to a non-defendant debt collector; and (3) in case the Net Settlement Fund is not sufficient to provide complete recovery to every class member who submits a timely claim form, to provide relatively more compensation to class members whose claims are timely as compared to those with fewer—or no—timely claims (based on the most generous possible accrual date). Class members whose judgments were not sold and from whom Defendants collected no money are not entitled to monetary relief but they will receive valuable injunctive relief as detailed *infra.* Brinckerhoff Decl. ¶ 37.

### 3.    Allocation Formula

In order to accomplish these goals, all class members who submit timely claim forms will be sorted into groups. Allocations of the Fund will be made from the net Settlement Fund, which will total at least $38.8 million, to class members who have submitted timely claim forms. Defendants have provided Plaintiffs' counsel with a list of sold judgments and detailed payment records for each class member, including the date and amount of each payment and the total amount paid. Plaintiffs' counsel will use these records to sort class members into allocation groups, as follows:

---

[5] Judge Weinstein's biography, including his extensive experience mediating complex high-stakes cases, is detailed at http://www.jamsadr.com/weinstein/.

- <u>Nominal Restitution Group</u>: About 19,000 members of the Rule 23(b)(2) Settlement Class from whom Defendants collected money even though no default judgment was ever entered against them. These class members will receive $100 each. Ex. 4 ¶¶ 6, 8.

- <u>Sold Judgment Group</u>: About 26,000 Rule 23(b)(3) class members whose judgments were sold. These class members will receive $100 each. *Id.* ¶¶ 5, 8. About 3,000 members of the Sold Judgment Group will also be included in both the Economic Loss Group and the Sold Judgment Group. *Id.* ¶ 5. Those in two groups will receive the total of the amount they are entitled due to their membership in each group.

- <u>Economic Loss Group</u>: Members of the Rule 23(b)(3) Settlement Class from whom Defendants collected money. *Id.* ¶¶ 3-4. This group is further subdivided according to whether class members have timely claims under the three causes of action asserted against the Defendants: (a) FDCPA (one year statute of limitation), (b) GBL § 349 (three year statute of limitation), and (c) RICO (four year statute of limitation). *Id.* ¶ 4. Claim accrual is measured from the date that Defendants first collected money and differs depending on whether the default judgment was entered in New York City Civil Court or any other court.[6] *Id.* ¶ 4. The four Economic Loss Subgroups are:

  o <u>3 Claims Group</u>: Those who have timely claims under the FDCPA, GBL § 349 and RICO (about 24,200 class members).

  o <u>2 Claims Group</u>: Those who have timely claims under GBL § 349 and RICO but not the FDCPA (about 22,300 class members).

---

[6] This action was filed on October 6, 2009, asserting claims based on default judgments obtained in the New York City Civil Court, and this is the operative date for claim accrual purposes for Economic Loss Group members who had judgments entered against them in the New York City Civil Court. Ex. 4 at 3 n.1. For Economic Loss Group members who had a default judgment entered against them in any other court, accrual dates are measured from December 15, 2014, the date the parties entered into a binding settlement term sheet. Brinckerhoff Decl. *Id.*

- o <u>1 Claim Group</u>: Those who have timely claims under RICO only (about 5,400 class members).

- o <u>Untimely Group</u>: Those who have no timely claims (about 23,000 class members).

*Id.*

As noted above, Plaintiffs will allocate $100 to each member of the Nominal Restitution, Sold Judgment, and Untimely Groups who submits a timely claim form. *Id.* ¶ 8. Even if every single member of each of these three groups submits a timely claim form the maximum payout would be $6.8 million. *Id.* Because the participation rate will be significantly less than 100%, the amount allocated to these groups is likely less than $2 million. *Id.* But even assuming 100% participation, no less than $24.2 million would still be left for distribution to members of the Economic Loss Group.

The remaining funds (the "Economic Loss Fund") will be allocated to members of the Economic Loss Group who submit timely claim forms, starting with the 3 Claims, 2 Claims and 1 Claim subgroups and including the Untimely Group only if the Economic Loss Fund is sufficient to first compensate members of the other three subgroups in amounts equal to 100% of each member's total loss. *Id.* ¶¶ 9-10. In no event will anyone in the Economic Loss Group receive less than $100. *Id.* ¶ 11.

If the Economic Loss Fund is insufficient for the members of each of the three subgroups to be awarded 100% of the money collected from them, the funds will be divided in a manner that differentiates between members of each subgroup by an amount equal to 15 cents for every dollar collected. *Id.* ¶ 10. Thus, the members of the 3 Claims Group will receive 15 cents more for every dollar collected than members of the 2 Claims Group (up to 100 cents on

the dollar) and the members of the 2 Claims Group will receive 15 cents more for every dollar collected than members of the 1 Claim Group (up to 100 cents on the dollar). *Id.* Consistent with the goals of the allocation plan, and as explained further below, these differentials between the three subgroups will only be maintained up to the point the members of each of the three subgroups are allocated an amount equal to 100 percent of their loss, at which point the excess will distributed to those in the other subgroups who have not yet been allocated an amount equal to 100% of their loss. *Id*.

If the Economic Loss Fund is sufficient for each member of the 3 Claims Group to be allocated an amount equal to 100% of their loss, the excess over that 100% recovery will be distributed proportionally to the members of the 2 Claims Group and the 1 Claim Group until it is expended or members of the 2 Claims Group reach an allocation equal to 100% of their loss. *Id*. Similarly, if the Economic Loss Fund is sufficient for each member of the 3 Claims Group and the 2 Claims Group to be allocated 100% of their loss, the excess over that 100% recovery will be allocated to the members of the 1 Claim Group until it is expended or each member of the 1 Claim Group (along with the 3 Claims Group and the 2 Claims Group) has received compensation equal to 100% of their loss. *Id*.

If the Economic Loss Fund is sufficient for each member of the 3 Claims Group, the 2 Claims Group, and the 1 Claim Group to be allocated 100% of their loss, the remaining funds will distributed proportionally to amounts lost by each member of the Untimely Group who submits a timely claim form (factoring in the $100 payment that will have already been allocated to each member of the Untimely Group). *Id*. ¶ 10(f).

Finally, if the Economic Loss Fund is sufficient for each member of the Economic Loss Group (which includes the 3 Claims Group, 2 Claims Group, 1 Claim Group and Untimely

Group) to be allocated an amount equal to 100% of their loss, than the remaining funds will be allocated pro rata to each member of the Economic Loss Group in an amount proportional to their total loss. *Id*. ¶ 10(g).

For example, if there are three class members that each had $1,000 collected from them and one is in the 1 Claim Group, one in the 2 Claim Group, and one in 3 Claim Group and there is $2,550 to distribute amongst them, the person in the 3 Claim Group would receive $1000, the person in the 2 Claim Group would receive $850, and the person in the 1 Claim Group would receive $700. If the distributable number were less, i.e., $1,800, but the losses were still $1,000 for each of the three class members, the 15 cents per dollar difference will be maintained such that the person in 3 Claim Group would receive $750, the person in the 2 Claim Group would receive $600, and the person in 1 Claim Group would receive $450. If, however, under the same scenario, the distributable amount were increased to $2,750, than the person in the 3 Claim Group would receive $1,000, the person in the 2 Claim Group would receive $950, and the person in 1 Claim Group would receive $800 because recovery is limited in each group to full recovery of the total amount collected. Only when every member of the 3 Claim Group, the 2 Claim Group and the 1 Claim Group who submit timely claim forms receive full restitution does the plan call for allocating funds over the base $100 to the Untimely Group to provide compensation for the amounts of money collected from that group.

After calculating each class member's individual award, Plaintiffs will mail settlement checks to class members. If settlement checks remain uncashed 180 days after the Final Approval Order, the remaining funds will be redistributed among class members who have timely cashed their checks or, if that is not administratively sensible, distributed to a charity

under the *cy pres* doctrine. Leu. Agr. at 48 § III(A)(4)(f), Ex. 1 (cy pres provision); MH/SS Agr. at 35 § III(A)(3)(f), Ex. 3 (same).

   Assuming that the amount of money collected from members of the Economic Loss Group (as defined in the Allocation Plan) that submit timely claim forms are uniformly distributed amongst all the claim groups, and assuming a 50% participation rate for class members entitled to $100 payments (from the Nominal Restitution, Sold Judgments, and Untimely Claims Groups, all defined in the Allocation Plan), Plaintiffs project the following amounts of recovery based on varying levels of participation in the settlement. If 50% of the Economic Loss Group submit timely claim forms, each member of the 3 Claims Group will recover 80% of their losses, with 65% recovery for the 2 Claims Group and 50% recovery for the 1 Claim Group. If 40% of the Economic Loss group submit timely claim forms, the 3 Claim Group will receive back 98% of their losses, with 83% and 68% respectively for the 2 Claims Group and the 1 Claim Group. If 30% submit timely claim forms, each member of the three groups will receive 100% of their losses and the group with untimely claims will receive 82% of their losses. If 20% submit timely claim forms, every member of the Economic Loss Group, including those with untimely claims, will receive 160% of their losses. Brinckerhoff. Decl. ¶ 38.

   Plaintiffs aim to maximize the percentage of class members who submit claim forms. Based on Class Counsel's experience, however, and in consultation with the Class Administrator, Plaintiffs do not expect more than 30% of the eligible class members to submit claim forms. *Id.* ¶ 39. At that participation rate, all class members with timely claims who had money collected due to default judgments will recover all their money and even class members with untimely claims will see the majority of the money collected (82%) returned to them. *Id.*

### 4.    Releases

Rule 23(b)(2) Nominal Restitution Recipients who do not submit Nominal Restitution Declinations and Rule 23(b)(3) class members who do not exclude themselves are bound by the terms of their respective releases in the settlement agreements and will release all claims (injunctive and monetary) that they have, could have had, or could have against Defendants and related entities related to the collection of LR Credit's consumer debt or the settlement of this action, as detailed in the release and proposed bar order. Leu. Agr. at 62 § VII., Ex. 1; MH/SS Agr. at 57 at VII, Ex. 3. Third parties who purchased debt from LR Credit are not included in the release and bar order, however, so class members whose debts or judgments were sold retain any claims that they may have against the current holders of their debt, if not LR Credit.

Class members who decline restitution or exclude themselves, as relevant, will not receive any monetary payment but will still be eligible for the injunctive relief (and be entitled to have collections on their debt stopped and their account transferred to an entity Plaintiffs designate); as such, they will be bound by the terms of the Rule 23(b)(2) Injunction Only Release and the Settlement Release that are found in both settlement agreements. Leu. Agr. at 62 § VII., Ex. 1; MH/SS Agr. at 57 at VII, Ex. 3. As note above, however, the release does not extend to third-party purchasers of class members' alleged debts or judgments.

### E.  Service Awards, Attorneys' Fees and Costs, and Administrative Costs

### 1.    Service Awards

In accordance with the settlement agreements, Plaintiffs will request in their Motion for Final Approval that the Court approve service awards for the four Named Plaintiffs in the amount of $30,000 each, in recognition of the services they rendered on behalf of the class. Leu. Agr. at 61 § V(A), Ex. 3; MH/SS Agr. at 4 § I(A) (incorporating definition), Ex. 3. Those

services included: participating over several years in fact development and discovery, including

being subjects of depositions; rejecting Rule 68 offers of judgment for $15,000; and, in the

interest of the case, publicizing their personal experiences with debt collection. Brinckerhoff

Decl. ¶ 42.

   The Named Plaintiffs contributed significant time and effort to the investigation

and prosecution of the case by providing Class Counsel with detailed factual information

regarding their experiences with Defendants' debt collection scheme and the enforcement of

default judgments against them individually. They also helped Class Counsel prosecute their

claims by responding to multiple discovery requests from all three sets of Defendants, providing

hundreds of responsive documents—many of them containing personal financial information—

answering and reviewing numerous sets of interrogatories, and participating in depositions that

delved into sensitive questions about their credit history. Further, the Named Plaintiffs were

involved with the lengthy settlement negotiations, and made themselves readily available to

communicate with Class Counsel. The time and effort contributed by the Named Plaintiffs for

the benefit of the class and the additional burdens they sustained thus support the requested

service awards. *Id*. ¶ 43.

   Named Plaintiffs deserve to be rewarded for remaining in the case instead of

accepting early settlement offers and for helping to obtain relief for the entire class, which they

have achieved with the settlement agreement. They took on significant risks by rejecting

Defendants' Rule 68 Offers of Judgment of $15,000 per Plaintiff (which three of the four Named

Plaintiffs did in 2011), which opened themselves to possibly significant exposure. If a plaintiff

rejects a Rule 68 offer of judgment and he or she ultimately obtains a judgment less favorable

than the offer, he or she is liable for costs incurred after the offer was made. Fed. R. Civ. P.

68(d); *see also, e.g., Stanczyk v. City of New York*, 752 F.3d 273, 280 (2d Cir. 2014). All Named

Plaintiffs are low-income consumers for whom the prospect of having to pay Defendants' costs

was a significant risk and grave concern. They also risked the stress and stigma of sharing their

personal experience with debt collection. Named Plaintiffs subjected themselves to sharing and

publicizing their private financial information by participating in the action, including the

depositions, and helping to prosecute the claims. Brinckerhoff Decl. ¶ 45.

  The service awards requested here of $30,000 for each Named Plaintiff—which

amounts to 0.2% of the total recovery—are therefore reasonable.[7]

### 2. Attorneys' Fees and Costs

  At the appropriate time, Class Counsel will apply for an award of attorneys' fees

and costs to be paid from the Settlement Fund. The Court need not decide attorneys' fees and

costs now; pursuant to Federal Rules of Civil Procedure 23(h) and 54(d)(2), Class Counsel will

move for attorneys' fees and costs along with their Motion for Final Approval of the Settlement.

The settlement agreements provide that attorneys' fees and expenses shall not exceed one-third

of the funds remaining in the Settlement Fund after deductions for service awards, administration

expenses, and tax expenses. Leu. Agr. at 59-60 § IV(A), Ex. 1; MH/SS Agr. at 55-56 § IV(A),

Ex. 3.[8]

---

[7] The requested awards are also comparable to awards made in other cases where the lead plaintiffs were able to effect substantial relief for class members. *See, e.g., McBean v. City of New York*, 228 F.R.D. 487, 494-95 (S.D.N.Y. 2005) (approving payments of $25,000 incentive awards to each named plaintiff); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 203-04 (S.D.N.Y. 1997) (awarding named plaintiffs who had initiated class action incentive awards of $85,000 and $50,000); *Dornberger*, 203 F.R.D. at 125 (granting incentive awards in part because they were "small in relation to the . . . fund from which the awards will be made").

[8] "District courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater." *Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 09194, 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010) (collecting authorities).

### 3. Administrative Costs

#### a. Settlement Class Administrator

Under the terms of the settlement agreements, the Settlement Class Administrator's fees will be paid out of the Settlement Fund, except that the Notice Expenses will be paid for separately by the Leucadia Defendants (unless separate notices must be mailed for the MH/SS Agreement, *see supra* note 4). Leu. Agr. at 53 § III(E), Ex. 3; MH/SS Agr. at 47 § III(E)(1), Ex. 1. Plaintiffs selected Epiq Systems ("Epiq"), which has extensive experience administering class action agreements. Brinckerhoff Decl. ¶ 60.

Pursuant to the agreement with Epiq, Epiq shall be responsible for the following tasks: locating class members as necessary; mailing notices to class members in accordance with the Court's Preliminary Approval Order; receiving and tracking opt-out statements, statements from objectors, and claim forms; establishing and administering the Settlement Fund and closing the Settlement Fund upon conclusion of the settlement process; calculating the settlement awards; distributing the settlement checks to class members, developing procedures and responding to inquiries from class members about the settlement, the notice, and the procedures contained therein; creating and operating a settlement website; creating a database of class members who have received and negotiated settlement checks; creating a database of class members who have returned opt-out statements; creating a database of objectors and providing the Parties with all objectors' statements; providing Class Counsel's contact information to any class member who requests the same from the Class Administrator; responding to inquiries from Class Counsel concerning the settlement process; and completing any other duties and responsibilities necessary to administer the settlement. Epiq has agreed to cap Notice Expenses at

$350,000 which shall be paid by the Leucadia Defendants and not out of the Settlement Fund, *but see* note 4). Brinckerhoff Decl. ¶ 62.

Epiq has agreed to cap Administration Expenses, which will be paid for out of the Settlement Fund, at $300,000 if over 30% of eligible class members file claim forms, at $275,000 if between 20% and 30% of eligible class members file claims forms, at $250,000 if between 10% and 20% of eligible class members file claim forms, and at $200,000 if less than 10% of eligible class members file claim forms. *Id*. ¶ 63.

### b.    The Einstein Firm

Under the terms of the Leucadia Amendment, the Parties agreed to pay, if approved by the Court, $500,000 from the Leucadia Account to the Einstein Firm as an Administrative Expenses. This payment is to compensate the Einstein firm for the significant amount of work needed to suspend collection activity on the class members' debts and is likely to be far less than the Einstein Firm's commission on class members' payments were collections to continue until the settlement is finally approved. The first payment of $350,000 would be paid upon preliminary approval and the second payment, of $150,000, would be paid 90 days thereafter, by which point the Einstein Firm would have completed much, if not all, of the work of suspending the collection machinery. *See supra* Section I.C.3.A (Immediate Cessation of Collection).

## III.    PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE

The law favors compromise and settlement of class action suits. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 116 (2d Cir. 2005) (noting the "strong judicial policy in favor of settlements, particularly in the class action context") (internal quotation marks and citation omitted); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("[T]here is an overriding public interest in settling class action litigation, and it should therefore

be encouraged."). "Courts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere." *Hernandez v. Merrill Lynch & Co., Inc.*, No. 11 Civ. 8472, 2012 WL 5862749, at *2 (S.D.N.Y. Nov. 15, 2012); *see also Diaz v. E. Locating Serv., Inc.*, No. 10 Civ. 4082, 2010 WL 5507912, at *3 (S.D.N.Y. Nov. 29, 2010) (giving "weight to the parties' judgment that the settlement is fair and reasonable"). The Parties here acted responsibly in reaching a settlement in this case.

The approval of a proposed class action settlement is a matter of discretion. *See Maywalt v. Parker & Parsley Petroleum Co*., 67 F.3d 1072, 1078 (2d Cir. 1995). "[C]ourts should give proper deference to the private consensual decision of the parties . . . [and] should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation . . . ." *Clark v. Ecolab, Inc.*, Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672, 2009 WL 6615729, at *3 (S.D.N.Y. Nov. 27, 2009) (internal quotation marks and citations omitted).

"Preliminary approval . . . requires only an initial evaluation of the fairness of the proposed settlement on the basis of written submissions and an informal presentation by the settling parties." *Id.* at *3 (internal quotation marks omitted). Preliminary approval is "at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness." *In re Traffic Exec. Ass'n-E. R.Rs.*, 627 F.2d 631, 634 (2d Cir. 1980). "A proposed settlement of a class action should therefore be preliminarily approved where it appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval."

31

*Felix v. Northstar Location Servs., LLC*, 290 F.R.D. 397, 407 (W.D.N.Y. 2013) (internal

quotation marks omitted). "Fairness is determined upon review of both the terms of the

settlement agreement and the negotiating process that led to such agreement." *Frank v. Eastman

Kodak Co.*, 228 F.R.D. 174, 184 (W.D.N.Y. 2005). "Absent fraud or collusion, [courts] should

be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *In

re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240, 2007 WL 2230177, at *4

(S.D.N.Y. July 27, 2007).

### A.  The Settlement is Procedurally Fair

Evaluation of the fairness, reasonableness, and adequacy of a proposed settlement

involves two inquiries: a substantive analysis of the settlement itself, and an examination of the

procedural process by which it was reached to ensure that negotiations were fair and conducted

at arms length. *D'Amato v. Deutsche Bank*, 236 F.3d 76, 85-87 (2d Cir. 2011); *McBean v. City of

New York*, 233 F.R.D. 377, 382-91 (S.D.N.Y. 2006) ("*McBean II*").

In evaluating procedural fairness, the court must examine "the negotiating process

leading to settlement." *Wal-Mart Stores*, 396 F.3d at 116; *see D'Amato*, 236 F.3d at 85. "A court

reviewing a proposed settlement must pay close attention to the negotiating process, to ensure

that the settlement resulted from 'arm's-length negotiations and that plaintiffs' counsel have

possessed the experience and ability, and have engaged in the discovery, necessary to effective

representation of the class's interests.'" *Id.* (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d

Cir. 1982)). "A 'presumption of fairness, adequacy, and reasonableness may attach to a class

settlement reached in arm's-length negotiations between experienced, capable counsel after

meaningful discovery.'" *Wal-Mart Stores*, 396 F.3d at 116 (quoting Manual for Complex

Litigation, Third, § 30.42 (1995)).

Here, negotiations between the Parties were lengthy, complex, vigorously contested, and always conducted at arm's length. As set forth in more detail above (*supra* Section I.C), the Parties engaged in extensive discovery, including exchanging and reviewing thousands of pages of documents, reviewing and analyzing key electronic databases maintained by the Leucadia and Mel Harris Defendants, and conducting 14 depositions including three representatives of the Leucadia Defendants, five representatives of the Samserv Defendants, and two representatives of the Mel Harris Defendants. While discovery is still not complete, the Parties certainly reviewed enough material to have a very good sense of the strength and weaknesses of each other's' positions.

As set forth in more detail above (*supra* Section I.C), the Parties—who were represented by experienced, highly capable counsel—settled this matter only after protracted settlement negotiations overseen by California Superior Court Judge Daniel Weinstein and Magistrate Judge Ronald L. Ellis. *Cf. D'Amato*, 236 F.3d at 85 ("[A] court-appointed mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure."). Judge Weinstein also reviewed and approved the Allocation Plan. Brinckerhoff Decl. ¶ 40.

Because the settlement process was fair, arms-length and collusion-free, the resulting agreement is presumed to be fair, adequate, and reasonable.

## B. The Settlement is Substantively Fair

In evaluating a class action settlement, courts in the Second Circuit generally consider the nine factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) ("*Grinnell*"). Although the Court's task on a motion for preliminary approval is merely to perform an initial evaluation to determine whether the settlement falls within the range of

possible final approval, it is useful for the Court to consider the criteria on which it will ultimately judge the settlement.

The *Grinnell* factors are (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the Settlement Fund in light of the best possible recovery; and (9) the range of reasonableness of the Settlement Fund to a possible recovery in light of all the attendant risks of litigation. *Grinnell*, 495 F.2d at 463. The *Grinnell* factors weigh in favor of approval of the settlement, and certainly in favor of preliminary approval (although, as to the Leucadia Defendants' only, their ability to withstand a greater judgment (*Grinnell* Factor 7) is likely not in question).

### 1. Litigation Through Trial Would be Complex, Costly, and Long (*Grinnell* Factor 1).

By reaching a favorable settlement prior to dispositive motions or trial, Plaintiffs seek to avoid significant expense and delay and ensure recovery for the class. "Most class actions are inherently complex and settlement avoids the costs, delays and multitude of other problems associated with them." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato*, 236 F.3d.

This case is no exception. With a class period dating back to 2005 and claims arising under a variety of federal and state statutory provisions – including RICO – this case is extraordinarily complex.

Further litigation here would cause additional expense and delay. Though the case has been pending for six years, Plaintiffs have yet to depose some key witnesses from among the

Defendants, and discovery is far from complete. Following discovery, the Parties envision

summary judgment motions raising many technical and novel issues of law, such as (to name just

two of many examples) whether the Fair Debt Collection Practices Act applies to false

statements made to court officials, and whether the *Rooker-Feldman* doctrine bars Plaintiffs'

damages claims. If Plaintiffs defeat summary judgment, a fact-intensive trial would likely be

necessary to determine both liability and damages. A trial would be lengthy and complex, would

require extensive testimony from expert witnesses, and would consume tremendous time and

resources for the Parties and the Court. Any judgment would likely be appealed, further

extending the litigation. Even after final resolution of the litigation, class members would be

unlikely to be able to immediately collect their full judgment against the Mel Harris and Samserv

Defendants given those Defendants' limited resources and the magnitude of the judgment that

Plaintiffs believe they would obtain if they succeed at trial; as a result there would be further

delay to engage in judgment collection. Class members would not obtain relief for years. The

settlement, on the other hand, makes monetary and injunctive relief available to class members in

a prompt and efficient manner. Brinckerhoff Decl. ¶ 52. Therefore, the first *Grinnell* factor

weighs in favor of approval.

### 2. The Reaction of the Class Has Been Positive (*Grinnell* Factor 2).

Notice of the settlement and its details has not yet been issued to the class. The

Court should more fully analyze this factor after notice issues and class members are given the

opportunity to opt out or object. At this early stage in the process, Named Plaintiffs Monique

Sykes, Kelvin Perez, Rea Veerabadren, and Clifton Armoogam have expressed their approval of

the settlement by agreeing to the settlement agreements. *Id.* ¶ 41. Therefore, this factor weighs in

favor of approval.

### 3. Discovery Has Advanced Far Enough to Allow the Parties to Resolve the Case Responsibly (*Grinnell* Factor 3).

The Parties have completed extensive discovery. "Because much of the point of settling is to avoid litigation expenses such as full discovery, it would be inconsistent with the salutary purposes of settlement to find that extensive pre-trial discovery is a prerequisite to approval of a settlement." *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 263 (S.D.N.Y. 1998) (internal quotation marks and citations omitted). The proper question is "whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Warfarin*, 391 F.3d at 537 (internal quotation marks omitted). "[T]he pretrial negotiations and discovery must be sufficiently adversarial that they are not designed to justify a settlement . . . [, but] an aggressive effort to ferret out facts helpful to the prosecution of the suit." *In re Austrian*, 80 F. Supp. 2d at 176 (internal quotation marks and citation omitted).

The Parties' discovery here meets this standard. As set forth in more detail above (*supra* Section I.D), before filing the action, Class Counsel thoroughly investigated the underlying claims and gathered significant factual information through pre-suit research and data gathering. During discovery, the Parties propounded and responded to numerous discovery requests, subpoenaed third parties, reviewed 500,000 of documents (of which 320,000 were produced by the Leucadia Defendants alone), participated in 14 depositions (including three representatives of the Leucadia Defendants, five representatives of the Samserv Defendants and two representatives of the Mel Harris Defendants) and consulted with various experts and consultants. The Parties also exchanged additional information regarding their factual and legal positions in connection with the mediation conducted in late 2012, and as part of the revived settlement negotiations. Brinckerhoff Decl. ¶¶ 9-10.

36

The thoroughness of the discovery performed here favors preliminary approval. *See, e.g.*, *McMahon v. Olivier Cheng Catering and Events, LLC*, No. 08 Civ. 8713, 2010 WL 2399328, at *5 (S.D.N.Y. Mar. 3, 2010) (finding that the parties' "efficient, informal exchange of information" was enough discovery to recommend settlement approval); *Frank*, 228 F.R.D. at 185 (approving settlement of case where parties had exchanged extensive information pertaining to the identities of class members and defendant's practices). Courts often grant final approval of class settlements in cases where the parties conducted less discovery than in this case. *See, e.g.*, *Matheson v. T-Bone Rest., LLC*, No. 09 Civ. 4214, 2011 WL 6268216, at *5 (S.D.N.Y. Dec. 13, 2011) (granting final approval where parties engaged in informal information exchange with no depositions because "Plaintiffs obtained sufficient discovery to weigh the strengths and weaknesses of their claims" and "[t]he parties' participation in a day-long mediation allowed them to further explore the claims and defenses"); *Johnson v. Brennan*, No. 10 Civ. 4712, 2011 WL 4357376, at *9-10 (S.D.N.Y. Sept. 16, 2011) (finding that parties were "well-equipped to evaluate the strengths and weaknesses of the case" and granting final approval where parties engaged in informal discovery and no depositions were taken); *Diaz*, 2010 WL 5507912, at *5 (granting final approval of pre-suit class settlement, where informal discovery consisted of pre-suit document exchange); *McMahon*, 2010 WL 2399328, at *5 (granting final approval where parties conducted informal discovery but no depositions); *Khait v. Whirlpool Corp.*, No. 06-6381, 2010 WL 2025106, at *6 (E.D.N.Y. Jan. 20, 2010) (approving settlement with informal discovery but no depositions). Here, where Class Counsel engaged in extensive document discovery and consulted with experts, this factor unquestionably favors preliminary approval.

### 4. Plaintiffs Would Face Real Risks if the Case Proceeded (*Grinnell* Factors 4 and 5).

Although Plaintiffs believe their case is strong, it is subject to considerable risk. "Litigation inherently involves risks." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997). "The proposed settlement benefits each plaintiff in that he or she will recover a monetary award immediately, without having to risk that an outcome unfavorable to the plaintiffs will emerge from a trial." *Velez v. Majik Cleaning Serv., Inc.*, No. 03 Civ. 8698, 2007 WL 7232783, at *6 (S.D.N.Y. June 25, 2007).

A trial on the merits would involve significant risks for Plaintiffs as to both liability and damages. Among other things, to recover the maximum possible damages for the maximum possible number of people, Plaintiffs would have to prevail on their RICO claims, including establishing that each Defendant intentionally engaged in racketeering activity. Even if Plaintiffs succeed in proving their RICO claims, Defendants have argued strenuously and under multiple legal theories that Plaintiffs' largest category of damages—the money that was collected from them via the fraudulently-obtained judgments—is not actually recoverable. While Plaintiffs believe that they could ultimately establish both liability and damages, this would require significant factual development, requiring hundreds of additional hours of discovery, plus the time and resources required to litigate dispositive motions and prevail at trial, and then prevail again on the inevitable appeal. Plaintiffs would further face the risks that any judgment against the Mel Harris or Samserv Defendants will not be collectible. Brinckerhoff Decl. ¶¶ 53-56.

Class Counsel are experienced and realistic, and understand that the resolution of liability issues, the outcome of the trial, and the inevitable appeals process are inherently uncertain in terms of outcome and duration. The proposed settlement alleviates these uncertainties. This factor thus weighs in favor of approval.

### 5.     Maintaining the Class Through Trial Would Not Be Simple (*Grinnell* Factor 6).

The risk of maintaining class certification through trial is also present.

Defendants strenuously opposed class certification on the ground that too many individual issues

existed to maintain a class. In particular, Defendants argued that damages could not be

determined on a class-wide basis because each class member's entitlement to damages would

turn on a fact-intensive inquiry as to whether that class member was served and/or owed the

alleged underlying debt. Although Plaintiffs disagree that these questions are relevant to

determining damages, these are still open questions in the case. *See Sykes*, 780 F.3d at 88-89

(declining to decide these questions at class certification stage). Accordingly, this factor also

weighs in favor of approval.

### 6.     The Mel Harris and Samserv Defendants are unlikely to be able to withstand a greater judgment (*Grinnell* Factor 7).

"[E]vidence that the defendant will not be able to pay a larger award at trial tends

to weigh in favor of approval of a settlement, since the 'prospect of a bankrupt judgment debtor

down at the end of the road does not satisfy anyone involved in the use of class action

procedures.'" *In re PaineWebber*, 171 F.R.D. at 129 (quoting *In re Warner Commc'ns Sec.

Litig.*, 618 F. Supp. 735, 746 (S.D.N.Y. 1985)).

The Mel Harris and Samserv Defendants provided Plaintiffs with detailed

financial information as part of the settlement discussions conducted by Magistrate Judge Ellis.

Class Counsel carefully reviewed that information with their certified Valuation Analysis. That

information demonstrated to Plaintiffs' satisfaction that the Mel Harris and Samserv Defendants

would be highly unlikely to be able to pay a judgment of the magnitude Plaintiffs will seek at

trial. At best, Plaintiffs will only be able to collect a portion of the judgment immediately and

have to continue collection efforts, likely over a period of years—whereby the administrative

costs of distributing such money to the Class will quickly overwhelm the recovery itself. Brinckerhoff Decl. ¶ 57. This factor weighs in favor of approval.

> **7.      The Settlement Fund is Substantial, Even in Light of the Best Possible Recovery and the Attendant Risks of Litigation (*Grinnell* Factors 8 and 9).**

Defendants agreed to settle this case for a substantial amount: approximately $54.5 million (plus the Leucadia Defendants' and Mel Harris Defendants continuing share of collections since settlement, for a current total of over $59 million). The amount represents substantial value given the attendant risks of litigation, even though recovery could theoretically be greater if Plaintiffs defeated a motion for summary judgment and defeated motions to decertify the class; succeeded on all claims at trial; survived an appeal; and were able to collect on the judgment they obtained. Brinckerhoff Decl ¶ 47.

This settlement represents a significant percentage of the best possible recovery. The total amount of money collected from class members with default judgments to date is approximately $172 million. Of that total, approximately $113 million that was collected as a result of default judgments from class members with claims that are timely (based on accrual dates that are most favorable to members of the Rule 23(b)(3) Settlement Class). Accordingly, the maximum total likely recovery in this action was approximately $113 million, though class members also have claims for treble damages under RICO against all defendants and for treble damages under the N.Y Judiciary Law against the Mel S. Harris law firm and the individual Mel Harris Defendants who are lawyers. With trebling, the maximum total recovery is $339 million. While the maximum total potential recovery would have increased the longer this action was litigated, that increase would have been to the detriment the class. The $59 million monetary settlement represents *over 50%* of the $113 million LR Credit collected from class members with default judgments who had timely claims. If 30% of class members who are sent claim forms

40

return them (which would be a high return rate), *those class members with timely claims would receive all the money collected* as a result of default judgments. With a 30% return rate, class members with untimely claims who had money collected as a result of default judgments would receive 82% of that money back. *Id*. ¶¶ 50, 53.

      Furthermore, the Settlement Fund does not represent the sole economic benefit to class members. The Leucadia Defendants have agreed to transfer class members' default judgments to an entity designated by Plaintiffs so that Plaintiffs may work with the New York State courts to vacate those judgments. Leu. Agr. at 48-49 § III(B)(1), Ex. 1. These judgments are worth approximately $800 million, plus 9% annual post-judgment interest. Many of these judgments also appear on class members' credit reports, where they prevent class members from gaining access to housing and jobs, and cause them to pay more for credit than they otherwise would. Relieving class members from these judgments—along with the attendant risk that their wages could be garnished and their money and property seized—thus provides substantial, additional economic benefits to class members. Brinckerhoff Decl. ¶ 49.

      Additionally, the Leucadia Defendants have agreed to immediately suspend collection of money from class members while this Court (and any appellate Court) decides whether to approve the settlement. Leu. Amend. at 4(B), Ex. 2. Those collections have, in recent months, totaled approximately one million dollars each month, so ending those collections immediately is an additional, substantial benefit to the Class. Brinckerhoff Decl. ¶ 30. If the settlement is approved, the Leucadia Defendants will transfer class members' debts to Rolling Jubilee, a nonprofit 501(c)(4) with the exclusive mission of buying and abolishing debt as a gift to low-income debtors. The abolition of these debts is another significant economic benefit to class members. Brinckerhoff Decl. ¶¶ 30-31.

The determination of whether a settlement amount is reasonable "does not involve the use of a 'mathematical equation yielding a particularized sum.'" *Frank*, 228 F.R.D. at 186 (quoting *In re Austrian*, 80 F. Supp. 2d at 178). "Instead, 'there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Id.* (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). "[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell*, 495 F.2d at 455 n.2. "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair." *Officers for Justice v. Civil Serv. Comm'n of City and Cnty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982) (emphasis added); *see also Cagan v. Anchor Sav. Bank FSB*, No. 88 Civ. 3024, 1990 WL 73423, at *12-13 (E.D.N.Y. May 22, 1990) (approving $2.3 million class settlement over objections that the "best possible recovery would be approximately $121 million").

Here, the settlement is significant and dwarfs the recovery obtained in similar cases. As an example, consider *Vassalle v. Midland Funding, LLC*, a nationwide class action brought against a debt buyer for filing false affidavits in state court, which ultimately settled for $5.2 million, of which each class member would receive $17.38, and Midland would continue to collect their alleged debt. No. 3:11 Civ. 00096, 2014 WL 5162380 (N.D. Ohio Oct. 14, 2014); *see also Torres v. Toback, Bernstein & Reiss LLP*, No. 11 Civ. 1368, 2014 WL 1330957, * 2 (E.D.N.Y. Mar. 31, 2014) (establishing settlement fund of $34,250, of which each class member would receive no more than $68, plus interest rate adjustments and refunds of overpayment if applicable). In this case, by contrast, class members from whom Defendants collected money

will be entitled to receive refunds in the amount of hundreds or even thousands of dollars,

depending on the nature and extent of their injuries. In addition, class members will receive the

economic benefit of cessation of collections and likely vacatur of their judgments without having

to submit a claim form, go to court, or hire an attorney.

***

Given the legal and factual disputes that persist, the settlement represents a

substantial recovery for class members. The *Grinnell* factors weigh in favor of issuing

preliminary approval of the settlement. In the event that a substantial number of objectors come

forward with meritorious objections, the Court can reevaluate its determination then. Because the

settlement, on its face, is "'fair, adequate, and reasonable, and not a product of collusion,'"

*Frank*, 228 F.R.D. at 184 (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138-39 (2d Cir. 2000)), the

Court should grant preliminary approval.

## IV.  CERTIFICATION OF THE RULE 23 EXPANDED SETTLEMENT CLASS IS APPROPRIATE

Plaintiffs ask this Court to certify the expanded Rule 23(b)(3) and Rule 23(b)(2)

Settlement Classes (*see supra* Section II.B), under Federal Rule of Civil Procedure 23(e) for

purposes of effectuating the settlement. In detailed opinions issued on September 4, 2012 and

March 28, 2013, this Court certified the Rule 23(b)(2) and Rule 23(b)(3) Litigation Classes,

finding that the classes met the requirements of Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3), and

appointed Neighborhood Economic Development and Advocacy Project (now NEP), MFY, and

ECBA as Class Counsel. *Sykes*, 285 F.R.D. at 290; Dkt 170.

The proposed settlement classes largely mirror the certified Litigation Classes

(*see supra* Section I.B.4), except that while the Litigation Classes only covered judgments that

were or could have been sought in New York City Civil Court, the settlement classes include

persons against whom judgments were or could have been sought *throughout New York State*.

For largely the reasons set forth in the September 4, 2012 opinion, the expanded

settlement classes meet all of the requirements for class certification for settlement purposes. As

this Court already found, the "overarching claim is that defendants systematically filed false

affidavits of merit and, in many instances, false affidavits of service to fraudulently procure

default judgments." *Sykes*, 285 F.R.D. at 290. These overarching claims in this lawsuit do not

vary based on *where* the default judgment was (or could have been) sought. Resolving those

claims, the Court found, will require resolution of common questions, including "the veracity of

the affiant's uniform statement of 'personal knowledge' of the underlying debt" and "whether

making false representations in court, rather than to the debtor, violates the FDCPA." *Id.* The

resolution of these common questions are not dependent on whether the judgment was sought in

New York City Civil Court or in a court elsewhere in the State. Because the issues as to the

legality of Defendants' actions in seeking default judgments in courts statewide are the same as

the question of the legality of their actions in seeking default judgments in New York City Civil

Court, these common questions predominate over any individual questions, and a class action is

superior to other available methods. And, not surprisingly, the expanded class is more numerous

than the certified classes.[9]

Additionally, the class representatives and their counsel are adequate to pursue

these common questions. This Court has already appointed ECBA, MFY, and NEP as Class

---

[9] Here, the Rule 23(b)(3) Settlement class contains approximately 192,000 people (divided such that approximately 2/3 of them were part of the certified Litigation Class and 1/3 are only part of the expanded Settlement Class). The Rule 23(b)(2) Settlement class would contain those 192,000 plus an additional approximately 161,000 persons whose debts were listed on portfolios LR Credit purchased but who have not had a default judgment entered against them.

Counsel, finding that "the combined experience of class counsel in class action litigation and consumer advocacy to be more than sufficient to continue to act on behalf of the classes in this litigation." *Id.* at 292 (S.D.N.Y. 2012). Class counsel's advocacy here has resulted in a settlement of this case that already is among the largest, if not the largest, ever achieved in a consumer debt class action. *Cf. In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004) (considering settlement value in analyzing adequacy).

Moreover, a district court "[c]onfronted with a request for settlement-only class certification . . . need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 239 (2d Cir. 2012) ("'A key question in a litigation class action is manageability—how the case will or can be tried, and whether there are questions of fact or law that are capable of common proof. But the settlement class presents no management problems because the case will not be tried.'" (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 335 (3d Cir. 2011) (Scirica, J., concurring))). Thus, to the extent there is any concern about the common proof that would be required concerning the process of seeking default judgments in the various courts throughout the State, such concerns fall by the wayside in certifying the settlement classes.

Defendants do not oppose provisional certification of the larger classes for settlement purposes only. *See* Newberg § 13:3 ("If a class has not yet been certified, the parties stipulate to the conditional or temporary establishment of settlement classes for the purposes of the agreement."); *Cnty. of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1422, 1424 (E.D.N.Y. 1989) ("negotiat[ing] a proposed settlement . . . prior to certification of the class" is appropriate), *aff'd in part, rev'd in part on other grounds*, 907 F.2d 1295 (2d Cir. 1990).

## V.      THE NOTICE PLAN AND DISTRIBUTION PROCESS ARE APPROPRIATE

The Proposed Notices, Exs. 5-12, comply with due process and Federal Rule of

Civil Procedure 23.

### A.   Notice of the Settlement

The settlement requires publication notice to all members of the classes and that

individual direct notices be mailed to the Rule 23(b)(3) Settlement Class and Rule 23(b)(2)

Nominal Restitution Recipients. Leu. Agr. at 50 § III(D), Ex. 1. The Leucadia Defendants will

pay the costs of such notice in addition to the amount they paid into the Settlement Fund (unless,

for unanticipated reasons, a separate notice is needed for the MH/SS Agreement, *see* note 4).[10]

Leu. Agr. 50-52 at III(D), Ex. 1. The notices describe the terms of the settlement; inform the

class about their legal rights and options (including their right to exclude themselves from

portions of the settlement or to object); inform the class that Plaintiffs will seek to recover costs,

attorneys' fees, and service awards from the Settlement Fund; and provide specific information

regarding the date, time, and place of the final approval hearing. Exs. 5-12.

The publication notice, which is attached as Exhibit 13, will be published in each

of the following publications: the *New York Daily News,* the *New York Post*, *AM New York*, *New

York Metro*, *El Diario*, the *Times Union* and the *Buffalo News*. Ex. 1 at III.D.2. The publication

notice will be published at least thirty days before the deadline to object, request exclusion or

decline the nominal restitution. *Id*. III.D.2.b.

All members of the Rule 23(b)(3) Settlement Class and the Nominal Restitution

Rule 23(b)(2) class members will receive direct notices. The direct notices, which are attached as

Exhibit 5 to 12, will be sent to the class by first class mail; each class member will be sent an

---

[10] The Agreement also provides for CAFA Notice to appropriate federal and state officials.

English and Spanish notice. The settlement agreements provide that the Class Administrator will update class members' last-known address using publicly-available databases. Leu. Agr. at 52 § III(D)(1)(a), Ex. 1. Direct notices will be mailed at least 90 days before the deadline to object, request exclusion or decline the nominal restitution. Leu. Agr. at 51 § III(D)(1)(b), Ex. 1. The Notices contain information about how to exclude oneself or object to the settlement. Exs. 5-12.

The direct notices will be customized in two distinct ways: First, each class member who receives direct notice will receive one of eight form notices, which are specific to what the class member will be entitled to based on the allocation plan and the injunctive provisions. Specifically, the language of the notice is customized as to whether the class members' judgments were sold or not, whether money was ever collected from them by Defendants (with or without a default judgment), whether their claims are timely, and whether they are entitled to a monetary payment or not. Exs. 5-12. To take one example, the notice sent to class members whose judgments are still owned by LR Credit will explain that, upon final approval, their judgment will be transferred to an entity designated by Plaintiffs; in contrast, notices sent to class members whose judgments are no longer owned by LR Credit will be told that their judgment will not be transferred.[11] *Compare* Ex. 1 *with* Ex. 2.

Second, the direct notices will be customized to indicate how much each class member will likely receive (based, where relevant, on likely return rates). Specifically, using information from Defendants' records, the notices will include (1) the amount of the default judgment (for Rule 23(b)(3) members); (2) the amounts of money Defendants collected (for

---

[11] For persons who fit into multiple categories (e.g., a person who had multiple default judgments, only one of which remains owned by Leucadia), Plaintiffs and the Administrator will create combined notices, each reflecting each potential combination. For ease of the Court, Plaintiffs have not submitted such combined notices to the Court but Plaintiffs can supplement this submission should the Court wish. Such combined notices will not deviate materially from the language in the Proposed Notices submitted herein.

those who had collections); (3) the class members' maximum recovery assuming a highly improbable 100% response rate from class members, as well as recoveries using more probable response rates (30%; 20%; and 10%). Exs. 5-12.

These individualized notices aim to maximize participation by listing a specific dollar figure the class member may receive so as to encourage class members to complete a claim form. The customization also minimizes confusion by ensuring that class members learn the information that is most relevant to their particular circumstances; the Notice also provides enough information about the settlement generally so that class members understand the entire settlement and have the opportunity to lodge any objection they may have.

Courts have approved class notices even when they provided only general information about a settlement. *See In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (class notice "need only describe the terms of the settlement generally"). The detailed information in the proposed notices far exceeds this bare minimum and fully complies with the requirements of Rule 23 (c)(2).

Class members who are entitled to a monetary payment will be required to fill out and return a claim form verifying only their identity and agreeing to the release. To maximize participation, the claim form requires the minimum possible information necessary to verify that the person completing the claim form is the person listed in the Leucadia Defendants' records. Ex. 14.

Epiq has also agreed to take numerous additional steps that go beyond the requirements of the settlements to ensure that class members receive notice, have few difficulties filing claims, and have their questions answered, including: (1) conducting sophisticated address searches before sending the notices; (2) sending the notice in both English and Spanish to all

who receive individual notice; (3) sending a pre-addressed postage-paid envelope for claim

forms; (4) providing for online claim filing; (5) providing information on the web site in eight

languages; and (6) having live operators who speak those languages and more available to

answer class members questions. Brinckerhoff Decl. ¶ 16.

Plaintiffs respectfully submit that this process is fair and amply protects the due

process rights of absent class members to know about and participate in the settlement.


**CONCLUSION**

Plaintiffs, joined by all Defendants, respectfully request that the Court grant

Plaintiffs' motion for preliminary approval of the settlement agreements and enter the proposed

preliminary approval order which is attached to the Brinckerhoff Declaration as Exhibit 16

(which is the same proposed order that is attached to the Leucadia Amendment of today's date).


Dated:  November 12, 2015
        New York, New York


EMERY CELLI BRINCKERHOFF
 & ABADY LLP

By: _____/s/_____
Matthew D. Brinckerhoff
Debra L. Greenberger
Elizabeth S. Saylor
600 Fifth Avenue, 10th Floor
New York, New York 10020
212-763-5000

NEW ECONOMY PROJECT
Susan Shin
Josh Zinner
121 W 27th Street, Suite 804
New York, NY 10001
212-680-5100

49

MFY LEGAL SERVICES, INC.
Carolyn E. Coffey and
Ariana Lindermayer, of counsel to
Jeanette Zelhof
299 Broadway, 4th Floor
New York, New York 10007
212-417-3701

NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
Claudia Wilner
Of counsel to New Economy Project
275 Seventh Avenue, Suite 1506
New York, NY 10001-6708
212-633-6967

*Attorneys for Plaintiffs and the Certified Classes*