## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MONIQUE SYKES, *et al.*,**<br><br>               **Plaintiffs,**<br><br>     **v.**<br><br>**MEL S. HARRIS AND ASSOCIATES, LLC, *et al.*,**<br><br>               **Defendants.** | 09 Civ. 8486 (DC) |

## DECLARATION OF MATTHEW D. BRINCKERHOFF
## IN SUPPORT OF APPROVAL OF CLASS ACTION SETTLEMENT

MATTHEW D. BRINCKERHOFF, an attorney duly admitted to practice in the Southern District of New York, declares under penalty of perjury:

1.      I am a partner in the firm of Emery Celli Brinckerhoff & Abady LLP ("ECBA"), attorneys for the Plaintiff Classes in this case.

2.      I respectfully submit this declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement, Attorneys' Fees, Costs, and Service Awards.

3.      Attached hereto are true and correct copies of Exhibits 1-23, which are described in the annexed list of exhibits.

4.      The proposed settlement in this action is unprecedented in the relief it will provide to members of the Plaintiff Classes.  In summary, the amount of the Class Settlement Account, reflecting interest that will accrue by June 9, 2016, is $60,006,945.34.  This reflects the initial payments by Defendants of $54.5 million, along with the Leucadia Defendants' and Mel Harris Defendants' continuing share of collections since settlement and the Leucadia Defendants' payment of Notice Costs.

5.      Since this Court preliminarily approved the settlement, collection on class members' judgments and alleged debts has been suspended.  Upon final approval, the class members' judgments and the alleged debts will be transferred to the Rolling Jubilee Fund ("Rolling Jubilee"), a non-profit 501(c)(4) organization with the exclusive mission of buying and abolishing debt, thus stopping collections permanently as detailed further below.  Those judgments have a remaining face value of over $585 million ($763 million minus $178 million collected).  Additionally, collections will cease on over $459 million of alleged debts against Class Members.  Wright Decl. ¶¶ 15-16 (Ex. 8).

6.      Upon final approval and transfer, Plaintiffs will work with the New York State courts to vacate class members' judgments through a N.Y. CPLR § 5015(c) proceeding, which invokes the broad powers of an administrative judge to vacate improperly granted default judgments *en masse*. The relevant Leucadia entities, the Mel Harris Defendants, and the Samserv Defendants have also agreed to change their business practices, as detailed further below.

7.      Because the proposed settlement satisfies all of the criteria for final approval, the Parties respectfully request that the Court approve:

(i)      the Stipulation of Settlement as to Claims Against Certain Defendants ("Original Leucadia Agreement") and the First Amendment to the Stipulation of Settlement as to Claims Against Certain Defendants ("Leucadia Amendment" and, collectively with the Original Leucadia Agreement, the "Leucadia Agreement"), Exs. 1, 2;

(ii)      the Stipulation of Settlement as to Claims Against Mel Harris Defendants and Samserv Defendants  ("MH/SS Agreement"), Ex. 3;

(iii)      Plaintiffs' proposed plan of allocation, Ex. 4;

(iv)      service awards to Lead Plaintiffs in the amount of $120,000; and

2

(iv)   Class Counsel's request for attorneys' fees, in the amount of $14,401,667, and costs in the amount of $192,230.30.

8.   This declaration does not detail the full settlement or set out the entire history of the case.  The declaration is limited to describing those aspects of the litigation and settlement that are not readily apparent from other documents submitted in support of Plaintiffs motion for final approval.

**Discovery and Information Exchange**

9.   For more than six months before filing this class action, Class Counsel thoroughly investigated the underlying claims and gathered significant factual information through pre-suit research and data gathering.  During discovery, Class Counsel diligently pursued all information relevant to establishing Plaintiffs' claims by propounding numerous rounds of discovery requests, subpoenaing  non-parties, reviewing many thousands of documents (Defendants produced over 500,000 pages of documents), participating in 18 depositions, including defending all Named Plaintiffs' depositions, and consulting with various experts and consultants.  The Parties also engaged in motion practice and sought the Court's intervention on disputes involving the sufficiency of discovery responses, bifurcation of discovery, third-party discovery, subpoenas, privileged information, and the number of depositions, among other issues.

10.   The Parties also exchanged additional and extensive information regarding their factual and legal positions in connection with the mediation conducted in late 2012, as part of the revived settlement negotiations between Plaintiffs and the Leucadia Defendants, and as part of the settlement proceedings conducted before Magistrate Judge Ellis.

**Negotiation of the Settlements**

11.     In October 2012, shortly after the Court granted Plaintiffs' motion for class

certification, the Parties agreed to mediate before former California Superior Court Judge Daniel

Weinstein.  Judge Weinstein's biography, including his extensive experience mediating complex

high-stakes cases, is detailed at http://www.jamsadr.com/weinstein/.  In November 2012, the

Parties submitted extensive mediation statements to Judge Weinstein and Plaintiffs shared

portions of their submission with Defendants.  On December 5, 2012, counsel for all Parties

participated in a full-day mediation session at JAMS.  At the meeting, Class Counsel made a

detailed presentation to all Defendants setting out Plaintiffs' factual and legal positions regarding

their claims.

12.     The Parties were unable to reach a settlement at the December 2012 session, but

counsel for Leucadia Defendants and Plaintiffs had several meetings in person and by telephone

regarding settlement throughout December 2012 and January 2013; Judge Weinstein also

continued to work with the Parties to help reach resolution.  However, the Parties were unable to

resolve their differences and, in February 2013, Class Counsel advised the Court that the Parties'

settlement negotiations had reached an impasse and requested that the Court lift the stay of

discovery, which the Court did in a March 5, 2013 order.

13.     In April 2013, Defendants filed petitions pursuant to Federal Rule of Civil

Procedure 23(f) with the Second Circuit seeking leave to appeal the Court's class certification

order.  Plaintiffs opposed interlocutory review, but the petitions were granted on July 19, 2013.

Defendants retained Paul Clement, a former Solicitor General of the United States, and Miguel

Estrada, to represent them on appeal, and the Parties then engaged in extensive merits briefing.

Opposing Defendants' petition for interlocutory appeal and the merits brief defending the

Court's order, was a significant undertaking that required a significant investment of attorney hours. The Second Circuit heard oral argument in February 2014, which lasted over an hour. In a February 10, 2015 opinion and judgment (*Sykes v. Mel S. Harris and Assocs., LLC*, 780 F.3d 70 (2d Cir. 2015)), the Second Circuit affirmed the Court's March 28, 2013 class certification order, in a 2-1 decision.

14.     In October 2014, after oral argument on the Second Circuit appeal but before a decision was issued, counsel for Leucadia Defendants and Class Counsel resumed settlement discussions.  Between then and December 14, 2014, Leucadia Defendants and Class Counsel engaged in extensive and contentious arms'-length settlement discussions, which culminated in the Term Sheet executed on December 14, 2014, Ex. 15.  The Parties did not discuss attorneys' fees in negotiating the Term Sheet, except to agree that any attorneys' fees and administrative expenses (other than specified notice expenses) would be paid from the Settlement Fund.  As part of the settlement process with the Leucadia Defendants, I consulted with bankruptcy counsel to ensure the agreement protected the class members, to the extent possible, if the Leucadia Defendants filed for bankruptcy and consulted with tax counsel concerning potential tax issues.

15.     The Leucadia Defendants and Class Counsel ultimately reached an agreement on all terms, which was memorialized in the Original Leucadia Agreement, dated March 18, 2015 and attached as Exhibit 1.

16.     After signing the Term Sheet with the Leucadia Defendants, Class Counsel resumed separate settlement discussions with counsel for the Mel Harris and Samserv Defendants.  These negotiations were protracted and contentious and involved both monetary and injunctive terms.

17.     The settlement negotiations with the Samserv and Mel Harris Defendants had to address the limited financial assets of these Parties, which would make impossible payment of the full judgment the Plaintiffs sought should they prevail at trial.  However, Plaintiffs and the Mel Harris and Samserv Defendants disagreed as to what those assets actually were.  In March 2015, the Parties jointly sought the assistance of the Court, which referred this case to Magistrate Judge Ronald Ellis for settlement.

18.     On April 6, 2015, the Parties met with Judge Ellis and negotiated a process in which the individual and corporate Mel Harris and Samserv Defendants would share sufficient financial information with Plaintiffs to verify their net worth and assets available from which they could satisfy a judgment.  Plaintiffs retained an accountant who was certified as a "Valuation Analyst" to review and analyze the financial information provided by the Mel Harris and Samserv Defendants.

19.     The Parties had multiple sessions and telephonic conferences amongst themselves and with Judge Ellis throughout April, May, June and July that resulted in the Mel Harris and Samserv Defendants providing several rounds of financial information to Plaintiffs and exchanging settlement demands.  The Parties had a phone conference with Judge Ellis on April 28, 2015 to address with greater specificity the scope of financial information Defendants should provide.  On June 26, 2015, the Parties wrote to Judge Ellis requesting another settlement conference, which was held on July 27, 2015.

20.     Per Judge Ellis' request, on August 11, 2015, the Parties made submissions to him that included an analysis by Plaintiffs' Valuation Analyst.  As a result of a subsequent request by Judge Ellis, the Parties provided written responses to each other's submissions on August 20, 2015.

21.     On September 11, 2015, Judge Ellis held a telephonic hearing in which he recommended settlement amounts to the Parties, and requested that each party communicate to him privately by September 17 whether it would accept Judge Ellis's recommendation.  On September 17 and 18, 2015, Plaintiffs reached financial settlements in principle with the Mel Harris Defendants and the Samserv Defendants, respectively.

22.     Between late September and November 12, 2015, Plaintiffs had extensive negotiations with the Mel Harris and Samserv Defendants concerning injunctive relief and the terms of the lengthy settlement agreement, including its exhibits.  Class Counsel again consulted with bankruptcy counsel to ensure the agreement protected the class members, to the extent possible, if the Mel Harris or Samserv Defendants filed for bankruptcy and consulted with tax counsel concerning potential tax issues.

23.     Throughout the settlement discussions, Plaintiffs had demanded that any settlement include an immediate cessation of collections.  Because the Mel Harris Defendants had an ownership interest in the LR Credit debts, immediate cessation of collections could not occur when there was only a partial settlement with the Leucadia Defendants.  Once, however, there was the prospect of a settlement with the Mel Harris Defendants, the Leucadia Defendants agreed to suspend new collections.  But affirmative action was required to stop ongoing collections because third parties (marshals, sheriffs, banks, etc.) involved in those collections needed to be contacted and instructed to stop such collections.  Additionally, class members needed to be contacted and instructed to stop sending payments.

24.     Unfortunately, this aspect of the settlement was complicated by the fact that on September 17, 2015, the law firm of Mel Harris and Associates, LLC, ceased operating.  All the LR Credit accounts were transferred to the Einstein Firm, which served as LR Credit's counsel in

place of Mel Harris and Associates, LLC.  Consistent with the Leucadia Defendants' agreement not to institute new collections, the Einstein Firm agreed to follow their client's direction on that score.  However, the Einstein Firm continued to receive and process payments from class members in the amount of approximately $1 million per month.  Although the Leucadia Defendants' share of this money was deposited into a fund for the benefit of the class, 25% of all moneys collected were going to the Einstein Firm as a fee.

25.     Arranging for the Einstein Firm to perform the work necessary to shut down the collections operation was critical.  Absent such an agreement, certain class members would collectively have been exposed to paying approximately one million dollars per month in the aggregate for every month that passed between preliminary approval and final approval of the settlement (including exhaustion of any appeals).  Class Counsel could not perform the work to shut down the collections operation because the Einstein Firm collects debts as counsel to LR Credit—the defendants Plaintiffs have sued.

26.     After complex protracted negotiations, Plaintiffs and the Einstein Firm reached an agreement, Ex. 17 (the "Einstein Agreement"), which provides that the Einstein Firm will take affirmative actions to suspend all collection work.  In exchange for ceasing collection on approximately 5,200 active accounts, the Einstein Firm was paid a total of $500,000 as an Administrative Expense from the Settlement Fund, or approximately $100 per account.  The Court approved that payment as part of its preliminary approval order.

27.     By paying $500,000 to the Einstein Firm, the Class will save approximately $5 million that would have been collected in total ($1 million per month), $1,250,000 of which would have been paid to the Einstein Firm for such collections through the date of the fairness hearing.

28.     As detailed further in the Declaration of Anthony Poulin, attached as Exhibit 7, the Einstein Firm has stopped all collections.  Specifically, "all known executions, levies, bank account restraints, payments and automated withdrawals have been terminated and closed by the responsible agency, and any applicable refunds due have been issued."  Ex. 7 ¶ 14.

29.     In light of the Einstein Agreement, no LR Credit entity has retained money from a class member since December 10, 2015, the effective date of the Einstein Agreement. Ex. 7 ¶ 2. As a result, though the Mel Harris Settlement agreement (like the Leucadia Settlement Agreement) provided that the Mel Harris Defendants would contribute their portion of debt collection proceeds beginning after settlement, those Additional Settlement Payments have totaled only $123,453 (for the month between the date of settlement and the effective date of the Einstein Agreement), evidencing the effectiveness of ending collections.

**Transfer of Debt Portfolios and Vacating Judgments**

30.     The Leucadia Agreement provides, as injunctive relief, a mechanism by which class members' judgments and alleged debts will be relieved.  The face value of the default judgment component of the portfolios alone totals approximately $763 million plus substantial post-judgment interest, of which approximately $178 million was collected to date, so this relief is very substantial to the class. The accompanying Declaration of Jason Wright, a forensic accountant, analyzes the present (discounted) value to Class Members from ending collections on the extant judgments.  Mr. Wright conservatively calculates that value at $26.1 million. *See* Wright Decl. ¶ 14 (Ex. 8).

31.     Specifically, within 30 days after the final approval becomes final (e.g. 30 days after the time to appeal has run or, if appealed, all appeals are concluded), the Leucadia Defendants, with the assistance of the Mel Harris Defendants, will transfer all debt portfolios

(including but not limited to default judgments) owned by LR Credit, LLC or any of its subsidiaries to Rolling Jubilee, which will immediately and permanently cease all collection efforts.  Rolling Jubilee is a 501(c)(4) non-profit organization with the exclusive mission of buying and abolishing debt.  Typically, the organization acquires portfolios of charged off alleged debt for pennies on the dollar, much as commercial debt buyers do. However, its aim in purchasing these alleged debts is not to collect them for its own profit, but to forgive them.  In so doing, it provides charitable relief to the people who are subject to collections on the alleged debts and, through media advocacy, shines a light on the troubling nature of the debt buying industry.  Here, Rolling Jubilee has agreed to receive all the debt portfolios LR Credit owns so that it may forgive the debts as a gift to class members.  Class members will be relieved of all further obligations to pay the debts, and the debts will never be collected or sold.  Indeed, the debts will no longer exist at all.  Plaintiffs have consulted with Rolling Jubilee's tax counsel, who advised that he believes class members will not have any tax obligations on the forgiven debts because Rolling Jubilee is making a tax-free gift to the people whose debt it is abolishing. The transfer agreement to Rolling Jubilee is being drafted and we intend to submit the agreement to the Court before the final approval hearing.  The transfer will be contingent on final approval of the settlement.

32.     Once the debts are transferred to Rolling Jubilee, with the reasonable cooperation of the Leucadia and Mel Harris Defendants, Plaintiffs will work with the New York State Office of Court Administration ("OCA") to seek to vacate all default judgments entered against class members.  While Plaintiffs cannot guarantee that OCA will be able to vacate the judgments, as detailed in the accompanying declaration of Carolyn Coffey, Plaintiffs have had numerous

conversations with OCA and believe they are likely to achieve this relief, through OCA or otherwise.  Coffey Decl. ¶ 17 (Ex. 5).

33.     Prior to engaging in settlement negotiations, Defendants sold a small minority of class members' accounts to third parties, including approximately 25,000 accounts where they had already obtained default judgments.  Because Defendants no longer own or control these accounts, they cannot stop collections on them and cannot transfer them to the entity designated by Plaintiffs, and thus Plaintiffs cannot terminate collection of these class members' debts.  With respect to those class members whose judgments were sold, Plaintiffs intend to work with OCA to seek to vacate those judgments too.  Plaintiffs cannot ensure the cooperation of the third party purchasers, and there is thus is more uncertainty about whether their efforts to vacate the sold judgments will be successful (for this reason, the allocation plan provides additional money to class members with sold judgments, as detailed below).  But because the sold judgments were obtained as part of the same fraudulent scheme as all the other judgments, Plaintiffs believe the sold judgments will likely be vacated as well.  Coffey Decl. ¶ 17 (Ex. 5).

34.     The settlement release and bar order does not extend to third party purchasers, so class members whose accounts were sold will also retain their ability to pursue any claims they may have against the current owners of their alleged debts.

**Allocation of the Settlement Fund**

35. The settlement agreements create a common fund consisting of (1) from the Leucadia Defendants, $46 million, plus L-Credit LLC's share of additional moneys LR Credit and its subsidiaries received from debt portfolio assets on or after January 1, 2015 (the month after the Term Sheet was executed), plus interest, which totals $51,386,060.92; (2) from the Mel Harris Defendants, including their insurer, $7,975,000, plus Rushmore's share of additional moneys LR

Credit and its subsidiaries receive from debt portfolio assets after November 12, 2015 (the date

Plaintiffs and the Mel Harris Defendants settled), plus interest, which totals $8,102,057.81; (3)

from the Samserv Defendants, including their insurer, $517,500, plus interest, which totals

$518,826.61 (the Samserv Defendants were not required to make additional payments); and (4)

from the Leucadia Defendants, the cost of the notice expenses, which is currently $350,000 (but

may increase as explained the declaration of Guy Thompson, Ex. 9 ¶ 20).  Leu. Agr. at 31 §

I(A)(88) & 44 § III(A)(2); MH/SS Agr. at 4 § I(B)(1), 10 § I(B)(28), 25 § I(B)(51), (53), & 31-

32 § III(A)(1).  These amounts include the interest that will accrue by early June, the earliest date

the money can be disbursed to class members.  Additionally, the Leucadia Defendants agreed to

pay Notice Expenses, which are currently $350,000.  In total, the Settlement Fund is

approximately $60 million. The following chart summarizes the breakdown of the Defendants'

contributions to the Settlement Fund.

| Defendant | Settlement Amount | Additional Payments & Interest | Notice Payment | Total |
|---|---|---|---|---|
| Leucadia | $46,000,000 | $5,036,060.92 | $350,000 | $51,386,060.92 |
| Mel Harris | $7,975,000 | $127,057.81 | | $8,102,057.81 |
| Samserv | $517,500 | $1326.61 | | $518,826.61 |
| | | **Total:** | | **$60,006,945.34** |

36.     The settlement agreements do not provide for any reversion of settlement funds to

Defendants based on participation in the settlement, or for any other reason.  All of the

settlement funds will be irrevocably transferred for the benefit of the class after final approval.

37.     The Settlement Fund will cover class members' awards, service payments to

Named Plaintiffs, attorneys' fees and costs, and administrative and notice expenses (including

the payment to the Einstein Firm). After deducting for service awards to Named Plaintiffs,

requested attorneys' fees and costs, and administrative expenses, the Net Settlement Fund will

total at least $44.1 million.  The following chart summarizes Class Counsel's proposed

breakdown of the overall $60 million Settlement Fund:

| Description | Amount | Percent of Fund |
|---|---|---|
| Proposed Amount to Class Members (exclusive of service awards) | $44,103,561.48 | 73.5% |
| Proposed Service Awards | $120,000 | 0.2% |
| Payment to Einstein Firm | $500,000 | 0.8% |
| Administrative Expenses | $339,486.56 | 0.6% |
| Attorneys' Expenses | $192,230.30 | 0.3% |
| Proposed Attorneys' Fees | $14,401,667 | 24% |
| Notice Expenses | $350,000 | 0.6% |
| **TOTAL** | **$60,006,945.34** | 100% |

38.    Allocations of the Net Settlement Fund will be made to class members who have

submitted timely claim forms, pursuant to Plaintiffs' proposed Allocation Plan, which is attached

as Exhibit 4.

39.    The Allocation Plan is based on records Defendants have provided Class Counsel.

Those records include, for each class member, whether and in what court a judgment was

entered, the amount of the judgment, the total amount paid, the date and amount of each

payment, and whether their account was sold.  Class Counsel used these records to sort class

members into allocation groups, as detailed in the Allocation Plan.

40.    As detailed in the attached declaration from the Administrator, Epiq Class Action

& Claims Solutions ("Epiq"), 29,953 class members submitted valid and timely claims, an

additional 591 class members submitted incomplete claims that may still be corrected, and 1,332

class members (as of April 14, 2016) submitted untimely claims that the Parties are prepared to

treat as timely, for a current total of up to 31,878 valid claims. Thompson Decl. ¶ 30 (Ex. 9).  We have spoken to numerous members of the Class, all of whom indicated approval of the Settlement.

41.     Plaintiffs' Allocation Plan is designed to allocate the Net Settlement Fund fairly among those class members (currently up to 31,878) who submit valid claims. The Allocation Plan's goals are (1) to provide as much compensation as possible to members of the Rule 23(b)(3) class who had judgments entered against them that were used to collect money from them via wage garnishment, bank account levy, or other means; (2) to provide a base level of compensation in the amount of $100 for every person who paid money to Defendants or had their default judgment sold to a non-defendant debt collector; and (3) because the Net Settlement Fund is not sufficient to provide complete recovery to every class member who has submitted a timely claim form, to provide more compensation to class members whose legal claims against Defendants are within the relevant statutes of limitations,  as compared to those with fewer—or no—timely claims (based on the most generous possible accrual date, i.e. the first date of economic loss, namely the collection of any money from the class member).  Class members whose judgments were not sold and from whom Defendants collected no money are not entitled to monetary relief but they will receive valuable injunctive relief as detailed *infra*.

42.     Based on the processing and analysis of the claim forms received to date, Plaintiffs expect the following distribution.[1]  First, approximately 13,819 class members entitled to $100 payments (from the Nominal Restitution, Sold Judgments, and Untimely Claims Groups, all defined in the Allocation Plan), have submitted claim forms, for a total payment of

---

[1] This analysis is still preliminary, and we will update the Court before the Fairness Hearing as appropriate.  This analysis also includes all those who submitted incomplete claim forms, as they may be able to provide necessary information to complete those forms.

approximately $1,381,900.[2]  Second, approximately 293 class members entitled to an additional

$100 payment (those who are in both the Sold Judgment and Untimely Claims Groups) have

submitted claim forms, for a total additional payment of $29,300.  In total, then, those entitled to

$100 payments under the Allocation Plan will collectively receive no more than $1,411,200.

43.     Subtracting the $1,411,200 from the $44,103,561 Plaintiffs propose to distribute

to Class Members, leaves $42,692,361 to distribute to those with timely causes of action.

Approximately 18,223 people with at least one timely cause of action submitted valid claim

forms (including, for present purposes, late forms and incomplete forms that may be corrected).

*See* Thompson Decl. ¶ 33 (Ex. 9).  Collectively, $49,322,612 was collected from those 18,223

people.

44.     Because there is not enough money in the Net Settlement Fund to return all the

money that was collected to the 18,223 claimants, Plaintiffs' Allocation Plan awards relatively

more money to those with three timely claims (RICO, FDCPA, and GBL), as compared to those

with only two timely claims (RICO and GBL), or one timely claim (RICO only).  These are

denominated the 3 Claims Group, 2 Claims Group, and 1 Claim Group in the Allocation Plan

based on each group's number of timely claims.

45.     Including incomplete claims that may still be corrected, 8,480 members of the 3

Claims Group (with about $20.8 million in losses) have submitted claim forms, 7,601 members

of the 2 Claims Group (with about $22.3 million in losses) have submitted claim forms, and

1,771 members of the 1 Claim Group (with about $5.9 million in losses) have submitted claim

forms.  Depending on resolution of incomplete claims and other issues detailed above, our

preliminary calculations indicate that those in the 3 Claims Group will likely receive close to the

---

[2] This includes 470 claims from class members whose judgments have already been vacated and for
whom additional investigation is required to determine whether they are in the Untimely Claims Group or
whether they have any timely causes of action; the total collected from these 470 people is $1.07 million.

full amount collected (approximately 98%), those in the 2 Claims Group will likely receive approximately 83% collected, and those in the 1 Claim Group approximately 68% of the amount collected.

46.     It is common in class action settlements of this size that a significant portion of checks remain uncashed.  In that circumstance we will redistribute the uncashed checks to class members (so long as the amount of uncashed checks is sufficient to account for the cost of re-distribution).  Upon re-distribution, Plaintiffs' Allocation Plan provides that those with timely claims who have not received all the money collected will receive priority.  In other words, it is likely that those in the 3 Claims, 2 Claims, and 1 Claims group will ultimately receive as a settlement payment a higher percentage of the money collected than is detailed in the previous paragraph.

47.     Judge Weinstein, who served as a mediator in this case as detailed above, reviewed and approved Plaintiffs' proposed allocation plan.

48.     Plaintiffs aimed to maximize the percentage of class members who submit claim forms and were successful in doing so.  The Administrator sent Claim Forms to 118,810 Class Members and received 40,773 claims (including duplicates).  Upon processing those claims, there may be up to 31,878 complete claims (depending on resolution of the 591 incomplete claims that may be corrected).  *See* Thompson Decl. ¶ 30 (Ex. 9).  That is a 27% response rate; and the response rate was even higher among those with timely legal claims—over 34%.  *Id.* ¶ 33.  That is a very high response rate in a claims-made class action settlement.  *See, e.g., In re Initial Pub. Offering Sec. Litig.*, No. 21 MC 92 (SAS), 2010 WL 2834894, at *1 (S.D.N.Y. July 7, 2010) (describing a 5.5 percent response rate in a securities action as "not outside the norm"); *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA WMC, 2012 WL 5392159, at *14 (S.D. Cal.

Nov. 5, 2012) (overruling objection to settlement of consumer fraud case because of 4.9 percent

response rate and citing cases approving settlements that yielded even lower claim rates); *Stoner*

*v. CBA Info. Servs.*, 352 F. Supp. 2d 549, 552 (E.D. Pa. 2005) (approving settlement of consumer

class action alleging violations of the Fair Credit Reporting Act and describing a 16 percent

response rate as "relatively high response rate" and indicating a "more than favorable class

reaction").

       49.    We believe our high 27% response rate (and the 34% response rate for those with

any timely legal claims) is a testament to the overwhelmingly positive response from the Class

and the result of the work Class Counsel and the Administrator (at our direction) did to ensure

that Class Members knew of the settlement and were inclined to access its benefits.  First, the

Notices were uniquely customized.  Each class member received one of 11 form notices, which

were tailored based on the relief to which the recipient was entitled based on the allocation plan

and the injunctive provisions of the settlement.  The notices were customized to indicate a

specific dollar figure that each class member would likely receive (based, where relevant, on

likely return rates).  *See* Thompson Decl. Ex. A (Ex. 9) (attaching copies of forms).  Second, the

Claim Form was simple—just one page, requiring identity verification and agreement to the

release only.  *Id.*  Third, Class Members could submit a Claim Form by paper or online;

approximately a third of claim forms were submitted online.  *See* Thompson Decl. Ex. I (Ex. 9).

Fourth, to further increase participation rates, Class Counsel obtained the Court's permission to

send a reminder postcard, which resulted in a 34% increase in Claim Forms in the week

following the reminder as compared to the week before.  *Id.* ¶ 28.  Fifth, information was

accessible to non-English speakers; the Notices and Claim Forms were sent in English and

Spanish and Epiq's website and telephone support provided information in eight different

languages.  *Id.* ¶¶ 6, 22, 24.  Sixth, in addition to traditional forms of notice, Class Counsel did

media outreach to obtain press coverage that would reach Class Members.  *See* Shin Decl. ¶ 39

(Ex. 6).

50.  One result, however, of this high response rate is that the assumptions we made in

our preliminary approval brief—including that all those with timely claims would obtain a full

recovery—did not prove accurate.  Instead, a much larger number of people will receive a

substantial recovery from the settlement, with each person receiving somewhat less than we had

originally estimated.

**Advantages of Settlement**

51.  This section of my declaration sets forth some of the factual reasons that the

settlement should be approved, as well as some of the risks of the litigation.  This declaration

does not discuss the many advantages of the settlement that are apparent from the face of the

agreements.

52.  Defendants agreed to settle this case for a substantial amount: approximately

$54.5 million, plus the Leucadia Defendants' and Mel Harris Defendants continuing share of

collections since settlement and interest, for a current total of over $60 million.  The amount

represents substantial value given the attendant risks of litigation, even though recovery could

theoretically be greater if Plaintiffs defeated a motion for summary judgment and defeated

motions to decertify the class; succeeded on all claims at trial; survived an appeal; and were able

to collect on the judgment they obtained.

53.  Furthermore, the Settlement Fund is not the sole economic benefit to class

members that the settlement provides.  The Leucadia Defendants have agreed to transfer class

members' default judgments and accounts to Rolling Jubilee, a non-profit entity designated by

Plaintiffs, which will forgive the debts as a gift to class members.  In addition, Plaintiffs will work with the New York State courts to vacate the judgments.

54.    The LR Credit judgments have a face value of approximately $763 million, plus 9% annual post-judgment interest; approximately $178 million has already been collected from class members.  Those collections were ongoing at the pace of approximately $1 million per month as of September 2015 when the financial settlement with all Defendants was reached in principle.  Thus, halting those collections entirely as part of the preliminary approval of this settlement *already* represents a substantial economic benefit to the class.  Upon final approval, Class Members will receive the economic benefit of ending collections and likely vacatur of their judgments, all without having to submit a claim form, go to court, or hire an attorney.  As detailed above, the forensic accountant conservatively calculates the present (discounted) value to Class Members from ending collections on the extant judgments at $26.1 million.  *See* Wright Decl. ¶ 14 (Ex. 8).

55.    As detailed further in the attached Declaration of Carolyn Coffey, many of these judgments also appear on class members' credit reports, where they prevent class members from gaining access to housing and jobs, and cause them to pay more for credit than they otherwise would, or foreclose the possibility of credit altogether.  Relieving class members from these judgments—along with the attendant risk that their wages could be garnished, and their money and property seized—thus provides substantial economic benefits to class members.

56.    Another way to look at the value to class members of the injunctive relief is that Class Members will likely obtain vacatur of their default judgments without the cost of hiring counsel.  Were Class Members to seek a private attorney to complete this work, it would cost each class member on average at least $1,000 in attorney's fees to resolve, as detailed in the

attached declarations from Daniel Schlanger, an attorney with significant experience vacating

default judgment in consumer credit cases in New York City, *see* Ex. 10, and Anthony

Pietrafesa, an attorney who specializes in defending consumers in debt collection lawsuits in

upstate New York, *see* Ex. 11.

57.     The settlement makes this monetary and injunctive relief available to class

members in a prompt and efficient manner, unlike continuing litigation.  Though the case has

been pending for six years, Plaintiffs have yet to depose some key witnesses from among the

Defendants, and discovery is far from complete.  Following discovery, the Parties envision

summary judgment motions raising many technical and novel issues of law, such as (to name just

two of many examples) whether the Fair Debt Collection Practices Act applies to false

statements made to court officials, and whether issues of comity, federalism and the Full Faith

and Credit Clause of the Constitution bar Plaintiffs' damages claims.

58.     If Plaintiffs succeed on summary judgment, a fact-intensive trial would likely be

necessary to determine both liability and damages.  A trial on the merits would involve

significant risks for Plaintiffs as to both liability and damages.  A trial would be lengthy and

complex, would require extensive testimony from expert witnesses, and would consume

tremendous time and resources for the Parties and the Court.   Among other things, to recover the

maximum possible damages for the maximum possible number of people, Plaintiffs would have

to prevail on their RICO claims, including establishing that each Defendant intentionally

engaged in racketeering activity.  Even if Plaintiffs succeed in proving their RICO claims,

Defendants have argued strenuously and under multiple legal theories that Plaintiffs' largest

category of damages—the money that was collected from them via the fraudulently-obtained

judgments—is not actually recoverable.  While Plaintiffs believe that they could ultimately

establish both liability and damages, this would require significant factual development,

requiring hundreds of additional hours of discovery, plus the time and resources required to

litigate dispositive motions and prevail at trial, and then prevail again on the inevitable appeal.

59.     The risk of maintaining class certification through trial is also present.

Defendants strenuously opposed class certification on the ground that too many individual issues

existed to maintain a class.  In particular, Defendants argued that damages could not be

determined on a class-wide basis because each class member's entitlement to damages would

turn on a fact-intensive inquiry as to whether that class member was served and/or owed the

alleged underlying debt.  Although Plaintiffs disagree that these questions are relevant to

determining damages, these are still open questions in the case.

60.     In addition, any judgment would likely be appealed, further extending the

litigation.

61.     Even if Plaintiffs were to prevail at trial and on appeal, it is unlikely that class

members would be able to immediately collect their full judgment against the Mel Harris and

Samserv Defendants given those Defendants' limited resources and the magnitude of the

judgment that Plaintiffs believe they would obtain if they succeeded at trial.

62.     The Mel Harris and Samserv Defendants provided Plaintiffs with detailed

financial information as part of the settlement discussions conducted by Magistrate Judge Ellis.

Class Counsel carefully reviewed that information along with their certified Valuation Analysts.

That information demonstrated to Plaintiffs' satisfaction that the Mel Harris and Samserv

Defendants would be highly unlikely to be able to pay a judgment of the magnitude Plaintiffs

would seek at trial.  At best, Plaintiffs would only be able to collect a portion of the judgment

immediately and would have to continue collection efforts, likely over a period of years during

which the administrative costs of distributing such money to the Class would quickly overwhelm the recovery itself.

63.     Without a settlement, class members would not obtain relief for years. Furthermore, the substantial injunctive relief secured for Class Members, including debt forgiveness and mass vacatur of default judgments, would be very difficult if not impossible to obtain outside of settlement.

64.     In summary, this settlement represents a significant percentage of the best possible recovery.  The total amount of money collected to date from class members with default judgments is approximately $178 million.  Of that, approximately $119 million was collected from class members with timely legal claims (based on the most generous possible accrual date). Accordingly, the maximum recovery in this action was approximately $119 million.  However, class members also have claims for treble damages under RICO against all defendants and under the New York Judiciary Law against the Mel S. Harris law firm and the individual attorney Defendants.  With trebling, the maximum total recovery is approximately $357 million.  While the maximum total potential recovery would have increased the longer this action was litigated and defendants continued to collect money from class members, that increase would have been to the detriment of the class.  The $60 million monetary settlement represents more than half of the $119 million LR Credit collected from class members with default judgments who had timely claims.  Moreover, as detailed above, Plaintiffs expect to be able to return the vast majority of money collected to class members with timely legal claims who submitted claim forms.

**Administration of the Settlement**

65.     Under the terms of the settlement agreements, Class Counsel was responsible for selecting and retaining a Class Administrator, whose fees will be paid out of the Settlement

Fund, except that the Notice Expenses will be paid for separately by the Leucadia Defendants.

Plaintiffs selected Epiq, which has extensive experience administering class action agreements.

*See* Thompson Decl. ¶ 2 (Ex. 9).

66.     Epiq has taken numerous additional steps that go beyond the requirements of the

Settlement Agreements to ensure that class members receive notice, have few difficulties filing

claims, and have their questions answered, including: (1) conducting sophisticated address

searches before sending the notices; (2) sending the notice in both English and Spanish to all

who receive individual notice; (3) sending a pre-addressed postage-paid envelope for claim

forms; (4) providing for online claim filing; (5) providing information on the web site in eight

languages; (6) having live operators who speak those languages and more available to answer

class members' questions; and (7) sending reminder postcards to all class members eligible to

submit claim forms.

67.     The additional steps taken by Epiq, at Class Counsel's direction, resulted in the

unusually high return rate in this case, as detailed above.

68.     A description of the work that Epiq has completed to date, along with the costs it

incurred, can be found in the Declaration of Guy Thompson, attached as Exhibit 9.

**Qualifications of Class Counsel**

69.     ECBA has litigated this case jointly with attorneys and staff from the New

Economy Project and MFY Legal Services.  A description of their qualifications, hours

expended, and hourly rates can be found in the Declaration from Carolyn Coffey for MFY,

attached as Exhibit 5, and the Declaration from Susan Shin for the New Economy Project,

attached as Exhibit 6.

70.     ECBA has extensive experience handling class actions and complex litigation in the Southern District of New York.  Courts in this district have repeatedly appointed ECBA as class counsel, describing ECBA as a "preeminent" firm, *see Betances v. Fischer*, 304 F.R.D. 416, 428 (S.D.N.Y. 2015); *accord Brown v. Kelly*, 244 F.R.D. 222, 233 (S.D.N.Y. 2007), *aff'd in part, vacated in part on other grounds*, 609 F.3d 467 (2d Cir. 2010), and have taken "judicial notice of ECBA's high reputation, finding it to be one of the most competent, successful, and reputable civil rights firms practicing in this Court," *Wise v. City of New York*, 620 F. Supp. 2d 435, 445 (S.D.N.Y. 2008) (citation omitted); *see also id.* at 446 (noting that the Court "has the highest regard for the abilities of the ECBA attorneys in this case"); *Vilkhu v. City of New York*, No. 06 Civ. 2095, 2009 WL 185101 at *3 (E.D.N.Y. June 26, 2009) (noting ECBA's "collective experience [and] success rate"), *vacated on other grounds*, 372 F. App'x 222 (2d Cir. 2010); *Harvey v. Home Savers Consulting Corp.,* No. 07 Civ. 2645, 2011 WL 4377839, at *4 (E.D.N.Y. Aug. 12, 2011) (noting ECBA's "excellent reputation"); *McBean v. City of New York*, 260 F.R.D. 120, 132 n.17 (S.D.N.Y. 2009) (finding that "the services . . . provided by [ECBA] in this matter amply demonstrate counsel's ability and determination to represent the class effectively"); *T.E. v. Pine Bush Central Sch. Dist.*, 12 Civ. 02303 (Karas, J.) (July 9, 2015 proceedings in Infant Comprise Hearing where Court approved the Settlement and stated that it would "join others who recognize its [ECBA's] very strong reputation in New York and throughout the country in the work that it does and, in particular, in civil rights work. … Needless to say, counsel have vast experience in this case.")

71.     ECBA has served or is currently serving as class counsel in the following certified class actions, among others: *Nunez v. City of New York*, No. 11 Civ. 5845 (S.D.N.Y.) (entry of consent judgment for certified class action alleging widespread use of excessive force by

correction officers at Rikers Island); *Almendras, et al. v. Atelier Mériguet-Carrère, et al.,* No. 13 Civ. 8815 (S.D.N.Y.) (wage and hour class action settlement finally approved February 5, 2015, awarding substantial monetary relief to painters misclassified as independent contractors); *Dugan v. London Terrace Gardens, L.P.*, 986 N.Y.S.2d 740 (N.Y. Sup. Ct. 2013) (certifying, under state law, a class of tenants alleging that defendants charged excessive rents);[3] *Tyson v. City of New York*, No. 97 Civ. 3762 (S.D.N.Y.) (class of 60,000 settled for $50 million); *McBean*, 260 F.R.D. 120 (S.D.N.Y. 2009) (certifying Rule 23(b)(3) class of persons subjected to unlawful misdemeanor pre-trial strip search policy); *Casale v. Kelly*, 257 F.R.D. 396 (S.D.N.Y. 2009) (certifying Rule 23(b)(2) and (b)(3) classes of persons arrested for subsections of loitering statute declared unconstitutional); *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006) (reversing and certifying Rule 23(b)(3) class of persons subjected to unlawful misdemeanor pretrial strip search policy); *D.D. v. N.Y.C. Bd. of Educ.*, No. 03 Civ. 2489, 2004 WL 633222 (E.D.N.Y. Mar. 30, 2004) (certifying Rule 23(b)(2) class of New York City preschool children seeking to enforce the Individuals with Disabilities Education Act), *vacated in part on other grounds*, 456 F.3d 503 (2d Cir. 2006); *Ingles v. City of New York*, No. 01 Civ. 8279, 2003 WL 402565 (S.D.N.Y. Feb. 20, 2003) (certifying Rule 23 (b)(1) and (2) class of tens of thousands of incarcerated persons in connection with allegations of inmate abuse at Rikers Island); *Childers v. The New York and Presbyterian Hospital*, No. 13 Civ. 5414 (S.D.N.Y.) ($6.632 million settlement fund for certified class action involving overpayment of taxes by former medical residents).

---

[3] ECBA also represents certified classes in several similar actions in state court.  *E.g.*, *Gerard v. Clermont York Assocs. LLC*, No. 101150/2010 (N.Y. Sup. Ct.); *Casey v. Whitehouse Estates, Inc.*, No. 111723/11 (N.Y. Sup. Ct.); *Bleknap v. First New Amsterdam Realty LLC*, No. 113269/11 (N.Y. Sup. Ct.).

72.     I have reviewed fee records showing all of the hours ECBA attorneys and staff have spent investigating, litigating, and settling this case.  ECBA's fee records are compiled from contemporaneous entries maintained by each attorneys and staff in ECBA's electronic software, PCLaw.  Each attorney or staff member enters into the software the work performed on each date, describing the tasks completed with reasonable particularity.  Time is kept in increments of 1/10th of an hour or 6 minutes.

73.     Class Counsel accumulated nearly 8,000 hours on this case.  *See also* Shin Decl. ¶ 8 (Ex. 6); Coffey Decl. ¶ 20 (Ex. 5).  The following chart summarizes the hours that ECBA attorneys and staff billed to this matter (as of April 14, 2016) and their respective rates.  Although the billing records are not attached to this declaration, I am prepared to immediately produce them for *in camera* review at the Court's request.

| Name | Position & Graduation Year | Hours | Rate | Lodestar |
|---|---|---|---|---|
| Jonathan S. Abady | Partner (1990) | 535.50 | $625 | $334,687.50 |
| Matthew D. Brinckerhoff | Partner (1990) | 2161.60 | $625 | $1,351,000.00 |
| Debbie Greenberger | Partner (2005) | 843.70 | $450 | $379,665.00 |
| Elizabeth Saylor | Partner (2001) | 274.70 | $500 | $137,350.00 |
| Eisha Jain | Associate (2007) | 844.20 | $375 | $316,575.00 |
| Julia Sheketoff | Associate (2010) | 213.20 | $375 | $79,950.00 |
| Vasudha Talla | Associate (2009) | 101.40 | $375 | $38,025.00 |

| Other ECBA Attorneys | | 128.50 | $350-$1000[4] | $55,015 |
|---|---|---|---|---|
| ECBA Paralegals | Paralegals | 259.5 | $150 | $38,925 |
| | | | **Total** | $2,731,192.50 |

74.     These hours are reasonable given the length and complexity of this case. This

calculated lodestar, however, does not include the many hours that Class Counsel will spend

vacating judgments on behalf of the class.  We expect Class Counsel to collectively expend a

significant amount of time in connection with final approval (including any appeals) and

subsequent to final approval.  After final approval we will expend additional attorney and staff

time to manage the check distribution process, including any re-distributions and *cy pres*

payments, resolve class member concerns, and ensure the transfer of LR Credit accounts to

Rolling Jubilee.  More significantly, we expect to expend substantial time working with OCA to

vacate the Class Members judgments.  We are Class Counsel in *McBean v. City of New York* ,

No. 02 Civ. 5426 (S.D.N.Y.), a case involving a similarly large class, and in that case have

expended approximately 1,000 hours of attorney and staff time *after* final approval—though

*McBean* did not involve anything like our commitment here to work with OCA to seek to vacate

the judgments.  Accordingly, based on our experience, we expect to expend *at least* 1,000

additional hours of attorney and staff time beyond that listed in our lodestar above.  Using the

approximately $475 average hourly rate of the attorneys listed above, I estimate that the lodestar

of the post-settlement work alone will exceed $475,000.

---

[4]  The other ECBA attorneys, with the exception of one, have rates between $350 and $625.  Prof. Charles J. Ogletree, Jr. is a Harvard Law School Professor who is of counsel to ECBA.  He incurred just 10.1 hours in this case, limited to the mediation before Judge Weinstein.

75.     As the chart above reflects, a number of attorneys from ECBA have worked on

this matter.   However, all of the attorneys listed above did not all work on this matter at the

same time and several attorneys and staff members billed small amounts of time to the matter for

ad hoc contributions like proofreading and editing filings or consulting on particular issues.

Furthermore, over the last six years, several attorneys who worked on this matter have since left

the firm.

76.     The rates reflected above and utilized for purposes of this motion are the same

rates that ECBA charges clients who pay hourly and the rates are based on the experience levels

of the attorney performing the work.

77.     I am a 1990 graduate of the New York University School of Law and founding

partner of ECBA.  I am an experienced plaintiffs' class action attorney who began my legal

career with a clerkship in this District and have litigated for over twenty-five years at all levels,

from New York City Housing Court to the United States Supreme Court.  *See Gasperini v. The*

*Ctr. for Humanities*, 518 U.S. 415 (1996).  I previously represented a class of 60,000 in *Tyson v.*

*City of New York*, No. 97 Civ. 3762 (S.D.N.Y.), which settled for $50 million, and a class of

22,000 in *Casale v. Kelly*, No. 05 Civ. 5442 (S.D.N.Y.), which settled in 2013 for $15 million in

monetary relief as well as significant injunctive relief. More detail on my background, as well as

a list of representative cases, can be found at http://www.ecbalaw.com/our-people/matthew-d-

brinckerhoff/, which is also attached as Exhibit 19 hereto.

78.     Mr. Abady is 1990 graduate of New York University School of Law and is a

senior partner of ECBA.  He has over twenty-five years of experience litigating a wide array of

cases, which includes significant experience in class action and multi-party litigation.  He

represented family members of victims who died in the 1988 bombing of Pan Am Flight 103,

which resulted in a $2.7 billion settlement with the government of Libya.  He was one of the lead lawyers in *Nunez v. City of New York*, No. 11 Civ. 5845 (S.D.N.Y.), a class action that alleged widespread use of excessive force by correction officers at Rikers Island.  This suit culminated in a settlement among the City, the plaintiff class, and the United States, making headlines across the country.  More detail on his background, as well as a list of representative cases, can be found at http://www.ecbalaw.com/our-people/jonathan-s-abady/, which is also attached as Exhibit 20 hereto.

79.     Ms. Greenberger received her J.D. from New York University School of Law in 2005, *magna cum laude*, and is a partner with ECBA.  She possesses more than ten years of litigation experience, including handling class actions and other complex suits.  She represented inmates at Rikers Island in the class action suit, *Nunez v. City of New York*, No. 11 Civ. 5845 (S.D.N.Y.), which is described above.  She also represented a class of detainees in *McBean v. City of New York*, No. 02 Civ. 5426 (S.D.N.Y.), which resulted in a $33 million settlement and extensive injunctive relief.  Prior to joining the firm, she clerked for the Honorable Robert A. Katzmann of the Second Circuit Court of Appeals and for the Honorable Edward R. Korman of the Eastern District of New York. More detail on her background can be found at http://http://www.ecbalaw.com/our-people/debra-greenberger/, which is also attached as Exhibit 21 hereto.

80.     Ms. Saylor, currently a partner with ECBA, has 15 years of experience in federal and state court at the trial and appellate level. She has argued appeals in numerous courts, including the Second Circuit Court of Appeals and New York Court of Appeals.  Elizabeth has extensive class action experience, including the following:

- a $33 million settlement and extensive injunctive relief for persons who were illegally strip searched (*McBean v. City of New York*, No. 02 Civ. 5426 (S.D.N.Y.));

- a $6.6 million settlement on behalf of hundreds of former medical residents against a hospital (*Childers v. N.Y. & Presbyterian Hospital*, 13 Civ. 5414 (S.D.N.Y));

- a detailed four-year injunction and retroactive public benefits for thousands of immigrants *M.K.B. v. Eggleston*, 05 Civ. 10446 (S.D.N.Y.); and

- a $540,000 settlement for high-end painters who were misclassified as independent contracts and denied overtime pay (*Almendras v. Atelier Meriguet-Carrere*, No. 13 Civ. 8815 (S.D.N.Y)).

Prior to joining ECBA in 2006, she clerked for the Honorable Robert D. Sack on the U.S. Court of Appeals for the Second Circuit and spent four and a half years at the Legal Aid Society, where she began as a Skadden fellow, representing victims of domestic violence in a variety of cases including a class action that successfully challenged the systematic denial of public benefits to immigrants. *M.K.B. v. Eggleston*, 445 F. Supp. 2d 400 (S.D.N.Y. 2006).   She received her J.D., *magna cum laude*, from Harvard Law School, where she won the Sears Prize for being one of two second-year students with the highest GPAs.  More detail on her background, as well as a list of representative cases, can be found at http://www.ecbalaw.com/our-people/elizabeth-s-saylor, which is also attached as Exhibit 22 hereto.

81.     Ms. Jain is a 2007 graduate of Yale Law School, where she was awarded Yale Law Journal's Michael Egger Prize for her scholarship on employment discrimination law.  She worked as an associate for ECBA from January 2010, until November 2013.  During her time with the firm, she represented victims in numerous civil rights cases. Prior to joining the firm, she clerked for Judge Walter K. Stapleton on the Third Circuit Court of Appeals.  Ms. Jain is

currently a research fellow and adjunct professor at Georgetown University Law Center. More detail on her background is also attached as Exhibit 12 hereto.

82.     Ms. Sheketoff graduated *magna cum laude* from New York University School of Law in 2009.  Prior to joining the firm, she clerked for the Honorable John Gleeson of the Eastern District of New York and the Honorable David Sentelle, the Chief Judge of the D.C. Circuit Court of Appeals.  She worked as an associate for ECBA from October 2012 until October 2013, when she left to clerk for the Honorable Stephen Breyer, Associate Justice of the U.S. Supreme Court. She is currently an associate at Jones Day.  More detail on her background is attached as Exhibit 12 hereto.

83.     Ms. Vasudha Talla is a 2009 graduate of Yale Law School.  She joined the firm in 2011 as an associate.  Prior to doing so, she clerked for the Honorable Keith P. Ellison of the Southern District of Texas.  Ms. Talla left the firm in 2014.  After leaving the firm, she worked as Executive Agency Counsel for the City of New York's Civilian Complaint Review Board. She currently is in Lebanon working for the International Refugee Assistance Project.  More detail on her background is attached as Exhibit 12 hereto.

**Costs**

84.     Below is a summary of the costs paid by Class Counsel to date, which total $192,230.30.  The itemized list of costs and underlying invoices and receipts are maintained in ECBA's offices and available upon request.

85.     I have reviewed the itemized list of costs and certify that the chart below reflects the actual costs that were reasonably and necessarily incurred by Class Counsel in connection with this case.  These costs were expended without any guarantee of recovery.

86.     The chart below summarizes the costs incurred.

| Category | Amount |
|---|---|
| Photocopies | $6,921.83 |
| Postage | $281.75 |
| Travel and Meals | $2,166.04 |
| Legal Research | $13,051.97 |
| Process Servers | $2,550.82 |
| Experts | $101,580.23 |
| Outside Vendors | $22,104.97 |
| Messenger and Federal Express | $1,594.55 |
| Court Fees | $1,981.81 |
| Arbitration Fee | $17,180.37 |
| Teleconferences | $264.55 |
| Deposition and Witness Fees | $22,551.41 |
| **Total** | **$192,230.30** |

87.     Specifically, the expert cost category above includes the cost of an accountant who was certified as a "Valuation Analyst" to review and analyze the financial information provided by the Mel Harris and Samserv Defendants, which were used as part of the settlement negotiations before Judge Ellis; the Valuation Analyst also analyzed the value of the injunctive relief component of the settlement. The expert cost category also includes the cost of a data consultant to analyze Defendants' records, both for purposes of settlement negotiations and to administer the class (including providing notice).  The outside vendor cost above includes e-discovery vendors to manage the extensive documents produced in this case, investigators to analyze the Mel Harris and Samserv Defendants' assets, and the appellate printer.

**Service Awards**

88.     Named Plaintiffs Monique Sykes, Kelvin Perez, Rea Veerabadren, and Clifton Armoogam have expressed their approval of the settlement by agreeing to the settlement agreements.

89.     In accordance with the settlement agreements, Plaintiffs request that the Court approve service awards for the four Named Plaintiffs in the amount of $30,000 each, in recognition of the services they rendered on behalf of the class.  Those services included: participating over several years in fact development and discovery, including being subjects of depositions; rejecting Rule 68 offers of judgment for $15,000; and, in the interest of the case, publicizing their personal experiences with debt collection.

90.     The Named Plaintiffs contributed significant time and effort to the investigation and prosecution of the case by providing Class Counsel with detailed factual information regarding their experiences with Defendants' debt collection scheme and the enforcement of default judgments against them individually.  They also helped Class Counsel prosecute their claims by responding to multiple discovery requests from all three sets of Defendants, providing hundreds of responsive documents (many of them containing personal financial information), answering and reviewing numerous sets of interrogatories, and participating in depositions that delved into sensitive questions about their credit history.  Further, the Named Plaintiffs were involved with the lengthy settlement negotiations, and made themselves readily available to communicate with Class Counsel.  The time and effort contributed by the Named Plaintiffs for the benefit of the class and the additional burdens they sustained support the requested service awards.

91.     Named Plaintiffs also deserve to be rewarded for remaining in the case instead of accepting early settlement offers and for helping to obtain relief for the entire class, which they have achieved with the settlement agreements.  All of the Plaintiffs named in the second amended class action complaint and jury demand were served with Offers of Judgment pursuant to Federal Rule of Civil Procedure 68 in the amount of $15,000.  Five of them (Ruby Cohen,

Fatima Graham, Saudy Rivera, Paula Robinson, and Enid Roman) settled with the Defendants, and judgments were filed with respect to those Plaintiffs on April 18, 2011.  Three of the Plaintiffs (Monique Sykes, Rea Veerabadren, and Kelvin Perez) did not accept the $15,000 offers of judgment and chose to proceed with the case.  These Plaintiffs rejected the $15,000 offer despite knowing that their ultimate recovery at trial might be less than $15,000 and if Plaintiffs received less than $15,000 at trial, they could be personally liable for all of Defendants' costs, under the terms of Rule 68.

92.     All Named Plaintiffs are low-income people for whom the prospect of having to pay Defendants' costs was a significant risk and grave concern.  They also risked the stress and stigma of sharing their personal experiences with debt collection.  Named Plaintiffs subjected themselves to sharing and publicizing their private financial information by participating in the action, including the depositions, and helping to prosecute the claims.

****

93.     For the reasons stated above and in the accompanying Memorandum of Law and exhibits, Plaintiffs respectfully ask the Court to enter the proposed Approval Order, attached as Exhibit 16.

Dated: April 18, 2016
       New York, New York


                                        /s/
                              _____
                              MATTHEW D. BRINCKERHOFF

**EXHIBITS TO THE DECLARATION OF MATTHEW D. BRINCKERHOFF**

*Sykes, et al. v. Mel S. Harris and Associates LLC, et al.*, 09 Civ. 8486 (DC)

| EXHIBIT | NO. |
|---|---|
| Stipulation of Settlement with the Leucadia Defendants and accompanying exhibits, dated March 18, 2015, attaching as Exhibits proposed orders and a judgment that were superseded by the November 12, 2015 First Amendment .......................................................................................................... | 1 |
| First Amendment to Stipulation of Settlement with the Leucadia Defendants and accompanying exhibits, attaching Exhibit A (Preliminary Approval Order), Exhibit B (Approval Order), and Exhibit C (Judgment), dated November 12, 2015................................................................................................................... | 2 |
| Stipulation of Settlement with the Mel Harris Defendants and Samserv Defendants, dated November 12, 2015, attaching Annex 1 (March 18, 2015 Stipulation of Settlement with Leucadia Defendants with Exhibits) and Annex 2 (November 12, 2015 First Amendment to Stipulation of Settlement with Leucadia Defendants with Exhibits)............................................ | 3 |
| Proposed Allocation Plan..................................................................................... | 4 |
| Declaration from Carolyn Coffey, dated April 18, 2016 (MFY Legal Services), attaching Exhibits A - D | 5 |
| Declaration from Susan Shin, dated April 18, 2016 (New Economy Project), attaching Exhibits A - D | 6 |
| Declaration of Anthony Poulin, dated April 14, 2016 (Stephen Einstein & Associates, P.C.) ................................................................................. | 7 |
| Declaration of Jason Wright, dated April 18, 2016 (Stout Risius Ross), attaching Exhibits 1 - 4 ...................................................................... | 8 |
| Declaration of Guy Thompson, dated April 18, 2016 (Epiq Administrator), attaching Exhibits  A - K ....................................................................... | 9 |

Declaration of Daniel A. Schlanger, dated April 17, 2016 (Kakalec & Schlanger, LLP) ........................................................................ 10

Declaration of Anthony Pietrafesa, dated April 15, 2016 ................................. 11

Biographies or Resumes of Prior ECBA Associates Eisha Jain, Vasudha Talla, and Julia Sheketoff ........................................................ 12

Order Preliminarily Approving Settlements, Directing Notice to Class Members, and Scheduling Fairness Hearing ............................................ 13

Civil Docket for Case #: 1:09-cv-08486-DC ...................................... 14

Executed Term Sheet with Leucadia Defendants, dated December 14, 2014 ............ 15

[Proposed] Order Approving Settlement ........................................ 16

Agreement between *Sykes* Plaintiffs and the law firm Stephen Einstein & Associates, P.C., dated November 12, 2015 ................................ 17

Letter Agreement between *Sykes* Plaintiffs and the law firm Stephen Einstein & Associates, P.C., dated September 17, 2015 ............................... 18

Biography of Matthew D. Brinckerhoff ........................................... 19

Biography of Jonathan S Abady ................................................. 20

Biography of Debbie Greenberger ............................................... 21

Biography of Elizabeth Saylor ................................................. 22

*T.E. v. Pine Bush Cent. Sch. Dist.*, No. 12 Civ. 2303 (S.D.N.Y. July 9, 2015) Transcript of Proceedings ................................................ 23