UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MONIQUE SYKES et al.,                      :

                    Plaintiffs,        :

         - against -                      :

                              :

MEL HARRIS AND ASSOCIATES, LLC,            :
et al.,                                    :

                 Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

09 Civ. 8486 (DC)

```
┌──────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____               │
│ DATE FILED: 5/24/16              │
└──────────────────────────────────┘
```

**APPEARANCES:**    (see last page)

**CHIN, Circuit Judge:**

       In this class action, Plaintiffs allege that Defendants -- a debt-buying company, a law firm, a process service company, and affiliated entities and individuals -- engaged in abusive debt collection practices to obtain default judgments against hundreds of thousands of consumers in state court.  Plaintiffs allege that Defendants did so by engaging in "sewer service," the practice of filing fraudulent affidavits attesting to service of a summons and complaint when service was not in fact made.  When debtors failed to appear because they did not have notice of the lawsuits, Defendants obtained default judgments against them.

       After almost seven years of litigation before this Court and in the Second Circuit, the parties have settled the action in two separate agreements (together, the "Settlement") and ask the Court to approve the Settlement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

I find that the Settlement is fair, reasonable, and adequate.  Indeed, the Settlement brings this hard-fought litigation to a remarkable resolution, as it will bring concrete and extraordinarily meaningful benefits to tens of thousands of individuals.  Those benefits include the following:

- Defendants will pay over $60 million into a settlement fund;

- the settlement fund will be used to pay damages to class members who suffered losses because they had judgments entered against them and were subjected to wage garnishments, bank levies, and other means of collection;

- some 8,300 class members (those with the strongest legal claims) will receive between approximately 96-98% of their money back; another 7,400 class members (those with somewhat weaker claims) will receive approximately 81-83% of their money back; and an additional 1,700 class members (those with relatively weaker claims) will receive approximately 66-68% of their money back;

- class counsel will work with the New York State Office of Court Administration ("OCA"), with cooperation from Defendants, to vacate all default judgments entered against class members, and more than $1 billion in judgments and outstanding notes will be extinguished; and

- Defendants have agreed to substantial permanent injunctive relief:  certain defendants will no longer engage in the debt-buying business; the law firm defendant has terminated its operations; its former partners have agreed not to act as attorneys in any future consumer debt collection proceedings; and the process service company will no longer serve process in consumer debt collection cases.

The monetary relief is significant, but the benefits that will result from Defendants' agreement to cease collections and allow judgments to be vacated are just as important. Wage garnishments will end and bank accounts will be unfrozen. Credit reports with adverse entries will be cleared, and class members should have an easier time obtaining credit and finding housing and employment. The Settlement will have an immediate and enormously positive impact on the lives of many.

Accordingly, the parties' request to approve the Settlement is granted. The Court will enter an order and a judgment approving the Settlement and dismissing the Action with prejudice. I make the following findings of fact and conclusions of law, based on the parties' joint proposed findings of fact and conclusions of law.

## I.    BACKGROUND

### A.    The Settlement Agreements

1.    Lead Plaintiffs Monique Sykes, Rea Veerabadren, Kelvin Perez, and Clifton Armoogam and defendants Leucadia National Corporation, L-Credit, LLC, LR Credit, LLC, LR Credit 10, LLC, LR Credit 14, LLC, LR Credit 18, LLC, LR Credit 21, LLC, Joseph A. Orlando, and Philip M. Cannella (the "Leucadia Defendants") entered into a Stipulation of Settlement and a First Amendment to Stipulation of Settlement (together with exhibits, the "Leucadia Settlement Agreement").[1]

2.    Lead Plaintiffs and Mel S. Harris and Associates, LLC, Mel S. Harris, Michael Young, David Waldman, Kerry Lutz, and Todd Fabacher (the "Mel Harris Defendants") and Samserv Inc., William Mlotok, Benjamin Lamb, Michael Mosquera, and John Andino (the

---

[1]    Unless otherwise specifically defined in these Findings of Fact and Conclusions of Law, the capitalized terms have the same meaning as attributed to them in the Settlement Agreements.

"Samserv Defendants") entered into a settlement agreement (the "Mel Harris/Samserv Settlement Agreement," and together with the Leucadia Settlement Agreement, the "Settlement Agreements").

3.        Together the Settlement Agreements resolve all the claims in this Action.

### B.    Materials Considered by the Court

4.        In reaching its decision to approve the Settlement, the Court has considered the written submissions of the parties, including (*i*) Lead Plaintiffs' motion for final approval and the supporting declarations of fact submitted with the motion, (*ii*) Lead Plaintiffs' memorandum in support of their motion, (*iii*) the Leucadia Defendants' memorandum in support of Lead Plaintiffs' motion, (*iv*) the Mel Harris Defendants' memorandum in support of Lead Plaintiffs' motion, (*v*) Lead Plaintiffs' reply memorandum in support of their motion and (*vi*) Lead Plaintiffs' letter submission to the Court after the Fairness Hearing regarding an untimely objection.  The Court also considered the written submissions made by Class Members, including one timely objection, one withdrawn objection, two untimely objections and four letters received from Class Members indicating their intention to make a presentation at the Fairness Hearing.  Finally, the Court considered the presentations made at the May 11, 2016 Fairness Hearing, including Class Counsel's presentation and statements by three Class Members.

### C.    Summary of the Proceedings

5.        This Action arises out of the collection of (or attempts to collect) consumer debt from putative class members by the Mel S. Harris Defendants.  The Mel Harris Defendants pursued collection of such debt on behalf of their client, defendant LR Credit, LLC or one of its subsidiaries (collectively "LR Credit").  LR Credit is a limited liability corporation formed by

defendant L-Credit, LLC, an indirectly owned subsidiary of defendant Leucadia National Corporation, and Rushmore Recovery Management, LLC for the purpose of purchasing and collecting consumer debt. The Mel Harris Defendants used a variety of methods to collect the consumer debt purchased by LR Credit, including filing collection lawsuits in New York State courts. In some of the collection lawsuits, the Mel Harris Defendants used defendant Samserv, Inc. to serve the summons on the individuals who owed the debt.

6.      The Settlement is presented to the Court for approval after almost seven years of hard-fought litigation. The original complaint in this case was filed in October 2009 by Lead Plaintiff Monique Sykes as an individual action. (Dkt. No. 1). Approximately two months later, Ms. Sykes was joined by others, including Lead Plaintiff Rea Veerabadren, in filing an amended class action complaint. (Dkt. No. 2). A second amended class action complaint was filed on March 31, 2010. (Dkt. No. 29). The Court granted in part and denied in part defendants' motions to dismiss the second amended complaint (Dkt. Nos. 57, 83 and 98) on December 29, 2010. *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010).

7.      In April 2011, five of the plaintiffs named in the second amended complaint (Ruby Colon, Fatima Graham, Saudy Rivera, Paula Robinson, and Enid Roman) accepted Federal Rule of Civil Procedure 68 Offers of Judgment for $15,000 and settled with the defendants. (Declaration of Matthew D. Brinckerhoff ¶ 91, Dkt. No. 244 ("Brinckerhoff Decl.")).

8.      On April 15, 2011, the plaintiffs who rejected the Rule 68 Offers of Judgment (Monique Sykes, Rea Veerabadren, and Kelvin Perez) moved for certification of a class pursuant to Fed. R. Civ. P. Rule 23(b)(1)(A), (b)(2) and/or (b)(3). (Dkt. No. 69). While their motion was

pending, plaintiffs filed a third amended complaint (pursuant to a stipulation with defendants) that, among other things, added a new plaintiff (Clifton Armoogam).  (Dkt. No. 82).

9.    On September 4, 2012, the Court issued an opinion granting Lead Plaintiffs' motion to certify a Fed. R. Civ. P. Rule 23(b)(2) class and a Fed. R. Civ. P. Rule 23(b)(3) class (the "Class Certification Opinion").  *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279 (S.D.N.Y. 2012), *aff'd*, 780 F.3d 70 (2d Cir. 2015).  After considering briefing from the parties regarding the language of the proposed certification order, the Court entered plaintiffs' proposed order on March 28, 2013 pursuant to which the Court certified a Fed. R. Civ. P. Rule 23(b)(2) class and a Fed. R. Civ. P. Rule 23(b)(3) class, appointed Monique Sykes, Rea Veerabadren, Kelvin Perez and Clifton Armoogam as Lead Plaintiffs and appointed Emery Celli Brinckerhoff & Abady LLP, New Economy Project (f.k.a. Neighborhood Economic Development Advocacy Project) and MFY Legal Services, Inc. as Class Counsel.  (Dkt. No. 171).

10.    The Second Circuit granted Defendants' Fed. R. Civ. P. Rule 23(f) petitions for leave to file an interlocutory appeal from the Court's March 28, 2013 class certification order. Consequently, I stayed all proceedings in the Action pending resolution of the appeal.  On February 10, 2015, the Second Circuit affirmed the Court's class certification order.  *Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70 (2d Cir. 2015).

### D.    Discovery

11.    Between 2011 and 2013, the parties engaged in extensive document discovery (with Defendants producing over 500,000 pages of documents -- including debt purchase agreements, Leucadia Defendants' corporate structure documents, and relevant emails -- and Lead Plaintiffs over 5,000 pages), responded to interrogatories and participated in fifteen depositions (including depositions of Lead Plaintiffs and Defendant representatives who were the

6

most knowledgeable regarding LR Credit's purchase and collection of consumer debt). The parties also engaged in motion practice in connection with discovery issues, seeking the Court's intervention with respect to disputes involving the sufficiency of discovery responses, bifurcation of discovery, third-party discovery, subpoenas, privileged information, and the number of depositions, among other issues. *See, e.g.,* Dkt. Nos. 57, 83, and 98.

12.    The parties also exchanged information regarding their factual and legal positions during the mediation that occurred in December 2012 and January 2013 and exchanged information during their settlement negotiations. The Lead Plaintiffs also obtained additional factual data necessary for development of the Allocation Plan.

13.    Throughout the pendency of the action, including during the mediation and settlement discussions, Lead Plaintiffs and the Defendants were advised by competent and experienced counsel as well as various consultants and experts, including individuals with expertise in consumer protection and consumer finance issues.

### E.    Settlement Discussions and Execution of Settlement Agreements

14.    The parties engaged in multiple attempts to settle this Action. The first attempt -- notice of which was provided to the Court in an October 2, 2012 letter (Dkt. No. 133) -- was through participation in a one-day mediation session with retired California Superior Court Judge Daniel Weinstein in December 2012. The parties were unable to resolve the claims at the mediation session or during subsequent discussions that continued, with Judge Weinstein's assistance, through January 2013. In a February 7, 2013 letter, Lead Plaintiffs advised the Court that the settlement discussions had reached an impasse.

15.    Between October 2014 and December 14, 2014 -- while defendants' Rule 23(f) appeal of the Court's class certification order was pending -- Lead Plaintiffs and the Leucadia

Defendants engaged in rigorous, arm's-length negotiations, including numerous telephonic meetings, an in-person meeting and the exchange of factual information regarding certain of the consumer debt portfolios.  These discussions led to execution of a binding term sheet on December 14, 2014 (*see* Dkt. No. 192) and execution of a Stipulation of Settlement on March 18, 2015.  The Leucadia Defendants and Lead Plaintiffs agreed (with the Court's approval) that they would refrain from seeking preliminary approval of their Stipulation until Lead Plaintiffs further explored whether they could reach a settlement with the Mel Harris Defendants and the Samserv Defendants.

16.    Lead Plaintiffs and the Mel Harris and Samserv Defendants had multiple sessions and conferences among themselves and with the Court and Magistrate Judge Ronald Ellis in an attempt to resolve this action.  After months of exchanging information and settlement demands, plaintiffs reached financial settlements in principle with both the Mel Harris and Samserv Defendants on September 17 and 18, 2015, respectively, and a Stipulation of Settlement was executed on November 12, 2015.  Also on November 12, 2015, the Leucadia Defendants and Lead Plaintiffs executed a First Amendment to Stipulation of Settlement.  The Settlement Agreements were filed with the Court on November 12, 2015.

## II.    THE TERMS OF THE SETTLEMENT

### A.    The Settlement Classes

17.    For purposes of the Settlement, the parties have agreed to certification of two settlement Classes, a Rule 23(b)(2) Class and an overlapping Rule 23(b)(3) Class.  These settlement Classes -- which are set out in full in the Court's Order Approving Settlement -- are analogous to the Rule 23(b)(2) and Rule 23(b)(3) classes certified by the Court in its March 28, 2015 order, but extend the reach of each Class to include similarly situated individuals

8

throughout New York State (and not just individuals in New York City). For purposes of the Settlement, the Court finds that the claims of all of these individuals arise from the same operative facts that have been pled by Lead Plaintiffs in this Action and the findings of fact the Court made as to the Classes it certified in its March 28, 2013 order apply to the settlement Classes.

### B.    Monetary Terms

18.    The Leucadia Defendants contributed $46 million to a Settlement Fund at the time they executed the Stipulation of Settlement and additionally caused to be contributed to the Settlement Fund L-Credit's share of the additional debt payments collected by LR Credit on or after January 1, 2015 (approximately $5 million). The Leucadia Defendants additionally agreed to pay all notice expenses -- which are expected to be approximately $500,000.

19.    The Mel Harris Defendants and the Samserv Defendants, together with their respective insurers, contributed approximately $8.6 million to the Settlement Fund.

20.    With interest, Class Members have received over $60 million in monetary relief pursuant to the Settlement Agreements.

21.    After approval of the Settlement becomes final (and no longer subject to appeal), the Settlement Fund (plus any interest that has accrued and less any administration expenses or tax expenses incurred before or as of the date the settlement approval becomes final) will be distributed pursuant to Lead Plaintiffs' Allocation Plan to eligible Class Members. Eligible Class Members will have 90 days to cash their settlement checks. If sufficient checks remain uncashed such that a second distribution is cost effective, there will be a second distribution of checks to eligible Class Members and, if necessary and cost effective, there will be a third distribution of checks to eligible Class Members. No monies will be returned to Defendants.

22.     Pursuant to the Settlement Agreements, collection activities of consumer debt on behalf of LR Credit, including all known executions, levies, bank account restraints, payments and automated withdrawals from consumer accounts were suspended and consumers with voluntary payment agreements were notified to cease sending payments -- and no interest accrued during the suspension period.  (Declaration of Anthony Poulin, Dkt. No. 244, ¶¶ 2, 14 ("Poulin Decl.")).  As approved by the Court in the Preliminary Approval Order, the cost of implementing the suspension of collections (an aggregate amount of $500,000) was paid out of the Settlement Fund to the law firm of Stephen Einstein & Associates, PC (the "Einstein Firm") in compensation for its work with Class Counsel to effect the suspension.

### C.     Non-Monetary Terms

23.     If the Settlement is finally approved, the Leucadia Defendants will cause all of the Consumer Debt Portfolios that LR Credit held as of December 14, 2014 (including any default judgments that were obtained) to be transferred to the Rolling Jubilee Fund ("Rolling Jubilee"), an entity identified by Lead Plaintiffs that is a 501(c)(4) non-profit corporation with the sole mission and purpose of providing charitable relief to consumers across the United States by lawfully acquiring their unpaid legal obligations and subsequently extinguishing those obligations.  LR Credit, Lead Plaintiffs, and Rolling Jubilee are entering into an agreement pursuant to which Rolling Jubilee will receive the Consumer Debt Portfolios.  Rolling Jubilee has agreed not to engage in any type of collection efforts in connection with the transferred Consumer Debt Portfolios.[2]

---

[2]     The remaining face amount of the outstanding judgment debt is over $585 million.  (Declaration of Jason T. Wright, Dkt. No. 244, ¶ 7 ("Wright Decl.")).  Plaintiffs' accountant projects that absent settlement, defendants could collect approximately $45 million on these judgments, which is presently worth $26 million to defendants.  (Wright Decl. ¶ 14).  The face amount of outstanding non-judgment debt exceeds

24.     If the Settlement Agreements are finally approved, Lead Plaintiffs will continue to work with OCA to vacate all the default judgments entered against members of the Rule 23(b)(3) Class. Class Counsel has had multiple meetings with representatives of OCA and has determined that the most efficient mechanism to vacate the default judgments entered against Class Members is through a proceeding under N.Y. C.P.L.R. Rule 5015(c), which invokes the broad powers of an administrative judge to vacate improperly granted default judgments *en masse*. (Declaration of Carolyn Coffey, Dkt. No. 244, ¶ 17 ("Coffey Decl.")). The Leucadia Defendants and the Mel Harris Defendants will cooperate in Lead Plaintiffs' efforts to vacate the Default Judgments.

25.     The parties agree that, solely for purposes of a proceeding in state court under CPLR 5015(c) as part of the Settlement: (*i*) Class Members can show that they are "uniformly entitled" to interpose a defense predicated upon one of the defenses detailed in CPLR Rule 5015(c), (*ii*) notice to Class Counsel constitutes sufficient notice to the Class Member defendants in the consumer debt collection cases in New York State courts, and (*iii*) Defendants will not object to entry of a judgment vacating Class Members' default judgments and dismissing the consumer debt collection cases. Nothing in this paragraph (or any other portion of these findings of fact and conclusions of law) shall be deemed to be an admission of any wrongdoing on the part of any of the Defendants.

26.     Defendants will have no liability with respect to the fees or expenses incurred by Lead Plaintiffs, Rolling Jubilee, or any person or entity acting on their behalf, in connection with

---

$450 million. In total, the face about of the remaining debt from which class members will be relieved exceeds $1 billion. (Wright Decl. ¶¶ 15-16).

vacatur of the Default Judgments. Any expenses incurred in connection with such vacatur will be paid, or otherwise reimbursed, from the Settlement Fund.

27.    According to Lead Plaintiffs' accountant, had the Settlement not occurred, the Leucadia Defendants and the Mel Harris Defendants would have collected approximately $41.5 million more on the Default Judgments that will be transferred to RollingJubilee. That savings is presently worth $26 million -- after applying a 14% discount rate to account for the time value of money and taking into account the relative risk in collecting the debt. (Wright Decl., ¶¶ 7, 16).

28.    Defendants have also agreed to entry of permanent injunctions as more fully set out in the Court's Order Approving Settlement. The Leucadia Defendants agree to a permanent injunction barring L-Credit, LLC, LR Credit, LLC or any of their subsidiaries from purchasing or collecting consumer debts in the future. The Leucadia Defendants also agreed that, as of December 14, 2014, those entities would no longer seek additional default judgments on the debt portfolios they own. The Mel Harris Defendants agree that the Mel Harris firm will not engage in the practice of law and its former partners will not act as attorneys in any consumer debt collection proceeding initiated following the Settlement, except to the extent their cooperation is required in the effort to terminate collection cases against Class Members. Samserv agrees to stop serving process in consumer debt collection cases and to pay process servers for unsuccessful attempts at the same rate as for successful attempts. Samserv and William Mlotok agree to provide a list of debt collection lawsuits and the corresponding affidavits of service to help obtain necessary information to vacate the judgments. The Mel Harris/Samserv Agreement also requires certain process servers to include a description of the actual location where process was delivered, to ensure adequate service is made in the future. (*See* Pls. Mem. at 17-18 (citing relevant provisions of Settlement Agreements)).

### D.    Payment of Administrative and Notice Expenses

29.    All Administration Expenses other than Notice Expenses (including, without limitation, the fees, costs, and expenses of the Class Administrator and any fees, costs or expenses associated with providing the relief set out in the Settlement Agreements, including with respect to vacatur or attempts at vacatur of Default Judgments) will be paid from the Settlement Funds.

### E.    Attorneys' Fees and Expenses and Service Awards

30.    Subject to the Court's approval, (*i*) Class Counsel requested $14,401,667 in fees and $192,230.30 in costs and (*ii*) Lead Plaintiffs have requested Service Awards in the amount of $30,000 for each of the four Lead Plaintiffs.  Under the terms of the Settlement Agreements, the approved amounts will be paid out of the Settlement Fund.

### F.    Releases and Waivers

31.    The Court's Order Approving Settlement incorporates the Releases and Waiver found in Section III.H of the Leucadia Settlement Agreement and Section III.H of the Mel Harris/Samserv Settlement Agreement (a copy of which are attached as Appendix 3 to the Order Approving Settlement).  As discussed below, the full text of the releases (including the definition of "Releasees") was made available to Class Members on the Class Administrator's website during the notice period.

## III.    PRELIMINARY APPROVAL OF THE SETTLEMENT

32.    On November 16, 2015, the Court preliminarily approved the Settlement Agreements.  Among other things, the Court found preliminarily that the Settlement, as reflected in the Settlement Agreements and Lead Plaintiffs' Allocation Plan, was sufficiently fair, reasonable and adequate to warrant providing notice to the Classes and scheduling a fairness

hearing.  The Court also (*i*) approved, as to form and content, the individual notices, claim forms and publication notice submitted by the parties to the Court, (*ii*) approved the retention of Epiq Class Action & Claims Solutions ("Epiq") as Class Administrator, (*iii*) authorized the Class Administrator to distribute notice in accordance with the procedures set out in the Preliminary Approval Order, (*iv*) authorized the payment of $500,000 to the Einstein Firm as an administrative expense and (*v*) certified the settlement Classes.  The Preliminary Approval Order also set out procedures for Class Members to object to the fairness, reasonableness or adequacy of the Settlement, including the Allocation Plan, and scheduled a fairness hearing for May 11, 2016.  (Dkt. No. 136, Preliminary Approval Order ¶¶ 4, 11, 13-20.).

## IV.    NOTICE TO THE CLASS

33.    Class Counsel retained Epiq as the Class Administrator and the relevant Leucadia Defendants entered into a contract with Epiq regarding the payment of notice costs.

34.    Epiq mailed Notice Packets in English and Spanish to all members of the Rule 23(b)(3) Class and all members of the Rule 23(b)(2) Nominal Restitution Class.  Each Notice Packet contained a customized Individual Notice and, for Class Members entitled to money pursuant to Plaintiffs' Allocation Plan, a Claim Form.  (Declaration of Guy J. Thompson, Dkt. No. 244, Ex. 9, ¶¶ 6, 9, 11 ("Thompson Decl.")).

35.    The Individual Notices were customized in two distinct ways.  First, several form notices were created, with personalized language to reflect (*i*) whether the Class Member's judgment was sold, (*ii*) whether money was collected from the Class Member by Defendants (with or without a Default Judgment), (*iii*) whether the Class Member's claims were timely, and (*iv*) whether the Class Member was entitled to a monetary payment.  (*Id.* ¶ 12).  Second, where applicable, each of the form notices was customized to reflect (*i*) the amount of the default

14

judgment for each Rule 23(b)(3) Class Member; (*ii*) for Class Members from whom Defendants collected money, the amount collected; (*iii*) the Class Member's maximum proportionate recovery assuming a 100% response rate from all eligible Class Members, as well as recoveries using more probable response rates (30%, 20% and 10%) (*Id.*, Ex. A (claim form)). The Individual Notice also provided (*i*) detailed information about the Action, (*ii*) the settlement benefits (including the non-monetary relief) available to Class Members, (*iii*) Class Members' right to object to the Settlement Agreements and to appear at the Fairness Hearing, (*iv*) Class Members' right to request exclusion from the Rule 23(b)(3) Class or to decline nominal restitution provided to eligible members of the Rule 23(b)(2) Class, and (*v*) the process by which eligible Class Members could submit a Claim Form to obtain monetary relief.

36.     The Class Administrator commenced the mailing process on January 15, 2016, mailing the Notice Packet, via first class United States Mail postage prepaid, to 210,388 Class Members. (*Id.*). On January 22, 2016, Epiq mailed nine different notices to 5,467 Class Members who had multiple names on their accounts. (*Id.*). Epiq processed mail that was returned as undeliverable. For undeliverable mail that listed a forwarding address on the mailing package, Epiq sent a copy of the Notice Packet to that address. If the undeliverable mail did not include a forwarding address, Epiq took additional steps to identify a more accurate address and, on March 11, 2016, sent additional Notice Packets to the secondary address that it located. (*Id.* at ¶ 13).

37.     The Class Administrator also arranged for publication of the Publication Notice, on January 21, 2016, in each of the following local newspapers: Albany Times Union, AM New York, Buffalo News, El Diario la Prensa, Metro New York, New York Daily News, and New York Post. (*Id.* ¶ 15). The Publication Notice contained a summary of the settlement terms --

including setting out relevant deadlines -- and provided contact information for obtaining additional information about the Settlement.

38.     The Class Administrator established a toll-free telephone bank to receive and respond to Class Members' inquiries regarding the Action.  The telephone bank included an option to speak with trained customer service representatives fluent in eight different languages (English, Spanish, Mandarin, Cantonese, French, Russian, Creole, and Bengali).  (*Id.* ¶ 22). Since January 15, 2016, Epiq received a total of 25,092 telephonic inquiries.  (*Id.*).

39.     The Class Administrator also established a website dedicated to the proposed settlements at www.SykesClassAction.com.  The website set out relevant dates and provided Class Members with the option to submit a Claim Form online.  (*Id.*).  The website also provided Class Members with access to the Individual Notice, the Publication Notice, a full copy of the Releases and Waivers contained in the Settlement Agreements (with relevant definitions), and copies of significant Court documents, including the complete Settlement Agreements.  (*Id.*).

40.     In addition to the call center and website, Epiq also provided an email account, questions@sykesclassaction.com, to allow Class Members to email questions and concerns.  As of April 15, 2016, Class Members sent 102 emails to Epiq.  Epiq's standard practice was to respond to email correspondence within three business days.  (*Id.* ¶ 26).

41.     On March 17, 2016, Epiq also mailed a postcard reminder to eligible Class Members to remind them to submit a claim form by April 14, 2016.  (*Id.* ¶ 26).

42.     Consistent with the requirements of the Class Action Fairness Act on November 20, 2015, an affiliate of Epiq sent notices of the Settlement Agreements by certified mail to the Attorneys General of each of the 50 states, the District of Columbia and the U.S. Territories, and

the NY Superintendent of Financial Services and by United Parcel Service to the Attorney General of the United States.

### G.    Submission of Claim Forms

43.    Approximately 27% of Class Members eligible to receive monetary relief submitted claim forms. (*Id.* ¶ 29). The response rate among those with timely causes of action was even higher: over 35% of Class Members with at least one timely cause of action submitted a claim. (Supp. Declaration of Guy J. Thompson, Dkt. No. 252, Ex. 2, ¶ 12 ("Thompson Supp. Decl.")).

## V.    THE FAIRNESS HEARING

44.    The Court held a hearing regarding the fairness, reasonableness and adequacy of the Settlement on May 11, 2016.

45.    In addition to Class Counsel and counsel for the Defendants, a large number of individuals were present in the Courtroom. Class Counsel made a presentation regarding the Settlement, addressing among other things, the significant monetary relief provided by the Settlement, the non-monetary forms of settlement relief -- including the present monetary value of the parties' agreement that no further collections will be made with respect to the Consumer Debt Portfolios if the Settlement is finally approved -- the standard for approving a class action settlement, and the reasons why the Settlement warrants approval.

46.    After Class Counsel's presentation, the Court asked whether anyone in the Courtroom wished to be heard and three individuals asked to speak: Joseph Gavin, Monique Sykes (one of the Lead Plaintiffs), and Dolores Adams. Mr. Gavin stated that his bank account had been liquidated without prior notice in November 2005, but did not raise any specific objections to the Settlement. Ms. Sykes and Ms. Adams both expressed their support for the

Settlement. None of the four individuals who had submitted letters indicating their intention to speak at the Fairness Hearing responded to the Court's invitation to be heard.

## VI.    JURISDICTION

47.    This Court has subject matter jurisdiction to rule on the request to approve the Settlement. Pursuant to 28 U.S.C. § 1331, the Court has federal question jurisdiction over this Action. The Court also has personal jurisdiction over the named plaintiffs and Class Members. *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985); *Dornberger v. Metropolitan Life Ins. Co.*, 203 F.R.D. 118, 148 (S.D.N.Y. 2001). This Court can exercise personal jurisdiction over all absentee Class Members because Class Members received proper notice of the class action.

## VII.    THE CLASS NOTICE SATISFIES ALL APPLICABLE REQUIREMENTS

48.    Class notice must meet the requirements of Federal Rule of Civil Procedure 23(e). The Second Circuit has held that "[t]he standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir. 2005). Under Rule 23(c)(2), notice to the class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem Prods. v. Windsor,* 521 U.S. 591, 617 (1997).

49.    Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii) provides:

> The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting

exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Under Rule 23(e)(1), the Court must "direct notice in a reasonable manner to all class members who would be bound by the proposal."

50.    In its Preliminary Approval Order, the Court approved the forms of notice to be provided to Class Members and instructed the parties to provide notice consistent with the directives set out in the Preliminary Approval Order. (Preliminary Approval Order ¶¶ 13-20).

51.    The Notice provided to Class Members (as more fully described above) was consistent with the Court's directives in the Preliminary Approval Order and more than satisfies due process and the requirements of Rule 23. *See, e.g., In re Scotts EZ Seed Litig.*, No. 12-CV-4727(VB), 2015 WL 5502053, at *1 (S.D.N.Y. July 7, 2015). The Individual Notice, which is written in plain English (and also was provided to Class Members in Spanish), includes (*i*) the caption of the litigation, (*ii*) a description of the action, (*iii*) a description of settlement Classes, (*iv*) identification of counsel for the class, (*v*) a comprehensive summary of the Settlement Agreements' terms, (*vi*) detailed information about the releases, (*vii*) a description of the Allocation Plan and estimates of the amount each recipient Class Member would receive pursuant to different participation levels, (*viii*) the procedure for submitting claim forms, (*ix*) the hearing date, (*x*) the procedure for submitting objections, requests for exclusion from the Rule 23(b)(3) class and declining the nominal restitution, (*xi*) the consequences of approval of the settlements by the Court, (*xii*) notice of Class Counsel's intent to request attorneys' fees, (*xiii*) notice of Lead Plaintiffs' intent to seek service awards, (*xiv*) the contact information for the Class Administrator (who was available to answer Class Members' questions), and (*xv*) the procedure for obtaining additional information.

19

52.     The Publication Notice, which was widely published in newspapers throughout New York State, also contained all the information required by Rule 23 and due process, including a toll-free number for Class Members to call for further information and a website where they could find the Individual Notice and all relevant court documents.

53.     Separately and together, these notices provided sufficient information for Class Members to understand the Settlement and their options. *See, e.g., In re Worldcom, Inc. ERISA Litig.*, No. 02 Civ. 4816(DLC), 2005 WL 3107725, at *2 (S.D.N.Y. Nov. 21, 2005).

## VIII.  CLASS CERTIFICATION

54.     In its Preliminary Approval Order, the Court certified a Rule 23(b)(2) Class and a Rule 23(b)(3) Class for settlement purposes, based on its finding that the proposed classes meet the four threshold requirements of Federal Rule of Civil Procedure 23(a) -- numerosity, commonality, typicality, and adequacy of representation -- and in addition are maintainable under Rule 23(b).  As set out in the Court's Order Approving Settlement, the Court confirms certification of these Classes in connection with its approval of the Settlement.  Consistent with that certification, the Court finds that:

a.     Joinder of the 390,000 Class Members would be impractical and thus the numerosity requirement is met. *See In re Fosamax Prods. Liability Litig.*, 248 F.R.D. 389, 398 (S.D.N.Y. 2008).

b.     Lead Plaintiffs have raised questions of fact and law that are common to all Rule 23(b)(2) Class Members and all Rule 23(b)(3) Class Members throughout New York State (including (*i*) whether Defendants' actions in seeking default judgments in courts statewide was legal, (*ii*) whether making false representations in court, rather than to the debtor, violates the FDCPA, and (*iii*) whether making false representations in court is sufficient to establish a

20

violation of New York's GBL or Judiciary Law) and thus satisfy the commonality requirement. *See Shapiro v. JPMorgan Chase & Co.*, Nos. 11 Civ. 8331(CM)(MHD), No. 11 Civ. 7961(CM), 2014 WL 1224666, at *14 (S.D.N.Y. Mar. 24, 2014) (citing *Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) ("The commonality requirement is satisfied if the named plaintiffs share at least one question of fact or law in common with the purported class")).

    c.  Lead Plaintiffs allege that Defendants engaged in uniform conduct affecting all Class Members, and Lead Plaintiffs' claims are typical of the other Members of the Rule 23(b)(2) Class and of the Rule 23(b)(3) Class throughout New York State. *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001) *abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) (internal quotations omitted) (typicality requirement "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability"); *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993) ("minor variations in the fact patterns underlying [the] individual claims" do not preclude a finding of typicality).

    d.  Lead Plaintiffs are capable of fairly and adequately protecting the interests of the members of the Rule 23(b)(2) Class and the Rule 23(b)(3) Class, in that (*i*) Lead Plaintiffs' interests are consistent with those of the other Rule 23(b)(2) Class Members and the other Rule 23(b)(3) Class Members throughout New York State, (*ii*) Class Counsel are able and qualified to represent members of the Rule 23(b)(2) Class and the Rule 23(b)(3) Class throughout New York State, and (*iii*) Lead Plaintiffs and Class Counsel have fairly and adequately represented all of the Rule 23(b)(2) Class Members and all of the Rule 23(b)(3) Class Members in obtaining both monetary and injunctive relief, and in negotiating and entering the Settlement Agreements (*see Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (court must

determine whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation")).

55.    For settlement purposes, the Court finds further that:

a.    Defendants have acted on grounds that apply generally to the members of the Rule 23(b)(2) Class, so that injunctive relief is appropriate respecting the Rule 23(b)(2) Class as a whole (*see Wal-Mart*, 564 U.S.at 361 (2011) (quoting *Nagareda*, 84 N.Y.U. L. Rev. at 132) ("The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'")).

b.    After considering, among other things, (*i*) the Rule 23(b)(3) Class Members' interest in individually controlling the prosecution of separate actions, (*ii*) the impracticability or inefficiency of prosecuting separate actions, (*iii*) the extent and nature of any litigation concerning these claims already commenced, and (*iv*) the desirability of concentrating the litigation of the claims in a particular forum, for settlement purposes, questions of law and/or fact common to Members of the Rule 23(b)(3) Class predominate over such questions affecting only individual Rule 23(b)(3) Class Members, and a class action is superior to all other available methods for the fair and efficient resolution of the Action. *See Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)) (internal quotation marks omitted) (predominance requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.").

## IX.    FAIRNESS OF THE SETTLEMENT

56.    I find that the Settlement is fair, reasonable and adequate.  In doing so, I have taken into account the following:  (*i*) the negotiations occurred at arm's length, (*ii*) there was sufficient discovery and (*iii*) the parties are represented by "experienced, capable counsel." *Wal-Mart Stores, Inc.*, 396 F.3d at 116 (quoting *Manual for Complex Litig., Third*, § 30.42 (1995)).  I find further that (*i*) both Lead Plaintiffs and Defendants were represented by counsel with extensive experience litigating complex class actions and thorough familiarity with the factual and legal issues of the case, (*ii*) substantial documentary and testimonial discovery was undertaken and the parties also reviewed and analyzed key electronic databases maintained by the Mel Harris Defendants, (*iii*) both Lead Plaintiffs and Defendants retained and consulted with several experts, including consumer finance and damages experts, and (*iv*) the settlement negotiations for both settlements were vigorous and hard-fought, and the material settlement terms were reached only after months-long settlement discussions, including, as discussed above, several mediation and negotiation sessions with retired California Superior Court Judge Daniel Weinstein and Magistrate Judge Ronald Ellis.  Moreover (as discussed in more detail below) the reaction of Class Members to the Settlement Agreements has been overwhelmingly positive, and only a very small fraction of Class Members have objected to the Settlement, requested exclusion, or declined restitution.  The Settlement thus enjoys a presumption of fairness.

57.    The Court has also considered the substantive fairness of the Settlement according to the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).

58.    *Complexity, Expense and Likely Duration of the Litigation* -- Settlement is favored if settlement results in "substantial and tangible present recovery, without the attendant

risk and delay of trial." *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425

(S.D.N.Y. 2001); *see also In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164,

174 (S.D.N.Y. 2000) ("Most class actions are inherently complex and settlement avoids the

costs, delays and multitude of other problems associated with them."), *aff'd sub. nom D'Amato v.*

*Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001). With a class period dating back over a decade and

claims arising under a variety of federal and state statutory provisions (including RICO), this

litigation has been particularly complex, expensive, and time consuming -- and would have

continued to be so if the case had proceeded to trial. Additional discovery -- including expert

discovery -- remains to be completed and any trial of this Action would be lengthy and complex

and would raise numerous factual issues concerning the consumer debt collection industry. And,

even if Lead Plaintiffs were to prevail at trial, post-trial motions and the potential for appeal

could prevent the class members from obtaining any recovery for several years, if at all. *See*

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 254, 261 (S.D.N.Y. 2003)

("[E]ven if . . . a class member was willing to assume all the risks of pursuing the actions through

further litigation . . . the passage of time would introduce yet more risks . . . and would, in light

of the time value of money, make future recoveries less valuable than this current recovery.").

    59.    *The Reaction of the Class to the Settlement* -- A positive reaction of the class to

the proposed settlement favors its approval. *See Tiro v. Pub. House Invs., LLC*, Nos. 11 Civ.

7679(CM), 11 Civ. 8249(CM), 2013 WL 4830949, at *7 (S.D.N.Y. Sept. 10, 2013) ("Where

relatively few class members opt-out or object to the settlement, the lack of opposition supports

court approval of the settlement."); Newberg on Class Actions 13:54 (5th ed.) ("[I]f only a small

number of objections are received, that fact can be viewed as indicative of the adequacy of the

settlement."). Though over 200,000 Notice Packets were mailed and notice was published in

newspapers throughout New York City and New York State, an extremely low number of objections, requests for exclusion, or declinations of restitution were submitted. Only 38 potential Class Members have requested exclusion from the Rule 23(b)(3) Class or declined the Nominal Restitution -- a miniscule number considering that there were 215,0000 individuals who were members in the Rule 23(b)(3) Class or who were Rule 23(b)(2) Nominal Restitution Recipients. (Supplemental Declaration of Guy Thompson, Dkt. No. 252, ¶ 5). Similarly only four objections -- well under one one-hundredth of a percent of Class Members -- have been submitted regarding the settlements. (Thompson Decl. ¶ 16 as to those submitted prior to the Fairness Hearing). Moreover, as discussed above, two of the objections were untimely and one objection was withdrawn. The only timely outstanding objection (which is discussed in more detail below) objects to the attorneys' fees to be awarded to Class Counsel and the potential tax implications of the settlements without challenging the substance of the settlements. Similarly, the Class Member (Mr. Gavin) who expressed an objection at the Fairness Hearing did not raise any specific objection to the Settlement (and, as discussed above, the other two Class Members who spoke at the Fairness Hearing supported the Settlement). The small number of exclusions, declinations and objections relative to the size of the class in this case supports approval of the settlement. *See Wal-Mart Stores, Inc.*, 396 F.3d at 118 (concluding that only 18 objections from a class of five million was indicative of the adequacy of the settlement); *D'Amato*, 236 F.3d at 86-87 (holding that the district court properly concluded that 18 objections from a class of 27,883 weighed in favor of settlement approval); *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 619 (S.D.N.Y. 2012) (finding that where 16 out of 1500 class members requested exclusion from the settlement, the "response demonstrate[d] strong support for the settlement.").

60.    *The Stage of the Proceedings and the Amount of Discovery Completed* -- This factor focuses on whether the parties have obtained sufficient information to assess the strengths and weaknesses of their respective positions, and requires the Court to consider the extent of the discovery completed by the parties. *Wal-Mart*, 396 F.3d at 117.  When evaluating the level of discovery completed, "the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement." *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012) (internal citations and quotation marks omitted).  The discovery here -- which is described above -- more than meets this standard.

61.    *The Risks of Establishing Liability and Damages* -- In weighing the risks of continued litigation, the Court "must only weigh the likelihood of success by the plaintiff class against the relief offered by the settlement." *In re Austrian*, 80 F. Supp. 2d at 177 (internal quotation and citation omitted).  A trial on the merits of the claims in this Action would involve significant risks for Lead Plaintiffs (and Class Members) as to both liability and damages. Among other things, to recover the maximum possible damages for the maximum number of people, Lead Plaintiffs would have to prevail on their RICO claims, including showing the existence of an enterprise or a common intent to engage in fraudulent conduct. *See* 18 U.S.C. § 1961(4).  With respect to the FDCPA claim, Defendants assert that a significant question exists as to whether the FDCPA permits a plaintiff to assert claims for a false statement that was made to a court as opposed to the debtor. *See, e.g., O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938 (7th Cir. 2011) (holding that § 1692e only applies to false statements made by debt collectors to consumers).  In addition, Defendants argue that their actions did not proximately

26

cause plaintiffs' injury and that therefore Lead Plaintiffs cannot prevail on their GBL § 349

claim. *See, e.g., Douyon v. N.Y. Med. Health Care, P.C.*, No. 10-CV-3983(AKT), 2012 WL

4486100, at *14 (E.D.N.Y. Sept. 28, 2012). Lead Plaintiffs will also face significant risks in

establishing damages even if they are able to prevail on some or all of their claims. Establishing

damages will require complex expert testimony -- which involves risk that the Settlement avoids.

*See In re Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 54 (S.D.N.Y. 1993) ("[T]he magnitude of

damages becomes a battle of experts at trial, with no guarantee of the outcome in the eyes of the

jury."). When the risk that Lead Plaintiffs would face in demonstrating Defendants' liability is

balanced against the immediate and certain benefits of the Settlement, it weighs heavily in favor

of approval. *In re Austrian*, 80 F. Supp. 2d at 177.

62.      *The Risks of Maintaining the Class Action Through Trial* -- Under Federal Rule of

Civil Procedure 23(c), a court may decertify a class at any time before final judgment. Fed R.

Civ. P. 23(c)(1)(C). The risk of maintaining class certification through trial is present here. *See*

*Mazzei v. Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015) (decertifying class following jury

verdict in favor of class). This Court has previously recognized that, should Defendants

ultimately be found liable on some or all of the alleged claims, "individual issues may exist as to

causation and damages as well as to whether a class member's claim accrued within the

applicable statute of limitations." *Sykes*, 285 F.R.D. at 293. While these problems might have

been addressed through various management tools, including decertifying the classes after a

liability trial, the Settlement eliminates the need to employ such tools.

63.      *Defendants' Ability to Withstand Greater Judgment* -- While the Leucadia

Defendants may have the ability to withstand a greater judgment, this does not prevent the Court

from approving the Leucadia Settlement Agreement. *See Aboud v. Charles Schwab & Co., Inc.*,

27

No. 14 Civ. 2712(PAC), 2014 WL 5794655, at *4 (S.D.N.Y. Nov. 4, 2014) (a "defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair") (internal quotation and citation omitted); *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132(CM)(GWG), 2014 WL 1883494, at *9 (S.D.N.Y. May 9, 2014) (stating that Courts "generally do not find the ability of a defendant to withstand a greater judgment to be an impediment to settlement when the other factors favor the settlement."), *aff'd*, 607 F. App'x 73 (2d Cir. 2015). The Mel Harris Defendants and Samserv Defendants provided plaintiffs with detailed financial information as part of the settlement discussions conducted by Magistrate Judge Ellis. Class Counsel carefully reviewed that information with their certified Valuation Analysis and concluded that the information satisfactorily demonstrated that the Mel Harris and Samserv Defendants would likely be unable to pay a judgment of the magnitude Lead Plaintiffs would seek at trial. (Brinckerhoff Decl. ¶ 62). "[E]vidence that the defendant will not be able to pay a larger award at trial tends to weigh in favor of approval of a settlement, since the 'prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures.'" *In re PaineWebber Ltd. P'Ships, Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) (quoting *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 746 (S.D.N.Y. 1985)), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

64.     *The Range of Reasonableness in Relation to Potential Recovery* -- The determination of whether a settlement amount is reasonable does not involve use "of a mathematical equation yielding a particularized sum." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 178 (internal quotation and citation omitted). "Instead, 'there is a range of reasonableness with respect to a settlement -- a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in

28

taking any litigation to completion.'" *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). Moreover, "[m]uch of the value of a settlement lies in the ability to make funds available promptly." *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1396, 1405 (E.D.N.Y. 1985), *modified on other grounds*, 818 F.2d 179 (2d Cir. 1987). When a "settlement assures immediate payment of substantial amounts to class members, even if it means sacrificing 'speculative payment of a hypothetically larger amount years down the road,'" the settlement is reasonable. *Gilliam v. Addicts Rehab. Ctr. Fund*, No. 05 Civ. 3452(RLE), 2008 WL 782596, at *5 (S.D.N.Y. Mar. 24, 2008) (quoting *Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*, No. 01-CV-11814(MP), 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004)). The cash settlement amount of the Leucadia Settlement Agreement alone is sizeable -- $46 million, approximately $5 million in additional payments from collections made after January 1, 2015 and approximately $500,000 in notice expenses, for a total of $51.5 million. That amount represents over 43% of the likely maximum of $119 million in recoverable damages, according to Lead Plaintiffs' analysis. When the cash paid pursuant to the Mel Harris/Samserv Settlement Agreement -- approximately $8.6 million -- is considered, the total settlement amount represents over half of the $119 million LR Credit collected from Class Members who had timely claims. (Brinckerhoff Decl. ¶ 46). Moreover, the Settlement Agreements provide for definite and prompt payment of relief to eligible Class Members, which is more valuable than a speculative future payment. Class Members with timely claims will receive the vast majority of the money collected from them as a result of default judgments, based on the number of claims received. (*Id.*). In addition, the Settlement provides economic benefit to Class Members in addition to the significant Settlement Funds. As described above more fully, (*i*) collections have been suspended while the approval process was

proceeding and will remain suspended until this Court's approval of the Settlement becomes final and no longer subject to appeal, (*ii*) if the Settlement is finally approved, the Consumer Debt Portfolios will be transferred to Rolling Jubilee, and (*iii*) Class Counsel will continue to work with the New York State courts to have the default judgments vacated, to stop collections of any additional debt from Class Members, and to have Rolling Jubilee cancel the debt as a gift to Class Members. (Brinckerhoff Decl. ¶ 31). Ending collections on default judgments alone will save Class Members $41.5 million in additional collections, which Plaintiffs' accountant valued at $26.1 million today. (Wright Decl. ¶ 14). The Settlements is significant and dwarfs the recovery obtained in similar cases. *See, e.g., Vasalle v. Midland Funding, LLC*, 708 F.3d 747, 753 (6th Cir. 2013) (involving nationwide class action brought against a debt buyer for filing false affidavits in state court that ultimately settled for $5.2 million, of which each class member received only $17.38).

## X.    FAIRNESS OF THE ALLOCATION PLAN

65.    In its Preliminary Approval Order, the Court preliminarily concluded that the Allocation Plan was within the range of possible approval and that none of the terms and conditions of the Allocation Plan had any obvious deficiencies or improperly granted preferential treatment to any individual Class Member. (Preliminary Approval Order ¶ 3). The Court makes the following findings in support of its decision to grant final approval of the Allocation Plan, which findings are intended to supplement and affirm the findings in its Preliminary Approval Order.

66.    In determining the fairness, reasonableness, and adequacy of a proposed plan of allocation, courts give considerable weight to the opinion of qualified counsel. *In re American Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) ("An allocation

30

formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.") (internal citation and quotation omitted).

67.     The proposed Allocation Plan, which was available on the Class Administrator's website, was prepared by Class Counsel, and reviewed and approved by retired California Superior Court Judge Daniel Weinstein.  The Plan provides (*i*) as much compensation as possible to members of the Rule 23(b)(3) Class who had judgments entered against them that were collected via wage garnishment, bank account levy, or other means (the "Economic Loss Group"); (*ii*) a base level of compensation in the amount of $100 for every person who paid money to Defendants without a judgment or had their default judgment sold to a non-defendant debt collector; and (*iii*) more compensation to Class Members whose legal claims against Defendants are within the relevant statutes of limitations.  (Brinckerhoff Decl. ¶¶ 41, 48).

68.     Pursuant to the proposed Allocation Plan, based on the response rate, Class Members in the Economic Loss Group with timely FDCPA, GBL, and RICO claims will receive approximately 96-98% of the amount collected from them.  (Dkt. 253 at 4).  Those with timely RICO and GBL claims will receive approximately 81-83% of the money collected.  (*Id.*).  And Class Members in the Economic Loss Group with timely RICO claims will receive approximately 66-68% of the amount collected from them.  (*Id.*).  The balance of Class Members who paid money to Defendants or had their default judgment sold to a non-defendant debt collector, but whose claims are not timely, will receive $100 or $200.  (Allocation Plan ¶¶ 5, 6, 8).  As will be discussed below, only one Class Member objected to the fairness of the proposed Allocation Plan, but that Class Member withdrew her objection.

69.     For the reasons set out above, the Court approves the Allocation Plan as fair, adequate and reasonable.

## XI.    CLASS COUNSEL'S REQUEST FOR FEES

70.    It is well settled that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The fees awarded "may not exceed what is reasonable under the circumstances," and determining "[w]hat constitutes a reasonable fee is properly committed to the sound discretion of the district court." *Goldberger*, 209 F.3d at 47 (internal quotation marks omitted).

71.    A district court, in determining a reasonable fee in a common fund case, may apply either the percentage-of-the-fund method or the lodestar method. *Id.* at 50. While either method is permitted, "[t]he trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of the litigation." *Wal-Mart Stores, Inc.*, 396 F.3d at 121 (internal quotation and citation omitted).

72.    Class Counsel seeks an award of $14,401,667 in attorneys' fees, which is 24% of the total monetary relief or 16.7% of the total monetary relief when an estimate for the value of the additional extinguished debt ($26.1 million) is included in the monetary settlement relief.

73.    The Second Circuit has also said it is appropriate, in considering a fee request, to perform a lodestar cross-check. *Goldberger*, 209 F.3d at 50; *but see Davis v. J.P. Morgan & Chase & Co.*, 827 F. Supp. 2d 172, 185 (W.D.N.Y. 2011) (noting that cross-check is solely a "rough indicator of the propriety of a fee request," and a district court "must be cautious of placing too much weight" on the numbers underlying the lodestar calculation so as not to reintroduce the problems associated with the method) (internal quotations and citations omitted). When considering the time Class Counsel committed to this case at the prevailing rates in the

markets where the services were rendered, the total lodestar, including future post-settlement work, is likely to be approximately $4.35 million, reflecting almost 9,000 hours in attorney and intern/paralegal hours.

74.    After the lodestar is calculated, a district court should "divid[e] the proposed fee award by a lodestar calculation, resulting in a lodestar multiplier." *Id.* at 184. The multiplier here is 3.3, which is consistent with other cases in the Second Circuit. *See, e.g., Wal-Mart Stores*, 396 F.3d at 123 ("multipliers of between 3 and 4.5 have become common"); *Davis*, 827 F. Supp. 2d at 185 (awarding a multiplier of 5.3 times the lodestar); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 590 (S.D.N.Y. 2008) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."). The lodestar cross-check further supports Class Counsel's fee request.

75.    In assessing the fee request, the Court has also considered the factors set out in *Goldberger*, 209 F.3d at 50, and found that the fee request satisfies each such factor.

76.    *The Time and Labor Expended by Counsel* -- Class Counsel has spent over six years and nearly 8,000 hours litigating this complex and novel case, including (*i*) opposing motions to dismiss raised by all defendants, (*ii*) participating in the discovery described above, (*iii*) consulting with various experts and consultants, and (*iv*) negotiating the settlements with all parties. (Brinckerhoff Decl. at ¶¶ 9, 22, 73). Class Counsel also expended a significant amount of time and effort litigating the issue of class certification, both before this Court as well as the Second Circuit. (*Id.* at ¶ 13). Class Counsel will also expend significant hours in post-settlement work to work with OCA to seek to vacate all default judgments entered against over 190,000 Class Members. (*Id.* at ¶ 74).

77.     *Magnitude and Complexities of the Litigation* -- This case, commenced in October 2009, has been particularly complex, expensive, and time-consuming.     .

78.     *Risk of Litigation* -- The Second Circuit has made clear that the risk of success is "perhaps the foremost factor to be considered in determining" the reasonableness of an attorneys' fees request. *Goldberger*, 209 F.3d at 54 (internal quotation and citation omitted).  In considering this factor, the risk should be measured at the outset of the case and not at the time of settlement.  *Id.* at 55.  In this case, Class Counsel undertook representation of plaintiffs and the Classes on a contingent basis.  Class Counsel's risk of no recovery was high.  Class Counsel did not benefit from a previous, similar suit or from any similar government action or investigation. Nor was there a high likelihood of settlement at the outset of filing suit -- as evidenced by the fact that settlement discussions lasted over two years.  In addition, as discussed above, Defendants asserted numerous novel defenses to Lead Plaintiffs' claims which put recovery for Class Members and Class Counsel at risk.  *See In re Beacon Assocs. Litig.*, No. 09 Civ 777(CM), 2013 WL 2450960, at *13 (S.D.N.Y. May 9, 2013) ("[A]ll of these matters were taken on contingency, so in view of the novelty of the issues there was some possibility that counsel would recover nothing at all.").  Finally, Lead Plaintiffs faced the real risk of the Classes being decertified, which would have impacted Class Members' potential for recovery.  *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. 2004) (finding that a denial of class certification in that case would create an "appreciable risk to the class members' potential for recovery").

79.     *Quality of Representation* -- In considering this factor, courts "review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Raniere v. Citigroup, Inc.*, 310 F.R.D. 211, 221 (S.D.N.Y. 2015) (quoting *Taft v. Ackermans*, No.

34

02 Civ. 7951(PKL), 2007 WL 414493, at *10 (S.D.N.Y. Jan. 31, 2007)).  As noted above, Class

Counsel is knowledgeable about, and experienced in, complex class actions of this nature.  Class

Counsel effectively and efficiently litigated this Action from its inception, during more than six

years of contentious litigation against more than able defense counsel.  Class Counsel secured a

Settlement with a total monetary value of more than $86 million and also secured important

reforms on behalf of both Class Members and the public.

80.     *Fee in Relation to Settlement* -- Class Counsel's request for $14.4 million

represents 24% of the value of the $60 million monetary settlement and 16.7% of the settlement

value to the Classes when the calculable value of the extinguishment of remaining debt is

considered.  *See, e.g., Sheppard v. Consol. Edison Co. v. N.Y., Inc.*, No. 94-CV-0403(JG), 2002

WL 2003206, at *7 (E.D.N.Y. Aug. 1, 2002) (valuing non-monetary injunctive relief at "an

estimated $5 million," when considering the reasonableness of class counsel's fee request).

Under either calculation of the full value of the Settlement, Class Counsel's request is reasonable.

*See, e.g., Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 09194(CM), 2010 WL 4877852, at *21

(S.D.N.Y. Nov. 30, 2010) ("District courts in the Second Circuit routinely award attorneys' fees

that are 30 percent or greater.") (collecting authorities).

81.     *Public Policy Considerations* -- Public policy considerations also support Class

Counsel's fee request.  "There is . . . commendable sentiment in favor of providing lawyers with

sufficient incentive to bring common fund cases that serve the public interest." *Goldberger*, 209

F.3d at 51.  New Economy Project and MFY are both not-for-profit corporations with missions

that include representing low-income consumers in class actions such as this one.  The attorneys'

fees recovered by both entities will be devoted to fulfilling their respective missions.

(Declaration of Susan Shin, Dkt. No. 244, ¶¶ 4-6, 16; Coffey Decl. ¶¶ 3-4).  Further, Class

Counsel is requesting less than the amount permitted under the Settlement Agreements. This requested amount does not result in a "windfall to class counsel to the detriment of the plaintiff class." *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 130 (S.D.N.Y. 2009), *aff'd*, 405 F. App'x 532 (2d Cir. 2010).

82.     Because all the *Goldberger* factors, as well as the percentage-of-the-fund method and the lodestar cross-check, support the requested fee, the requested fee is approved.

## XII.    REIMBURSEMENT OF CLASS COUNSEL'S EXPENSES

83.     Attorneys who obtain a common settlement fund for the benefit of a class are entitled to reimbursement of expenses they advance to a class. *Hart v. RCI Hospitality Holdings, Inc.*, No. 09 Civ. 3043(PAE), 2015 WL 5577713, at *18 (S.D.N.Y. Sept. 22, 2015). It is common for courts in the Second Circuit to "grant expense requests in common fund cases as a matter of course." *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05 Civ. 10240(CM), 2007 WL 2230177, at *18 (S.D.N.Y. July 27, 2007). Class Counsel is seeking reimbursement for $192,230.30 in expenses. These expenses include costs for filing fees, postage, messenger services, e-discovery vendors, a forensic accountant, a data consultant, and mediation expenses. (Brinckerhoff Decl. ¶¶ 87-88). Because plaintiffs' counsel's actual costs and expenses were reasonable and necessary to litigate this lengthy and complex case and were expended without guarantee of recovery, the Court approves the request.

## XIII.    LEAD PLAINTIFFS' REQUEST FOR SERVICE AWARDS

84.     Lead Plaintiffs provided services in this Action, including: (*i*) participating over several years in fact development and discovery, including being subjects of depositions, (*ii*) rejecting Rule 68 offers of judgment for $15,000, and (*iii*) publicly sharing their personal experiences with debt collection. (Brinckerhoff Decl. ¶ 90).

85.    Courts acknowledge that service awards are important to compensate plaintiffs for the contributions they make to advance the prosecution of their case. *See Diaz v. Scores Holding Co.*, No. 07 Civ. 8718(THK), 2011 WL 6399468, at *3 (S.D.N.Y. July 11, 2011); *Parker v. Jekyll & Hyde Entm't Holdings, LLC*, No. 08 Civ. 7670(BSJ)(JCF), 2010 WL 532960, at *1 (S.D.N.Y. Feb. 9, 2010) ("Enhancement awards for class representatives serve the dual functions of recognizing the risks incurred by named plaintiffs and compensating them for their additional efforts.").

86.    Lead Plaintiffs have requested that the Court approve Service Awards for the four Lead Plaintiffs in the amount of $30,000 each.  The Service Awards are reasonable in light of (*i*) the significant time and effort expended by Lead Plaintiffs; (*ii*) the significant risks Lead Plaintiffs took on by being part of the Action; and (*iii*) awards made in other cases where the lead plaintiffs were able to effect substantial relief for class members.  *See, e.g., Sewell v. Bovis Lend Lease, Inc.*, No. 09 Civ. 6548(RLE), 2012 WL 1320124, at *15 (S.D.N.Y. Apr. 16, 2012) (granting service awards to named plaintiffs who "provided detailed factual information to class counsel for the prosecution of their claims and made themselves available regularly for any necessary communications with counsel").

87.    In addition, Lead Plaintiffs also took on significant risks in rejecting the Rule 68 Offers of Judgment.  Lead Plaintiffs subjected themselves to the publicizing of their private financial information and also risked the stress and stigma of sharing their personal experiences with debt collection.  Incentive awards are appropriate when considering "the sacrifice of [Plaintiffs'] anonymity" and where lead plaintiffs are required to "expose[] their private financial affairs." *In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D.

226, 245 (E.D. Pa. 2009). In addition, by rejecting the Rule 68 Offers of Judgment, Lead Plaintiffs exposed themselves to liability for costs incurred after the offer was made to the extent the ultimate judgment obtained was less favorable than the offer. Fed. R. Civ. P. 68(d).

88.    Finally, the service awards requested of $30,000 for each of the Lead Plaintiffs are comparable to awards made in other cases where the lead plaintiffs were able to effect substantial relief for class members. *See, e.g., McBean v. City of N. Y.*, 228 F.R.D. 487, 494-95 (S.D.N.Y. 2005) (approving payments of $25,000 incentive awards to each named plaintiff). Further, the awards amount to 0.2% of the total monetary recovery. The awards suggested here are far below what has been deemed reasonable in similar cases. *See, e.g., Parker*, 2010 WL 532960, at *2 (stating that service awards totaling 11% of the total recovery were reasonable "given the value of the representatives' participation and the likelihood that class members who submit claims will still receive significant financial awards"); *Reyes v. Altamarea Grp.*, No. 10-CV-6451 (RLE), 2011 WL 4599822, at *9 (S.D.N.Y. Aug. 16, 2011) (approving awards representing approximately 16.6% of the settlement).

89.    For the reasons stated above, Lead Plaintiffs' request for service awards are approved.

## XIV.  OBJECTIONS TO THE SETTLEMENT AGREEMENT

90.    Only three objections are currently asserted -- and only one of those objections was timely. A fourth objection was timely asserted, but withdrawn prior to the Fairness Hearing. In addition, a Class Member who did not submit any written objection (and thus did not comply with the procedure for objecting to the Settlement) expressed an objection at the Fairness Hearing.

91.    The outstanding timely objector complains primarily of attorneys' fees in the amount of $20 million to be awarded to Class Counsel.  (*See* Objection No. 600000002).  First, as discussed above, Class Counsel is not seeking $20 million, but instead is seeking $14.4 million.  Second, as discussed above, Class Counsel has litigated this case since 2009 and has at all times vigorously prosecuted plaintiffs' claims.  The award they seek is consistent with the amounts awarded in similar settlements and fairly compensates Class Counsel for the time they expended in prosecuting and securing a substantial settlement on behalf of plaintiffs.  This objector also complains that the IRS will tax monies awarded to him through settlement.  The Class Administrator has represented that there should be no tax consequence to Class Members who receive back any amount that is equal to or less than what had been collected from him or her.  (Thompson Decl. ¶ 17).  In any event, whether or not any relief this objector receives will be taxed has little probative value with respect to the fairness, reasonableness, or adequacy of the settlements.  For the reasons stated above, the Court finds his objection not to be substantial or meritorious.

92.    The withdrawn objector had complained about the amount of the settlement relief she is due under the settlement.  She had asserted that her anticipated settlement payment of $100 is too low and that she is entitled to receive the total amount (*i.e.,* $700) that she allegedly paid to the Mel Harris Defendants.  (*See* Objection No. 60000001).  On May 2, 2016, the objector withdrew her objection.  Even this objection were considered, I would find it to be meritless.  Courts routinely overrule objections from class members that the anticipated relief they will receive under the settlement is too low.  *See, e.g., Hicks v. Stanley*, No. 01 Civ. 10071(RJH), 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005) (overruling class member objections that settlement amount was too low; "[t]here are obstacles that the plaintiffs would

face in continued litigation with defendants, and it is uncertain whether they could overcome these obstacles to prove both liability and damages . . . . settlement amount represents a fair payment to plaintiff class due to the risk that protracted litigation may be fruitless"); *Taft v. Ackermans*, No. 02 Civ. 7951(PKL), 2007 WL 414493, at *7 (S.D.N.Y. Jan. 31, 2007) (overruling objections that the settlement amount was insufficient because, among other things, Lead Plaintiffs faced serious challenges in establishing liability and damages); *In re PaineWebber Ltd. P'Ships, Litig.*, 171 F.R.D. at 131 (noting that "the fact that the settlement fund may equal only a fraction of the potential recovery at trial does not render the settlement inadequate" particularly in light of the considerable risks a class would face at trial). That the settlement "does not provide for a full recovery of legal damages . . . is the hallmark of compromise." *Id.* at 131.

93.    To the extent the withdrawn objection may also be read to be complaining about the Allocation Plan, it is similarly without merit. The longest statute of limitations for the claims Plaintiffs brought is RICO's four-year statute of limitations. The Allocation Plan measures claim accrual generally from the first date of economic loss, namely the collection of any money from the Class Member. Here, the objector's first collection was in June 2004 based on a default judgment from Orange County, New York. Her claims thus expired long before this lawsuit was filed on October 6, 2009. Therefore, the $100 allocated to her under the Allocation Plan is fair and reasonable and the objection would have been overruled had it not been withdrawn.

94.    Two objections were received by Epiq after the April 14, 2016 and are thus untimely. *See, e.g., In re Worldcom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 341 (S.D.N.Y. 2005) (waiving late-filed objection as untimely). Even if the Court were to consider these untimely objections, the Court would find them to be without merit. Neither of the untimely objectors

expresses any specific objection to the particular terms of the Settlement. Instead, both simply inform the Court of the objectors' situation. Similarly the Class Member (Mr. Gavin) who failed to submit a written objection, but nevertheless asked to be heard at the Fairness Hearing, did not express any specific objection to the terms of the Settlement, but simply told the Court about his situation. The untimely written objections and the statement made by Mr. Gavin, even if considered, provide no basis to disapprove the Settlement.

## XV.    CONCLUSION

95.    For the reasons set out above, the Court finds that the Settlement (as set forth in the two Settlement Agreements, including the Allocation Plan) is fair, adequate, and reasonable. Accordingly, the Settlement is approved and an order and a judgment will be entered accordingly.

SO ORDERED.

Dated:        New York, New York
              May 24, 2016

DENNY CHIN
United States Circuit Judge
Sitting by Designation

41

**APPEARANCES:**

For Plaintiffs:

EMERY CELLI BRINCKERHOFF & ABADY LLP
By:    Matthew D. Brinckerhoff, Esq.
       Debra L. Greenberger, Esq.
600 Fifth Avenue, 10th Floor
New York, New York  10020

NEIGHBORHOOD ECONOMIC DEVELOPMENT ADVOCACY PROJECT
By:    Susan Shin, Esq.
       Josh Zinner, Esq.
176 Grand Street, Suite 300
New York, New York  10013

- and -

MFY LEGAL SERVICES, INC.
By:    Carolyn E. Coffey, Esq.
       Andrew Goldberg, Esq.
       Anamaria Segura, Esq.
299 Broadway, 4th Floor
New York, New York  10007

For Mel Harris Defendants:

KAUFMAN DOLOWICH VOLUCK & GONZO LLP
By:    Brett A. Scher, Esq.
135 Crossways Park Drive, Suite 201
Woodbury, New York  11797

QUINN EMANUEL URQUHART & SULLIVAN, LLP
By:    Maria Ginzburg, Esq.
       James Robert Asperger, Esq.
       Paul Peter Hughes, Esq.
51 Madison Avenue, 22nd Floor
New York, New York  10010

For Leucadia Defendants:

PROSKAUER ROSE LLP
By:    Ralph C. Ferrara, Esq.
       Ann M. Ashton, Esq.
       Margaret A. Dale, Esq.
Eleven Times Square
New York, New York  10036

42

- and -

MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
By:    Lewis H. Goldfarb, Esq.
       Ryan P. Mulvaney, Esq.
       Philip W. Lamparello, Esq.
88 Pine Street, 24th Floor
New York, New York  10005

For Samserv Defendants:
       BABCHICK & YOUNG, LLP
       By:    Jordan Sklar, Esq.
              Jack Babchik
       200 East Post Road, 2nd Floor
       White Plains, NY  10601